**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

**COAL CITY COB COMPANY, INC.,**

**Plaintiff,**

**v.**

**CIVIL ACTION NO. ________________**

**PALM ENTERPRISES, INC., SHARON FRANK, TRANSWOOD CARRIERS, INC., and TRANSWOOD, INC.,**

**Defendants.**

**DEFENDANTS' NOTICE OF REMOVAL UNDER 28 U.S.C. §1332(a)**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Pursuant to 28 U.S.C. §1332(a) Defendants Transwood Carriers, Inc. and Transwood, Inc. hereby files this Notice of Removal, removing the case styled *Coal City Cob Company, Inc. v. Palm Enterprises, Inc. Sharon Frank, Transwood Carriers, Inc., and Transwood, Inc.* under Cause No. 96285 filed in the 443rd Judicial District Court of Ellis County, Texas (the "State Court Action") to the United States District Court for the Northern District of Texas. As grounds for this removal, Transwood Carriers, Inc. and Transwood, Inc. respectfully state the following:

**I.**

**THE STATE COURT ACTION**

1. On June 7, 2017 Plaintiff Coal City Cob Company, Inc. filed its verified Original Petition and Application for Temporary Restraining Order in the 443rd Judicial District Court of Ellis County, Texas against Palm Enterprises, Inc. and Sharon Frank (only).

2. On December 14, 2017 Plaintiff Coal City Cob Company, Inc. filed its verified First Amended Petition in the 443rd Judicial District Court of Ellis County, Texas, against the previously-

named Defendants as well as new Defendants Transwood Carriers, Inc. and Transwood, Inc.

3. The Transwood Defendants were served with process on or about December 20, 2017.

4. Plaintiff Coal City Cob Company, Inc. is a corporation organized under the laws of the state of Illinois.

5. Defendant Palm Enterprises, Inc. is a corporation organized under the laws of the state of Indiana.

6. Defendant Sharon Frank is a resident/citizen of the state of Indiana.

7. Defendant Transwood Carriers, Inc. is a corporation organized under the laws of the state of Nebraska.

8. Defendant Transwood, Inc. is a corporation organized under the laws of the state of Nebraska.

9. The parties in this case are completely diverse.

10. Plaintiff's live Petition demonstrates that the amount in controversy exceeds the sum of $75,000 (excluding interest and costs).

11. This Notice of Removal is being filed within thirty (30) days from the date that Defendants Transwood Carriers, Inc. and Transwood, Inc. received Plaintiff's initial pleading (naming them as Defendants) in this case. Accordingly, this Notice of Removal is being filed in a timely manner. 28 U.S.C. §1446(b)(1).

## II.

## REQUIREMENTS FOR REMOVAL

1. In accordance with 28 U.S.C. §1446(a), Defendants Transwood Carriers, Inc. and Transwood, Inc. attach the following to their Notice of Removal:

a.   Exhibit A:   An electronic Register of Actions created in the State Court Action that identifies each document and indicates the date the document was filed.

b.   Exhibit B:   Copies of all process and pleadings filed in the State Court Action, individually arranged in order of filing under tabs 1 through 26.

2.     These Defendants have provided written notice of the filing of this Notice to all parties as required by 28 U.S.C. §1446(d).

3.     Counsel for Defendants Transwood Carriers, Inc. and Transwood, Inc. have conferred with counsel for previously-named Defendants Palm Enterprises, Inc. and Sharon Frank about this Notice of Removal. Those Defendants consent to removal of the State Court Action to the United States District Court for the Northern District of Texas. See Exhibit "C".

4.     Venue for filing this Notice of Removal is proper in the United States District Court for the Northern District of Texas because this action is being removed from the 443rd Judicial District Court of Ellis County, Texas.

WHEREFORE, PREMISES CONSIDERED, Defendants Transwood Carriers, Inc. and Transwood, Inc. respectfully request that the State Court Action proceed in this Court as an action properly removed to it.

Respectfully submitted,

FEE, SMITH, SHARP & VITULLO, L.L.P

**THOMAS W. FEE**
State Bar No. 06873160
**HOWARD J. KLATSKY**
State Bar No. 00786024

Three Galleria Tower
13155 Noel Road, Suite 1000
Dallas, Texas 75240
972-934-9100
972-934-9200 [Fax]
tfee@feesmith.com
hklatsky@feesmith.com

**ATTORNEYS FOR DEFENDANT TRANSWOOD, INC.**

**CERTIFICATE OF SERVICE**

THIS WILL CERTIFY that a true and correct copy of the foregoing instrument has been mailed, telecopied or hand delivered to all attorneys of record in accordance with the Federal Rules of Civil Procedure on the 18th day of January, 2018, as follows:

***Via Email & CMRRE***
Brian N. Hail/Jason T. Weber
Gruber Hall Johansen Shank, LLP
1445 Ross Ave, Suite 2500
Dallas, Texas 75202

***Via Email & First Class Mail***
Vic Henry
Henry, Dodo, Austin, Fletcher, PC
1700 Pacific, Suite 2700
Dallas, Texas 75201

______________________________
**HOWARD J. KLATSKY**

# EXHIBIT

# A

**9252 FILINGS**

| | | | |
|---|---|---|---|
| 1 | Original Petition | 06/07/17 | Image |
| 2 | E-File Service | 06/07/17 | |
| 3 | Receipt Issued | 06/07/17 | |
| 4 | Motion for Protection | 06/07/17 | No Image |
| 5 | Certified Photo (??) | 06/07/17 | |
| 6 | Receipt Issued | 06/07/17 | |
| 7 | Temporary Restraining Order | 06/07/17 | Image |
| 8 | Order (Protective) | 06/07/17 | Image |
| 9 | Rule 11 Agmt | 06/16/17 | Image |
| 10 | E-File Service | 06/16/17 | |
| 11 | Receipt Issued | 06/19/17 | |
| 12 | Citation (Palm Enterprises) | 06/19/17 | Image |
| 13 | Citation (Sharon Frank) | 06/19/17 | Image |
| 14 | Notice of Hearing | 06/19/17 | Image |
| 15 | Request | 06/19/17 | |
| 16 | E-File Service | 06/19/17 | |
| 17 | Receipt Issued | 06/20/17 | |
| 18 | E-filed Attorney (??) | 06/20/17 | |
| 19 | E-File Service | 07/14/17 | |
| 20 | Receipt Issued | 07/14/17 | |
| 21 | Temporary Injunction | 07/14/17 | Image |
| 22 | Rule 306A (PL) | 07/14/17 | No Image |
| 23 | Rule 306A (DF) | 07/14/17 | No Image |
| 24 | E-filed Attorney (??) | 07/14/17 | |
| 25 | Letter to/from Mediator | 07/14/17 | Image |
| 26 | Motion for Substitution (PL) | 07/21/17 | Image |
| 27 | E-File Service | 07/21/17 | |
| 28 | Receipt Issued | 07/24/17 | |
| 29 | Answer & Counter Petition | 07/24/17 | Image |
| 30 | E-File Service | 07/24/17 | |
| 31 | Receipt Issued | 07/24/17 | |
| 32 | Motion to Modify TRO | 08/03/17 | Image |
| 33 | E-File Service | 08/03/17 | |
| 34 | Receipt Issued | 08/04/17 | |
| 35 | Notice of Hearing | 08/04/17 | Image |
| 36 | E-File Service | 08/04/17 | |
| 37 | Receipt Issued | 08/04/17 | |
| 38 | Order for Substitution | 08/04/17 | Image |
| 39 | Notice of Hearing | 08/08/17 | Image |
| 40 | E-filed Attorney (??) | 08/08/17 | |
| 41 | E-filed Attorney (??) | 08/08/17 | |
| 42 | E-File Service | 08/14/17 | |
| 43 | Receipt Issued | 08/14/17 | |
| 44 | E-File Service | 08/14/17 | |

| 45 | Receipt Issued | 08/14/17 | |
|---|---|---|---|
| 46 | Temporary Injunction | 08/30/17 | Image |
| 47 | Rule 306A (PL) | 08/30/17 | No Image |
| 48 | Rule 306A (DF) | 08/30/17 | No Image |
| 49 | E-filed Attorney (??) | 08/30/17 | |
| 50 | Return (Other) | 08/31/17 | |
| 51 | Receipt Issued | 08/31/17 | |
| 52 | Writ | 08/31/17 | No Image |
| 53 | Request | 08/31/17 | Image |
| 54 | E-File Service | 08/31/17 | |
| 55 | Receipt Issued | 08/31/17 | |
| 56 | E-filed Attorney (??) | 08/31/17 | |
| 57 | Certificate (Deposition) | 10/11/17 | Image |
| 58 | E-File Service | 10/11/17 | |
| 59 | Receipt Issued | 10/12/17 | |
| 60 | Certificate (Deposition) | 10/11/17 | Image |
| 61 | E-File Service | 10/12/17 | |
| 62 | Receipt Issued | 10/12/17 | |
| 63 | Motion for Substitution | 10/18/17 | Image |
| 64 | E-File Service | 10/18/17 | |
| 65 | Receipt Issued | 10/19/17 | |
| 66 | Order for Substitution | 10/25/17 | Image |
| 67 | E-filed Attorney (??) | 10/25/17 | |
| 68 | Motion for Substitution | 10/27/17 | Image |
| 69 | E-File Service | 10/27/17 | |
| 70 | Receipt Issued | 10/30/17 | |
| 71 | Order for Substitution | 11/06/17 | Image |
| 72 | E-filed Attorney (??) | 11/06/17 | |
| 73 | Amended Petition | 12/14/17 | Image |
| 74 | E-File Service | 12/14/17 | |
| 75 | Receipt Issued | 12/15/17 | |
| 76 | Citation (Transwood) | 12/15/17 | No Image |
| 77 | Citation (Transwood) | 12/15/17 | Image |
| 78 | Citation (SOS – Transwood) | 12/15/17 | No Image |
| 79 | Service by Certified Mail | 12/15/17 | No Image |
| 80 | Copies | 12/15/17 | |
| 81 | Request | 12/15/17 | Image |
| 82 | E-File Service | 12/15/17 | |
| 83 | Receipt Issued | 12/15/17 | |
| 84 | E-filed Attorney (??) | 12/18/17 | |
| 85 | E-File Service | 12/27/17 | |
| 86 | Receipt Issued | 12/27/17 | |
| 87 | Transwood DFs' Answer | 01/12/18 | |
| 88 | E-File Service | 01/12/18 | |
| 89 | Receipt Issued | 01/17/18 | |

# EXHIBIT

# B

# TAB

# 1

Ellis County - 443rd District Court
Filed 6/7/2017 11:00:12 AM
Melanie Reed
District Clerk
Ellis County, Texas

CAUSE NO. 96285

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ELLIS COUNTY, TEXAS |
| | § | |
| PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR) | § | |
| | § | |
| | § | |
| Defendants. | § | ____ JUDICIAL DISTRICT |

**PLAINTIFF'S VERIFIED ORIGINAL PETITION**
**AND REQUEST FOR INJUNCTIVE RELIEF**

Plaintiff Coal City Cob, Inc. ("Coal City") files this Original Petition and Request for Injunctive Rélief complaining of Defendants Palm Enterprises, Inc. and Sharon Frank (as Guarantor) (collectively, "Palm").

## A. NATURE OF THE CASE

1. This is a case about corporate espionage. Coal City is in the business of liquid bulk transportation services to the Chemical and Hazardous Waste industries. Palm worked for Coal City by dispatching vehicles to transport liquids for Coal City's customers. Palm's position was, therefore, one of operations within the Coal City company. As such, Palm had wide access to and necessarily utilized the portions of Coal City's Enterprise Resource Planning ("ERP") system containing all of Coal City's highly confidential and proprietary trade secrets, including all of Coal City's information about its finances, customer rates, customer identifications, customer lanes, and information about valuable Coal City employees (including names, addresses, e-mail addresses and phone numbers). Through its participation in weekly Terminal Managers (Operations) calls, Palm also acquired knowledge of Coal City's operating activities and strategies. Palm was granted

access to all this highly confidential and proprietary trade-secret information because of the signing of an agreement that prohibits Palm from using or releasing such information.

2. In March 2017, Palm planned to quit working for Coal City and begin working for a competitor. But while still under contract with Coal City, Palm used its position of confidence to (a) steal certain of Coal City's confidential information and provide it to the competitor, (b) damage customer relationships so the customers would transfer business from Coal City to the competitor, and (c) persuade some of Coal City's most valuable workers to quit their positions with Coal City and, like Palm, start working for the competitor. These acts were prohibited by an agreement between Coal City and Palm, and they constitute breach of contract and tortious interference with existing contracts, common law civil conversion, violation of the Texas Theft Liability Act, and violation of the Texas Uniform Trade Secrets Act. Furthermore, if Palm is not stopped, Palm will continue committing these illegal acts against Coal City and continue causing Coal City to suffer irreparable harm.

## B. SUMMARY OF THE CASE

3. As stated above, Palm worked for Coal City in operations, and as such, Palm had wide access to and necessarily utilized the portions of Coal City's ERP containing all of Coal City's highly confidential and proprietary trade secrets, including all of Coal City's information about its finances, customer rates, customer identifications, customer lanes, and information about valuable Coal City employees (including names, addresses, e-mail addresses and phone numbers). Through its participation in weekly Terminal Managers (Operations) calls, Palm also acquired knowledge of Coal City's operating activities and strategies. Palm was granted access to all this highly confidential and proprietary trade-secret information because of the signing of an agreement that prohibits Palm from using or releasing such information. Specifically, to protect this information, Palm and Coal City entered into agreement by which Palm agreed that Palm would

not misappropriate Coal City's confidential information. Palm violated this covenant, and it began doing so even while still under contract with and supported by Coal City. Palm has not returned the confidential information,

4. In the same agreement, Palm agreed that it would not solicit Coal City's customers to send its business elsewhere, and Palm would not solicit Coal City's drivers to leave Coal City to work elsewhere. Palm violated these two covenants as well, and it began doing so even while still under contract with and supported by Coal City. Palm is still soliciting the customers and the drivers to this day.

5. While still working for Coal City, Palm entered into an agreement to work for a competitor company. Then, while still working for Coal City, Palm misappropriated Coal City's confidential information and provided it to the competitor. Palm attempted to conceal its illegal acts (a) first by forwarding e-mails containing the confidential information from a Coal City e-mail account to a personal account, and then (b) deleting the e-mails from the Coal City e-mail account. Palm even boasted about this subterfuge in an email to its new employer. Coal City has attempted to recover the confidential information from Palm's new employer, but has been unsuccessful. So, to this day, and because of Palm, a competitor of Coal City possesses Coal City's confidential information. Plus, if not stopped, Palm will continue disseminating confidential information to the competitor and/or other third parties.

6. Two months after signing on with the competitor and providing it with the confidential information, Palm told Coal City that it was terminating the agreement in five days. Then, during those five days, Palm proceeded to cause massive damage to Coal City. Pretending to still be acting on behalf of Coal City—even though it was during the 5-day termination period—Palm began lying to Coal City's customers. Palm told the customers Coal City was unable to haul certain freights. Palm cancelled other Coal City freights. And, Palm told customers that certain

other freights were to be hauled not by Coal City but by its competitor. These acts of business disruption—again, while Palm pretended to be an agent of Coal City—caused massive confusion and chaos for the customers, along with extreme customer dissatisfaction. Then, taking further advantage of the maelstrom Palm caused, Palm began soliciting those same customers to transfer their business from Coal City to the competitor for whom Palm was about to start working. At present, Palm is still violating its agreement with Coal City by lying to and soliciting Coal City's customers. If not stopped, Palm will continue doing this and causing Coal City to suffer irreparable harm.

7.      While still under contract with by Coal City, and in violation of its agreement with Coal City, Palm also solicited Coal City's drivers. These drivers require specialized training and licensing, which makes them rare and highly coveted workers. Plus, most own their own specialized vehicles, which frees their employers from the financial burden of having to invest heavily in maintaining their own large fleets. These drivers are also substantially-high-revenue generators and are incredibly difficult to replace. While still under contract with Coal City, Palm successfully persuaded two of Coal City's drivers to quit Coal City and follow Palm to work for the competitor. And, since leaving Coal City, Palm has continued soliciting Coal City's drivers and causing Coal City to suffer irreparable harm.

8.      Importantly, Palm's theft of confidential information, solicitation of customers, and solicitation of drivers were all part of a longstanding and calculated plan. Indeed, months before announcing its termination, Palm and the competitor were communicating via e-mail about the likelihood that Palm's actions would result in a lawsuit. Yet, incredibly enough, Palm unabashedly implemented its plan of attack, presumably confident that Coal City would shy away from litigation, even where it is necessary to prevent irreparable harm.

9. Beyond being illegal, Palm's acts were also unscrupulous. Indeed, so much of Palm's interference, havoc, and illegal solicitation occurred while Palm was still in a position of confidence with Coal City, and while Palm was still being supported by Coal City.

10. Coal City now seeks relief from the Court, including an initial request to temporarily restrain Palm from continuing to disseminate Coal City's confidential information, continuing to solicit and do business with Coal City's customers, and continuing to solicit and dispatch Coal City's drivers.

**C. DISCOVERY CONTROL PLAN.**

11. Pursuant to the Texas Rules of Civil Procedure 190, Coal City intends for discovery to be conducted by a Level 2 discovery control plan. Coal City reserves the right to move the Court to enter a discovery control plan order under Texas Rule of Civil Procedure 190.4. Coal City seeks monetary relief of over the minimum jurisdictional limit of this court and nonmonetary relief.

**D. PARTIES.**

12. Coal City is a corporation with its principal place of business at 4300 I-35E North, Waxahachie, Texas 75165 in Ellis County, Texas.

13. Upon information and belief, Palm Enterprises, Inc. is a corporation domiciled in Indiana and with a principal office address of 1060 Kennedy Avenue, Schererville, Indiana 46375. Upon information and belief, Palm Enterprises, Inc. can be served through its President, Secretary, and Registered Agent, Sharon J. Frank, at that same address.

14. Upon information and belief, Sharon Frank (as Guarantor to Palm Enterprises, Inc.) is a resident of Indiana who can be served at 1060 Kennedy Ave., Schererville, Indiana 46375.

## E. JURISDICTION AND VENUE.

15. Palm, acting as an affiliate or agent or Coal City, was at all times relevant to this lawsuit, in the business of transporting bulk chemicals to and from locations in Texas, including, among others, (a) Kilgore, Texas, (b) Centerville, Texas, (c) Hebbronville, Texas, (d) Dallas, Texas, (e) Longview, Texas, (f) Pasadena, Texas, and (g) Corsicana, Texas.

16. On July 1, 2010, Palm Enterprises, Inc. entered into a contractor agreement with Coal City ("2010 Agreement").[1] On May 3, 2013, Palm Enterprises and Sharon Frank (as Guarantor) entered into an affiliate agreement with Coal City ("2013 Agreement").[2] This agreement stated, "[t]his Agreement sets forth the entire Agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, if any related thereto." On February 3, 2014, Palm Enterprises, Inc. and Sharon Frank (as Guarantor) entered into another affiliate agreement that also stated (in paragraph 33), "[t]his Agreement sets forth the entire Agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, if any related thereto." Thus, the governing agreement between Palm and Coal City is the affiliate agreement dated February 3, 2014 (the "Affiliate Agreement") (Ex. A.) This Affiliate Agreement is the subject of this lawsuit. Paragraph 25 of the Affiliate Agreement reads, in relevant part:

> [Palm] hereby specifically agrees that, for the purposes of this Agreement and the relationship between [Coal City] and [Palm], [Palm] is authorized to do business, and does business, in the State of Texas. . . [E]ach party hereby irrevocably submits to the non-exclusive jurisdiction of the state and federal courts of the State of

[1] A copy of the 2010 Agreement is available to the Court upon request. It is not being attached to this Verified Petition due to its inclusion of potentially confidential information. Relevant portions of the 2010 Agreement are quoted herein and verified.

[2] A copy of the 2013 Agreement is available to the Court upon request. Relevant portions of the 2013 Agreement are quoted herein and verified.

> Texas and consents to service of process upon such party in any legal proceeding arising out of or in connection with this Agreement.[3]

17. Coal City seeks monetary relief more than the minimum jurisdictional limits of this Court and nonmonetary relief. Further support for jurisdiction is provided in Article 5, Sections 1 and 8 of the Texas Constitution and Sections 24.007 and 24.008 of the Texas Government Code.

18. Pursuant to Texas Civil Practice and Remedies Code Section 15.002(a)(1), venue is proper in Ellis County because Palm worked for Coal City, which has its principal place of business in Ellis County, and which is where Coal City sustained injuries sustained from Palm's conduct. Additionally, venue is appropriate in—and, in fact exclusive to—Ellis County, Texas, based on paragraph 25 of the Affiliate Agreement, which states, in relevant part:

> Any action, proceeding, or claim arising out of or relating to this Agreement commenced by any party must be prosecuted in Ellis County, Texas. Each party hereby waives any plea of privilege that might exist in the absence of such party's agreement to prosecute such claim in Ellis County, Texas[.][4]

**F. VERIFIED FACTS.**

19. <u>Coal City is a provider of liquid bulk transportation services.</u> Founded in 1970, Coal City is a provider of liquid bulk transportation services to the Chemical and Hazardous Waste industries. Coal City has a loyal customer base of major chemical manufacturers, distributors, specialty chemical companies and end users who represent some of the most respected names in the business.

20. <u>Coal City entered into an Affiliate Agreement with Palm</u>. On July 1, 2010, Palm Enterprises, Inc. entered into the 2010 Agreement. On May 3, 2013, Palm Enterprises and Sharon Frank (as Guarantor) entered the 2013 Agreement. On February 3, 2014, Palm Enterprises and

---

[3] Paragraph 25 of the 2013 Agreement contained identical language.

[4] Paragraph 25 of the 2013 Agreement contained identical language.

Sharon Frank (as Guarantor) entered the Affiliate Agreement. Since 2010, and under the 2010 Agreement, 2013 Agreement, and Affiliate Agreement, Palm performed liquid bulk transportation services for Coal City's customers.

21. Palm had wide access to Coal City's Confidential Information. Palm worked for Coal City by dispatching vehicles to transport liquids for Coal City's customers. Palm's position was, therefore, one of operations within the Coal City company. As such, Palm had wide access to and necessarily utilized the portions of Coal City's ERP system containing contained all of Coal City's highly confidential and proprietary trade secrets, including, without limitation, its services, products, customer information, processes, sales information, know-how, practice, policies, and other confidential information which is considered proprietary or secret by Coal City. Some of the most important confidential and proprietary trade secrets included Coal City's information about its finances, customer rates, customer identifications, customer lanes, and information about valuable Coal City employees (including names, addresses, and phone numbers). Additionally, treating Palm similarly to a company-owned facility, Coal City included Palm on its weekly Terminal Managers (Operations) calls, during which Palm acquired knowledge of Coal City's operating activities and strategies. All this information described in this paragraph shall be defined herein as "Coal City's Confidential Information."

22. Palm agreed not to misappropriate Coal City's Confidential Information. Under the Affiliate Agreement, Palm agreed not to misappropriate or transmit to third parties Coal City's confidential information. Paragraph 11 of the Affiliate Agreement reads, in relevant ("Agreement Not to Misappropriate Confidential Information"):

> **Confidentiality**. As part of the business relationship between [Coal City] and [Palm], [Coal City] will be required to disclose to [Palm] or [Palm] may come into possession of information or data which constitute proprietary information and trade secrets of [Coal City], including, without limitation, it[s] services, products, customer information, processes, sales information, know-how, practice, policies,

> and other confidential information which is considered proprietary or secret by [Coal City] (hereinafter "Confidential Information"). In consideration of the receipt of such Confidential Information and potential business, [Palm] hereby agrees that during the term of this Agreement and for a period of five (5) years thereafter, it will maintain such Confidential Information in the utmost of confidence and will not disclos[e] such Confidential Information without the prior written consent of [Coal City]; to use such solely in connect with such business relationship; and to take all measures necessary to protect such Confidential Information.

Palm has been on notice as to the restriction against misappropriating Coal City's Confidential Information for nine years. Paragraph 17 of the 2010 Agreement stated that:

> [Palm] shall at no time during or after the termination of this Agreement by either party, directly or indirectly through one or more of its shareholders, officers, directors, employees, or otherwise, use o[r] disclose any confidential or proprietary information of Coal City except solely in connection with the performance of this Agreement.

Paragraph 11 of the 2013 Agreement contained identical language to paragraph 11 of the Affiliate Agreement.

23. Palm serviced Coal City's Customers. Palm provided services for many of Coal City's most important customers, including, among others: (a) Tradebe Treatment & Recycling, LLC ("Tradebe"), (b) Kemira Chemicals, Inc. ("Kemira"), (c) Solvay USA, Inc. ("Solvay"); (d) Univar USA, Inc., ("Univar"); (e) Nalco-Champion ("Nalco"); and (f) Harcross Chemicals, Inc. ("Harcross") (collectively, the "Coal City Customers").

24. Palm Serviced the Customer on the Customer Lanes. Examples of lanes on which Palm performed liquid bulk transportation services for the Coal City Customers include, among others (collectively of the "Customer Lanes"):

a. Tradebe – East Chicago, Indiana to Logansport, Indiana;

b. Tradebe – East Chicago, Indiana to Greencastle, Indiana;

c. Tradebe – East Chicago, Indiana to Paulding, Ohio

d. Kemira – East Chicago, Indiana to Millington, Tennessee;

e. Kemira – Butler, Indiana to East Chicago, Indiana;

f. Kemira – Jeffersonville, Indiana to East Chicago, Indiana

g. Solvay – University Park, Illinois to Knoxville, Tennessee;

h. Solvay – University Park, Illinois to Murray, Kentucky;

i. Solvay – University Park, Illinois to Corsicana, Texas;

j. Solvay – University Park, Illinois to Saint Louis, Missouri;

k. Solvay – University Park, Illinois to Kilgore, Texas;

l Nalco – University Park, Illinois to Kilgore, Texas;

m. Nalco – University Park, Illinois to Centerville, Texas;

n. Nalco – University Park, Illinois to Hebbronville, Texas.

o. Harcross – Lima, Ohio to Dallas, Texas;

p. Harcross - University Park, Illinois to Longview, Texas;

q. Harcross - University Park, Illinois to Sibley, Louisiana;

r. Harcross - Houston, Texas to Dallas, Texas;

s. Harcross - University Park Illinois to Dallas, Texas;

t. Harcross - Winder, Georgia to Longview, Texas;

u. Harcross – Winder, Georgia to Sibley, Louisiana;

v. Harcross - University Park, Illinois to Pasadena, Texas; and

w. Univar – Charleston, South Carolina to North Charleston, South Carolina.

25. Palm serviced Coal City's Customers with the Coal City Drivers. Under the Affiliate Agreement, Palm also performed liquid bulk transportation services for Coal City's customers by utilizing Coal City's independent contractors who were owner operators of vehicles, including, among others: (a) Rashid Malik (who owned and operated a vehicle with VIN number M1AW07Y0FM046539), (b) Christian Russell (who operated a vehicle owned by Eric L. Holder

with VIN number 5KJJABCK15PN82105), (c) James P. Uribe (who owned and operated a vehicle with VIN Number 1XP5D49XX7N679837, (d) Eric L. Holder (who owned and operated a vehicle with VIN Number 1XKADB9X47J156443 and owned the vehicle operated by Christian Russell identified above, and (e) Derek L. Turner (who owned and operated a vehicle with VIN number 2WKEDDJJ4YK965013) (collectively, the "Coal City Drivers" and the "Driver Vehicles").[5]

26. The Coal City Drivers are extremely valuable. Coal City's owner-operator drivers are extremely valuable to Coal City. These drivers need specialized training and licensing, which makes them rare and highly coveted workers. Plus, not only do they provide for Coal City liquid bulk transportation services, many do so with their own vehicles (or vehicles owned and operated by other independent contractors of Coal City). This eliminates the need for Coal City to expend substantial resources purchasing and maintaining as large a fleet of specialized vehicles. The drivers generate large amounts of revenue for Coal City. Replacing owner operators like them is incredibly difficult and time-consuming. And, even if Coal City were fortunate enough to be able do so, it would then need to expend time and money on training and other related expenses for new hires of this sort.

27. Palm agreed not to solicit the Coal City Customers or the Coal City Drivers. Under the Affiliate Agreement, Palm also agreed that after termination of the Affiliate Agreement, it

---

[5] Palm also performed services for Coal City Customers on Customer Lanes with eight of its own vehicles. Those vehicles have the following VIN numbers (collectively, the "Eight Palm Vehicles"):

a. 1XPBD49X7FD308061;
b. 1XPBD49X7GD308062;
c. 1XPBD49X9GD308063;
d. 1XPBD49X0GD308064;
e. 1XPBD49X2GD308065;
f. 1XPBD49X4GD308066;
g. 1XKDD49X8DJ334908; and
h. 4V4NC9EH4EN164270.

would not solicit Coal City's customers or drivers. Paragraph 12 of the Affiliate Agreement reads

as follows ("Agreement Not to Solicit Customers" and "Agreement Not to Solicit Drivers"):

> **Non-Competition. Non-Solicitation.** Due to the importance and sensitivity of the Confidential Information, and in consideration for the agreement of [Coal City] to disclose and make such Confidential Information available to [Palm] as set forth above, as well as the payments hereunder, [Palm] hereby covenants and agrees that, during the term of this Agreement and for a period of thirty-six (36) months (the "Non-Compete Period") following the expiration or termination hereof, whether voluntary or involuntary, with or without cause, or for any reason or no reason and, as applicable, [Palm] shall not, either directly or indirectly, on behalf of itself, or any other individual, corporation, partnership, limited liability company, joint venture, or other entity other than [Coal City]: (a) contract or otherwise solicit, either directly or indirectly, any Designated Customer[6] for the purpose of selling, performing, marketing, or otherwise transacting transportation freight hauling, and/or other services of the type performed under this Agreement; or (b) solicit, hire, retain or otherwise engage or go into business with any individual who is or was an employee of or [Palm] Operator of [Coal City] at any time during the twenty-four (24) month period prior to the date of the expiration or termination of this Agreement[.]

Palm has been on notice as to the restriction against soliciting Coal City Customer or Coal City

Drivers for nine years. Paragraph 16 of the 2010 Agreement stated that:

> **Non-Solicitation.** (a) During the term of this Agreement, and for a period of one (1) year following the termination of this Agreement by either party, [Palm Enterprises, Inc.] shall not, directly or indirectly through one or more of its shareholders, officers, directors, employees, or otherwise, solicit any Coal City customer to which the [Palm Enterprises, Inc.] provided liquid or dry bulk transportation services under this Agreement for the purpose of providing such services directly to such customer, nor shall [Palm Enterprises, Inc.] provide liquid or dry bulk transportation services to such customer. [7]

---

[6] Paragraph 1(e) of the Affiliate Agreement defines "Designated Customer" to include any customer either expressly identified on an exhibit to the Affiliate Agreement, or any other customer for which Palm "renders or has rendered transportation services during the term of this agreement. All the customers referenced in this petition fall under the definition of "Designated Customer."

[7] Paragraph 15(b) of the 2010 Agreement provides that "[f]or purposes of this Section 16, a Coal City customer means any customer to which the [Palm Enterprises, Inc.] provided motor carrier services during the term of this Agreement, except those customers set forth on Schedule 2 attached hereto who were customers of [Palm Enterprises, Inc.] prior to the Effective Date." Schedule 2 contained 98 customers, none of whom are those identified as the Coal City Customers.

Paragraph 11 of the 2013 Agreement contained identical language to paragraph 11 of the Affiliate Agreement.

28. Palm provided a 5-day notice of termination. On May 15, 2017, Palm sent Coal City notice terminating the Affiliate Agreement effective May 20, 2017 ("5-Day Notice Period"). (Ex. B.) The 5-Day Notice Period proved key in the business disruption and interference Palm began causing. Upon receiving the May 15, 2017 notice of termination, Coal City immediately reviewed e-mails sent from Palm's Coal City e-mail address. On March 20, 2017, Coal City found e-mails to a competitor of Coal City, TransWood Carriers, Inc. ("TransWood") a mutual non-disclosure agreement ("NDA"). (Ex. C.) The name of the representative of TransWood appearing on the NDA and as recipient of the e-mails from Palm was Roger Nikodym (Director, Affiliate Relations at TransWood). Essentially, two months prior to announcing its termination of its Affiliate Agreement with Coal City, Palm agreed to provide liquid bulk transportation services for a competitor of Coal City. That, however, was only the beginning.

29. Palm Violated the Agreement Not to Misappropriate Confidential Information. A further review of Palm's e-mails revealed that in violation of paragraph 11 of the Affiliate Agreement, Palm also provided TransWood with Coal City's Confidential Information. Beginning in March 2017 (and possibly earlier), Palm provided its new employer (and director competitor of Coal City) with Coal City's Coal City's customer identities, Coal City driver identities, customer lanes Coal City was servicing, and pricing information ("Known Stolen Confidential Information"). As Palm had access to a much wider range of confidential and proprietary trade secrets, Coal City has reason to believe that Palm disseminated or is about to disseminate much

more of Coal City's Confidential Information, including some or all of Palm's financial information, customer rates, customer identities, and driver information.[8]

30. Palm Attempted to Conceal Evidence that it Violated the Agreement not to Misappropriate Confidential Information. Palm took affirmative steps to conceal its transmittal of the Known Stolen Confidential Information and its violation of the Agreement not to Misappropriate Confidential Information. On March 20, 2017, the day Palm e-mailed its signed NDA to TransWood, Palm also sent an e-mail to TransWood stating, "I am forwarding these emails to another email address and then deleting from Cob, so you know." (Ex. D.) A review of Palm's e-mail account at Coal City revealed that it had, as represented to TransWood, been deleting communications with TransWood, including those communications containing the Known Stolen Confidential Information.

31. During the 5-Day Notice Period, Palm Violated the Agreement Not to Solicit Customers. Under the false pretense of acting as an agent for Coal City, between May 15, 2017 and May 20, 2017—the 5-Day Notice Period—Palm contacted several Coal City customers and cancelled numerous loads (amounting in the range of $50,000 in lost revenues). Then, having created a business interruption for these customers, Palm took advantage of the confusion and the customer frustration over the cancellations by requesting that the customers transfer their business with Coal City to TransWood (including the $50,000 worth of cancelled loads as well as future loads that would have otherwise gone to Coal City). In other words, Palm committed acts of deception and fraud, and used the fallout from that as a launching pad to violate the Agreement Not to Solicit Customers.

[8] Coal City has made numerous attempts to retrieve the Known Stolen Confidential Information from TransWood, but such attempts were unsuccessful. (Ex. E.) On May 16, 2017, Coal City send a demand letter to cease its violations with the Affiliate Agreement and confirm such compliance by May 23, 2017. Palm ignored the demands. (Ex. J.)

32.    Palm solicited Tradebe during the 5-Day Notice Period. For example, Palm contacted or otherwise solicited Tradebe. On or about May 15, 2017, Palm cancelled all of Coal City's freight with Tradebe and misinformed Tradebe that Coal City could not handle Tradebe's freight any longer. At the same time, Palm advised Tradebe to retain TransWood to handle the freight that would have previously been handled by Coal City.

33.    Palm solicited Kemira during the 5-Day Notice Period. As a second example, Palm contacted or otherwise solicited Kemira. First, under the false pretense of acting as an agent for Coal City, on May 15, 2017, Palm cancelled Coal City's Kemira freights. Then, on that same day, presumably at the behest of Palm, TransWood contacted Kemira and—while representing that Palm had leased on with TransWood—asked Kemira to allow TransWood to service the lanes Coal City had been servicing.

34.    Palm solicited Solvay during the 5-Day Notice Period. As a third example, Palm contacted or otherwise solicited Solvay. On May 17, 2017, Solvay advised Coal City that Palm and TransWood requested that Solvay allow TransWood to handle a pre-paid load assigned to Coal City—freight number 1100396079. (Ex. F.) On May 19, 2017, Solvay told Coal City that Palm instructed Solvay to transfer freight 1100396079 from Coal City to TransWood. According to a May 19, 2017 e-mail from Solvay, Palm "insisted" that this freight was for TransWood. Solvay further told Coal City that Solvay was going "nuts" over the "mess" between Coal City and TransWood. (Ex. F.) Thus, the actions of Palm have caused Coal City to suffer reputational harm vis-à-vis Solvay, and potentially direct financial harm with respect to Solvay's future business.

35.    Palm solicited Nalco during the 5-Day Notice Period. As a fourth example, on or about May 17, 2017, Palm solicited or otherwise contacted Nalco. According to a customer e-mail entitled "Nalco Corsicana, Texas," Nalco was asked to transfer a Coal City freight to TransWood. The e-mail stated, in relevant part, "I am really trying to stay neutral in all this…and this load is a

prepaid load...I chose [Coal City]...However, [Palm and TransWood] are asking me to tender this to them over at TransWood." (Ex. G.)

36. Palm solicited Harcross during the 5-Day Notice Period. A fifth example involves both Nalco and Harcross. Upon information and belief, on or about May 17, 2017, Palm solicited Nalco and Harcross. On May 17, 2017, Coal City received a customer e-mail stating, in relevant part (Ex. F):

> There ha[ve] been some changes at [Coal City] with their logistical folks who act as subcontractors for them. I won't go into all the details as it is still a bit hazy to me...but there is some confusion on who handles the customer routed orders like Nalco and certain Harcross orders. As [Coal City] is typically the carrier who gets these loads. For example, we just had a Nalco [freight to be delivered to] Centerville, TX and this new company - Transwood - has taken the load or says it is theirs.

37. Palm likely solicited Univar during the 5-Day Notice Period. Upon information and belief, between May 15, 2017 and May 20, 2017, Palm contacted or otherwise solicited Univar as well.

38. After 5-Day Notice Period, Palm continued to violate the Agreement Not to Solicit Customers. Upon information and belief, after May 20, 2017, Palm continued contacting or otherwise soliciting the Coal City Customers to take business away from Coal City on the Customer Lanes.

39. During the 5-Day Notice Period, Palm Violated the Agreement Not to Solicit Drivers. In violation of its Affiliate Agreement, upon information and belief, Palm solicited and attempted to persuade certain of the Drivers to terminate their agreements with Coal City and begin working for TransWood. On or about May 17, 2017, four of the Drivers, Rashid Malik, Christian Russell, James Uribe, and Eric Holder terminated their independent-contractor agreements with Coal City to work for TransWood. (Ex. H.)

40.     After the 5-Day Notice Period, Palm continued to violate the Agreement Not to Solicit Drivers. Upon information and belief, Palm has been soliciting and attempting to persuade other employees and contractors, including drivers, to terminate their agreements with Coal City and work for TransWood as well.

41.     Palm's decision to violate the Affiliate Agreement was planned well in advance and with knowledge that it was illegal. A review of Palm's e-mails also revealed Palm's intentions to violate the Affiliate Agreement months in advance and with knowledge that its acts could be construed as illegal. In fact, on March 22, 2017, Palm e-mailed to TransWood a copy of the Affiliate Agreement and wrote:

> There is a possibility that Cob will initiate legal proceedings to challenge the non-compete language. I have already provided you with my attorneys [sic] assessment of this, however that may not stop them from trying. It could very well include TransWood being named. . . . What is TransWood's position on this? Will they assist with legal representation if this happens? I think it best to face this possibility now, rather than muddle through it later.

(Ex. I.) In other words, months before announcing its termination, Palm and TransWood were communicating about the likelihood that Palm's actions would result in a lawsuit. Yet, incredibly enough, Palm decided to violate the Affiliate Agreement anyway.

## G.     CAUSES OF ACTION

### First Cause of Action: Breach of Contract

42.     All the foregoing allegations are incorporated by reference for all purposes.

43.     For valuable consideration that is acknowledged in the Affiliate Agreement, Palm executed the Affiliate Agreement containing the: (a) Agreement Not to Misappropriate Confidential Information; (b) Agreement Not to Solicit Customers; and (c) Agreement Not to Solicit Drivers.

44. Palm violated each of these provisions as set forth above, including, among other things: (a) misappropriating and transmitting the Known Stolen Confidential Information to a competitor, TransWood; (b) soliciting the Coal City Customers, including with respect to transferring the business on the Customer Lanes from Coal City to TransWood; and (c) soliciting the Drivers, including persuading Messrs. Malik, Russell, Uribe, and Holder to quit Coal City and work for TransWood.

45. Coal City has been harmed by Palm's various breaches. Unless a temporary restraining order and temporary injunction are issued to prevent Palm from continuing to disseminate the Known Stolen Confidential Information, solicit and haul freight for the Coal City Customers on the Customer Lanes, and solicit the Drivers and dispatch them to haul freight for the Coal City Customer on the Customer Lanes, Coal City will suffer irreparable harm and injury. Accordingly, Coal City has no adequate remedy at law for the harm and loss suffered or that it will suffer because of Palm's breach of contract. Coal City is entitled to a temporary restraining order and, after notice and hearing, a temporary injunction for the enforcement of the Agreement Not to Misappropriate Confidential Information, Agreement Not to Solicit Customers, and Agreement Not to Solicit Drivers.

46. In addition, Palm's breach of contract has directly and proximately caused damages to Coal City that are more than the minimum jurisdictional limits of this Court. Coal City is therefore entitled to its damages, interest, attorneys' fees, and costs.

**Second Cause of Action: Tortious Interference with Existing Contract**

47. All the foregoing allegations are incorporated by reference for all purposes.

48. Coal City had valid agreements with the Coal City Customers with respect to the Customer Lanes.

49. Coal City also had valid agreements with the Drivers, including Messrs. Malik, Russell, Uribe, and Holder.

50. Palm committed willful and intentional acts of interference with the contracts of the Coal City Customers, including among other things: (a) telling Coal City Customers that Coal City was unable to haul certain freights; (b) cancelling Coal City freights; (d) telling Coal City customers that other Coal City freights were to be hauled by TransWood; and (e) requesting that the Coal City Customers transfer its business on the Customer Lanes from Coal City to TransWood.

51. Coal City committed willful and intentional acts of interference with the contracts of the Drivers by persuading or attempting to persuade them to terminate the contracts and begin working for TransWood.

52. Palm's intentional acts of interference were the proximate cause of actual damages to Coal City, including, among other things (a) damage to the business relationship with the Coal City Customers and attendant reduction of business from them, and (b) Loss of revenues from lost Drivers, including Messrs. Malik, Russell, Uribe, and Holder.

53. The defendants have aided and abetted each other in these tortious acts. Because of their conduct, they are jointly and severally liable for the damages sustained by Coal City. Palm's tortious interference has directly and proximately caused damages to Coal City that are more than the minimum jurisdictional limits of this Court. Coal City is therefore entitled to its damages, interest, attorneys' fees, and costs.

**Third Cause of Action: Common Law Civil Conversion.**

54. All the foregoing allegations are incorporated by reference for all purposes.

55. Coal City owned, had legal possession of, or was entitled to possession of the Known Stolen Confidential Information.

56. Palm assumed and exercised dominion and control over the Known Stolen Confidential Information in an unlawful and unauthorized manner, to the exclusion of and inconsistent with Coal City's rights.

57. Coal City made a demand for the property.

58. Palm has failed to return the property.

**Fourth Cause of Action: Texas Theft Liability Act.**

59. All the foregoing allegations are incorporated by reference for all purposes.

60. Palm has committed theft of the Known Stolen Confidential Information.

61. Palm is liable under Texas Civil Practice and Remedies Code Section 134.003, *et seq.*

**Fifth Cause of Action: Texas Uniform Trade Secrets Act**

62. All the foregoing allegations are incorporated by reference for all purposes.

63. Palm has committed theft of the Known Stolen Confidential Information.

64. Palm is liable under Texas Civil Practice and Remedies Code Section 13A.001, *et seq.*

## H. APPLICATION FOR TEMPORARY RESTRAINING ORDER AND FOR TEMPORARY INJUNCTION

65. All the foregoing allegations are incorporated by reference for all purposes.

66. Palm has violated the Agreement Not to Misappropriate Confidential Information, Agreement Not to Solicit Customers, and Agreement Not to Solicit Drivers.

67. The above verified facts demonstrate that, if not stopped, Palm will continue to: (a) disseminate the Known Stolen Confidential Information, and other of Coal City's Confidential Information beyond just the Known Stolen Confidential Information; (b) solicit Coal City Customers or haul freight for Coal City Customers on the Customer Lanes (including by use of

the Eight Palm Vehicles); (c) solicit Coal City Drivers or dispatch Coal City Drivers to haul freight for Coal City Customers on the Customer Lanes (including by use of the Driver Vehicles).

68.    The acts set forth in this verified petition constitute (a) breaches of the Affiliate Agreement, (b) tortious interference with contracts with the Coal City Customers, at least four of the Drivers (and likely other employees and contractors, including other drivers) (c) common law civil conversion, (d) violations of the Texas Theft Liability Act, and (e) violations of the Texas Uniform Trade Secrets Act. Palm has continued violating these laws, if not stopped, Palm will continue to violate these laws. Based on the preceding verified facts, Coal City has a probable right to recover for Palm's violation of the law.

69.    The harm that Coal City will suffer if a temporary restraining order and temporary injunction are not issued is probable, imminent, and irreparable. Unless Palm is restrained from continuing its current course of action: (a) Coal City's Known Stolen Confidential Information and Coal City's Confidential Information (beyond just the Known Stolen Confidential Information) will be disseminated more widely and its value imminently and irreparably lost; (b) Coal City will lose business from the Coal City Customers and its contractual relationships with the Coal City Customers will be imminently and irreparably lost; and (c) Coal City will lose additional contractors or employees, including drivers, and its contractual relationships with the contractors or employees, including other drivers, will be imminently and irreparably lost.

70.    The injuries suffered by Coal City are irreparable because they cannot be accurately measured or compensated through monetary damages.

71.    Palm's conduct, should it go unrestrained and enjoined, will cause harm to Coal City's operations and sales and will cause an impact on revenue and profitability that are impossible to quantify with a specific pecuniary standard.

72. Additionally, even if money damages could be accurately calculated, Coal City's losses are likely to exceed an amount that may be successfully recovered from Palm, possibly preventing adequate compensation to Coal City. Therefore, Coal City has no adequate remedy at law.

73. Coal City is entitled to a temporary restraining order because it is already suffering harm and will continue to suffer harm before notice can be served and a hearing may be held.

74. Coal City is also entitled to a temporary injunction because Coal City will suffer further irreparable harm unless a temporary injunction is issued from the time of a temporary injunction hearing until the trial is held on this matter.

75. Under the Texas Uniform Trade Secrets Act, Coal City is entitled to a temporary injunctive and further injunctive relief under Texas Civil Practice and Remedies Code Section 134A.003(a) ("Actual or threatened misappropriation may be enjoined").

76. Paragraph 11 of the Affiliate Agreement, which contains the Agreement Not to Misappropriate Confidential Information also provides for injunctive relief and with the waiver of the posting of bond or other security:

> Any breach by a party of any of its obligations under this section would result in irreparable injury to the other party. Such non-breaching party will be entitled (without prejudice to its right to other remedies, including monetary damages, and without the posting of a bond or other security) to injunctive and other equitable relief to prevent or restrain the breach of this section.

77. Paragraph 12 of the Affiliate Agreement, which contains the Agreement Not to Solicit Customers and the Agreement Not to Solicit Drivers also provides for injunctive relief and with the waiver of the posting of bond or other security:

> [Palm] acknowledges that, in the event of a breach or violation of Paragraphs 11 or 12, [Palm's] conduct will cause damages of an irreparable and continuing nature to [Coal City], for which money damages will not provide adequate relief. Therefore, [Palm] agrees that in addition to any money damages [Coal City] may be entitled to recover, [Coal City] also is entitled to obtain an injunction (including but not

> limited to a temporary restraining order) for the remainder of the period specified in the restrictive covenant which [Palm] breached. [Coal City] shall have the right to obtain such injunctive relief without having to post any bond or prove any specific damages.

78. Under Texas Rule of Civil Procedure 680, "no temporary restraining order shall be granted without notice to the adverse party unless it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before notice can be served and a hearing had thereon." For the reasons set forth above, the verified complaint shows that Coal City is suffering irreparable injury, loss and damage and will continue to suffer irreparable injury, loss, and damage before notice can be served a hearing had thereon. Accordingly, Coal City requests the entry of a temporary restraining order without notice to Palm.

79. In compliance with Texas Rule of Civil Procedure 680, Coal City requests that the temporary restraining order granted without notice be endorsed with the date and hour of issuance; be filed forthwith in the clerk's office and entered of record; define the injury and state why it is irreparable and why the order was granted without notice (i.e., summarize the aforementioned verified facts and evidence demonstrating the irreparable injury, loss, and damage); and expire by its terms within such time after signing, not to exceed fourteen days, as the Court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless Palm consents that it may be extended for a longer period.

## I. REQUEST FOR TEMPORARY INJUNCTION

80. Under Texas Rule of Civil Procedure 680, the temporary restraining order requested by Coal City would expire after a period of fourteen days. Thus, under Texas Rule of Civil Procedure 681, Coal City requests the Court enter a temporary injunction against Palm. Coal

City further requests that the Court set the hearing on the temporary injunction prior to the expiration of the temporary restraining order.

**J.     REQUEST FOR EXPEDITED DISCOVERY**

81.     To meet the evidentiary burden at the temporary injunction hearing, Coal City requires expedited but narrowly-tailored discovery.

82.     Without waiver of six-hour depositions on the merits during the regular discovery period, Coal City requests expedited depositions as follows (a) a corporate representative of Palm Enterprises, Inc. and Sharon Frank (limited to four hours on the record, collectively), (b) a corporate representative of TransWood and Roger Nikodym—the TransWood representative who signed the NDA and received the stunning e-mails from Palm (limited to three hours on the record, collectively), and (d) Rashid Malik, Christian Russell, Eric L. Holder, and James P. Uribe—the four Coal City Drivers whom Palm successfully recruited to quit Coal City and follow Palm to TransWood (limited to six hours on the record, collectively). This would result in expedited depositions that collectively would not exceed thirteen hours on the record (collectively, the "Expedited Depositions").

83.     Coal City would also request that prior to the depositions, the deponents produced a limited body of documents. Specifically, Coal City would request a copy of all e-mails (and attachments) since March 1, 2017 between (a) Sharon Frank (through her Coal City e-mail address or through her personal e-mail address), on the one hand and (b) the deponent (or in the case of the TransWood corporate representative, anyone with a TransWood e-mail address), on the other hand (collectively, the "Expedited Document Production").

**K.     REQUEST FOR PROTECTIVE ORDER**

84.     To prophylactically address potential objections from the deponents regarding issues of confidentiality, and to avoid delays in compliance with the expedited discovery, Coal

City requests that the Court order that testimony from the Expedited Depositions and Expedited Document Production may be designated by the testifying/responding/producing party or by Coal City as Confidential or AEO pursuant to the terms of a separate Protective Order to be entered by the Court at the same time as its entry of the temporary restraining order.

**L.     REQUEST FOR ATTORNEYS' FEES**

85.     Based on its cause of action for breach of contract, under Texas Civil Practice and Remedies Code Section 38.001(8), and paragraph 32 of the Affiliate Agreement, Coal City seeks its attorneys' fees. Under the Texas Theft Liability Act, Coal City also seeks its attorneys' fees under Texas Civil Practice and Remedies Code Section 134.005(b). Under the Texas Uniform Trade Secrets Acts, Coal City also seeks its attorneys' fees under Texas Civil Practice and Remedies Code Section 134A.005.

**M.     REQUEST FOR DISCLOSURE**

86.     Under Texas Rule of Civil Procedure 194, Coal City requests that Palm disclose, within 50 days of the service of Plaintiff's Original Petition, the information or material described in Rule 194.2.

**N.     PRAYER**

87.     Coal City respectfully prays that the Court enter judgment in its favor and against Palm on each of its claims, as set forth above.  Coal City prays for the following:

    a.     The Court issue a temporary restraining order against Palm (without bond) and preventing Palm from the following (the "Injunctive Acts"):"

        (1)     Disseminating the Known Stolen Confidential Information and any of Coal City's Confidential Information (whether or not part of the Known Stolen Confidential Information);

      (2)     Soliciting Coal City Customers or hauling freight for Coal City Customers on the Customer Lanes (including by use of the Eight Palm Vehicles or any other vehicles); and

      (3)     Soliciting Coal City Drivers any Coal City's employees, contractors, or drivers (whether or not among the Coal City Drivers) to haul freight for Coal City Customers on the Customer Lanes (including by use of the Driver Vehicles or any other vehicles);

b.     The Court schedule a hearing on Coal City's application for a temporary injunction on the Injunctive Acts prior to the expiration of the temporary restraining order;

c.     The Court order that prior to the hearing on the temporary injunction, Coal City may take the Expedited Depositions and Obtain the Expedited Documents;

d.     The Court order that testimony from the Expedited Depositions and Expedited Document Production may be designated by the testifying/responding/producing party or by Coal City as Confidential or AEO pursuant to the terms of a separate Protective Order to be entered by the Court at the same time as its entry of the temporary restraining order;

e.     After a hearing on Coal City's application for a temporary injunction (without bond) on the Injunctive Acts, the Court grant a temporary injunction against Palm on the Injunctive Acts;

f.     After a trial on the merits, the Court grant a permanent injunction against Palm on the Injunctive Acts;

g.    After a trial on the merits, the Court enter judgment against Palm and award

Coal City its actual damages, punitive and exemplary damages, attorneys'

fees, costs of court, pre-judgment interest, post-judgment interest, and such

other and further relief, at law or in equity, to which Coal City may be justly

entitled.

Date: June 7, 2017                                    Respectfully submitted,

*/s/ Barry M. Golden*
Barry M. Golden
Texas State Bar. No. 24002149

MILLER, EGAN, MOLTER & NELSON, LLP
2911 Turtle Creek Blvd., Suite 1100
Dallas, Texas 75219
Phone: (214) 628-9500
Facsimile: (214) 628-9505
bgolden@milleregan.com

ATTORNEYS FOR CLAIMANT
COAL CITY COB COMPANY, INC.

**VERIFICATION**

**STATE OF TEXAS**

**ELLIS COUNTY**

Stephen Barnish, verifies the following:

1. "I am over twenty-one years of age, of sound mind, capable of making this statement, and am personally acquainted with the facts stated in it, which are true.

2. I am President and Chief Financial Officer of Coal City Cob Company, Inc.

3. I have read Plaintiff's Verified Original Petition and Request for Injunctive Relief ("Petition"), including all the factual statements contained in it. Based on my personal knowledge, all the factual statements contained in the Petition are true and correct.

Further affiant sayeth not."

Stephen Barnish

Executed this 6th day of June 2017

NOTARY STAMP

NOTARY PUBLIC STATE OF TEXAS
MILDRED ALCALA
NOTARY PUBLIC
STATE OF TEXAS
MY COMM EXP 10/25/2017

NOTARY SIGNATURE

Mildred Alcala

# Exhibit A

## AFFILIATE AGREEMENT

**THIS AFFILIATE AGREEMENT** ("Agreement") is hereby entered into, effective as of the date set forth below, by and between **COAL CITY COB COMPANY, INC.** ("CARRIER"), an Illinois Corporation; and the AFFILIATE and GUARANTOR(s) named below:

**AFFILIATE:** PALM ENTERPRISES, Inc., an Indiana corporation
Address: 1060 Kennedy Avenue
Schereryille, IN 46375

**GUARANTOR(s):** [signature]
Address: ______

which parties hereby covenant and agree as follows:

**WHEREAS,** CARRIER is a motor carrier operating pursuant to authority issued by various state and/or federal agencies; and

**WHEREAS,** AFFILIATE is a X corporation ☐ partnership ☐ LLC ☐ Other ______, and is duly organized/incorporated and existing under the laws of the State of Indiana, and the owner or lessee of certain tractor and/or trailer equipment who desires to perform transportation services for the CARRIER and the Designated Customers.

**NOW THEREFORE,** in consideration of the promises, covenants, representations, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. Definitions. For the purposes of this Agreement, the following terms shall have the meanings set forth:

(a) "Affiliate Operator(s)" shall mean an independent operator or owner-operator with whom the AFFILIATE has a contract or agreement for the performance of transportation services on behalf of the AFFILIATE. As noted in Paragraph 2(g) below, Affiliate Operators may from time to time be assigned by CARRIER to work out of a terminal or location of AFFILIATE.

(b) "Carrier Operator(s)" shall mean an independent operator or owner-operator with whom the CARRIER has a contract or agreement for the performance of transportation services on behalf of the CARRIER. As noted in Paragraph 2(g) below, CARRIER Operators may from time to time be assigned by CARRIER to work out of a terminal or location of AFFILIATE.

(c) "Carrier Representatives" shall mean any officer, director, shareholder, employee, agent, partner, parent corporation, subsidiary, attorney, lender, insurer, affiliate, representative, successor, and assignee of the CARRIER.

(d) "Change of Control" shall mean (i) any sale, lease, exchange or other transfer (in one transaction or a series of transactions) of all or substantially all of the assets of AFFILIATE (ii) a merger or consolidation of AFFILIATE in which the stockholders, partners, members, or other owners of AFFILIATE as of the date of this Agreement would own, immediately prior to such transaction, in the aggregate, less than fifty percent (50%) of the total combined voting power of all classes of stock, partnership interests, membership interests or other ownership interests of the surviving entity normally entitled to vote, of the surviving entity; or (iii) any reorganization, consolidation or merger of the AFFILIATE where the outstanding stock, partnership interests, membership interests or other ownership interests of the stockholders, partners, members, or other owners of AFFILIATE as of the date of this Agreement are converted into less than fifty percent (50%) of the outstanding voting power of the surviving entity (or its parent entity) immediately after the transaction.

(e) "Designated Customers" shall mean (i) the customers of CARRIER as listed in Schedule "B" and as may be added thereto by CARRIER from time to time and (ii) any other customer of CARRIER for which the AFFILIATE renders or has rendered transportation services during any term of this Agreement.

(f) "DOT" shall mean the United States Department of Transportation and its departments, divisions, and sub-agencies.

(g) "Employee Operator(s)" shall mean a driver or operator employed by the AFFILIATE who performs transportation services on behalf of the AFFILIATE. As noted in Paragraph 2(g) below, Employee Operators may from time to time be assigned by CARRIER or AFFILIATE to work out of a terminal or location of AFFILIATE.

(h) "Equipment" shall mean the tractor(s), trailer(s) and other transportation equipment listed in Schedule "E" attached hereto, which Schedule may be amended from time to time.

(i) "Income Withholding Order" shall mean any order, writ, or notice issued by a court or government agency of competent jurisdiction requiring the CARRIER to withhold income from any income or revenues due to an employee of the AFFILIATE hereunder in connection with the payment, collection, or enforcement of any child support, spousal support, alimony, or other family support.

(j) "Motor Carrier Laws" shall mean the (1) Federal Motor Carrier Act and the rules and regulations of the Federal Motor Carrier Safety Administration, including 49 C.F.R. Parts 382, 383, 391, 392 and 395; (2) Motor Carrier Act of 1980; (3) rules and regulations of DOT; (4) the rules and regulations of the Federal Motor Carrier Safety Administration; (5) Interstate Commerce Commission Termination Act of 1995; and (6) any state or local laws, statutes, rules, or ordinances governing motor vehicles and/or equipment and transportation services rendered within such jurisdiction, together with any and all successor or replacement legislation enacted with respect to such federal, state, or local laws, statutes, rules and regulations.

2. **Services; Equipment**. During the Term (as set forth in Paragraph 2 below) of this Agreement, AFFILIATE hereby agrees to perform and provide to CARRIER the following services and equipment:

(a) *Services*. AFFILIATE hereby agrees to provide and perform the transportation and other related services to CARRIER, as are designated in Schedule "A-1" attached hereto, for the benefit of CARRIER and the Designated Customers. AFFILIATE has the right to accept or refuse any transportation service assignments requested by the CARRIER. AFFILIATE represents and warrants that AFFILIATE has title to or is authorized to contract the Equipment and Services to CARRIER. It is acknowledged that this Agreement does not require the assignment of any particular load, run or trip to any described vehicle, nor does this Agreement commit CARRIER to the use of any described vehicle if it does not desire or require its use. AFFILIATE understands and agrees that it is responsible for its load and for the route selection, loading, and delivery of such load to and unloading at its destination.

(b) *Equipment*. AFFILIATE further agrees to provide for the use of the Equipment. The parties agree in the event of any addition, substitution, or decrease of any Equipment to be provided by AFFILIATE under this Agreement, the parties shall amend Schedule "E" to provide for the listing and identification of such added, substituted, or deleted Equipment. AFFILIATE hereby warrants and represents that the Equipment:

(1) AFFILIATE is the owner or lessee of the Equipment and holds any and all licenses, permits, and registrations required to operate the Equipment in interstate commerce for the purposes contemplated by this Agreement;

(2) The Equipment is in compliance with any and all local, state and federal laws, statutes, ordinances, rules, and regulations required to operate the Equipment and to perform the Services contracted for hereunder; and

(3) The Equipment is mechanically sound and AFFILIATE is not aware of any defects or conditions that would affect the rendering or safety of any Services to be performed under this Agreement.

If the signatory to this Agreement will be anyone other than the beneficial owner of the Equipment, the AFFILIATE agrees to provide such necessary Power(s) of Attorney as CARRIER may require.

(c) *Use of Equipment.* The parties agree to be bound by all Motor Carrier Laws applicable to operations hereunder. CARRIER agrees that the Equipment shall be operated only by the AFFILIATE, or its Employee Operators, Affiliate Operators, agents, or employees. AFFILIATE agrees that said Equipment will be operated in compliance with all applicable Federal, State, and local laws and the rules and regulations of any regulatory body having jurisdiction. AFFILIATE shall require its Employee Operators and Affiliate Operators to carry a copy of this Agreement in the Equipment at all times and file with CARRIER, on a timely basis, all log sheets, physical examination certificates, accident reports, and any other required data, documents, or reports.

(d) *Leased Equipment*. In the event that the Equipment or any portion thereof is the subject of a lease/purchase agreement (the "Lease-Purchase Agreement") between CARRIER and AFFILIATE, the parties hereby acknowledge and agree that (1) the terms of the Lease-Purchase Agreement shall control and govern the relationship between the parties relating to such

Equipment and (2) in the event of any conflict in the provision of this Agreement and the Lease-Purchase Agreement, the terms of the Lease-Purchase Agreement shall control.

(e) *Carrier's Equipment*. In the course of performing the services, the parties acknowledge that it may be necessary for AFFILIATE to use tank trailers, cargo trailers, and other equipment owned by the CARRIER (the "Carrier Equipment"). In connection with the use of such Carrier Equipment, AFFILIATE hereby agrees as follows:

(1) *Use; Rental/Maintenance Charges*. AFFILIATE agrees to use the Carrier Equipment in a careful and competent manner. AFFILIATE further agrees to keep the Equipment in clean appearance and identified as described herein, at its sole cost and expense, and to return such equipment to the possession of CARRIER upon termination of this Agreement, or upon demand of CARRIER, in the same condition as received, less ordinary wear and tear, at the terminal the AFFILIATE is domiciled or as otherwise mutually agreed to in writing by AFFILIATE and CARRIER. In connection with the use of such Carrier Equipment, AFFILIATE hereby agrees to pay CARRIER, as part of the settlement procedures described in Paragraph 5(c) below, such weekly rental fees and maintenance/mileage fees as set forth in Schedule E-2 (the "Carrier Equipment Charges"), which Schedule may be amended from time to time by CARRIER upon 30 days' notice to AFFILIATE.

(2) *Trailer Damage*. AFFILIATE shall be liable for the first two thousand dollars ($2000.00) damage or loss to Carrier's Equipment while in possession or control of the AFFILIATE, its agents or employees, due to theft, abuse, negligence or accident. Provided, however, any loss or damage to Carrier's Equipment which is a result of gross negligence on the part of AFFILIATE, its agents or employees, shall be the complete and total responsibility of the AFFILIATE up to maximum of ten thousand dollars ($10,000.00) per occurrence. AFFILIATE AGREES TO PAY CARRIER THE FULL VALUE OF THE COST OF REPAIRING OR REPLACING SUCH CARRIER'S EQUIPMENT UP TO A MAXIMUM OF TEN THOUSAND DOLLARS ($10,000.00) AS REQUIRED BY CARRIER AND SHALL INDEMNIFY AND HOLD CARRIER HARMLESS FOR ANY LIABILITY RESULTING FROM SUCH DAMAGE.

(3) *Tank Washes*. AFFILIATE will be responsible for the payment of One Hundred percent (100%) of all tank wash charges for Equipment cleaned at an approved CARRIER tank wash facility, listed in Schedule "F". In the event that AFFILAITE desires to use a particular tank wash facility, it shall submit the name and address of such facility, along with such other information as requested by CARRIER, for approval as an authorized tank wash facility. Thereafter, CARRIER shall have thirty (30) days to investigate and qualify such facility and notify AFFILIATE of its approval or rejection of such facility as an authorized tank wash facility. Should the facilities on Schedule "F" ne changed, whether by CARRIER or the addition of a facility requested by AFFILIATE, the parties agree that a new Appendix B will be supplied to the AFFILIATE by CARRIER. AFFILIATE agrees that, under no circumstances, will it use or utilize a tank cleaning facility that has not been approved by the applicable local, state and federal governmental agencies. AFFILIATE agrees to pay one hundred percent (100%) of all tank wash charges incurred at any third-party tank wash facility not listed in Appendix B, attributable to loads which AFFILIATE is transporting under this Agreement. CARRIER may elect to advance and pay such tank wash charges on behalf of AFFILIATE and deduct such amounts in connection with the settlement of charges due and owing to AFFILIATE.

(4) *Product Disposal*. AFFILIATE herby agrees to insure that all product is unloaded at the customer's/consignee's facility. Unless the retention of product in a trailer in excess of three (3) gallons is specifically authorized and approved by CARRIER or CARRIER's agent, AFFILIATE agrees to pay one hundred percent (100%) of all charges assessed by ANY tank wash facility, as a result of disposing of product in all instances where the amount of product in the tank exceeds three (3) gallons.

(5) *Return of Equipment and/or Other Property of Carrier*. AFFILIATE hereby covenants and agrees that while this Agreement is in effect, and upon termination of this Agreement, AFFILIATE will return all of Carrier's equipment, including CARRIER'S trailers to the possession of CARRIER at the terminal facility at which AFFILIATE has been assigned or as otherwise mutually agreed to in writing by AFFILIATE and CARRIER. AFFILIATE acknowledges and agrees that CARRIER'S business requires a careful allocation of equipment among CARRIER'S facilities in the United States and hereby covenants and agrees that if directed to do so by the CARRIER at the termination of any dispatch or upon termination of this Agreement, and returned the same to the CARRIER'S facility from which the original dispatch occurred or to the following location(s): Coal City, IL ____. In addition, in the event that AFFILIATE fails or refuses to return any Carrier's Equipment or to pick up an empty trailer as directed by CARRIER, AFFILIATE shall be liable for all costs and expenses incurred by CARRIER, including all legal fees and other out of pocket expenses paid by CARRIER in obtaining a return of such equipment. The

provisions of Section 5(e) related to chargeback of expenses shall also apply to the obligations created under this paragraph. AFFILIATE further agrees to remove the placard, decal, lettering, designs, etc., immediately upon the return of the Equipment to him by CARRIER, and CARRIER may withhold payment pending proof of conformation of such removal. Additionally, AFFILIATE shall pay CARRIER twenty-five dollars ($25.00) a day for AFFILIATES failure to return any of CARRIERS property.

(f) *Inspections*. AFFILIATE agrees that prior to the commencement of this Agreement, it will make the subject Equipment available to CARRIER at CARRIER's nearest place of business or to a third party designated by CARRIER to inspect the same to ensure compliance with said rules and regulations. Attached as Appendix C is a Systemic/Annual Inspection Form which shall be completed for each piece of Equipment under this Agreement at the time such Equipment becomes subject to this Agreement, and such form shall be completed bimonthly thereafter during the term of this Agreement. In the event of a failure to comply with this Section, then and in that event this Agreement shall be null and void and CARRIER shall have no liability to AFFILIATE. Any costs or fees charged or connected with said inspections shall be the responsibility of the AFFILIATE.

(g) *Affiliate Operators and Employee Operators*. In hiring Employee Operators and Affiliate Operators to operate said Equipment on behalf of AFFILIATE, AFFILIATE agrees to retain, hire, and/or contract with only competent and experienced drivers who meet all of the requirements of CARRIER, DOT, and the Motor Carrier Laws, including, but not limited to, familiarity and compliance with state and federal motor carrier safety laws and regulations. AFFILIATE acknowledges and agrees that it has all responsibility for the payment of wages, compensation, payroll taxes, benefits, and all other amounts to said Employee Operators and Affiliate Operators and shall indemnify and hold CARRIER harmless for any such claims. When hiring employees (whether office staff, support personnel or drivers), AFFILIATE hereby agrees to obtain and retain a written waiver signed by each employee acknowledging that said employee is not an employee of CARRIER. AFFILIATE further agrees that when hiring employees, it will comply with all Federal, State, and Local laws and regulations, and shall be solely responsible for ensuring the payment of all payroll or employment taxes to any federal, state, or local government agency. In addition, AFFILIATE, expressly acknowledges and agrees that, in the performance of its obligations under this agreement, it will utilize only those Employee Operators and Affiliate Operators who at all times satisfy all of the CARRIER'S qualifications and standards enacted from time to time by CARRIER and that it will at all times cause its Employee Operators and Affiliate Operators to comply with CARRIER'S policies and procedures in the performance of AFFILIATE'S obligations under this Agreement. CARRIER reserves the right to disqualify any operator of the Equipment that does not meet the qualification standards set forth by CARRIER or the Motor Carrier Laws, in which case AFFILIATE is obligated to provide another fully qualified and licensed operator to operate the Equipment at its sole expense. AFFILIATE acknowledges and agrees that CARRIER may from time to time, for convenience and customer service purposes, assign or designate a CARRIER Operator to work out of, or be based at, a location or terminal owned or operated by AFFILIATE.

(h) *Accident Reports*. AFFILIATE shall immediately report any accident to CARRIER involving operations under this Agreement, including AFFILIATE's written report of such accident In the event AFFILIATE fails to immediately notify CARRIER of the accident, but in no instance shall the time of notification exceed four (4) hours from the time of the accident, AFFILIATE shall be liable for any and all damages resulting from that failure to notify, including but not limited to consequential damages, fines, claims by third parties and reasonable attorney fees.

(i) *Bills of Lading*. It is agreed that, in connection with any Services performed hereunder, any the bills of lading, way bills, freight bills, manifests or other papers identifying the products or cargo transported on or in the Equipment shall be in such from as approved by the CARRIER.

(j) *Customer Payments*. AFFILIATE shall immediately deliver to CARRIER any and all sums of cash, checks, and merchandise which AFFILIATE or its Employee Operators and Affiliate Operators receive pursuant to C.O.D. deliveries or otherwise. Such sums or instruments shall be delivered to CARRIER in the form received by the AFFILIATE. AFFILIATE shall have no liability for the receipt of false, fraudulent, or incorrect payments, so long as it has no knowledge of any facts about the falsity, fraudulent nature, or incorrectness of such payments..

(k) *Hours of Service Rules*. AFFILIATE will ensure that its Employee Operators and Affiliate Operators comply fully with the hours of service rules and prepare, carry on board, and produce upon request accurate daily logs, all in accordance with the Motor Carrier Laws of the various jurisdictions in which they are operating.

(l) *Subcontracting/Trip-Leasing*. AFFILIATE is not prohibited from the pickup, transportation, or delivery of property for more than one common carrier or any other person or entity, provided, that AFFILIATE complies with the trip lease requirements

under 49 C.F.R. § 376.12(c)(2) and this Agreement. AFFILIATE may trip-lease (subcontract) the Equipment to a third party other than an affiliate of CARRIER only upon receiving prior written authorization from CARRIER and only as allowed for under the federal leasing regulations [49 C.F.R. §376.12(c)(2)]. CARRIER assumes no responsibility for the collection of freight charges or payment to AFFILIATE of any trip-lease related revenue. During the term of any trip-lease, AFFILIATE will display only the trip-lease carrier's identification, and, as between AFFILIATE and CARRIER, CARRIER will have no responsibility for, and AFFILIATE will fully indemnify CARRIER regarding, the operation of the Equipment.

3. **CARRIER's Responsibilities**. CARRIER shall have the following duties and responsibilities:

(a) *Operating-Authority*. CARRIER shall be responsible for maintaining the proper operating authority and certificates, as mandated by the Motor Carrier Laws or the appropriate state regulatory bodies.

(b) *Exclusive Possession and Responsibility*. The Equipment shall be for CARRIER's exclusive possession, control, and use for the duration of this Agreement. CARRIER shall assume complete responsibility for the operation of the Equipment, as required by the Motor Carrier Laws. This subparagraph is set forth solely to conform with Motor Carrier Laws on regulations and shall not be used for any other purposes, including any attempt to classify AFFILIATE as an employee of CARRIER; nor does this provision alter the AFFILIATE's freedom to choose the methods and means of how it will perform the perform the transportation Services offered to it by CARRIER. Nothing in the provisions required by 49 C.F.R. § 376.12(c)(1) is intended as evidence that AFFILIATE or any worker provided by AFFILIATE is an employee of CARRIER. During the term of this Agreement, CARRIER will have the exclusive right to subcontract the Equipment to other authorized motor carriers. AFFILIATE may only subcontract the Equipment only upon meeting the following conditions: (1) AFFILIATE shall receive prior written authorization from CARRIER as set forth in Section 2(l) above, (2) during the performance of such subcontracted services, AFFILIATE shall remove all plates, permits, signage, and identification of CARRIER, and (3) AFFILIATE's subcontracted services shall be under a separate operating authority independent of CARRIER's authority. CARRIER has no right to and will not control the manner nor prescribe the method of doing that portion of the operation which is contracted for in this Agreement by AFFILIATE, except such control as can reasonably be construed to be required by Applicable Law. AFFILIATE reserves the right to accept or reject any freight tendered for transportation by CARRIER.

(c) *Inspection of Equipment*. CARRIER agrees that before taking possession of the Equipment, the Equipment will be inspected by one of its responsible and qualified employees or agents.

(d) *Identification of Equipment*. CARRIER shall identify the Equipment in accordance with the requirements of the Federal Motor Carrier Safety Administration, Department of Transportation, and appropriate state regulatory agencies. CARRIER shall have the right to place and maintain on the Equipment Carrier's name and any lettering, advertisement, slogans or designs as CARRIER may choose. AFFILIATE shall remove such identification at the termination of this Agreement or while operating such Equipment for any purpose other than conducting Carrier's business.

4. **Duration of Agreement**. This Agreement shall begin on the date indicated on the signature page and shall remain in effect for a period of not less than Three (3) *years* days from that date, but then may be terminated in accordance with the provisions of Section 13; provided, however, that this Agreement may be terminated at any time in accordance with the provisions of Section 12.

5. **Compensation; Billing**. The CARRIER and AFFILIATE hereby agree that the AFFILIATE shall be compensated for the performance of the Services in accordance with the following provisions:

(a) *General*. It is expressly understood and agreed that AFFILIATE's compensation shall be as set forth in Schedule "C" and such compensation shall constitute the total compensation for everything furnished, provided, or done by AFFILIATE in connection with this Agreement, including the services of AFFILIATE'S Employee Operators and Affiliate Operators. If AFFILIATE's compensation is based on a percentage of gross revenue for a shipment, then, for purposes of computing AFFILIATE's compensation, gross revenue means those monies received by CARRIER from the Shipper or consignee for the transportation of commodities by AFFILIATE on behalf of CARRIER.

(b) *Customer Billing*. AFFILIATE shall be responsible for the entry of all delivery, billing, and invoicing information for the Designated Customers for services rendered by AFFILIATE under the terms of this Agreement. CARRIER shall provide AFFILIATE with its dedicated billing software and/or information as necessary for AFFILIATE to enter, maintain, and monitor such billing procedures. AFFILIATE hereby agrees to (i) perform such billing services in accordance with the CARRIER's applicable policies, rules, and guidelines as may be adopted from time to time, (ii) keep, maintain, and retain any and all delivery, invoices, supporting documents, and other billing information in its ordinary course of business, and in such form

and for such times as CARRIER may require; and (iii) deliver to CARRIER, upon reasonable notice, copies of any and all such billing documents and information as CARRIER may request.

(c) *Settlement Period.* CARRIER shall settle with AFFILIATE with respect to services provided under this Agreement within Five (5) calendar days after AFFILIATE's submission for billing of the proper form of those documents necessary for CARRIER to secure payment. AFFILIATE agrees that CARRIER shall be entitled to deduct from such settlement payment the items listed in Schedule "A-2". If AFFILIATE disagrees with, or disputes any deductions, setoffs, charge backs, or the amount of the settlement payment, it must notify CARRIER, in writing within sixty (60) days of receiving said settlement check, setting forth the basis of its disagreement. The failure to so notify the CARRIER within said thirty (30) day period, shall serve as the AFFILIATE's acceptance of the compensation paid for the loads carried for that settlement period, and AFFILIATE further agrees to forever release and discharge CARRIER from any claim or liability arising out of, or pertaining to, the sum(s) of money paid to the AFFILIATE or deducted from AFFILIATE's settlement payment for that period. CARRIER shall have the right to review all of AFFILIATE's documents and records relating to the use of the Equipment and to the services provided under this Agreement, and AFFILIATE agrees to provide CARRIER with access to such documents and records upon reasonable notice.

(d) *Advances.* AFFILIATE may request from CARRIER, an advance on earned, but unpaid compensation. CARRIER, in its sole discretion, has the right to grant or deny said request. In the event CARRIER grants said request for an advance, AFFILIATE agrees to reimburse or pay CARRIER any and all charges/expenses attributable to making said advance. Said payment or reimbursement shall be deducted on AFFILIATE's next settlement.

(e) *Loans for Repairs.* In the event that CARRIER makes any loans or advances any credit to AFFILIATE for the repair, maintenance, care, or replacement of any Equipment, AFFILIATE hereby agrees to repay such amounts in accordance with the terms and conditions of such loan or advance. In the event that AFFILIATE fails to repay such loan or advance as agreed, CARRIER is hereby authorize to deduct and withhold any such amounts from any compensation due hereunder. Nothing contained in this Agreement shall be construed or interpreted to require or obligate CARRIER to make any such loans, advances, or extensions of credit.

(f) *Chargebacks.* CARRIER shall charge back to AFFILIATE at the time of payment or settlement, any expenses CARREER has initially paid that, under this Agreement, the AFFILIATE is obligated to bear. Such expenses shall be deducted from the amount of AFFILIATE's compensation and shall include, but not be limited to, fuel and mileage taxes, tank washes, product disposal, workman's compensation insurance (as applicable), occupational disability insurance (as applicable), cargo claims, property damage, license and permit fees, and any other expenses set forth in this Agreement. CARRIER will furnish AFFILIATE with a written explanation of how the charge back is computed and, if requested by AFFILIATE, will make the necessary documents available to determine the validity of the charge back.

(g) *Income Withholding Orders/Notices.* In the event that CARRIER is served with any Income Withholding Order for any Employee Operators and Affiliate Operators, CARRIER shall notify AFFILIATE of its receipt and may notify the applicable government agency or administrative body of the relationship evidenced by this Agreement and that such person is not an employee of CARRIER. Upon receipt of such notice, AFFILIATE hereby agrees to take all actions as are necessary or required by law to comply with such Income Withholding Order. AFFILIATE hereby covenants and agrees to indemnify and hold CARRIER harmless from any and all claims, demands, damages, fines, penalties, costs, expenses, attorneys' fees, and other amounts incurred in connection with any Income Withholding Order relating to an employee of AFFILIATE. In consideration of the CARRIER's agreement hereunder, AFFILIATE hereby waives any claim, demand, action, or cause of action against CARRIER arising, either directly or indirectly, out of CARRIER's action relating to an Income Withholding Order.

6. **Operational and Other Expenses.**

(a) *Payment of Operational Expenses.* AFFILIATE shall, at its sole cost and expense, provide all the Equipment ready to operate and fully roadworthy, including the necessary licenses, permits, cab cards, vehicle identification stamps, and state base plates, and shall furnish all necessary oil, fuel, tires and other parts, supplies and equipment necessary or required for the safe and efficient operation and maintenance of the Equipment, including repairs for the operation of such Equipment; and shall pay all other expenses incident to such operation, including, but not limited to, highway use taxes, weight taxes, state property or indefinite state taxes, fuel taxes, fuel tax surcharges, license, permit and registration fees, ferry charges, toll violations, toll evasion, toll charges, and detention and accessorial charges not collected by CARRIER because of AFFILIATE's failure to provide the required documentation.

(b) *Employee Operator's and Affiliate Operator's Expenses*. AFFILIATE agrees to pay all expenses of its drivers and Contracted Operators, helpers, and other employees, including, but no limited to wages, workers compensation insurance or occupational disability insurance, health, welfare and pension costs, and taxes of any kind assessed against the AFFILIATE.

(c) *Empty Mileage Expense*. Unless otherwise required by law, or otherwise agreed between the parties, empty mileage expense, including any expense associated with obtaining the return of empty trailer or other property to the CARRIER'S possession as directed by the Carrier shall be borne by AFFILIATE.

(d) *In-Cab Systems*. Other than initial installation costs and repairs covered by the manufacturer's warranty, AFFILIATE shall be responsible for all costs and expenses required in relocating to another vehicle, operating, and maintaining any communications, GPS, email, asset tracking, and other similar trucking technology equipment and systems.

(e) *Equipment Expenses*. AFFILIATE shall be responsible for all costs and expenses required in maintaining, and shall maintain the Equipment in safe condition and in complete compliance with all Motor Carrier Laws and any and all laws and regulations of the states in which AFFILIATE operates.

(f) *Assessed Expenses*. AFFILIATE recognizes that certain of the foregoing expenses, including, but not limited to, fuel and mileage taxes, are initially assessed against CARRIER even though they are the responsibility of the AFFILIATE. Whenever any such expenses are assessed against CARRIER, the AFFILIATE agrees to pay CARRIER fully for actual documented these expenses with payment terms specified by CARRIER. AFFILIATE expressly agrees that CARRIER may deduct such actual documented expenses from any compensation owed to AFFILIATE.

(g) *Rebates; Discounts*. AFFILIATE hereby acknowledges that CARRIER may from time to time be entitled to discounts, rebates, and/or other incentives in connection with any products, services, plans, or programs to which it may provide access to the AFFILIATE. AFFILIATE hereby agrees that all such discounts, rebates and/or other incentives are the property of the CARRIER and that it has no rights or entitlement thereto. However, nothing contained herein shall prohibit CARRIER, in its sole and absolute discretion and upon such terms and conditions as it may determine, from passing along all or any portion of such discounts, rebates and/or other incentives to AFFILIATE.

(h) *IRP Plate*. AFFILIATE may, if desired at its sole discretion, purchase from CARRIER an International Registration Plan ("IRP") base plate, which plate will be obtained in CARRIER'S name for use by AFFILIATE or its Employee Operators and/or Affiliate Operators. The cost of each IRP plate purchased through CARRIER includes the actual plate cost, taxes, fees, interest and administrative expenses, and shall be deducted from AFFILIATE'S compensation at a rate set forth in Schedule "C" attached hereto until the cost of the IRP plate (as defined above) is paid in full. In the event AFFILIATE chooses to purchase an IRP plate through CARRIER, then AFFILIATE and its Employee Operators and/or Affiliate Operators shall be required to return the plate immediately upon the termination of this Agreement, in which case CARRIER shall refund to AFFILIATE a pro-rata share of the amount received by CARRIER in the event that CARRIER is able to reuse the plate or sell the plate to another contractor. AFFILIATE shall not be entitled to reimbursement for the unused portion of a base plate, however, unless CARRIER is able to reuse or sell the plate to another contractor. AFFILIATE is under no obligation to purchase an IRP plate through CARRIER, and may obtain, at its sole cost and expense, an IRP base plate in its own name.

(i) *Fines*. AFFILIATE agrees to pay all fines imposed for violation of any law or regulation by the state in which AFFILIATE operates, the Department of Transportation, or the Federal Motor Carrier Safety Administration, where such violation results, at least partially, from the acts or omissions of AFFILIATE or its Employee Operators and/or Affiliate Operators.

(j) *Chargebacks*. It is further understood that, except as hereinafter set forth, in the event CARRIER pays any of the items set forth in this section, the amount thereof, any attorneys' fees, paid by the CARRIER shall be repaid to CARRIER by way of a charge-back to the AFFILIATE against any funds or compensation owed to AFFILIATE.

7. **Liability for Damages to Cargo, Etc.** The parties hereby agree as follows:

(a) *Product/Cargo*. AFFILIATE shall be liable for any cost, expenses or other amounts (including any insurance deductibles charged to or required to be paid by CARRIER) relating to any loss, damage, delay, mis-delivery, or contamination of product or cargo resulting from any incident of loss or damage to such product or cargo, which loss, damage, delay, mis-delivery, or contamination is caused by the negligence, grossly negligence, or intentional act of the AFFILIATE, its agents, employees, representatives, Employee Operators, or Affiliate Operators. AFFILIATE AGRESS TO INDEMNIFY AND HOLD CARRIER HARMLESS FOR ANY SUCH CLAIM.

(b) *Other Damages/Claims*. Other than the types of damages/claims addressed in Sections 2(f)(2) and 7(a) of this Agreement, AFFILIATE shall be liable for any cost, expenses or other amounts (including any insurance deductibles charged to or required to be paid by CARRIER) relating to any loss, damage, injury, costs, expenses or amounts incurred by CARRIER or the Designated Customers resulting from negligence, grossly negligence, or intentional act of the AFFILIATE, its agents, employees, representatives, Employee Operators, or Affiliate Operators. AFFILIATE AGRESS TO INDEMNIFY AND HOLD CARRIER HARMLESS FOR ANY SUCH CLAIM.

(c) Nothing contained herein shall in any manner be interpreted or construed to limit or waive any rights of subrogation or contribution that CARRIER or its insurers may have against any third party, including AFFILIATE, its agents, employees, representatives, Employee Operators, or Affiliate Operators, arising out of any for any incident of loss, damage, or injury.

8. **Insurance**. The responsibilities and obligations between CARRIER and AFFILIATE involving insurance shall be as follows:

(a) Unless authorized to be self-insured, CARRIER shall maintain public liability, property damage, and cargo insurance in such amounts as are required by the Interstate Commerce Commission, Department of Transportation, and applicable state regulatory agencies and as set forth in Schedule "D".

(b) AFFILIATE acknowledges that from time to time, CARRIER may make certain insurance programs, plans, and benefits available to AFFILIATE and/or its Employee Operators or Affiliate Operators. In connection with any such programs, plans or benefits, AFFILIATE hereby agrees that it is responsible for the payment of any and all premiums, cost, or other expenses related thereto. Notwithstanding the foregoing, nothing contained herein shall be construed or interpreted to require CARRIER to provide any insurance programs, plans, and benefits available to AFFILIATE, its Employee Operators, and/or Affiliate Operators. AFFILIATE acknowledges and agrees that CARRIER is not a broker, agent, or seller of insurance coverage or benefits, but is merely providing access to such programs, plans, and benefits as an accommodation to AFFILIATE.

(c) AFFILIATE hereby authorizes CARREIR to deduct from its compensation due hereunder any and all premiums and other charges due and owing by AFFILIATE for its insurance coverages required hereunder. In the event that such compensation is insufficient to pay any premiums or other amounts due and owing by AFFILIATE, AFFILIATE hereby agrees to pay to CARRIER, within three (3) days of demand, any such amounts due and owing. AFFILIATE acknowledges and agrees that (1) it is its responsibility to maintain all insurance coverages in full force, (2) it is its obligation and responsibility to pay all premiums and other charges due and owing, and (3) the deduction and/or remittance of premiums by CARREIR is merely for convenience and administrative purposes only and is not intended to impose any duty or obligation on CARRIER to pay such amounts or notify AFFILIATE of any non-renewal or cancellation for non-payment.

(d) AFFILIATE acknowledges and agrees that the insurance coverage provided by CARRIER does not and is not intended to protect AFFILIATE whenever the Equipment is not being operated on behalf of CARRIER. As such, in the event that AFFILIATE performs transportation services for any third party other than CARRIER using the Equipment, AFFILIATE agrees (1) to obtain and maintain separate and independent insurance coverages for any such third-party transportation services and (2) to name CARRIER as an additional insured on any such insurance coverages, and (3) to comply in all respects with Section 3(b) relating to removal of CARRIER identification/signage and operation under separate independent authority.

(e) CARRIER shall maintain insurance coverage for the protection of the public pursuant to the Federal Motor Carrier Safety Administration' and its applicable laws and regulations.

(f) CARRIER's self-insurance or possession of legally required insurance in no way restricts CARRIER's rights of indemnification from AFFILIATE under any provision of this Agreement.

(g) CARRIER shall have no insurance responsibilities or obligations pertaining to AFFILIATE other than those expressly stated in this Agreement or mandated by law.

9. **Cooperation With Carrier On Claims**. AFFILIATE hereby agrees to cooperate with CARRIER and assist in the notification, processing, investigation, management, and resolution of claims CARRIER, its customer and other third parties as follows:

(a) *Cargo Claims*. AFFILIATE warrants that all cargo loaded on the Equipment will be delivered to the consignee with reasonable diligence, speed and care and as may be required by the shipper or on the bill of lading. AFFILIATE and its Employee Operators and Affiliate Operators will immediately report any cargo exceptions, damages or delay to CARRIER.

(b) *Accidents*. AFFILIATE, and its Employee Operators and Affiliate Operators, will notify CARRIER immediately of any property damage and any incident or accident involving any pedestrian or occupant of any type of vehicle, whether or not the incident or accident appears to have resulted in personal injury and whether or not AFFILIATE appears to be at fault.

(c) *Roadside Inspections*. AFFILIATE, and its Employee Operators and Affiliate Operators, will notify CARRIER via telephone or other communications immediately upon completion of any roadside inspection of the Equipment and the results thereof, and AFFILIATE will provide CARRIER with a copy of the roadside inspection report received in connection with each such inspection.

(d) *Notice of Infractions, Claims, or Suits*. AFFILIATE will forward immediately to CARRIER every demand, notice, summons, ticket or other legal process received by AFFILIATE that involves a charge, infraction, claim, suit or other legal proceeding arising from the operation of the Equipment, the relationship created by this Agreement or the services performed hereunder.

(e) *AFFILIATE's Assistance and Cooperation*. AFFILIATE and its Employee Operators and Affiliate Operators will cooperate fully with CARRIER in any legal action, regulatory hearing or other similar process arising from the operation of the Equipment, the relationship created by this Agreement or the services performed by AFFILIATE. AFFILIATE will, upon CARRIER's request, provide written reports or affidavits, attend hearings and trials and assist in securing evidence or obtaining the attendance of witnesses. AFFILIATE will provide CARRIER with any assistance as may be necessary for CARRIER or CARRIER's representatives or insurers to investigate, settle or litigate any accident, claim or potential claim by or against CARRIER.

10. **AFFILIATE Parties Not Employees**. It is expressly and agreed that the AFFILIATE, its Employee Operators, and Affiliate Operators are not employees of the CARRIER and are serving as independent contractors for the Equipment and driver services provided pursuant to this Agreement. AFFILIATE and GUARANTOR hereby agree to defend, indemnify and hold CARRIER harmless for any claims, suits, or actions, including reasonable attorney's fees in protecting CARRIER's interests, brought by its employees, any union, the public, or state or federal agencies, arising out of the operation of the Equipment pursuant to this Agreement. In this regard, AFFILIATE and GUARANTOR hereby assume full control and responsibility for all hours scheduled and worked, wages, salaries, workers' compensation and unemployment insurance, state and federal taxes, fringe benefits and all other costs relating to the use of Employee Operators and Affiliate Operators and other employees of the AFFILIATE, provided by AFFILIATE pursuant to this Agreement. Proof of such control and responsibility shall be submitted by AFFILIATE to CARRIER as required by CARRIER and may include, but not be limited to, proof of highway use tax being currently paid when the AFFILIATE purchases the license; proof of income tax being currently paid; proof of payment of payroll tax for AFFILIATE's drivers and a certificate of insurance containing a 30-day notice of change and/or cancellation clause. As required by law, CARRIER agrees to file and submit information tax returns (Form 1099) to and for AFFILIATE in the event that AFFILIATE is paid more than the statutory amount during a calendar year.

11. **Confidentiality**. As part of the business relationship between CARRIER and AFFILIATE, CARRIER will be required to disclose to AFFILIATE or AFFILIATE may come into possession of information or data which constitute proprietary information and trade secrets of CARRIER, including, without limitation, it services, products, customer information, processes, sales information, know-how, practices, policies, and other confidential information which is considered proprietary or secret by CARRIER (hereinafter "Confidential Information"). In consideration of the receipt of such Confidential Information and potential business, AFFILIATE hereby agrees that, during the term of this Agreement and for a period of five (5) years thereafter, it will maintain such Confidential Information in the utmost of confidence and will not disclosure such Confidential Information without the prior written consent of CARRIER; to use such solely in connection with such business relationship; and to take all measures necessary to protect such Confidential Information. Any breach by a party of any of its obligations under this section would result in irreparable injury to the other party. Such non-breaching party will be entitled (without prejudice to its right to other remedies, including monetary damages, and without the posting of a bond or other security) to injunctive and other equitable relief to prevent or restrain the breach of this section. The obligations of this Paragraph 11 shall survive termination of this Agreement.

12. **Non-Competition; Non-Solicitation**. Due to the importance and sensitivity of the Confidential Information, and in consideration for the agreement of the Company to disclose and make such Confidential Information available to AFFILIATE as set forth above, as well as the payments hereunder, AFFILIATE hereby covenants and agrees that, during the term of this Agreement, and for a period of thirty-six (36) months (the "Non-Compete Period") following the expiration or termination hereof, whether voluntary or involuntary, with or without cause, or for any reason or no reason and, as applicable, AFFILIATE shall not, either directly or indirectly, on behalf of itself, or any other individual, corporation, partnership, limited liability company, joint venture, or other entity other than CARRIER: (a) contact or otherwise solicit, either directly or indirectly, any Designated Customer for the purpose of selling, performing, marketing, or otherwise transacting transportation, freight hauling, and/or other services of the type performed

under this Agreement; or (b) solicit, hire, retain, or otherwise engage or go into business with any individual who is or was an employee or CARRIER Operator of CARRIER at any time during the twenty-four (24) month period prior to the date of the expiration or termination of this Agreement; or (c) make any disparaging comments concerning CARRIER or any of its shareholders, officers, directors, or employees to customers of the CARRIER or other third parties. In addition, AFFILIATE expressly acknowledges (i) that it is and will be able to operate and maintain its business without violating the covenants set forth in Paragraphs 11 and 12; (ii) that its ability to do so was a condition precedent to CARRIER entering into this Agreement and offering the opportunity for the additional business to AFFILIATE as set forth in this Agreement; and (iii) that the covenants and agreements set forth in this Paragraphs 11 and 12 are separate and independent covenants and are adequately supported by the agreements and consideration given by CARRIER hereunder. AFFILIATE acknowledges that, in the event of a breach or violation of Paragraphs 11 or 12, AFFILIATE's conduct will cause damages of an irreparable and continuing nature to CARRIER, for which money damages will not provide adequate relief. Therefore, AFFILIATE agrees that in addition to any money damages CARRIER may be entitled to recover, CARRIER also is entitled to obtain an injunction (including but not limited to a temporary restraining order) for the remainder of the period specified in the restrictive covenant which AFFILIATE breached. CARRIER shall have the right to obtain such injunctive relief without having to post any bond or prove any specific damages. The remedies of CARRIER contained in this Agreement are in addition to and not to the exclusion of any other remedies whether specified in this Agreement, available at law, in equity or otherwise. The AFFILIATE's duties and obligations under this Paragraph shall survive the termination of this Agreement or any of its provisions.

13. **Breach**. Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated, at any time, by either party in the event of a breach by the other of any term obligation contained in this Agreement In the event of a breach and when practicable, written notice shall be served upon the breaching party, notifying such party of the breach and the termination of the Agreement and reason(s) therefore. If, in CARRIER's judgment, AFFILIATE has subjected CARRIER to liability because of AFFILIATE's acts or omissions, CARRIER may take possession of the lading entrusted to AFFILIATE and any equipment owned by CARRIER and complete performance, using such equipment or any other equipment. In such event, AFFILIATE shall waive any recourse against CARRIER for such action and AFFILIATE shall reimburse CARRIER for all direct or indirect costs, expenses, or damages including reasonable attorney's fees incurred by CARRIER as a result of CARRIER's possession of the lading and completing performance.

14. **Termination**. Subject to the provisions of Section 4, this Agreement may be terminated for any reason by giving five (5) business days written notice to that effect to the other party either personally, by mail, or by fax machine at the address or fax number shown at the end of this Agreement. However, the effective date and time of the termination of this Agreement must be either prior to the AFFILIATE picking up a load, or after the AFFILIATE completes delivery of a load (i.e., the effective date and time of termination of this Agreement cannot be when the AFFILIATE is under dispatch with a load).

15. **Indemnification**. Except as otherwise provided, AFFILIATE hereby covenants and agrees to defend, indemnify and hold CARRIER and the Carrier Representatives harmless from any direct, indirect and consequential loss, damage, fine, expenses, including reasonable attorneys' fees as a result of any action, claim for injury to persons, including death, and damage to property which CARRIER may incur arising out of or in connection with AFFILIATE's services, acts, omissions, or obligations under this Agreement.

16. **Purchase of Products, Equipment, or Services from Carrier**. AFFILIATE is not required to purchase or rent any products, Equipment or services from CARRIER as a condition of entering into this Agreement. AFFILIATE is free to purchase fuel solely at its discretion and at truck stops of its choice.

17. **Final Settlement Upon Termination**. With respect to final settlement upon termination of this Agreement, the failure on the part of AFFILIATE to remove all identification devices of CARRIER, and except in the case of identification painted directly on the Equipment, return them to CARRIER in any reasonable manner, shall constitute a breach of this Agreement Such breach, as will any breach, shall entitle CARRIER to withhold any payments owed to AFFILIATE until such obligations are met Upon termination of this Agreement, CARRIER will, within forty-five (45) days after on, return to AFFILIATE, any funds being held to pay expenses incurred prior to termination; however, if AFFILIATE is obligated to pay any sum to CARRIER under such provisions of this Agreement, CARRIER may deduct such obligations from the amounts due to AFFILIATE.

18. **Labor Disputes**. AFFILIATE hereby agrees that should it become involved in a labor dispute with its employees, it will immediately report this fact to CARRIER. If such labor dispute interferes or tends to interfere with the AFFILIATE'S operations for CARRIER, AFFILIATE agrees to continue its operation for CARRIER utilizing other employees not involved in the labor dispute.

19. **Operating Regulations; Company Policies**. In conjunction with this Agreement, CARRIER shall publish regulations which, pursuant to the appropriate governmental body having jurisdiction, AFFILIATE must comply with said regulations are hereby

incorporated into this Agreement, and the failure of the AFFILIATE to abide by these regulations may be considered by CARRIER a breach of this Agreement. CARRIER agrees to furnish the AFFILIATE with a copy, of any amendments or additions to the regulations to the AFFILIATE. In addition, AFFILIATE hereby agrees to comply, and require its Employee Operators and Affiliate Operators to comply, with any and all company policies of the CARRIER applicable to AFFILIATEs, as they now exist or may be amended, modified, revised, renewed, or adopted from time to time. Unless a shorter time is stated therein, any amendments or modifications to such policies or regulations shall be effective thirty (30) days after delivery to AFFILIATE,

20. __Equal Contracting Opportunity__: The Services and Equipment specified herein will be furnished by AFFILIATE in full compliance with any and all applicable federal, state, and local laws, statutes, ordinances, rules, and regulations pertaining to government contracts and subcontracts, including, without limitation, Executive Order 11246.

21. __Benefit__. This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors.

22. __Assignment; Right of First Refusal__. ~~CARRIER shall have the right to assign this Agreement at any time without the consent of AFFILIATE.~~ The AFFILIATE may not assign this Agreement or any rights to perform any Services hereunder without the prior written consent of the CARRIER. In the event of any attempted assignment of any rights hereunder, any sale of the AFFILIATE, or any Change of Control, the CARRIER shall the right to terminate this Agreement upon thirty (30) days written notice to AFFILIATE; *provided, however*, that in the event of the sale of the ownership interests in, or all or substantially all of the assets of, the AFFILIATE, CARRIER shall have the right, upon receipt of written notice from AFFILIATE of the terms and conditions of such sale, CARRIER shall have a right of first refusal for the purchase of the ownership interests in, or all or substantially all of the assets of, the AFFILIATE, upon the same such terms and conditions. Such right of first refusal shall be exercised by CARRIER within fifteen (15) days from the date of such written notice from AFFILIATE. In the event that AFFILIATE agrees to a modification of the original terms and conditions of such sale, CARRIER shall have an additional ten (10) days to determine whether to exercise such right of first refusal.

23. __Notices__. All notices required or permitted to be given pursuant to this Agreement will be in writing and will be (i) personally delivered, (ii) mailed, first class postage prepaid, or delivered by a nationally recognized express courier service, charges prepaid, (iii) delivered by fax, or (iv) electronic message, if to the Company to the address of CARRIER's registered office (as reflected on the records of the Secretary of State of the State of Texas) and if to AFFILIATE, to the appropriate address set forth above. Any such notice, when sent in accordance with the provisions of the preceding sentence, will be deemed to have been given and received (a) on the day personally delivered, (b) on the third day following the date mailed, (c) the date of actual delivery by a courier, and (d) the date of delivery and confirmation of delivery by the recipient if delivered by fax or electronic message. Any party may change its address, as set out above, by giving notice in writing to all other parties in the manner set forth in this Section, stating the new address.

24. __Complete Agreement And Construction__. This Agreement, including any Appendices attached, constitutes the sole, entire, and existing agreement between the parties herein, and supersedes all prior agreements and undertakings, oral and written expressed or implied, or practices, between the parties, and expresses all obligations and restrictions imposed on each of the respective parties during its terms, except those specifically modified or changed by mutual written agreement between CARRIER and AFFILIATE.

25. __Governing Law; Venue__. This Agreement, and the application or interpretation thereof, will be governed exclusively by its terms and by the laws of the State of Texas, without regard for the conflict of laws provisions of any other State. AFFILIATE hereby specifically agrees that, for the purposes of this Agreement and the relationship between CARRIER and AFFILIATE, AFFILIATE is authorized to do business, and does business, in the State of Texas. Any action, proceeding, or claim arising out of or relating to this Agreement commenced by any party must be prosecuted in Ellis County, Texas. Each party hereby waives any plea of privilege that might exist in the absence of such party's agreement to prosecute such claim in Ellis County, Texas, and each party hereby irrevocably submits to the non-exclusive jurisdiction of the state and federal courts of the State of Texas and consents to service of process upon such party in any legal proceeding arising out of or in connection with this Agreement.

26. __Severability__. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity will not affect the validity of the remainder of this Agreement and the illegal or invalid provision will be enforced to the maximum extent possible to still be legal and valid.

27. __Failure to Pursue Remedies__. The failure of any party to seek redress for violation, or to insist upon the strict performance, of any provision of this Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

28. Survival. The duties, obligations, and provisions of Paragraphs 7, 9, 10, 11, 12, and 15 shall survive the expiration and/or termination of this Agreement and be fully enforceable.

29. Successors and Assigns. Each and every covenant, term, provision, and agreement herein contained will be binding upon each of the parties and their respective heirs, legal representatives, successors, and assigns and will inure to the benefit of each of the parties.

30. Construction, Sections, Appendices, Etc. Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter. Each reference to a "Schedule" herein is, unless specifically indicated otherwise, a reference to a Schedule attached hereto. It is hereby understood that if any Schedule that is to be executed and delivered pursuant to the terms hereof contains blanks, it will be completed correctly and completely in accordance with the terms and provisions hereof and as contemplated herein prior to or at the time of its execution and delivery. All Appendices are a part of this Agreement and are hereby incorporated herein for all purposes.

31. Further Assurances. In connection with this Agreement and the transactions contemplated by it, each party will execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

32. Attorneys' Fees. If any party brings any legal action to enforce or interpret the provisions of this Agreement, the prevailing party will be entitled to reasonable attorneys' fees, costs, and expenses, in addition to any other relief to which such party may be entitled.

33. Entire Agreement. This Agreement sets forth the entire Agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, if any, related thereto.

34. Third-Party Beneficiaries. Except for the Carrier Representatives, there are no third party beneficiaries of this Agreement.

35. Section Headings. The headings in this Agreement are inserted for convenience and identification only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

36. Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if the parties had all signed the same document. All counterparts will be construed together and will constitute one instrument. In making proof of this Agreement, it will not be necessary to account for more than one counterpart executed by the person against whom enforcement is sought.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the 3 day of May, 2013.

**CARRIER:**

**COAL CITY COB CO., INC.**

By: ____________________
Name: ____________________
Title: ____________________

Address for Notices:

____________________
Waxahachie, Texas 75165
Fax: (____) ____-____

**AFFILIATE:**

**PALM ENTERPRISES, INC.**

By: Stacy C Frank
Printed Name:
Title: President

Address for Notices:

1060 Kennedy Ave
Schererville, IN 46375
Fax: (219) 836-7820
Email: sfrank@cccob.com

SCHEDULE "A-1"

AFFILIATE SERVICES AND RESPONSIBILITIES

1. Provide transportation, freight, dispatching, customer service, and billing services to meet the needs and requirements of CARRIER and CARRIER's customers.
2. Support CARRIER's various customer and business programs and comply with all related CARRIER policies and procedures relating thereto.
3. Provide at AFFILIATE's sole expense all normal and necessary facilities (and all utilities related thereto), including, but not limited to, office facilities; dispatch facilities; motor vehicle and equipment storage; repair and maintenance of equipment; telephone and voice telecommunications equipment; fuel and related products; tires and motor vehicle parts; equipment and supplies; safety equipment; and all their employees and operators protective equipment and supplies; and all other property and equipment as may be necessary to perform the services under this Agreement.
4. Inspect, maintain, repair, keep in compliance and operate the Equipment within all corporate policies, applicable laws, statutes and regulations of any Governmental body having jurisdiction over the equipment (including, but not limited to the Motor Carrier Laws).
5. Supervise all AFFILIATE drivers to assure a safe operation conducted in conformity with all applicable Motor Carrier Laws and the safety policies of CARRIER, including drivers' logs compliance.
6. Promptly perform all billing of services rendered to CARRIER's customers in accordance with CARRIER'S established billing practices, policies and guidelines and supply CARRIER with all billing information and documentation, utilizing and complying with CARRIER's prescribed scanning procedures.
7. Promptly supply CARRIER with all fuel and mileage reports, drivers' logs, and medical records, collections, and other documents as may be requested by CARRIER.
8. Provide CARRIER with copies of all documents, including correspondence, which AFFILIATE sends out under CARRIER's name.
9. Maintain compliance by AFFILAITE and it Drivers, employees, and Contracted Operator with all of CARRIER's company procedures and policies, including its safety and maintenance procedures, as may be adopted and promulgated from time to time.
10. Immediately notify and promptly provide CARRIER with all required information and documents concerning transportation delays and customer complaints, pursuant to CARRIER's customer service and complaints reporting procedures.
11. Adopt and maintain adequate policies and procedures for notification by AFFILIATE's employees and/or owner operators of (a) any safety violation, accident, injury, or death to or relating to any employee, driver, or Contracted Operator of AFFILIATE or other third party or (b) any release, spill, contamination, or cargo claim occurring in connection with any transportation services, loading, or unloading provided by AFFILIATE.
12. Conduct its operations and manage its personnel in such a manner that CARRIER's good name and reputation are maintained.
13. Adopt and implement a substance abuse testing policy (including random and "for cause" testing) acceptable to CARRIER.
14. Provide CARRIER with quarterly financial statements as may be requested by CARRIER, no later than forty-five (45) days from the end of the quarter. AFFILIATE shall also provide CARRIER with annual financial statements within ninety (90) days of the close of AFFILIATE's fiscal year. AFFILIATE will make available to CARRIER its books and records for examination by internal or outside auditors, within ten (10) days of CARRIER's written request.
15. Comply with all of CARRIER's dispatch and transportation management policies and procedures, including, but not limited to, the installation and implementation on AFFILIATE Equipment of CARRIER approved communications devices and all other related CARRIER software/hardware systems.
16. Maintain all computer software supplied by CARRIER. AFFILIATE shall be responsible for all expenses resulting from the damage, loss, or unauthorized use of software provided by CARRIER's for use by AFFILIATE. Upon the termination of this Agreement, AFFILIATE shall return all copies of computer software to CARRIER.

Initial: CARRIER ______ AFFILIATE ______

## SCHEDULE "A-1"

## AFFILIATE SERVICES AND RESPONSIBILITIES

1. Provide transportation, freight, dispatching, customer service, and billing services to meet the needs and requirements of CARRIER and CARRIER's customers.
2. Support CARRIER's various customer and business programs and comply with all related CARRIER policies and procedures relating thereto.
3. Provide at AFFILIATE's sole expense all normal and necessary facilities (and all utilities related thereto), including, but not limited to, office facilities; dispatch facilities; motor vehicle and equipment storage; repair and maintenance of equipment; telephone and voice telecommunications equipment; fuel and related products; tires and motor vehicle parts; equipment and supplies; safety equipment; and all their employees and operators protective equipment and supplies; and all other property and equipment as may be necessary to perform the services under this Agreement.
4. Inspect, maintain, repair, keep in compliance and operate the Equipment within all corporate policies, applicable laws, statutes and regulations of any Governmental body having jurisdiction over the equipment (including, but not limited to the Motor Carrier Laws).
5. Supervise all AFFILIATE drivers to assure a safe operation conducted in conformity with all applicable Motor Carrier Laws and the safety policies of CARRIER, including drivers' logs compliance.
6. Promptly perform all billing of services rendered to CARRIER's customers in accordance with CARRIER'S established billing practices, policies and guidelines and supply CARRIER with all billing information and documentation, utilizing and complying with CARRIER's prescribed scanning procedures.
7. Promptly supply CARRIER with all fuel and mileage reports, drivers' logs, and medical records, collections, and other documents as may be requested by CARRIER.
8. Provide CARRIER with copies of all documents, including correspondence, which AFFILIATE sends out under CARRIER's name.
9. Maintain compliance by AFFILAITE and it Drivers, employees, and Contracted Operator with all of CARRIER's company procedures and policies, including its safety and maintenance procedures, as may be adopted and promulgated from time to time.
10. Immediately notify and promptly provide CARRIER with all required information and documents concerning transportation delays and customer complaints, pursuant to CARRIER's customer service and complaints reporting procedures.
11. Adopt and maintain adequate policies and procedures for notification by AFFILIATE's employees and/or owner operators of (a) any safety violation, accident, injury, or death to or relating to any employee, driver, or Contracted Operator of AFFILIATE or other third party or (b) any release, spill, contamination, or cargo claim occurring in connection with any transportation services, loading, or unloading provided by AFFILIATE.
12. Conduct its operations and manage its personnel in such a manner that CARRIER's good name and reputation are maintained.
13. Adopt and implement a substance abuse testing policy (including random and "for cause" testing) acceptable to CARRIER.
14. Provide CARRIER with quarterly financial statements as may be requested by CARRIER, no later than forty-five (45) days from the end of the quarter. AFFILIATE shall also provide CARRIER with annual financial statements within ninety (90) days of the close of AFFILIATE's fiscal year. AFFILIATE will make available to CARRIER its books and records for examination by internal or outside auditors, within ten (10) days of CARRIER's written request.
15. Comply with all of CARRIER's dispatch and transportation management policies and procedures, including, but not limited to, the installation and implementation on AFFILIATE Equipment of CARRIER approved communications devices and all other related CARRIER software/hardware systems.
16. Maintain all computer software supplied by CARRIER. AFFILIATE shall be responsible for all expenses resulting from the damage, loss, or unauthorized use of software provided by CARRIER's for use by AFFILIATE. Upon the termination of this Agreement, AFFILIATE shall return all copies of computer software to CARRIER.

Initial: CARRIER ____ AFFILIATE ____

**SCHEDULE "A-2"**

**Settlement Items/Deductions**

**AFFILIATE: Initial all items that apply:**

| Initial | Item/Deduction |
|---|---|
| ______ | Charges for tank washes |
| ______ | Charges for In-Cab Systems |
| ______ | Repairs and maintenance charges * |
| ______ | Carrier Equipment Charges |
| ______ | Equipment lease/rental payments |
| ______ | Assessed Expenses – 6(f) |
| ______ | Permit or license fees payable by AFFILIATE |
| ______ | Loan or advance payments (including interest, if applicable) |
| ______ | State or federal fines and penalties |
| ______ | Customer Chargebacks |
| ______ | Insurance surcharges |
| ______ | Cargo damages/claims and related charges |
| ______ | Damages to customer property or personnel |
| ______ | Demurrage/Detention Charges |
| ______ | Fuel surcharges |
| ______ | Layover charges |
| ______ | Scaling/Scale tickets |
| ______ | Administrative fees |
| ______ | Any other charges due or payable by AFFILIATE under the Agreement |
| ______ | Other: ______________________________ |
| ______ | Other: ______________________________ |
| ______ | Other: ______________________________ |

Initial: CARRIER ________ AFFILIATE ________

**SCHEDULE "B"**

**DESIGNATED CUSTOMERS**

| | Customer Billing Code | Customer |
|---|---|---|
| 1. | CAININ | Calumet Lubricants |
| 2. | CHTSG | Champion Technologies |
| 3. | CIEVCO | Cam2 International |
| 4. | CLBBPA | Chemlogix/Pilot |
| 5. | HADATX | Harcros |
| 6. | PCEAIN | Tradebe |
| 7. | PMPEIL | Sika |
| 8. | | |
| 9. | | |
| 10. | | |
| 11. | | |
| 12. | | |
| 13. | | |
| 14. | | |
| 15. | | |

Initial: CARRIER [signature] AFFILIATE ________

**SCHEDULE "C"**
**COMPENSATION**

| REVENUE ITEMS | AFFILIATE | | CARRIER | |
|---|---|---|---|---|
| | Initial | | Initial | |
| Linehaul[1] | 85% | | 15% | |
| Demurrage | 85% | | 15% | |
| Scaling | 85% | | 15% | |
| In-transit Heat | 85% | | 15% | |
| Fuel Surcharge | ~~85%~~ 100% | | ~~15%~~ 0% | |
| Scale Tickets | 100% | | 0% | |
| Reimbursed Tolls | 100% | | 0% | |
| Pumping/Blower | 100% | 65% to IC 20% to Palma | 0% | |
| Layover Charge | 85% | | 15% | |
| Extra Hose | ~~0%~~ 85% | ([illegible]) | ~~100%~~ 15% | |
| Tank Cleaning Charge | 100% | | 0% | |

1. Exceptions. The parties agree that the rate of compensation specified herein may be amended for specific shipments, routes or customers, including flat rates for handling products especially in local service. Any and all exceptions are described on the delivery receipt and likewise become a binding part of the Independent Contractor Agreement In such a case, CARRIER shall provide AFFILIATE with a new rate of compensation prior to the commencement of any trip by the AFFILIATE. The amended compensation rate will also be included in an addendum to this Agreement, to be provided to AFFILIATE prior to the commencement of any shipment.

Hose \
Pump - [illegible]

Storage - 100% [illegible]

[1] Certain loads may contain either an insurance surcharge or tank cleaning charges which have been included into the linehaul revenue. Said insurance surcharge or tank cleaning charge reduces the linehaul revenue allocated to the AFFILIATE on said loads.

**SCHEDULE "D"**
**INSURANCE REQUIREMENTS**

1.   AFFILIATE shall be covered under CARRIER's public liability, property damage and, with regard to common carrier service, cargo loss or damage insurance coverage while AFFILIATE is operating the Equipment on behalf of CARRIER (i.e., while under dispatch by CARRIER).  It shall be AFFILIATE's responsibility to provide, at its sole cost and expense, public liability and property damage insurance to protect AFFILIATE whenever the Equipment is not being operated on behalf of CARRIER.

2.   AFFILIATE shall furnish to CARRIER written certificates obtained from its insurance carrier showing that such insurance has been procured, is being properly maintained, that the premiums therefore are paid, specifying the name of the insurance carrier, the policy number, and the expiration date, and further showing that written notice of cancellation or modification of the policy shall be given to CARRIER at least (30) days prior to such cancellation or modification.

3.   AFFILIATE certifies that AFFILIATE has in effect, and will maintain, a policy of workers' compensation or an approved occupational disability insurance policy covering himself and AFFILIATE's employees, agents or servants. It is AFFILIATE's obligation to carry any fire, theft uninsured motorist and collision insurance that AFFILIATE may desire and, upon CARRIER's request, such insurance shall also name CARRIER as insured thereunder.  AFFILIATE shall comply with any and all insurance requirements (including, without limitation, workers' compensation insurance) as may be required by the State in which his residence or principal place of business is located.

4.   In the event AFFILIATE elects to carry occupational disability insurance instead of workers' compensation insurance pursuant to this Schedule, said occupational disability insurance coverage must be approved in writing by CARRIER.

**SCHEDULE "E"**
**AFFILIATE EQUIPMENT LIST**

Name: Palm
Address:

Fax No.:
Email:

| Year | Make | Model | VIN |
|---|---|---|---|
| 2007 131 | PETERBILT | 379 | 1XP5DU9X17N689382 |
| ~~2007 137~~ | ~~PETERBILT~~ | ~~379~~ | ~~1XP5DU9X27N689388~~ |
| 2007 1414 | PETERBILT | 379 | 1XP5D49X67N882501 |
| 2007 | KENWORTH | | 1XKADB9X57J153972 |
| 2004 | KENWORTH | T-60 | 3WKAAB8X44F062198 |
| ~~2007 1441~~ | ~~PETERBILT~~ | ~~379~~ | ~~1XP5D49X07N667826~~ |
| 2009 1451 | PETERBILT | 386 | 1XPHD49X99N776298 |
| 2009 | PETERBILT | 386 | 1XPHD49XX9N776312 |

0/0

Palm

1468
1469
1474
1477
1475
1426
1470
1471
1472
1473
1476

AS

SCHEDULE "E-2"
CARRIER EQUIPMENT LIST

| Year | Make | Model | VIN/SERIAL NO. | Weekly Rate | Maintenance/ Mileage Fee |
|---|---|---|---|---|---|
| 2005 | BULK | SSI | 3B9TS71E95G007209 | 175.00 | .09 |
| 2005 | BULK | SSI | 3B9TS71E55G007210 | 175.00 | .09 |
| 2005 | BULK | SSI | 3B9TS71E75G007211 | 175.00 | .09 |
| 2005 | BULK | SSI | 3B9TS61EX5G007312 | 175.00 | .09 |
| 2005 | BULK | SSI | 3B9TS61E35G007316 | 175.00 | .09 |
| 2005 | BULK | SSI | 1B9TS71E9X1295170 | 175.00 | .09 |
| 2000 | BRENNER | SSI | 10BFB72TXF0B1872 | 175.00 | .09 |
| 2007 | WALKER | SSI | 5WSAC42227N038418 | 175.00 | .09 |
| 2012 | STE | SSI | 1S9T74225C0017063 | 175.00 | .09 |
| 2012 | STE | SSI | 1S9T74223C0017076 | 175.00 | .09 |
| 1994 | BRENNER | SSI | 10BFU7218RF0A4350 | 175.00 | .09 |
| 2001 | HEIL | SSI | 190FL442113F14238 | 175.00 | .09 |
| 1998 | NOVA | SSI | 1N9S74221WA044128 | 175.00 | .09 |
| 1997 | STE | NISS | 1S9T74220V0017054 | 175.00 | .09 |

As Assigned

# Exhibit B

**Barry Golden**

**Subject:** FW: Palm Enterprises, Inc., 5-day notice of termination
**Attachments:** Palm Affiliate Agreement re signed February 2014.pdf; Palm Supplemental A.PDF; Palm Affiliate Agreement Amendment January 2017 related to Charlotte NC.PDF

---------- Forwarded message ----------
From: "Kurt Vragel" <kurt@kevtrucks.com>
Date: May 15, 2017 8:40 AM
Subject: Palm Enterprises, Inc., 5-day notice of termination
To: "s.barnish@cccob.com" <s.barnish@cccob.com>, "b.littleton@cccob.com" <b.littleton@cccob.com>
Cc:

5-DAY NOTICE OF TERMINATION – PALM ENTERPRISES, INC.

Steve Barnish

President & Chief Financial Officer

Coal City Cob Company, Inc.

4200 I-35E North

Waxahatchie, Texas 75165

by email: s.barnish@cccob.com

Bo Littleton

Coal City Cob Company, Inc.

4200 I-35E North

Waxahatchie, Texas 75165

by e-mail: b.littleton@cccob.com

As provided for in Section 14 of the Affiliate Agreement between Coal City Cob Company, Inc., and Palm Enterprises, Inc., this is your notice that Palm Enterprises, Inc., is terminating that Affiliate Agreement effective as of 9:00 A.M., Saturday, May 20, 2017.

Please send final payments of all money owed to Palm Enterprises, Inc., no later than June 5, 2017.

Any questions about termination, compensation due to Palm Enterprises, Inc., the return of any of your equipment, and any other things that may arise in connection with termination must be made through me and my office.

Please have your lawyer call me if you have any questions or need anything else.

Sincerely,

Kurt E. Vragel, Jr.

Kurt E. Vragel, Jr., P.C.

Attorney for Palm Enterprises, Inc.

1701 East Lake Ave., Suite 170

Glenview, Illinois  60025

Phone: (847) 657-8551

FAX: (847) 657-6801

kurt@kevtrucks.com

# Exhibit C

**Barry Golden**

**Subject:** FW: NDA
**Attachments:** 20170320112645252.pdf

**From:** Sharon Frank [mailto:s.frank@cccob.com]
**Sent:** Monday, March 20, 2017 11:50 AM
**To:** rnikodym@transwood.com
**Subject:** NDA

Here is the signed document Roger.

**Sharon J. Frank**

Coal City Cob
Company, Inc.

Indiana Terminal:
1060 Kennedy Avenue
Schererville, IN 46375
219.836.7815
219.836.7820 Fax
708.878.4161 Cell
s.frank@cccob.com

# MUTUAL NON-DISCLOSURE AGREEMENT

This Mutual Non-Disclosure Agreement (the "Agreement") dated as of the 17th day of March, 2017 is made by and between Palm Enterprises with principal offices located at 1060 Kennedy Avenue, Schererville, IN and TransWood Carriers, Inc. whose address is 2565 St. Mary's Avenue, Omaha, NE 68105 each of which is referred to herein individually as a "Party" and collectively as the "Parties".

WHEREAS, in connection with the consideration of possible transactions between the Parties, each Party may provide the other Party with certain sensitive and proprietary information relevant to the operations and business of the other Party in relation to a potential business relationship between the parties. ("the Proposal").

WHEREAS, as a condition to furnishing such information, each Party requires that such information receive confidential treatment in accordance with the provisions of this Agreement.

NOW THEREFORE, in reliance upon and in consideration of the following undertakings, and for good and valuable consideration hereby acknowledged as given and received by each of the Parties, the Parties, on behalf of themselves, their subsidiaries, and their affiliates, agree as follows:

1. Confidentiality. Subject to the provisions of this Agreement, each Party agrees to hold in confidence all confidential, proprietary or trade secret information which has been, or which may hereafter be, communicated to that Party by the other Party orally, in written or electronic form, or in ay other form of communication, either directly or indirectly, in connection with the Proposal ("Confidential Information") and not to disclose, distribute or disseminate the Confidential Information, or any documents, studies, reports or information derived therefrom, in any way to any third party, except as provided herein. This Agreement itself and the fact that the Parties are discussing the Proposal shall also be deemed Confidential Information.

2. Use. Each Party agrees to use Confidential Information received from the other Party only for purposes of the Proposal, or the evaluation thereof. No other rights or licenses to trademarks, inventions, copyrights, patents, or any other intellectual property are implied or granted under this Agreement or by the delivering of Confidential Information from one Party to the other.

3. Copying. Confidential Information supplied by each Party shall not be reproduced by the other Party in any form except pursuant to the terms and conditions of this Agreement and as required to accomplish the intent of this Agreement.

4. Care. Each Party shall provide the same care to avoid disclosure or unauthorized use of Confidential Information as it provides to protect its own similar proprietary information, which care in no event shall be less than that which is commercially reasonable. It is agreed that Confidential Information may only be disclosed by the receiving Party to that Party's (including its subsidiaries' and affiliates') employees, officers, directors, agents, or other representatives who need to know such information for purposes of this Agreement. Each Party agrees to inform each such employee, officer, director, agent, or other representative that the Confidential Information is the furnishing Party's proprietary, confidential and trade secret information and may not be disclosed to third parties. Each Party acknowledges that it will be responsible for any breach of the terms and conditions of this Agreement caused by any such employee, officer, director, agent, or other representative.

# Exhibit D

**Barry Golden**

**Subject:** FW: NDA

**From:** Sharon Frank [mailto:s.frank@cccob.com]
**Sent:** Monday, March 20, 2017 3:38 PM
**To:** RNikodym@transwood.com
**Subject:** RE: NDA

Hope you're feeling better. I am forwarding these emails to another email address and then deleting from Cob, so you know.

I am trying to get through the contract now. Lot's of distractions, but I will persevere until I am through it.

**Sharon J. Frank**

Indiana Terminal:
1060 Kennedy Avenue
Schererville, IN 46375
219.836.7815
219.836.7820 Fax
708.878.4161 Cell
s.frank@cccob.com

**From:** RNikodym@transwood.com [mailto:RNikodym@transwood.com]
**Sent:** Monday, March 20, 2017 3:36 PM
**To:** Sharon Frank
**Subject:** Re: NDA

Thanks Sharon . . . .having a slow day today due to dental surgery this morning, but will give you a shout tomorrow to discuss next steps, your questions, etc.

Hope you're having a great Monday!

Roger Nikodym
TransWood, Inc.
Director, Affiliate Relations
E Mail: rnikodym@transwood.com
Phone: 605-521-9724

From: Sharon Frank <s.frank@cccob.com>
To: rnikodym@transwood.com

Date: 03/20/2017 11:58 AM
Subject: NDA

Here is the signed document Roger.

**Sharon J. Frank**

Coal City Cob
Company, Inc.

Indiana Terminal:
1060 Kennedy Avenue
Schererville, IN 46375
219.836.7815
219.836.7820 Fax
708.878.4161 Cell
s.frank@cccob.com
[attachment "20170320112645252.pdf" deleted by Roger Nikodym/TWI]

# Exhibit E

# MILLER, EGAN, MOLTER & NELSON LLP

June 1, 2017

Brian Schuster, JD
TransWood Carriers, Inc.
2565 St. Mary's Ave.
Omaha, NE 68105

*Via Email*

**Re: Demand for TransWood to Return Coal City's Stolen Confidential Information**

Dear Brian,

I received your voice-mail and e-mails from yesterday. I appreciate your attention to this matter.

Coal City Cob Company, Inc. ("Coal City" or "CARRIER") rejects the counter-proposal from TransWood Carriers, Inc. ("TransWood"). The counter-proposal would not stop the irreparable harm being caused by TransWood and Palm Enterprises, Inc. ("Palm") with respect to the illegal solicitation of customers and drivers as detailed in my letters of May 22 and 26, 2017 ("Prior Correspondence").

There is one matter that Coal City must re-address immediately. As set forth in the Prior Correspondence, Coal City continues to demand that TransWood return Coal City's Stolen Confidential Information (defined below). As stated previously, paragraph 11 of the February 3, 2014 Affiliate Agreement between Coal City and Palm ("Affiliate Agreement") prohibited Palm from providing TransWood with "proprietary information and trade secrets of [Coal City], including, without limitation, its services, products, customer information, processes, sales information, know-how, practices, policies, and other confidential information which is considered proprietary or secret by [Coal City]."

Notwithstanding the restriction in paragraph 11 of the Affiliate Agreement, beginning in March 2017 (and possibly earlier), Palm, through Sharon Frank (Palm's Guarantor), provided TransWood with Coal City's confidential information, including (1) Coal City's customer lanes (2) Coal City's prices, (3) the identity of Coal City drivers who were dispatched by Palm Enterprises, (4) Coal City's contracts (*e.g.*, the Affiliate Agreement), and (5) Coal City's settlement schedule (collectively, the "Stolen Confidential Information").

I understand from our prior communications that TransWood is not disputing that it is in possession, custody, and control of the Stolen Confidential Information. Indeed, we have evidence regarding TransWood's possession of at least some—but certainly not all—of the Stolen Confidential Information, And, during the May 23 call, you stated that TransWood would agree to Coal City's demand to return the Stolen Confidential Information. However, TransWood still has not done so.

Coal City previously demanded, and once more demands, that TransWood return a copy of all e-mails (and attachments) between Sharon Frank (through her Coal City e-mail address or through her personal e-mail address), on the one hand, and anyone with a TransWood e-mail address, on the other hand. Coal City further seeks all text messages between Ms. Frank and anyone at

TransWood (the "Return Demand"). The period for the e-mails and texts should be from March 1, 2016 until present. Coal City would need to receive a copy of the Stolen Confidential Information and verify its completeness prior to TransWood taking any steps to destroy any copies on its end.[1]

In my letter of May 26, 2017, I requested that you let me know how quickly TransWood can comply with the Return Demand. Although I've heard from you since then, I have not yet received a response on this issue. Accordingly, Coal City will set the date. Coal City hereby demands that TransWood comply with the Return Demand and return the Stolen Confidential Information by 5:00 p.m. (Central) on June 8, 2017.

Nothing contained in or omitted from this letter is intended to waive any of Coal City's rights, claims, remedies, or causes of action against TransWood, its corporate officers, employees, contractors, or agents, or the same with respect to Palm and/or Sharon Frank. To the contrary, Coal City expressly reserves all such rights, remedies, and causes of action, whether at law or in equity.

Regards,

Barry Golden

cc: Steve Barnish (via e-mail)
Tom Russell (via e-mail)

[1] During the call, you referred to the potential destruction of all copies of the Stolen Information in the possession, custody, and control of TransWood. Coal City would request that TransWood refrain from any such destruction until after Coal City receives the Stolen Information and verifies in writing from Coal City to TransWood that it had no objections to the destruction. In the interim, TransWood should not destroy any documents.

# Exhibit F

**Barry Golden**

**Subject:** FW: Coal City Cobb

---------- Forwarded message ----------
From: **Stephens, Andrew** <andrew.stephens@solvay.com>
Date: Fri, May 19, 2017 at 9:37 AM
Subject: Re: Coal City Cobb
To: Mike Blanchard <m.blanchard@cccob.com>
Cc: Delma Disbrow <delma.disbrow@solvay.com>, Mark Ostroski <mark.ostroski@solvay.com>, Blake Ryder <b.ryder@cccob.com>, Robert Linkman <r.linkman@cccob.com>

However, There is some issues here and I really go nuts with this mess between you guys and transwood

Cause Sharon Frank had me send 1100396078 to her and she insisted it was for them...

On Fri, May 19, 2017 at 9:32 AM, Stephens, Andrew <andrew.stephens@solvay.com> wrote:

These are all I have on my radar right now

| Delivery | Picking Date | Picking time | Purchasing Document | Shipment | Material | Description |
|---|---|---|---|---|---|---|
| 83601073 | 5/20/2017 | 11:00:00 AM | 2260938 | 1100396079 | 116841 | MACKAM CBS 50G BULK |
| 83601076 | 5/21/2017 | 9:30:00 AM | 2264791 | 1100396078 | 116766 | MACKAM 35 BULK |
| 83604386 | 5/28/2017 | 8:00:00 AM | 2256020 | 1100397234 | 116766 | MACKAM 35 BULK |

On Fri, May 19, 2017 at 9:28 AM, Mike Blanchard <m.blanchard@cccob.com> wrote:

Good morning folks! Jack at Nalco tells me they have several loads on the books with you and also added a few more Kilgore's today. Andy could you please send over all tenders that you feel we should already have as we have none.

Thanks!

Mike

Mike Blanchard
National Account Manager
Coal City Cob Co., Inc.
815-693-6129
www.cccob.com

On May 17, 2017, at 1:39 PM, "Stephens, Andrew" <andrew.stephens@solvay.com> wrote:

Hello Delma / Mark

I have Mike Blanchard with Coal City Cobb on this email.

There has been some changes at CCC with their logistical folks who act as subcontractors for them.

I won't go into all the details as it is still a bit hazy to me...but there is some confusion on who handles the customer routed orders like Nalco and certain Harcros orders. As CCC is typically the carrier who gets these loads.

For example we just had a Nalco Centerville, TX and this new company - Transwood - has taken the load or says it is theirs..

I told Mike B, I don't want to get caught in the middle. So he has asked to be put in touch with the contacts at Harcros and Nalco to get this hatched out so we have the carrier for these loads.

I will leave that to you two if you are able to assist him or not.

Thank you.

This message and any attachments is intended for the named addressee(s) only and may contain information that is privileged and/or confidential. If you receive this message in error, please delete it and immediately notify the sender Any copying, dissemination or disclosure, either whole or partial, by a person who is not the named addressee is prohibited We use virus scanning software but disclaim any liability for viruses or other devices which remain in this message or any attachments

Ce message, ainsi que toute piece jointe, est exclusivement adresse au(x) destinataire(s) nomme(s) et peut contenir des informations confidentielles Si vous recevez ce message par erreur, merci de le detruire et d'en avertir immediatement l'emetteur Toute copie, transmission ou divulgation, integrale ou partielle, par une personne qui n'est pas nommee comme destinataire est interdite Nous utilisons un logiciel anti-virus mais nous denions toute responsabilite au cas ou des virus, ou tout autre procede, seraient contenus dans ce message ou toute piece jointe

This message and any attachments is intended for the named addressee(s) only and may contain information that is privileged and/or confidential If you receive this message in error, please delete it and immediately notify the sender. Any copying, dissemination or disclosure, either whole or partial, by a person who is not the named addressee is prohibited We use virus scanning software but disclaim any liability for viruses or other devices which remain in this message or any attachments

Ce message, ainsi que toute piece jointe, est exclusivement adresse au(x) destinataire(s) nomme(s) et peut contenir des informations confidentielles Si vous recevez ce message par erreur, merci de le detruire et d'en avertir immediatement l'emetteur. Toute copie, transmission ou divulgation, integrale ou partielle, par une personne qui n'est pas nommee comme destinataire est interdite Nous utilisons un logiciel anti-virus mais nous denions toute responsabilite au cas ou des virus, ou tout autre procede, seraient contenus dans ce message ou toute piece jointe

# Exhibit G

**Barry Golden**

**Subject:** FW: Nalco Corsicana, TX
**Attachments:** 20170517155819071.pdf

**From:** "Stephens, Andrew" <andrew.stephens@solvay.com>
**Date:** May 17, 2017 at 3:58:19 PM CDT
**To:** Mike Blanchard <m.blanchard@cccob.com>
**Subject: Nalco Corsicana, TX**

Mike

I am really trying to stay neutral in all this...and this load is a prepaid load...I chose CCC...However, they are asking me to tender this to them over at transwood.

I explained to them that I am honoring my commitment to CCC since that is whom I tendered it to.

So I don't know who is handling your dispatching now, but make sure they know which loads I was already promised for pick up

I need to know that you have this load on your books to pick up from us on the 20th @ 11am

see the tender

the pick up # 1100396079

confirm back to me please

This message and any attachments is intended for the named addressee(s) only and may contain information that is privileged and/or confidential If you receive this message in error, please delete it and immediately notify the sender Any copying, dissemination or disclosure, either whole or partial, by a person who is not the named addressee is prohibited We use virus scanning software but disclaim any liability for viruses or other devices which remain in this message or any attachments
..............................

Ce message, ainsi que toute piece jointe, est exclusivement adresse au(x) destinataire(s) nomme(s) et peut contenir des informations confidentielles Si vous recevez ce message par erreur, merci de le detruire et d'en avertir immediatement l'emetteur. Toute copie, transmission ou divulgation, integrale ou partielle, par une personne qui n'est pas nommee comme destinataire est interdite Nous utilisons un logiciel anti-virus mais nous denions toute responsabilite au cas ou des virus, ou tout autre procede, seraient contenus dans ce message ou toute piece jointe.

# Exhibit H



TransWood, Inc.
2565 St. Mary's Avenue
Omaha, NE 68105
Fax: 918-526-1441 (Alt: 918-748-3955)

# Fax Verification Request

Date: 05/22/17 2:34 pm

**To:** Coal City Cob
**From:** Whitney Kearney (driver_hr@transwood.com)
**RE:** Christian Russell -- XXX-XX-[redacted]

**Please return this cover sheet or page two with your response. We use the barcode to identify the driver in our system. Thank you!**

**Notes:**

ADDL INFO: Start Date: 2014-06-01

We have your fax # as 972-923-7599. Please email us if you'd prefer that we use a different number for verifications.

tenstreet
Hire Drivers Faster and Easier
Go Paperless, Better Compliance

**Our main fax is 918-526-1441. It works perfectly for almost all senders. You should always connect - we never have busy signals. If you do have issues, however, please try an alt number (918-748-3955, 267-535-5059, 918-295-8588). These numbers use different long-distance carriers between you and us that may route more cleanly for your particular fax machine. If you continue to have issues, email fax@tenstreet.com. We can usually help.**

fax@tenstreet.com www.tenstreet.com sales@tenstreet.com
pri3663245 support@tenstreet.com

## Employment/Lease Verification

TX12193946

TransWood, Inc.
2565 St. Mary's Avenue
Omaha, NE 68105
Phone: 800-366-3415
Fax: 918-526-1441 (Alt: 918-748-3955)

**Driver:** Christian Russell SSN: XXX-XX-[redacted] Date: 05/22/2017 2:34pm

**Company:** Coal City Cob
Schererville, IN

**Period of Service Detail:**
Start Date 1: ______ Start 2: ______ Start 3: ______ Miles / week: ____
End Date 1: ______ End 2: ______ End 3: ______ Hours / week: ____

Position(s) Held: ______ Reason(s) for Leaving ______

**Driver Class:** Company: ____ Lease: ____ Own/Op: ____ Other: ____

**Type:** Solo: ____ Team: ____ Student: ____ Other: ____

**Truck:** Tractor-Trailer: ____ Straight Truck: ____ Tanker: ____ Other: ____

**Subject to FMCSRs?** Yes: ____ No: ____

**Subject to DOT D&A?** Yes: ____ No: ____

**Eligible for rehire?** Yes ____ No ____ Review ____

**Terminated / Discharged?** Yes ____ No ____

**Experience:** Flatbed ____ Van ____ Reefer ____ Intermodal ____ Snow / Ice ____ Tanker ____ Other ____

**Responsible for maintaining logs?** Yes ____ No ____

**Area Driven:** OTR ____ Regional ____ Local ____ Other ____

# of states driven: ____

**Loads Hauled:** ______ **Trailer Length:** ______

**Accidents:** If none, check: ☐ # Preventable: ____ # Non-Preventable: ____ # DOT Reportable: ____
If more space is needed, please attach an additional sheet:

| Date | City, State / Description | #Fatalities | #Injuries | Hazmat? | Preventable? |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

**Drug and Alcohol** (to be accompanied by an appropriate drug and alcohol release)

In the three years prior to the date of the employee's signature (on the release), for DOT-regulated testing:

1 Did the employee have alcohol tests with a result of 0.04 or higher? Yes No
2 Did the employee have verified positive drug tests? Yes No
3 Did the employee refuse to be tested? Yes No
4 Did the employee have other violations of DOT agency drug and alcohol testing regulations? Yes No
5 Did a previous employer report a drug and alcohol rule violation to you? Yes No
6 If you answered "yes" to any of the above items, did the employee complete the return-to-duty process? N/A Yes No

NOTE: If you answered "yes" to item 5, you must provide the previous employer's report. If you answered "yes" to item 6, you must also transmit the appropriate return-to-duty documentation (e.g., SAP report(s), follow-up testing record).

Info provided by (Signature): ______ Title, Date ______ Phone ______

Printed Name ______ Email ______ Company DOT # ______

Comments: ______

**Request/Consent for Information from Previous Employer(s)/Carrier(s) For Alcohol and Controlled Substances Testing Records**
**And changes in Parts 390 and 391 of the FMCSA**

X 05-17-2017
Date

X [redacted]
Social Security Number

Christian D Russell
7214 S Prairie Avenue
Chicago, IL 60619
312-607-0209
Gender:

X **Christian D Russell**
Print Name (First, MI, Last)

X [signature]
Signature

I, the above mentioned signer, hereby authorize | Coal City Cob |

To release and forward in accordance with the following regulation, all known information pertaining to my alcohol and controlled substances testing/training records to TransWood, Inc.

## DISCLOSURE AND RELEASE

In accordance with DOT Regulation 49 CFR Part 391.23, I authorize the release of information from my DOT regulated drug and alcohol testing records by the carriers (company/school) listed above to Transwood, Inc., or to HireRight for the sole purpose of transmitting such records to Transwood, Inc.. I authorize release of the following information concerning DOT drug and alcohol testing violations including pre-employment tests during the past three years: (i) alcohol tests with a result of 0.04 or higher; (ii) verified positive drug tests; (iii) refusals to be tested (including verified adulterated or substituted results); (iv) other violations of DOT drug and alcohol testing regulations; (v) information obtained from previous employers of a drug and alcohol rule violation(s); and (vi) documents, if any, of completion of a return-to-duty process following a rule violation. I also authorize the carriers (company/school) listed above to release information about names and dates of previous employers, reasons for termination of employment, work experience, accidents, academic history, professional credentials and other information.

The information that I have authorized Transwood, Inc. or HireRight to review involves tests required by DOT. If any carrier (company/school) listed above furnishes Transwood, Inc. or HireRight with information concerning items (i) through (vi) above, I also authorize that carrier (company/school) to release and furnish the dates of my negative drug and/or alcohol tests and/or tests with results below 0.04 during the three-year period and the name and phone number of any substance abuse professional who evaluated me during the past three years.



TransWood

TransWood, Inc.
2565 St. Mary's Avenue
Omaha, NE 68105
Fax: 918-526-1441 (Alt: 918-748-3955)

# Fax Verification Request

Date: 05/22/17 2:32 pm

To: Coal City Cob
From: Whitney Kearney (driver_hr@transwood.com)
RE: Rashid Malik -- XXX-XX-[redacted] ([redacted]

**Please return this cover sheet or page two with your response. We use the barcode to identify the driver in our system. Thank you!**

**Notes:**

ADDL INFO: Start Date: 2016-11-01

We have your fax # as 972-923-7599. Please email us if you'd prefer that we use a different number for verifications.

tenstreet
Hire Drivers Faster and Easier
Go Paperless, Better Compliance

**Our main fax is 918-526-1441. It works perfectly for almost all senders. You should always connect - we never have busy signals. If you do have issues, however, please try an alt number (918-748-3955, 267-535-5059, 918-295-8588). These numbers use different long-distance carriers between you and us that may route more cleanly for your particular fax machine. If you continue to have issues, email fax@tenstreet.com. We can usually help.**

fax@tenstreet.com www.tenstreet.com sales@tenstreet.com
pri3683245 support@tenstreet.com

## Employment/Lease Verification

TransWood, Inc.
2565 St. Mary's Avenue
Omaha, NE 68105
Phone: 800-366-3415
Fax: 918-526-1441 (Alt: 918-748-3955)

TX12193913

**Driver:** Rashid Malik SSN: XXX-XX[redacted] Date: 05/22/2017 2:32pm

**Company:** Coal City Cob
Schererville, IN

**Period of Service Detail:**

Start Date 1: ______ Start 2: ______ Start 3: ______ Miles / week: ______

End Date 1: ______ End 2: ______ End 3: ______ Hours / week: ______

Position(s) Held: ______ Reason(s) for Leaving ______

**Driver Class:** Company: ___ Lease: ___ Own/Op: ___ Other: ___

**Type:** Solo: ___ Team: ___ Student: ___ Other: ___

**Truck:** Tractor-Trailer: ___ Straight Truck: ___ Tanker: ___ Other: ___

**Subject to FMCSRs?** Yes: ___ No: ___

**Subject to DOT D&A?** Yes: ___ No: ___

**Eligible for rehire?** Yes ___ No ___ Review ___

**Terminated / Discharged?** Yes ___ No ___

**Experience:** Flatbed ___ Van ___ Reefer ___ Intermodal ___ Snow / Ice ___ Tanker ___ Other ___

**Responsible for maintaining logs?** Yes ___ No ___

**Area Driven:** OTR ___ Regional ___ Local ___ Other ___

# of states driven: ___

**Loads Hauled:** ______ **Trailer Length:** ______

**Accidents:** If none, check: ☐ # Preventable: ___ # Non-Preventable: ___ # DOT Reportable: ___

If more space is needed, please attach an additional sheet:

| Date | City, State / Description | #Fatalities | #Injuries | Hazmat? | Preventable? |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

**Drug and Alcohol** (to be accompanied by an appropriate drug and alcohol release)

In the three years prior to the date of the employee's signature (on the release), for DOT-regulated testing:

1 Did the employee have alcohol tests with a result of 0.04 or higher? Yes No

2 Did the employee have verified positive drug tests? Yes No

3 Did the employee refuse to be tested? Yes No

4 Did the employee have other violations of DOT agency drug and alcohol testing regulations? Yes No

5 Did a previous employer report a drug and alcohol rule violation to you? Yes No

6 If you answered "yes" to any of the above items, did the employee complete the return-to-duty process? N/A Yes No

NOTE: If you answered "yes" to item 5, you must provide the previous employer's report. If you answered "yes" to item 6, you must also transmit the appropriate return-to-duty documentation (e.g., SAP report(s), follow-up testing record).

Info provided by (Signature): ______ Title, Date ______ Phone ______

Printed Name ______ Email ______ Company DOT # ______

Comments: ______

Request/Consent for Information from Previous Employer(s)/Carrier(s) For Alcohol and Controlled Substances Testing Records
And changes in Parts 390 and 391 of the FMCSA

X 05-17-2017
Date

X [redacted]
Social Security Number

Rashid Malik
8521 Drake Avenue
Skokie, IL 60076
207-313-7999
Gender:

X Rashid Malik
Print Name (First, MI, Last)

X
Signature

I, the above mentioned signer, hereby authorize | Coal City Cob |

To release and forward in accordance with the following regulation, all known information pertaining to my alcohol and controlled substances testing/training records to TransWood, Inc.

## DISCLOSURE AND RELEASE

In accordance with DOT Regulation 49 CFR Part 391.23, I authorize the release of information from my DOT regulated drug and alcohol testing records by the carriers (company/school) listed above to Transwood, Inc., or to HireRight for the sole purpose of transmitting such records to Transwood, Inc.. I authorize release of the following information concerning DOT drug and alcohol testing violations including pre-employment tests during the past three years: (i) alcohol tests with a result of 0.04 or higher; (ii) verified positive drug tests; (iii) refusals to be tested (including verified adulterated or substituted results); (iv) other violations of DOT drug and alcohol testing regulations; (v) information obtained from previous employers of a drug and alcohol rule violation(s); and (vi) documents, if any, of completion of a return-to-duty process following a rule violation. I also authorize the carriers (company/school) listed above to release information about names and dates of previous employers, reasons for termination of employment, work experience, accidents, academic history, professional credentials and other information.

The information that I have authorized Transwood, Inc. or HireRight to review involves tests required by DOT. If any carrier (company/school) listed above furnishes Transwood, Inc. or HireRight with information concerning items (i) through (vi) above, I also authorize that carrier (company/school) to release and furnish the dates of my negative drug and/or alcohol tests and/or tests with results below 0.04 during the three-year period and the name and phone number of any substance abuse professional who evaluated me during the past three years.

# Exhibit I

**Barry Golden**

**Subject:** FW: Concerns
**Attachments:** 20170322182556178.pdf

**From:** Sharon Frank [mailto:s.frank@cccob.com]
**Sent:** Wednesday, March 22, 2017 6:11 PM
**To:** RNikodym@transwood.com
**Cc:** sharoncccob@gmail.com
**Subject:** Concerns

Roger—Per our phone conversation today, I have read through the contract and had the following concerns:

1. Accounts Receivable requirements. My thought is that I don't want to take the time to be chasing after invoice payment on a routine basis, as I feel my time is better spent running the terminal. I am happy to step in when there is a problem that the "back office" folks have, but routinely seems excessive to me. As far as charge backs go, my thought is that customers are vetted through your TransWood. If they aren't paying, that should not be my responsibility. However, if there are issues with incorrect billings that result in charge backs, that is understandable.
2. Insurance deductible is very high. Currently, I am paying $2000 to $2500.
3. Trailer procedures. I'm not sure how you envision this, but currently, we are constantly swapping trailers with other terminals that come to this area and need a different trailer (rear vs. center, no time to wash, bad prior, etc). In addition, these are used trailers that will have all manner of normal wear and tear. I can't imagine a way for me to pay all maintenance for trailers assigned that would be fair to all concerned. I am in favor of a mileage charge in the area of 5 cents per mile for maintenance. That would ensure adequate maintenance and a fair way to charge.
4. There is a possibility that Cob will initiate legal proceedings to challenge the non-compete language. I have already provided you with my attorneys assessment of this, however that may not stop them from trying. It could very well include TransWood being named. As I said earlier, my attorney feels we have a solid basis for winning. What is TransWood's position on this? Will they assist with legal representation if this happens? I think it best to face this possibility now, rather than muddle through it later.

I have attached my current contract with Cob. The schedules are the only ones ever done and some predate the last contract. They were never properly completed. The "Schedule B" is the one Kurt Vragel refers to in his opinion.

**Sharon J. Frank**

Coal City Cob Company, Inc

Indiana Terminal:
1060 Kennedy Avenue
Schererville, IN 46375
219.836.7815
219.836.7820 Fax
708.878.4161 Cell
s.frank@cccob.com

# Exhibit J

# MILLER, EGAN, MOLTER & NELSON LLP

May 16, 2017

Kurt E. Vragel, Jr.
Kurt E. Vragel, Jr. P.C.
1701 East Lake Ave., Suite 170
Glenview, Illinois 60025.

*Via Email*

**Re: Palm Enterprises – Violation of Affiliate Agreement with Coal City Cob**

Dear Mr. Vragel:

My firm represents Coal City Cob Company, Inc. ("Carrier"). I am in receipt of your May 15, 2017 e-mail on behalf of Palm Enterprises, Inc. ("Affiliate") to Steve Barnish and Bo Littleton entitled "5-DAY NOTICE OF TERMINATOIN – PALM ENTERPRISES, INC." Your e-mail purports to invoke paragraph 14 of the February 3, 2014 Affiliate Agreement between Carrier and Affiliate ("Affiliate Agreement") entitled "Termination" ("Termination Provision"). Please direct all future correspondence regarding the Affiliate Agreement, the Termination Provision, or anything involving either to me.

By invoking the Termination Provision from the Affiliate Agreement, it is obvious that that Affiliate is aware of the Affiliate Agreement and its various legal obligations derived from it. Thus, I would like to call your attention to paragraph 12 of the Affiliate Agreement—two paragraphs up from the Termination Provision—entitled "Non-Competition; Non-Solicitation" ("Customer Theft Provision").

The Customer Theft Provision provides, in relevant part, that Affiliate shall not, for a period of thirty-six months following the invocation of the Termination Provision, "contact or otherwise solicit, either directly or indirectly, any Designated Customer for the purpose of selling, performing, marketing, or otherwise transacting transportation, freight hauling, and/or services of the type performed under this Agreement."

Carrier has learned that, while still employed by Carrier (and through Carrier's e-mail and server) Affiliate negotiated employment with a competitor company, TransWood Carriers, Inc. ("TransWood"). Carrier has also learned that through its employment with TransWood (and while still also employed by Carrier), Affiliate illegally and improperly contacted or otherwise solicited Kemira for selling, performing, marketing, or otherwise transacting transportation, freight hauling, and/or services of the type performed under the Affiliate Agreement ("Kemira Solicitation).

Carrier has further learned that Affiliate has, in fact, begun performing those services for Kemira ("Kemira Services").

Of course, none of this should come as a surprise to Affiliate. On March 22, 2017, Affiliate wrote and e-mail to TransWood (again, while still employed by Carrier and using her Carrier e-mail address and server), stating, in relevant part:

> There is a possibility that Cob will initiate legal proceedings to challenge the non-compete language. I have already provided you with my attorneys [sic] assessment of this, however that may not stop them from trying. It could very well include TransWood being named. As I said earlier, my attorney feels we have a solid basis for winning. What is TranWood's position on this? Will they assist with legal representation if this happens? I think it best to face this possibility now, rather than muddle through it later.

The Affiliate's e-mail continues by stating that Affiliate attached its current contract with Carrier and "[t]he 'Schedule B' is the one Kurt Vragel refers to in his position."

Presumably, your opinion is that Kemira is not a Designated Customer for which Affiliate is precluded from soliciting and servicing. Carrier would disagree. Paragraph 1(e) of the Affiliate Agreement defines "Designated Customer" to include any Carrier customer identified on Exhibit B of the Affiliate Agreement ***or*** any customer for which Affiliate "renders or has rendered transportation services during the term of this Agreement." While Kemira may not be identified on Exhibit B of the Affiliate Agreement, Kemira is certainly a customer for which Affiliate rendered transportation services during the term of the Affiliate Agreement. Accordingly, the Kemira Solicitation and performance of the Kemira Services directly violated (and continues to violate) the Customer Theft Provision of the Affiliate Agreement.

As a side (and somewhat ironic) note, on March 17, 2017 (and, once more, while still employed by Carrier and using carrier's e-mail and server), Affiliate entered into a "Mutual Non-Disclosure Agreement" with TransWood, through which Affiliate agreed that for two years after termination from TransWood, Affiliate would not "solicit the business of any specific traffic lane disclosed to the other party, by virtue of this Agreement." In other words, Affiliate—while currently violating the Customer Theft Provision with Carrier—entered into an agreement with a competitor making the same type of covenant.

In any event, the Customer Theft Provision sets forth remedies for violations such as the Kemira Solicitation and performance of the Kemira Services. Specifically, the Customer Theft Provision provides, in relevant part:

> AFFILIATE acknowledges that, in the event of a breach or violation of [the Customer Theft Provision], AFFILIATE'S conduct will cause damages of an irreparable and continuing nature to CARRIER, for which money damages will not

> provide adequate relief. Therefore, AFFILIATE agrees that in addition to any money damages CARRIER may be entitled to recover, CARRIER also is entitled to obtain an injunction (including but not limited to a temporary restraining order) for the remainder of the period specified in the restrict covenant which AFFILIATE breached.

Additionally, paragraph 32 of the Affiliate Agreement entitled "Attorneys' Fees" provides that a prevailing party in an action to enforce provisions such as the Customer Theft Provision, "will be entitled to attorneys' fees, costs and expenses, in addition to any other relief to which such party may be entitled."

Finally, paragraph 25 of the Affiliate Agreement entitled "Governing Law; Venue" states that litigation such as for violation of the Customer Theft Provision must be prosecuted in Ellis County, Texas. In other words, unless Affiliate complies with the following demands, Affiliate should expect to be named as a defendant in a lawsuit in Ellis County, Texas, through which Carrier will be seeking damages, injunctive relief (including a temporary restraining order), attorneys' fees, costs, and other available remedies.

Accordingly, Carrier demands that Affiliate and its principals, employees, affiliate, and agents:

- Immediate cease further Kemira Solicitation;
- Immediately cease performing the Kemira Services;
- Within seven (7) days of the date of this letter, provide a statement in writing that Affiliate has complied with the aforementioned demands; and
- Within seven (7) days of the date of this letter, provide an accounting of all revenues related to the Kemira Services.

Moreover, please be advised that this letter constitutes notice to Affiliate that Carrier anticipates the prospect of seeking recourse through litigation. Accordingly, Affiliate and its principals, employees, affiliates, and agents are subject to a legal obligation to preserve all information, documents, data, and things relating to this matter. That obligation includes preserving all electronic data and storage media, including but not limited to laptops, desktops, hard drives, flash drives, temporary files, cookies, browser history, programs, program information, source code, metadata, user-identification profiles, device information, server records, and server logs. Failure to preserve such information, documents, data, and things violates Affiliate's legal obligations under all applicable laws related to the preservation of documents and electronic data and it can subject Affiliate to sanctions in a court of law

Within seven (7) days of the date of this letter, please confirm in writing that Affiliate has taken all appropriate steps to preserve information, and that this letter and preservation notice have been

shared with all relevant Affiliate principals, employees, affiliates, and agents, including, but not limited to Sharon J. Frank (President and Secretary of Affiliate), Stacy C. Frank (Incorporator of Affiliate), Desi Weaver, Jim Hays, Jim Mitchell, Mark Rose, Marty King, Rick Rodriguez, Stanley Boyd, Tony Wieszkowiak, Sharon Peterson, and Eve Deluca. Carrier has invested heavily in creating its customer list and developing and maintaining its customer relationships, including its relationship with Kemira, and Carrier will enforce its right if necessary. **We look forward to your response within 7 days, which is May 23, 2017.**

Nothing contained in or omitted from this letter is intended to waive any of Carrier's rights, claims, remedies, or causes of action against Affiliate, its corporate officers, employees, contractors, or agents, or the same with respect to TransWood. To the contrary, Carrier expressly reserves all such rights, remedies, and causes of action, whether at law or in equity.

Regards,

Barry Golden

cc: Steve Barnish (via e-mail)

# TAB

# 2

ORIGINAL

FILED FOR RECORD 2017 JUN -7 PM 2:26 MELANIE REED DISTRICT CLERK ELLIS COUNTY, TX

CAUSE NO. 96285

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC., | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| v. | § | ELLIS COUNTY, TEXAS |
| PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR) | § | |
| Defendants. | § | 443RD JUDICIAL DISTRICT |

**TEMPORARY RESTRAINING ORDER AND**
**ORDER PERMITTING EXPEDITED DISCOVERY**

On this 7 day of June 2017, Plaintiff Coal City Cob Company, Inc. ("Coal City") presented its Verified Original Petition and Application for Temporary Restraining Order to this Court ("Verified Petition").

Having reviewed the Verified Petition and the associated evidence, the Court concludes that Coal City and the Defendants were parties to a February 3, 2014 Affiliate Agreement ("Affiliate Agreement"). Under the Affiliate Agreement, the Defendants agreed not to (1) misappropriate Coal City's confidential information, (2) solicit Coal City's customers to transfer their business away from Coal City, or (3) solicit Coal City's contractors and employees, including drivers, to quit working for Coal City and work elsewhere. Coal City has alleged that the Defendants violated all three provisions, and if not restrained, will continue doing so. The Court agrees. There is sufficient evidence demonstrating a likelihood of success on the merits for Palm in its claims against the Defendants for breach of contract, tortious interference with existing contracts, civil conversion, Texas Theft Liability Act, and/or Texas Uniform Trade Secrets Act. The Court has seen sufficient evidence that absent a temporary restraining order, the Defendants will continue violating these provisions of the Affiliate Agreement, and such violations will cause

Coal City to experience irreparable harm and that such harm is probable, imminent, and irreparable. Coal City has demonstrated that the injuries suffered by the Defendants are irreparable because they cannot be accurately measured or compensated through monetary damages. Coal City has shown that the Defendants' conduct, should it go unrestrained and enjoined, will cause harm to Coal City's operations and sales and will cause an impact on revenue and profitability that are impossible to quantify with a specific pecuniary standard. Coal City has shown that it is entitled to a temporary restraining order because it is already suffering harm and will continue to suffer harm before notice can be served and a hearing may be held.

IT IS THEREFORE ORDERED that based on the evidence contained in the Verified Petition, Coal City's application for temporary restraining order against the Defendants is GRANTED.

IT IS FURTHER ORDERED that for fourteen (14) days from the dates of this Order (the "TRO Period"), the Defendants restrained and enjoined from disseminating proprietary information and trade secrets of Coal City including, without limitation, its services, products, customer information, processes, sales information, know-how, practice, policies, and other confidential information which is considered proprietary or secret by Coal City, including without limitation, City's information about its finances, customer rates, customer identifications, customer lanes, and information about valuable Coal City employees (including names, addresses, e-mail addresses, and phone numbers).

IT IS FURTHER ORDERED that during the TRO Period, the Defendants shall not solicit or haul freight for the following Coal City customers on the following customer lanes: (a) Tradebe Treatment & Recycling, LLC ("Tradebe") – East Chicago, IN to Logansport, IN, (b) Tradebe – East Chicago, IN to Greencastle, IN; (c) Tradebe – East Chicago, IN to Paulding, OH, (d) Kemira Chemicals, Inc. ("Kemira")– East Chicago, IN to Millington, TN, (e) Kemira – Butler, IN to East

Chicago, IN; (f) Kemira – Jeffersonville, IN to East Chicago, IN, (g) Solvay USA, Inc – University Park,, ILL to Knoxville, TN; (h) Solvay – University Park, IL to Murray, KY, (i) Solvay – University Park, IL to Corsicana, TX, (j) Solvay – University Park, IL to Saint Louis, MO, (k) Solvay – University Park, IL to Kilgore, TX, (l) Nalco-Champion ("Nalco") – University Park, IL to Kilgore, TX, (m) Nalco – University Park, IL to Centerville, TX, (n) Nalco – University Park, IL to Hebbronville, TX, (o) Harcross Chemicals, Inc. – Lima, OH to Dallas, TX, (p) Harcross - University Park, IL to Longview, TX, (q) Harcross - University Park, IL to Sibley, LA, (r) Harcross - Houston, TX to Dallas, TX, (s) Harcross - University Park, IL to Dallas, TX; (t) Harcross - Winder, GA to Longview, TX; (u) Harcross – Winder, GA to Sibley, LA, (v) Harcross - University Park, IL to Pasadena, TX, and (w) Univar USA, Inc. – Charleston, SC to North Charleston, South, SC (collectively, the "Customer Lanes"). During the TRO Period, the Defendants are expressly prohibited from hauling freight for these customers on the Customer Lanes by use of vehicles containing the following VIN numbers: (1) 1XPBD49X7FD308061, (2) 1XPBD49X7GD308062, (3) 1XPBD49X9GD308063, (4) 1XPBD49X0GD308064, (5) 1XPBD49X2GD308065, (6) 1XPBD49X4GD308066, (7) 1XKDD49X8DJ334908, or (8) 4V4NC9EH4EN164270.

IT IS FURTHER ORDERED that during the TRO Period, the Defendants (and anyone acting in concert with the Defendants, including TransWood Carriers, Inc.) may not dispatch Rashid Malik, Christian Russell, James Uribe, or Eric Holder (the "Drivers") to haul freight on the Customer Lanes. The Defendants are expressly prohibited from facilitating the hauling of freight for these customers on the Customer Lanes by use of the vehicles owned or operated by the Driver containing the following VIN numbers: (1) M1AW07Y0FM046539), (2) 5KJJABCK15PN82105), (3) 1XP5D49XX7N679837, (4) 1XKADB9X47J156443, or (5) 2WKEDDJJ4YK965013).

IT IS FURTHER ORDERED that in addition to being binding on the Defendants, this temporary restraining order is also binding upon Palm's agents, servants, attorneys (collectively, "Agents") and anyone acting in concert or participation with Palm or any of the Agents who receive actual notice of this temporary restraining order, including without limitation, TransWood Carriers, Inc.

IT IS FURTHER ORDERED that the parties in the above-styled case shall appear before this Court on the 20th day of June at 8:30 o'clock A.m. for a temporary injunction hearing.

IT IS FURTHER ORDERED that without waiver of six-hour depositions on the merits during the regular discovery period and without notice requirements otherwise required under merits discovery, during the TRO period, Coal City may take depositions as follows (collectively, the "Expedited Depositions"): (a) a corporate representative of Palm Enterprises, Inc. and Sharon Frank (limited to four hours on the record, collectively), (b) a corporate representative of TransWood and Roger Nikodym (limited to three hours on the record, collectively), and (d) Rashid Malik, Christian Russell, Eric L. Holder, and James P. Uribe (limited to six hours on the record, collectively).

IT IS FURTHER ORDERED that at least two business days prior to the Expedited Depositions, the deponents each produce a copy of all e-mails (and attachments) since March 1, 2017 between (a) Sharon Frank (through her Coal City e-mail address or through her personal e-mail address), on the one hand and (b) the deponent (or in the case of the TransWood corporate representative, anyone with a TransWood e-mail address), on the other hand

The Clerk of this Court shall issue, without bond or any other securing, a temporary restraining order in conformity with the law and the terms of this Order.

The temporary restraining order is immediately effective upon the Court's signature as Palm has waived the requirement of a bond. Subject to further order of this Court, this temporary

restraining order expires at the close of the above-referenced hearing on the 20th day of June 2017.

**NOTICE – a violation of this Temporary Restraining Order can result in contempt of court, which is punishable by jail time, or a fine/sanction, or both jail time and a fine/sanction.**

SIGNED this 7 day of June 2017, at 2:05 o'clock p.m.

# TAB

# 3

ORIGINAL

FILED FOR RECORD 2017 JUN -7 PM 2:26 MELANIE REED DISTRICT CLERK ELLIS COUNTY, TX

CAUSE NO. 96285

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC., | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| v. | § | ELLIS COUNTY, TEXAS |
| | § | |
| PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR) | § | |
| | § | |
| Defendants. | § | 443rd JUDICIAL DISTRICT |

**PROTECTIVE ORDER**

The Court hereby enters this Protective Order containing the following terms:

1. **Confidential Information**. "Confidential Information" shall mean information received by a party (the "Receiving Party") whose dissemination to the public would most likely cause direct financial harm to the party disclosing the information (the "Producing Party"). Confidential Information shall not be considered Confidential Information under any or all the following conditions:

a. **Information Available to Public**. Information shall not be considered "Confidential Information" if it is available to the public at the time that the Producing Party provides it to the Receiving Party, or if it becomes available to the public after the time that the Producing Party provides it to the Receiving Party through no fault of the Receiving Party; or

b. **Information in Possession of Receiving Party**. Information shall not be considered "Confidential Information" if it is in the possession of the Receiving Party at the time the Producing Party provides it to the Receiving Party, or if it comes into the possession of the Receiving Party through a third-party (with authority to provide the

information to the Receiving Party) after the time that the Producing Party provides it to the Receiving Party.

2. **Qualified Persons**: Nothing in this Protective Order shall prevent a Producing Party from using or disclosing, as it alone sees fit, its *own* information and documents that it marked "Confidential" pursuant to this Protective Order. Any such use or disclosure shall not constitute a waiver of any rights of the Producing Party under this Protective Order or relieve a Receiving Party of any duties or obligations under this Protective Order (except to the extent of the provisions in paragraphs 1.a. and 1.b.). In that connection, a Receiving Party shall be prohibited from disseminating any Confidential Information or providing any Confidential Information to any individuals except to the following individuals that shall collectively be referred to as "Qualified Persons."

a. **Receiving Party's Inside Personnel**: Qualified Persons shall include officers, directors, managers, members, partners, or employees of a Receiving Party or its affiliates, provided that the duties and responsibilities of each such individual require access to Confidential Information for purposes of assisting the Receiving Party or counsel for the Receiving Party in this lawsuit (although the failure by any of these individuals to comply fully with this Protective Order shall be deemed as a failure by the Receiving Party, for which the Receiving Party shall be held accountable);

b. **Receiving Party's Outside Counsel**: Qualified Persons shall include a Receiving Party's undersigned counsel in this lawsuit, and such undersigned counsel's partners, associates, paralegals, and other legal staff, as well as outside vendors retained by the undersigned counsel for purposes of creating and managing document databases, retrieving, and organizing documents, copying documents, preparing charts and demonstratives, and similar document-related activities;

    c. **Receiving Party's Experts and Consultants**: Qualified Persons shall include a Receiving Party's outside testifying experts or non-testifying consultants (and their respective staff) retained to assist the Receiving Party in this lawsuit (although the failure by any of these individuals to comply fully with this Protective Order shall be deemed as a failure by the Receiving Party, to which the Receiving Party shall be held accountable);

d. **Third-Party Deponents**: Qualified Persons shall include third-party deponents and their respective counsel of record in connection with the above-styled lawsuit;

e. **Court Personnel**: Qualified Persons shall include the Court, including any mediator, court reporter or other Court personnel assigned, appointed, retained, or employed by the Court and/or the Court in connection with the above-styled lawsuit; and

f. **Source of the Document or Information**: Qualified Persons shall include the author, source, or recipient (other than in the course of this lawsuit) of the Confidential Information.

3. **AEO Information**. "AEO Information" shall mean Confidential Information received by the Receiving Party's counsel whose dissemination to the Receiving Party (*i.e.*, the client) would most likely cause direct financial harm to the Producing Party (*e.g.*, trade-secret information). In that connection, a Receiving Party shall be prohibited from disseminating any AEO Information or providing any AEO Information except for the individuals listed in paragraphs 2(b-c) and (e-f) of this Protective Order.

4. **Designation**. A Producing Party may indicate that a *document* contains Confidential Information or AEO Information by marking at the bottom of each page of the document the word "Confidential" or "AEO" (as the case may be). To the extent the document is an electronic document produced in native format, the Producing Party shall include the words                                                

"Confidential" or "AEO" (as the case may be) in the file name of the document and shall also transmit a cover letter along with the native document setting forth the location of the Confidential Information or AEO Information within the native document. A Producing Party may indicate that *testimony* contains Confidential Information or AEO Information by designating such testimony (a) to the court reporter and all counsel present during the testimony on the record ("Attendees"), or (b) by specifying in writing to the Attendees the pages and lines of the transcript containing the Confidential Information or AEO Information, within 30 days after the court reporter first transmits a copy of the transcript ("Confidentiality Designations" or "AEO Designations (as the case may be)). After the expiration of the 30 days for the Confidentiality Designations or AEO Designations, any testimony not designated shall be treated thereon as not Confidential Information or AEO Information. A party that inadvertently produces a document containing Confidential Information or AEO Information without the appropriate designations is not deemed to have waived any of its/his/her rights under this Protective Order and may request the destruction of the undesignated document by notifying the Receiving Party of the inadvertent disclosure and providing a replacement document containing the designation, at which point, the Receiving Party shall destroy (and cause each Qualified Person under its control to destroy) the undesignated document and any documents, information or material derived from or based thereon.

5. **Third Party Invocation.** Any non-party requested or required to produce or disclose Confidential Information or AEO Information may designate such information pursuant to the terms of this Protective Order. Thus, for purposes of the expedited discovery prior to the temporary-injunction hearing, third parties (as well as the Defendants) may not delay the production of documents or testimony based on an objection of confidentiality.

6. **Mandatory Destruction.** All Confidential Information and AEO Information will remain the property of the Producing Party and the Receiving Party will not acquire any rights in

the Confidential Information or AEO Information. Within one hundred twenty days after the entry of a final order, each Receiving Party shall destroy (and cause each Qualified Person under its control to destroy) all documents containing Confidential Information or AEO Information, including all documents, information or material derived from or based thereon, except the Receiving Party's counsel of record, which may maintain documents containing Confidential Information or AEO Information solely for the counsel's files, and not to be shared with clients or third parties or otherwise used in any commercial manner.

7. **Effective Date.** This Order shall continue in effect unless and until amended by a later order of the Court.

SIGNED this 7 day of June 2017.

JUDGE PRESIDING

# TAB

# 4

Filed 6/16/2017 5:47 PM
Melanie Reed
District Clerk
Ellis County, Texas

Representing Management Exclusively in Workplace Law and Related Litigation

Jackson Lewis P.C.
500 North Akard
Suite 2500
Dallas, Texas 75201
Tel 214 520-2400
Fax 214 520-2008
www.jacksonlewis.com

ALBANY, NY | GREENVILLE, SC | MONMOUTH COUNTY, NJ | RALEIGH, NC | ALBUQUERQUE, NM | HARTFORD, CT | MORRISTOWN, NJ | RAPID CITY, SD | ATLANTA, GA | HONOLULU, HI* | NEW ORLEANS, LA | RICHMOND, VA | AUSTIN, TX | HOUSTON, TX | NEW YORK, NY | SACRAMENTO, CA | BALTIMORE, MD | INDIANAPOLIS, IN | NORFOLK, VA | SALT LAKE CITY, UT | BIRMINGHAM, AL | JACKSONVILLE, FL | OMAHA, NE | SAN DIEGO, CA | BOSTON, MA | KANSAS CITY REGION | ORANGE COUNTY, CA | SAN FRANCISCO, CA | CHICAGO, IL | LAS VEGAS, NV | ORLANDO, FL | SAN JUAN, PR | CINCINNATI, OH | LONG ISLAND, NY | PHILADELPHIA, PA | SEATTLE, WA | CLEVELAND, OH | LOS ANGELES, CA | PHOENIX, AZ | ST. LOUIS, MO | DALLAS, TX | MADISON, WI | PITTSBURGH, PA | TAMPA, FL | DAYTON, OH | MEMPHIS, TN | PORTLAND, OR | WASHINGTON, DC REGION | DENVER, CO | MIAMI, FL | PORTSMOUTH, NH | WHITE PLAINS, NY | DETROIT, MI | MILWAUKEE, WI | PROVIDENCE, RI | GRAND RAPIDS, MI | MINNEAPOLIS, MN

*through an affiliation with Jackson Lewis P.C., a Law Corporation

MY DIRECT DIAL IS: 972-728-3287
MY EMAIL ADDRESS IS: TRACEY.WALLACE@JACKSONLEWIS.COM

June 16, 2017

**VIA FACSIMILE (214) 628-9505 AND**
**ELECTRONIC MAIL –bgolden@milleregan.com**

Barry Golden
Miller Egan Molter & Nelson LLP
2911 Turtle Creek Blvd
Suite 1100
Dallas, Texas 75219

Re: Cause No. 96285; Coal City Cob Company, Inc. v. Palm Enterprises Inc. and Sharon Frank (as Guarantor)
In the 443rd District Court, Ellis County, Texas

Dear Mr. Golden:

Pursuant to Rule 11 of the Texas Rules of Civil Procedure, please allow this correspondence to memorialize the following agreements.

Pursuant to the Court's expedited discovery order, the parties have agreed to the following schedule:

1. July 7, 2017 - TransWood, Palm Enterprises, Sharon Frank, and Roger Nikodym will produce, if they exist, relevant, responsive documents as defined in the Court's June 7, 2017, expedited discovery order.

2. Tuesday, July 11 – Sharon Frank and a corporate representative of Palm Enterprises, Inc. will be deposed at the offices of Jackson Lewis in Dallas, Texas. Tracey Wallace will accept service of the deposition notices/subpoenas via e-mail.

3. Wednesday, July 12 – Roger Nikodym and a corporate representative of TransWood Carriers, Inc. will be deposed at the offices of Jackson Lewis in Dallas, Texas. Tracey Wallace will accept service of the deposition notices/subpoenas via e-mail.

4. Thursday, July 13 – Mediation with an agreed upon mediator in Dallas, Texas.



5. Friday, July 14 – 1:30 p.m. Injunction Hearing.

Further, Plaintiff Coal City Cob Company, Inc., and Defendants Palm Enterprises and Sharon Frank agree to the extension of the Temporary Restraining Order (which was previously set to expire on June 20, 2017) until the close of the hearing on July 14th, 2017.

If I have accurately set forth our agreement, please sign below and return to me for filing with the Court.

Thank you for your courtesy in this regard. Should you have any questions regarding this or any other issue, please do not hesitate to contact me.

Very truly yours,

**JACKSON LEWIS P.C.**

/s/ Tracey R. Wallace

Tracey R. Wallace

Agreed:

By: ______________________
Barry Golden
Attorney for Plaintiff, Coal City Cob Company, Inc.

4845-3822-7786, v. 1

# TAB

# 5

96285

Ellis County - District Clerk

Filed 8/14/2017 11:50 AM
Melanie Reed
District Clerk
Ellis County, Texas

**CAUSE NO. 96285**

| | | |
|---|---|---|
| **COAL CITY COMPANY, INC.** **Plaintiff(s),** | § | **IN THE DISTRICT COURT** |
| **VS.** | § | **443RD JUDICIAL DISTRICT** |
| **PALM ENTERPRISES INC. AND SHARON FRANK AS GUARANTOR** **Defendant(s).** | § | **ELLIS COUNTY, TEXAS** |

## RETURN OF SERVICE

Came to my hand on **Thursday, June 8, 2017 at 3:15 PM,**
Executed at: **1060 KENNEDY AVE., SCHEREVILLE, IN 46375**
within the county of **LAKE** at **3:20 PM,** on **Wednesday, June 28, 2017.**
by delivering to the within named:

**PALM ENTERPRISES INC.**

By delivering to its **Registered Agent, SHARON FRANK**
a true copy of this

**TEMPORARY RESTRAINING ORDER AND ORDER PERMITTING EXPEDITED DISCOVERY; PROTECTIVE ORDER; AND PLAINTIFF'S VERIFIED ORIGINAL PETITION AND REQUEST FOR INJUCTIVE RELIEF WITH EXHIBITS**

having first endorsed thereon the date of the delivery.

**BEFORE ME,** the undersigned authority, on this day personally appeared **WILLIAM G. SHEEHAN** who after being duly sworn on oath states: "My name is **WILLIAM G. SHEEHAN.** I am a person over eighteen (18) years of age and I am competent to make this affidavit. I am a resident of the State of Indiana. I have personal knowledge of the facts and statements contained in this affidavit and aver that each is true and correct. I am not a party to this suit nor related or affiliated with any herein, and have no interest in the outcome of the suit. I have never been convicted of a felony or of a misdemeanor involving moral turpitude."

**WILLIAM G. SHEEHAN**

Of: **Lake County**

By: [signature]
Authorized Person -

**Subscribed and Sworn to by WILLIAM G. SHEEHAN, Before Me, the undersigned authority, on this 12th day of August, 2017.**

KATHERINE J. SHEEHAN
NOTARY PUBLIC
SEAL
STATE OF INDIANA
MY COMMISSION EXPIRES JAN. 24, 2021

[signature]
**Notary Public in and for the State of Indiana**

ORIGINAL

FILED FOR RECORD
2017 JUN -7 PM 2:26
MELANIE REED
DISTRICT CLERK
ELLIS COUNTY, TX

CAUSE NO. 96285

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC.., | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| v. | § | ELLIS COUNTY, TEXAS |
| PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR) | § | |
| Defendants. | § | 443RD JUDICIAL DISTRICT |

**TEMPORARY RESTRAINING ORDER AND**
**ORDER PERMITTING EXPEDITED DISCOVERY**

On this 7 day of June 2017, Plaintiff Coal City Cob Company, Inc. ("Coal City") presented its Verified Original Petition and Application for Temporary Restraining Order to this Court ("Verified Petition").

Having reviewed the Verified Petition and the associated evidence, the Court concludes that Coal City and the Defendants were parties to a February 3, 2014 Affiliate Agreement ("Affiliate Agreement"). Under the Affiliate Agreement, the Defendants agreed not to (1) misappropriate Coal City's confidential information, (2) solicit Coal City's customers to transfer their business away from Coal City, or (3) solicit Coal City's contractors and employees, including drivers, to quit working for Coal City and work elsewhere. Coal City has alleged that the Defendants violated all three provisions, and if not restrained, will continue doing so. The Court agrees. There is sufficient evidence demonstrating a likelihood of success on the merits for Plaintiff in its claims against the Defendants for breach of contract, tortious interference with existing contracts, civil conversion, Texas Theft Liability Act, and/or Texas Uniform Trade Secrets Act. The Court has seen sufficient evidence that absent a temporary restraining order, the Defendants will continue violating these provisions of the Affiliate Agreement, and such violations will cause

CERTIFIED A TRUE COPY
MELANIE REED
District Clerk, Ellis County, Texas
ATTEST: 6-7-2017 pgs 5
Deputy

FILED FOR RECORD
2017 JUN -7 PM 2:26
MELANIE REED
DISTRICT CLERK
ELLIS COUNTY, TX

CAUSE NO. 96285

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC., | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| v. | § | ELLIS COUNTY, TEXAS |
| | § | |
| PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR) | § | |
| | § | |
| Defendants. | § | 443rd JUDICIAL DISTRICT |

**PROTECTIVE ORDER**

The Court hereby enters this Protective Order containing the following terms:

1. **Confidential Information.** "Confidential Information" shall mean information received by a party (the "Receiving Party") whose dissemination to the public would most likely cause direct financial harm to the party disclosing the information (the "Producing Party"). Confidential Information shall not be considered Confidential Information under any or all the following conditions:

a. **Information Available to Public.** Information shall not be considered "Confidential Information" if it is available to the public at the time that the Producing Party provides it to the Receiving Party, or if it becomes available to the public after the time that the Producing Party provides it to the Receiving Party through no fault of the Receiving Party; or

b. **Information in Possession of Receiving Party.** Information shall not be considered "Confidential Information" if it is in the possession of the Receiving Party at the time the Producing Party provides it to the Receiving Party, or if it comes into the possession of the Receiving Party through a third-party (with authority to provide the

CERTIFIED A TRUE COPY
MELANIE REED
District Clerk, Ellis County, Texas
6-7-2017 pgs 5
ATTEST: J. Gordon Deputy

Ellis County - 443rd District Court

Filed 6/7/2017 11:00:12 AM
Melanie Reed
District Clerk
Ellis County, Texas

CAUSE NO. 96285

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ELLIS COUNTY, TEXAS |
| | § | |
| PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR) | § | |
| | § | |
| | § | |
| Defendants. | § | ____ JUDICIAL DISTRICT |

**PLAINTIFF'S VERIFIED ORIGINAL PETITION**
**AND REQUEST FOR INJUNCTIVE RELIEF**

Plaintiff Coal City Cob, Inc. ("Coal City") files this Original Petition and Request for Injunctive Relief complaining of Defendants Palm Enterprises, Inc. and Sharon Frank (as Guarantor) (collectively, "Palm").

## A. NATURE OF THE CASE

1. This is a case about corporate espionage. Coal City is in the business of liquid bulk transportation services to the Chemical and Hazardous Waste industries. Palm worked for Coal City by dispatching vehicles to transport liquids for Coal City's customers. Palm's position was, therefore, one of operations within the Coal City company. As such, Palm had wide access to and necessarily utilized the portions of Coal City's Enterprise Resource Planning ("ERP") system containing all of Coal City's highly confidential and proprietary trade secrets, including all of Coal City's information about its finances, customer rates, customer identifications, customer lanes, and information about valuable Coal City employees (including names, addresses, e-mail addresses and phone numbers). Through its participation in weekly Terminal Managers (Operations) calls, Palm also acquired knowledge of Coal City's operating activities and strategies. Palm was granted

# TAB

# 6

96285

Ellis County - District Clerk

Filed 8/14/2017 12:03 PM
Melanie Reed
District Clerk
Ellis County, Texas

**CAUSE NO. 96285**

| | | |
|---|---|---|
| **COAL CITY COB COMPANY, INC.** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | |
| **Plaintiff(s),** | § | |
| **VS.** | § | **443RD JUDICIAL DISTRICT** |
| **PALM ENTERPRISES, INC. AND SHARON FRANK AS GUARANTOR** | § | |
| | § | |
| | § | |
| **Defendant(s).** | § | **ELLIS COUNTY, TEXAS** |

**RETURN OF SERVICE**

Came to my hand on **Thursday, June 8, 2017 at 3:10 PM,**
Executed at: **1060 KENNEDY AVENUE, SCHEREVILLE, IN 46375**
within the county of **LAKE** at **3:20 PM,** on **Wednesday, June 28, 2017,**
by delivering to the within named:

**SHARON J. FRANK**

a true copy of this

**TEMPORARY RESTRAINING ORDER AND ORDER PERMITTING EXPEDITED DISCOVERY; PROTECTIVE ORDER; and PLAINTIFF'S VERFIED ORIGINAL PETITION AND REQUEST FOR INJUNCTIVE RELIEF with EXHIBITS**

having first endorsed thereon the date of the delivery.

**BEFORE ME,** the undersigned authority, on this day personally appeared **WILLIAM G. SHEEHAN** who after being duly sworn on oath states: "My name is **WILLIAM G. SHEEHAN.** I am a person over eighteen (18) years of age and I am competent to make this affidavit. I am a resident of the State of Indiana. I have personal knowledge of the facts and statements contained in this affidavit and aver that each is true and correct. I am not a party to this suit nor related or affiliated with any herein, and have no interest in the outcome of the suit. I have never been convicted of a felony or of a misdemeanor involving moral turpitude."

**WILLIAM G. SHEEHAN**

Of: **Lake County**

By: [signature]
Authorized Person -

**Subscribed and Sworn to by WILLIAM G. SHEEHAN, Before Me, the undersigned authority, on this 12th day of July, 2017.**

KATHERINE J. SHEEHAN
NOTARY PUBLIC
SEAL
STATE OF INDIANA
MY COMMISSION EXPIRES JAN. 24, 2021

[signature]
**Notary Public in and for the State of Indiana**

ORIGINAL

FILED FOR RECORD
2017 JUN -7 PM 2:26
MELANIE REED
DISTRICT CLERK
ELLIS COUNTY, TX

CAUSE NO. 96285

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC., | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| v. | § | ELLIS COUNTY, TEXAS |
| PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR) | § | |
| Defendants. | § | 443RD JUDICIAL DISTRICT |

**TEMPORARY RESTRAINING ORDER AND**
**ORDER PERMITTING EXPEDITED DISCOVERY**

On this 7 day of June 2017, Plaintiff Coal City Cob Company, Inc. ("Coal City") presented its Verified Original Petition and Application for Temporary Restraining Order to this Court ("Verified Petition").

Having reviewed the Verified Petition and the associated evidence, the Court concludes that Coal City and the Defendants were parties to a February 3, 2014 Affiliate Agreement ("Affiliate Agreement"). Under the Affiliate Agreement, the Defendants agreed not to (1) misappropriate Coal City's confidential information, (2) solicit Coal City's customers to transfer their business away from Coal City, or (3) solicit Coal City's contractors and employees, including drivers, to quit working for Coal City and work elsewhere. Coal City has alleged that the Defendants violated all three provisions, and if not restrained, will continue doing so. The Court agrees. There is sufficient evidence demonstrating a likelihood of success on the merits for Plaintiff in its claims against the Defendants for breach of contract, tortious interference with existing contracts, civil conversion, Texas Theft Liability Act, and/or Texas Uniform Trade Secrets Act. The Court has seen sufficient evidence that absent a temporary restraining order, the Defendants will continue violating these provisions of the Affiliate Agreement, and such violations will cause

CERTIFIED A TRUE COPY
MELANIE REED
District Clerk, Ellis County, Texas
ATTEST: 6-7-2017 pgs 5
Deputy

FILED FOR RECORD 2017 JUN -7 PM 2:26 MELANIE REED DISTRICT CLERK ELLIS COUNTY, TX

CAUSE NO. 96285

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC., | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| v. | § | ELLIS COUNTY, TEXAS |
| | § | |
| PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR) | § | |
| | § | |
| Defendants. | § | 443rd JUDICIAL DISTRICT |

**PROTECTIVE ORDER**

The Court hereby enters this Protective Order containing the following terms:

1. **Confidential Information.** "Confidential Information" shall mean information received by a party (the "Receiving Party") whose dissemination to the public would most likely cause direct financial harm to the party disclosing the information (the "Producing Party"). Confidential Information shall not be considered Confidential Information under any or all the following conditions:

a. **Information Available to Public.** Information shall not be considered "Confidential Information" if it is available to the public at the time that the Producing Party provides it to the Receiving Party, or if it becomes available to the public after the time that the Producing Party provides it to the Receiving Party through no fault of the Receiving Party; or

b. **Information in Possession of Receiving Party.** Information shall not be considered "Confidential Information" if it is in the possession of the Receiving Party at the time the Producing Party provides it to the Receiving Party, or if it comes into the possession of the Receiving Party through a third-party (with authority to provide the

CERTIFIED A TRUE COPY MELANIE REED District Clerk, Ellis County, Texas ATTEST 6-7-2017 pgs 5 Deputy

Ellis County - 443rd District Court

Filed 6/7/2017 11:00:12 AM
Melanie Reed
District Clerk
Ellis County, Texas

CAUSE NO. 96285

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ELLIS COUNTY, TEXAS |
| | § | |
| PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR) | § | |
| | § | |
| | § | |
| Defendants. | § | ____ JUDICIAL DISTRICT |

**PLAINTIFF'S VERIFIED ORIGINAL PETITION**
**AND REQUEST FOR INJUNCTIVE RELIEF**

Plaintiff Coal City Cob, Inc. ("Coal City") files this Original Petition and Request for Injunctive Relief complaining of Defendants Palm Enterprises, Inc. and Sharon Frank (as Guarantor) (collectively, "Palm").

**A. NATURE OF THE CASE**

1. This is a case about corporate espionage. Coal City is in the business of liquid bulk transportation services to the Chemical and Hazardous Waste industries. Palm worked for Coal City by dispatching vehicles to transport liquids for Coal City's customers. Palm's position was, therefore, one of operations within the Coal City company. As such, Palm had wide access to and necessarily utilized the portions of Coal City's Enterprise Resource Planning ("ERP") system containing all of Coal City's highly confidential and proprietary trade secrets, including all of Coal City's information about its finances, customer rates, customer identifications, customer lanes, and information about valuable Coal City employees (including names, addresses, e-mail addresses and phone numbers). Through its participation in weekly Terminal Managers (Operations) calls, Palm also acquired knowledge of Coal City's operating activities and strategies. Palm was granted

# TAB

# 7

Filed 6/19/2017 6:45 PM
Melanie Reed
District Clerk
Ellis County, Texas

Ellis County - District Clerk

CAUSE NO. 96285

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ELLIS COUNTY, TEXAS |
| | § | |
| PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR) | § | |
| | § | |
| | § | |
| | § | 443rd JUDICIAL DISTRICT |
| Defendants. | | |

## NOTICE OF HEARING

PLEASE TAKE NOTICE that Plaintiff's request for temporary injunction that was previously set for hearing on June 20, 2017 at 8:30 a.m. has been moved to July 14, 2017 at 1:30 p.m. in the courtroom of the 443rd Judicial District of Ellis County, Texas.

Date: June 19, 2017

Respectfully submitted,

Barry M. Golden
Texas State Bar. No. 24002149

MILLER, EGAN, MOLTER & NELSON, LLP
2911 Turtle Creek Blvd., Suite 1100
Dallas, Texas 75219
Phone: (214) 628-9500
Facsimile: (214) 628-9505
bgolden@milleregan.com

**ATTORNEYS FOR PLAINTIFF**
**COAL CITY COB COMPANY, INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was electronically filed on the CM/ECF system, which will automatically serve a Notice of Electronic Filing on all parties registered for such service on June 19, 2017.

TraceyWallace
JACKSON LEWIS P.C.
500 North Akard, Suite 2500
Dallas, Texas 75201
tracey.wallace@jacksonlewis.com

Barry Golden

# TAB

# 8

ORIGINAL

FILED FOR RECORD
2017 JUL 14 PM 4: 17
MELANIE REED
DISTRICT CLERK
ELLIS COUNTY, TX

CAUSE NO. 96285

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC., | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| v. | § | ELLIS COUNTY, TEXAS |
| PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR) | § | |
| Defendants. | § | 443rd JUDICIAL DISTRICT |

**AGREED TEMPORARY INJUNCTION**

On this 14th day of July 2017, Plaintiff Coal City Cob Company, Inc. ("Coal City") and defendants Palm Enterprises, Inc. and Sharon Frank (as Guarantor) submitted this agreed temporary injunction.

Having considered the evidence and the arguments, the Court concludes that Coal City and the Defendants were parties to a February 3, 2014 Affiliate Agreement ("Affiliate Agreement"). Under the Affiliate Agreement, the Defendants agreed not to (1) misappropriate Coal City's confidential information, (2) solicit Coal City's customers to transfer their business away from Coal City, or (3) solicit Coal City's contractors and employees, including drivers, to quit working for Coal City and work elsewhere. Coal City has alleged that the Defendants violated all three provisions, and if not restrained, will continue doing so. The Court agrees. There is sufficient evidence demonstrating a likelihood of success on the merits for Coal City in its claims against the Defendants for breach of contract, tortious interference with existing contracts, civil conversion, Texas Theft Liability Act, and/or Texas Uniform Trade Secrets Act. The Court has seen sufficient evidence that absent a temporary injunction, the Defendants will continue violating these provisions of the Affiliate Agreement, and such violations will cause Coal City to experience irreparable harm and that such harm is probable, imminent, and

irreparable. Coal City has demonstrated that the injuries suffered by the Defendants are irreparable because they cannot be accurately measured or compensated through monetary damages. Coal City has shown that the Defendants' conduct, should it go unrestrained and enjoined, will cause harm to Coal City's operations and sales and will cause an impact on revenue and profitability that are impossible to quantify with a specific pecuniary standard. Coal City has shown that it is entitled to a temporary restraining order because it is already suffering harm and will continue to suffer harm before notice can be served and a hearing may be held.

IT IS THEREFORE ORDERED that based on the evidence presented at the hearing on July 14, 2017, Coal City's application for temporary injunction Defendants is GRANTED.

IT IS FURTHER ORDERED that until the end of trial in this case (the Injunction Period"), the Defendants are restrained and enjoined from disseminating proprietary information and trade secrets of Coal City including, without limitation, its services, products, customer information, processes, sales information, know-how, practice, policies, and other confidential information which is considered proprietary or secret by Coal City, including without limitation, City's information about its finances, customer rates, customer identifications, customer lanes, and information about valuable Coal City employees (including names, addresses, e-mail addresses, and phone numbers).

IT IS FURTHER ORDERED that during the Injunction Period, the Defendants shall not solicit or haul freight for the following Coal City customers on the following customer lanes: (a) Tradebe Treatment & Recycling, LLC ("Tradebe") – East Chicago, IN to Logansport, IN, (b) Tradebe – East Chicago, IN to Greencastle, IN; (c) Tradebe – East Chicago, IN to Paulding, OH, (d) Kemira Chemicals, Inc. ("Kemira")- East Chicago, IN to Millington, TN, (e) Kemira – Butler, IN to East Chicago, IN; (f) Kemira – Jeffersonville, IN to East Chicago, IN, (g) Solvay USA, Inc – University Park,, ILL to Knoxville, TN; (h) Solvay – University Park, IL to Murray,

KY, (i) Solvay – University Park, IL to Corsicana, TX, (j) Solvay – University Park, IL to Saint Louis, MO, (k) Solvay – University Park, IL to Kilgore, TX, (l) Nalco-Champion ("Nalco") – University Park, IL to Kilgore, TX, (m) Nalco – University Park, IL to Centerville, TX, (n) Nalco – University Park, IL to Hebbronville, TX, (o) Harcross Chemicals, Inc. – Lima, OH to Dallas, TX, (p) Harcross - University Park, IL to Longview, TX, (q) Harcross - University Park, IL to Sibley, LA, (r) Harcross - Houston, TX to Dallas, TX, (s) Harcross - University Park, IL to Dallas, TX; (t) Harcross - Winder, GA to Longview, TX; (u) Harcross – Winder, GA to Sibley, LA, (v) Harcross - University Park, IL to Pasadena, TX, and (w) Univar USA, Inc. – Charleston, SC to North Charleston, South, SC (collectively, the "Customer Lanes"). During the TRO Period, the Defendants are expressly prohibited from hauling freight for these customers on the Customer Lanes by use of vehicles containing the following VIN numbers: (1) 1XPBD49X7FD308061, (2) 1XPBD49X7GD308062, (3) 1XPBD49X9GD308063, (4) 1XPBD49X0GD308064, (5) 1XPBD49X2GD308065, (6) 1XPBD49X4GD308066, (7) 1XKDD49X8DJ334908, or (8) 4V4NC9EH4EN164270.

IT IS FURTHER ORDERED that during the Injunction Period, the Defendants (and anyone acting in concert with the Defendants) may not dispatch Rashid Malik, Christian Russell, James Uribe, Eric Holder, or Derek Turner (the "Drivers") to haul freight on the Customer Lanes. The Defendants are expressly prohibited from facilitating the hauling of freight for these customers on the Customer Lanes by use of the vehicles owned or operated by the Driver containing the following VIN numbers: (1) M1AW07Y0FM046539), (2) 5KJJABCK15PN82105), (3) 1XP5D49XX7N679837, (4) 1XKADB9X47J156443, or (5) 2WKEDDJJ4YK965013).

IT IS FURTHER ORDERED that during the Injunction Period, the Defendants may not solicit any of Coal City's customers, or solicit any of Coal City's drivers or other contractors or employees.

IT IS FURTHER ORDERED that in addition to being binding on the Defendants, this temporary injunction is also binding upon Palm's agents, servants, attorneys (collectively, "Agents") and anyone acting in concert or participation with Palm or any of the Agents who receive actual notice of this temporary restraining order.

The Clerk of this Court shall issue, without bond or any other securing, a temporary injunction in conformity with the law and the terms of this Order.

The temporary injunction is immediately effective upon the Court's signature as Palm has waived the requirement of a bond. Subject to further order of this Court, this temporary restraining order expires at the close of trial.

**NOTICE – a violation of this Temporary Injunction can result in contempt of court, which is punishable by jail time, or a fine/sanction, or both jail time and a fine/sanction.**

SIGNED this 14 day of July 2017.

JUDGE PRESIDING

AGREED:

Barry M. Golden
Texas State Bar. No. 24002149
MILLER, EGAN, MOLTER & NELSON, LLP
2911 Turtle Creek Blvd., Suite 1100
Dallas, Texas 75219
Phone: (214) 628-9500
Facsimile: (214) 628-9505
bgolden@milleregan.com

ATTORNEYS FOR PLAINTIFF
COAL CITY COB COMPANY, INC.

AGREED:

Tracey R. Wallace
Texas State Bar No. 00797617
JACKSON LEWIS P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201
Phone:        (214) 520-2400
Facsimile:    (214) 520-2008
Tracey.Wallace@jacksonlewis.com

ATTORNEYS FOR DEFENDANTS
PALM ENTERPRISES, INC. AND SHARON
FRANK (AS GUARANTOR)

ORIGINAL

FILED FOR RECORD
2017 JUL 14 PM 4: 17
MELANIE REED
DISTRICT CLERK
ELLIS COUNTY, TX

CAUSE NO. 96285

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC., | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| v. | § | ELLIS COUNTY, TEXAS |
| PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR) | § | |
| Defendants. | § | 443rd JUDICIAL DISTRICT |

**AGREED TEMPORARY INJUNCTION**

On this 14th day of July 2017, Plaintiff Coal City Cob Company, Inc. ("Coal City") and defendants Palm Enterprises, Inc. and Sharon Frank (as Guarantor) submitted this agreed temporary injunction.

Having considered the evidence and the arguments, the Court concludes that Coal City and the Defendants were parties to a February 3, 2014 Affiliate Agreement ("Affiliate Agreement"). Under the Affiliate Agreement, the Defendants agreed not to (1) misappropriate Coal City's confidential information, (2) solicit Coal City's customers to transfer their business away from Coal City, or (3) solicit Coal City's contractors and employees, including drivers, to quit working for Coal City and work elsewhere. Coal City has alleged that the Defendants violated all three provisions, and if not restrained, will continue doing so. The Court agrees. There is sufficient evidence demonstrating a likelihood of success on the merits for Coal City in its claims against the Defendants for breach of contract, tortious interference with existing contracts, civil conversion, Texas Theft Liability Act, and/or Texas Uniform Trade Secrets Act. The Court has seen sufficient evidence that absent a temporary injunction, the Defendants will continue violating these provisions of the Affiliate Agreement, and such violations will cause Coal City to experience irreparable harm and that such harm is probable, imminent, and

irreparable. Coal City has demonstrated that the injuries suffered by the Defendants are irreparable because they cannot be accurately measured or compensated through monetary damages. Coal City has shown that the Defendants' conduct, should it go unrestrained and enjoined, will cause harm to Coal City's operations and sales and will cause an impact on revenue and profitability that are impossible to quantify with a specific pecuniary standard. Coal City has shown that it is entitled to a temporary restraining order because it is already suffering harm and will continue to suffer harm before notice can be served and a hearing may be held.

IT IS THEREFORE ORDERED that based on the evidence presented at the hearing on July 14, 2017, Coal City's application for temporary injunction Defendants is GRANTED.

IT IS FURTHER ORDERED that until the end of trial in this case (the Injunction Period"), the Defendants are restrained and enjoined from disseminating proprietary information and trade secrets of Coal City including, without limitation, its services, products, customer information, processes, sales information, know-how, practice, policies, and other confidential information which is considered proprietary or secret by Coal City, including without limitation, City's information about its finances, customer rates, customer identifications, customer lanes, and information about valuable Coal City employees (including names, addresses, e-mail addresses, and phone numbers).

IT IS FURTHER ORDERED that during the Injunction Period, the Defendants shall not solicit or haul freight for the following Coal City customers on the following customer lanes: (a) Tradebe Treatment & Recycling, LLC ("Tradebe") – East Chicago, IN to Logansport, IN, (b) Tradebe – East Chicago, IN to Greencastle, IN; (c) Tradebe – East Chicago, IN to Paulding, OH, (d) Kemira Chemicals, Inc. ("Kemira")- East Chicago, IN to Millington, TN, (e) Kemira – Butler, IN to East Chicago, IN; (f) Kemira – Jeffersonville, IN to East Chicago, IN, (g) Solvay USA, Inc – University Park,, ILL to Knoxville, TN; (h) Solvay – University Park, IL to Murray,

KY, (i) Solvay – University Park, IL to Corsicana, TX, (j) Solvay – University Park, IL to Saint Louis, MO, (k) Solvay – University Park, IL to Kilgore, TX, (l) Nalco-Champion ("Nalco") – University Park, IL to Kilgore, TX, (m) Nalco – University Park, IL to Centerville, TX, (n) Nalco – University Park, IL to Hebbronville, TX, (o) Harcross Chemicals, Inc. – Lima, OH to Dallas, TX, (p) Harcross - University Park, IL to Longview, TX, (q) Harcross - University Park, IL to Sibley, LA, (r) Harcross - Houston, TX to Dallas, TX, (s) Harcross - University Park, IL to Dallas, TX; (t) Harcross - Winder, GA to Longview, TX; (u) Harcross – Winder, GA to Sibley, LA, (v) Harcross - University Park, IL to Pasadena, TX, and (w) Univar USA, Inc. – Charleston, SC to North Charleston, South, SC (collectively, the "Customer Lanes"). During the TRO Period, the Defendants are expressly prohibited from hauling freight for these customers on the Customer Lanes by use of vehicles containing the following VIN numbers: (1) 1XPBD49X7FD308061, (2) 1XPBD49X7GD308062, (3) 1XPBD49X9GD308063, (4) 1XPBD49X0GD308064, (5) 1XPBD49X2GD308065, (6) 1XPBD49X4GD308066, (7) 1XKDD49X8DJ334908, or (8) 4V4NC9EH4EN164270.

IT IS FURTHER ORDERED that during the Injunction Period, the Defendants (and anyone acting in concert with the Defendants) may not dispatch Rashid Malik, Christian Russell, James Uribe, Eric Holder, or Derek Turner (the "Drivers") to haul freight on the Customer Lanes. The Defendants are expressly prohibited from facilitating the hauling of freight for these customers on the Customer Lanes by use of the vehicles owned or operated by the Driver containing the following VIN numbers: (1) M1AW07Y0FM046539), (2) 5KJJABCK15PN82105), (3) 1XP5D49XX7N679837, (4) 1XKADB9X47J156443, or (5) 2WKEDDJJ4YK965013).

IT IS FURTHER ORDERED that during the Injunction Period, the Defendants may not solicit any of Coal City's customers, or solicit any of Coal City's drivers or other contractors or employees.

IT IS FURTHER ORDERED that in addition to being binding on the Defendants, this temporary injunction is also binding upon Palm's agents, servants, attorneys (collectively, "Agents") and anyone acting in concert or participation with Palm or any of the Agents who receive actual notice of this temporary restraining order.

The Clerk of this Court shall issue, without bond or any other securing, a temporary injunction in conformity with the law and the terms of this Order.

The temporary injunction is immediately effective upon the Court's signature as Palm has waived the requirement of a bond. Subject to further order of this Court, this temporary restraining order expires at the close of trial.

**NOTICE – a violation of this Temporary Injunction can result in contempt of court, which is punishable by jail time, or a fine/sanction, or both jail time and a fine/sanction.**

SIGNED this 14 day of July 2017.

JUDGE PRESIDING

AGREED:

Barry M. Golden
Texas State Bar. No. 24002149
MILLER, EGAN, MOLTER & NELSON, LLP
2911 Turtle Creek Blvd., Suite 1100
Dallas, Texas 75219
Phone: (214) 628-9500
Facsimile: (214) 628-9505
bgolden@milleregan.com

ATTORNEYS FOR PLAINTIFF
COAL CITY COB COMPANY, INC.

AGREED:

Tracey R. Wallace
Texas State Bar No. 00797617
JACKSON LEWIS P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201
Phone:        (214) 520-2400
Facsimile:    (214) 520-2008
Tracey.Wallace@jacksonlewis.com

ATTORNEYS FOR DEFENDANTS
PALM ENTERPRISES, INC. AND SHARON
FRANK (AS GUARANTOR)

# TAB

# 9

96285
Filed 7/14/2017 4:17 PM
Melanie Reed
District Clerk
Ellis County, Texas

BURDIN
MEDIATIONS

July 14, 2017

**Cause No. 96285; 443rd District Court - Ellis County**

RE:
**COAL CITY COB COMPANY, INC, Plaintiff(s)**
**vs.**
**PALM ENTERPRISES, INC, ET AL, Defendant(s)**

TO THE HONORABLE JUDGE Judge Cindy Ermatinger:

The Court is advised that the above case was referred to KENNETH J RUBENSTEIN of Burdin Mediations on 06/29/17. The following action has been conducted as follows:

{ **XX** } MEDIATED on 07/13/17 and the results are marked below:

a. { } Settled at mediation { } Settled after mediation

b. { } Did not settle:____________________

c. { **XX** } Recessed:____________________

d. { } Partial settlement

Settled with:____________________

Did not settle with:____________________

{ } WAS NOT MEDIATED for the following reason:

a. { } Settled before mediation

b. { }Parties scheduled mediation with a mediator not affiliated with Burdin Mediations

c. { } Other____________________

**Burdin Mediations will close their case file unless further action is required. However, for cases not settled at mediation, our mediator's policy is to keep an active file open and continue negotiations as necessary. The court will be notified with a revised report for further developments as they occur.**

Respectfully,

*//Karen James//*

Karen James
Account Manager
KJames@Burdin-adr.com
Case 51794

# TAB

# 10

Filed 7/21/2017 3:13 PM
Melanie Reed
District Clerk
Ellis County, Texas

**NO. 96285**

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ELLIS COUNTY, TEXAS |
| | § | |
| PALM ENTERPRISES, INC. and, SHARON FRANK (AS GRANTOR) | § | |
| | § | |
| | § | |
| Defendants. | § | 443RD JUDICIAL DISTRICT |

**PLAINTIFF'S UNOPPOSED MOTION TO SUBSTITUTE COUNSEL FOR COAL CITY COB COMPANY, INC.**

Plaintiff Coal City Cob Company, Inc. ("Plaintiff" or "Coal City") hereby files this Motion to Substitute Counsel and respectfully shows the Court as follows:

1. Christopher Groves and Barry M. Golden of the law firm of Miller, Egan, Molter & Nelson, LLP are currently counsel of record for Coal City in the above-captioned case.

2. Plaintiff requests that Christopher M. LaVigne (State Bar No. 24026984), Steven V. Walkowiak (State Bar No. 24047060) and Samuel G. Davison (State Bar No. 24084280) of the law firm of Greenberg Traurig, LLP, 2200 Ross Avenue, Suite 5200, Dallas, TX 75201, be substituted as its counsel of record and that Barry M. Golden be allowed to withdraw from his representation of Coal City. Plaintiff further requests that Christopher M. LaVigne be designated as the lead counsel for all matters related to this cause.

3. This substitution of counsel is not sought for purposes of delay and no party will be prejudiced by the requested substitution and withdrawal. Plaintiff approves of this substitution. Defendants' counsel is not opposed to this substitution.

4.      Plaintiff respectfully requests that all pleadings, notifications, and correspondence concerning the above-styled and numbered cause of action be directed to Mr. LaVigne, Mr. Walkowiak and Mr. Davison as follows:  Greenberg Traurig, LLP, 2200 Ross Avenue, Suite 5200, Dallas, TX 75201; telephone (214) 665-3600; and facsimile (214) 665-3601.

WHEREFORE, Plaintiff Coal City Cob Company, Inc. respectfully requests that this motion be granted, that Christopher M. LaVigne, Steven V Walkowiak and Samuel G. Davison of the law firm of Greenberg Traurig, LLP be substituted as its counsel of record, with Christopher M. LaVigne as lead counsel for Plaintiff, and that Barry M. Golden and the law firm of Miller, Egan, Molter & Nelson, LLP be allowed to withdraw.

Dated: July 21, 2017

Respectfully submitted,

*/s/ Barry Golden*
Barry M. Golden
State Bar No. 24002149
bgolden@milleregan.com

MILLER, EGAN, MOLTER & NELSON, LLP
2911 Turtle Creek Blvd., Suite 1100
Dallas, Texas 75219
Telephone: 214-628-9500
Facsimile: 214-628-9505

WITHDRAWING COUNSEL FOR PLAINTIFF COAL CITY COB COMPANY, INC.

*/s/ Christopher M. LaVigne*
Christopher M. LaVigne
State Bar No. 24026984
lavignec@gtlaw.com
Steven V. Walkowiak
State Bar No. 24047060
walkowiaks@gtlaw.com
Samuel G. Davison
State Bar No. 24084280
davisons@gtlaw.com

GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
Telephone: 214.665.3600
Facsimile: 214.665.3601

SUBSTITUTING COUNSEL FOR PLAINTIFF COAL CITY COB COMPANY, INC.

**CERTIFICATE OF CONFERENCE**

I, the undersigned attorney, hereby certify to the Court that I have conferred with opposing counsel in an effort to resolve the issues contained in this motion without the necessity of Court intervention, and counsel has indicated that they do not oppose this motion.

*/s/ Christopher M. LaVigne*
Christopher M. LaVigne

**CERTIFICATE OF SERVICE**

The undersigned certifies that a true and correct copy of the foregoing document served on this 21st day of July, 2017 to the following counsel of record via the Court's filing system in accordance with the Texas Rules of Civil Procedure.

Tracey Wallace
Jackson Lewis P.C.
500 North Akard, Suite 2500
Dallas, Texas 75201
Tracey.wallace@jacksonlewis.com

*/s/ Steven V. Walkowiak*
Steven V. Walkowiak

# TAB

# 11

**CAUSE NO. 96285**

| | | |
|---|---|---|
| **COAL CITY COB COMPANY, INC,** | § | **IN THE DISTRICT COURT** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **OF ELLIS COUNTY, TEXAS** |
| | § | |
| **PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR)** | § | |
| | § | |
| | § | **443RD JUDICIAL DISTRICT** |
| **Defendant.** | § | |

**DEFEDANTS' ORIGNAL ANSWER, VERIFIED DENIAL, AFFIRMATIVE DEFENSES AND ORIGINAL COUNTERLCLAIM**

Defendants Palm Enterprises, Inc. and Sharon Frank ("Defendants") file their Original Answer, Verified Denial, Affirmative Defenses and Original Counterclaim.

**ANSWER**

1. Defendants generally deny all of the allegations in Plaintiff's Original Petition and demand strict proof thereof by a preponderance of the credible evidence.

**VERIFIED DENIAL**

2. Defendants deny that the confidentiality and non-solicitation clauses contained within the Affiliate Agreement are supported by consideration.

**AFFIRMATIVE DEFENSES**

3. At all times, the conduct of these Defendants was justified and the justification defense bars Plaintiff's claims, in whole or in part.

4. At all times material, these Defendants acted in good faith.

5. Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

6. Without any admission by Defendants that Plaintiff suffered injury in any way, to the extent that Plaintiff did suffer injury, its claims are barred in whole or in part because it failed

to use reasonable means to prevent the alleged damage and failed to use reasonable means to mitigate its damages.

7. Plaintiff's alleged claims to damages are barred, in whole or in part, by the right of Defendants to a set-off against such damages.

8. Plaintiff's claims are barred, in whole or in part, because the limitations as to time, geographic area and scope of activity to be restrained contained in the agreement sued upon are greater than necessary to protect Plaintiff's goodwill or other legitimate business interest.

9. Plaintiff's claims are barred because the agreement sued upon is an illegal restraint of trade and is unenforceable on ground of public policy.

10. Plaintiff has failed to state a claim upon which relief may be granted.

## COUNTERCLAIM

11. Defendants Palm Enterprises, Inc. and Sharon Frank ("Counter-Plaintiffs"), incorporate by reference their answer to the Petition and Affirmative defenses as if they were fully set forth herein.

12. Pursuant to Texas Civil Practice & Remedies Code § 37.004, Counter-Plaintiffs request the Court to construe their rights, status or other legal relations affected by the Affiliate Agreement and declare the rights, status and other legal relations thereunder, specifically including the declarations that: (i) the non-Solicitation covenant is a restraint on trade and governed by Chapter 15 of the Texas Business & Commerce Code and contains restrictions which are illegal, invalid and unenforceable; (ii) the non-solicitation provisions impose greater restraints than necessary to protect the goodwill or other legitimate interests of Plaintiff; (iii) the non-solicitation provisions do not contain limitations as to time, geographical area and scope of activity to be restrained that are reasonable; (iv) the non-solicitation provisions fail for lack of

consideration; (v) the non-solicitation provisions are unreasonably and unnecessarily broad in scope of activity to be restrained and, as a result, their enforcement would result in an unfair and illegal restraint of trade and competition; (vi) Plaintiff is unlawfully interfering with Defendants/Counter-Plaintiff's ability to continue their business relationships.

## ATTORNEYS' FEES

13.     Counter-Plaintiffs re-allege and incorporate by reference those facts set forth above.

14.     Pursuant to Texas Civil Practice & Remedies § 37.009, Counter-Plaintiffs request that the Court award Counter-Plaintiffs their costs and reasonable and necessary attorneys' fees. Counter-Plaintiffs further request an award of attorneys' fees pursuant to § 15.51 of the Texas Business & Commerce Code.  Counter-Plaintiffs are entitled to recover their attorneys' fees and costs because Plaintiff knows the non-solicitation covenant does not contain limitations as to time, geographical area, and scope of activity to be restrained that were reasonable, and the limitations imposed a greater restraint than necessary to protect any goodwill or other business interest of Plaintiff.  Further, Plaintiff has sought to enforce the Affiliate Agreement against Counter-Plaintiffs to a greater extent than is necessary to protect any goodwill or other business interest of Plaintiff.  Counter-Plaintiffs are thus entitled to recover reasonable attorneys' fees and costs incurred in defending Plaintiff's action seeking enforcement of the Affiliate Agreement.

## PRAYER FOR RELIEF

15.     Declaratory relief declaring the rights, status and other relations between the parties as described above;

16.     That Plaintiffs recover reasonable and necessary attorneys' fees and costs; and

17.     Such other and further relief the Court may deem appropriate.

## VERIFICATION

STATE OF INDIANA

COUNTY OF LAKE

Sharon Frank, verifies the following:

1. "I am over the age of twenty-one years, of sound mind, capable of making this verification, and am personally acquainted with the facts herein, which are true.

2. I am the President of Palm Enterprises, Inc.

3. I have read the Verified Denial. Based on my personal knowledge, the Verified Denial is true and correct.

Further affiant sayeth not."

Sharon Frank

SWORN TO AND SUBSCRIBED before me on the 24 day of July, 2017

Notary Public, State of INDIANA
Notary's Printed name: EVA DELUCA

My commission Expires: 01-20-2024

EVA DELUCA
Seal
Notary Public - State of Indiana
Lake County
My Commission Expires Jan 20, 2024

Respectfully submitted,

JACKSON LEWIS LLP

By: /s/ Tracey R. Wallace
Tracey R. Wallace Esq.
State Bar No. 00797617
Tracey.Wallace@jacksonlewis.com
Julie Farmer Esq.
State Bar No. 24059734
FarmerJ@jacksonlewis.com
500 N. Akard, Suite 2500
Dallas, Texas 75201
PH: (214) 520-2400
FX: (214) 520-2008

**ATTORNEYS FOR DEFENDANTS/COUNTER-PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document has been forwarded to all counsel of record in accordance with the Texas Rules of Civil Procedure on the 24th day of July, 2017, as follows:

Barry Golden
Miller Egan Molter & Nelson, LLP
2911 Turtle Creek Blvd., Suite 1100
Dallas, Texas 75219
Phone: (214) 628-9500
Facsimile: (214) 628-9505
bgolden@milleregan.com

/s/ Tracey R. Wallace
Tracey R. Wallace

4839-4927-6747, v. 1

# TAB

# 12

Filed 8/3/2017 1:48 PM
Melanie Reed
District Clerk
Ellis County, Texas
Ellis County - District Clerk

CAUSE NO. 96285

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC. | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | OF ELLIS COUNTY, TEXAS |
| | § | |
| PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR), | § § | |
| | § | |
| *Defendant.* | § | 443RD JUDICIAL DISTRICT |

**MOTION TO MODIFY AGREED TEMPORARY INJUNCTION**

Plaintiff Coal City Cob Company, Inc. ("Coal City") hereby files this Motion to Modify the Agreed Temporary Injunction entered by this Court on July 14, 2017, and states as follows:

1. On June 7, 2017, Coal City filed its Verified Original Petition and Request for Injunctive Relief (the "Original Petition") against Defendants Palm Enterprises, Inc. and Sharon Frank (collectively the "Defendants") wherein it asserted claims for breach of contract, tortious interference with existing contract, civil conversion, and violations of the Texas Theft Liability Act and Texas Uniform Trade Secret Act.

2. On July 14, 2017, following negotiation and agreement of the parties before the Court, the Court entered an Agreed Temporary Injunction ("Original Injunction") prohibiting Defendants from, among other things set forth in the order, disseminating Coal City's proprietary information and from soliciting certain Coal City customers.

3. Recently, the parties discovered two procedural errors contained in the Agreed Injunction entered by the Court on July 14, neither of which concerns or modifies the substance of the prohibitions contained in the Original Injunction, or which were expressly agreed to by the parties before the Court. Therefore, in order to fully abide by the Texas Rules of Civil Procedure and ensure the Orders of this Court meet all procedural and technical prerequisites, Coal City

asks the Court to enter the attached Amended Temporary Injunction ("Amended Injunction"). The Amended Injunction mirrors in all material respects the substantive terms of the Agreed Injunction, and serves only to satisfy those provisions of Tex. R. Civ. P. 683 which were lacking in the Original Injunction.

WHEREFORE Coal City asks the Court to enter the attached Amended Agreed Temporary Injunction.

Dated: August 3, 2017

*/s/Christopher M. LaVigne*
Christopher M. LaVigne
Texas State Bar No. 24026984
lavignec@gtlaw.com
Steven V. Walkowiak
Texas State Bar No. 24047060
walkowiaks@gtlaw.com
Samuel G. Davison
Texas State Bar No. 24084280
davisons@gtlaw.com

GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
Telephone: (214) 665 – 3600
Facsimile: (214) 665 – 3601

ATTORNEYS FOR PLAINTIFF
COAL CITY COBB COMPANY, INC.

## CERTIFICATE OF CONFERENCE

The undersigned counsel hereby certifies that Plaintiff contacted Defendant numerous times regarding the relief requested herein. Plaintiff's counsel emailed Defense counsel on July, 27, and 31st and again on August 2, 2017. On each occasion, Defense counsel indicated that she has "not had the opportunity to substantively discuss [Plaintiff's] papers with [Defendants']". It is therefore presumed that Palm Enterprises and Sharon Frank oppose the relief sought herein and it is therefore presented to the Court for determination.

/s/Steven V. Walkowiak
Steven V. Walkowiak

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing motion was served on August 3, 2017, pursuant to the Texas Rules of Civil Procedure by ***Electronic Mail***, to the following counsel of record:

Tracey R. Wallace
Tracey.wallace@jacksonlewis.com
JACKSON LEWIS P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201
Telephone: (214) 520 – 2400
Facsimile: (214) 520 – 2008

/s/Steven V. Walkowiak
Steven V. Walkowiak

CAUSE NO. 96285

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC. | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | OF ELLIS COUNTY, TEXAS |
| | § | |
| PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR), | § | |
| | § | |
| | § | |
| *Defendant.* | § | 443RD JUDICIAL DISTRICT |

**NOTICE OF HEARING**

PLEASE TAKE NOTICE that a hearing on Plaintiff's Motion to Modify Agreed Temporary Injunction is set for ___________, 2017 at ____________ __.m. before Judge Cindy Ermatinger, 109 S. Jackson St., Third Floor, Waxahachie, Texas 75165.

Dated: August 4, 2017

*/s/Christopher M. LaVigne*
Christopher M. LaVigne
Texas State Bar No. 24026984
lavignec@gtlaw.com
Steven V. Walkowiak
Texas State Bar No. 24047060
walkowiaks@gtlaw.com
Samuel G. Davison
Texas State Bar No. 24084280
davisons@gtlaw.com

GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
Telephone: (214) 665 – 3600
Facsimile: (214) 665 – 3601

ATTORNEYS FOR PLAINTIFF
COAL CITY COBB COMPANY, INC.

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing motion was served on August 4, 2017, pursuant to the Texas Rules of Civil Procedure by ***Electronic Mail***, to the following counsel of record:

Tracey R. Wallace
Tracey.wallace@jacksonlewis.com
JACKSON LEWIS P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201
Telephone:     (214) 520 – 2400
Facsimile:      (214) 520 – 2008

*/s/Steven V. Walkowiak*
Steven V. Walkowiak

# TAB

# 13

ORIGINAL

FILED FOR RECORD
2017 AUG -8 AM 10: 17
MELANIE REED
DISTRICT CLERK
ELLIS COUNTY, TX

**NO. 96285**

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC., | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| v. | § | ELLIS COUNTY, TEXAS |
| PALM ENTERPRISES, INC. and, SHARON FRANK (AS GRANTOR) | § | |
| Defendants. | § | 443RD JUDICIAL DISTRICT |

**ORDER GRANTING PLAINTIFF'S UNOPPOSED MOTION TO SUBSTITUTE COUNSEL FOR COAL CITY COB COMPANY, INC.**

On this day came on to be heard Plaintiff's Motion to Substitute Counsel for Coal City Cob Company, Inc. ("Motion to Substitute"). The Court finds that the Motion to Substitute is well-taken and should be and is GRANTED.

It is therefore ORDERED that Christopher M. LaVigne, Steven V. Walkowiak, and Samuel G. Davison and the law firm of Greenberg Traurig, LLP are hereby substituted in place of Barry M. Golden and the law firm of Miller, Egan, Molter & Nelson, LLP, as counsel of record for Plaintiff.

It is further ORDERED that Barry M. Golden and the law firm of Miller, Egan, Molter & Nelson, LLP are hereby withdrawn as counsel for Plaintiff.

The Court finds that the granting of this Motion to Substitute will not result in any delay or otherwise prejudice the parties.

SIGNED this 4 day of August 2017.

PRESIDING JUDGE

# TAB

# 14

ORIGINAL

FILED FOR RECORD 2017 AUG -8 AM 10:25 MELANIE REED DISTRICT CLERK ELLIS COUNTY, TX

CAUSE NO. 96285

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC. | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| v. | § | OF ELLIS COUNTY, TEXAS |
| | § | |
| PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR), | § | |
| | § | |
| *Defendant.* | § | 443RD JUDICIAL DISTRICT |

**NOTICE OF HEARING**

PLEASE TAKE NOTICE that a hearing on Plaintiff's Motion to Modify Agreed Temporary Injunction is set for Aug. 31, 2017 at 8:30 A.m. before Judge Cindy Ermatinger, 109 S. Jackson St., Third Floor, Waxahachie, Texas 75165.

Dated: August 4, 2017

/s/Christopher M. LaVigne
Christopher M. LaVigne
Texas State Bar No. 24026984
lavignec@gtlaw.com
Steven V. Walkowiak
Texas State Bar No. 24047060
walkowiaks@gtlaw.com
Samuel G. Davison
Texas State Bar No. 24084280
davisons@gtlaw.com

GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
Telephone: (214) 665 – 3600
Facsimile: (214) 665 – 3601

ATTORNEYS FOR PLAINTIFF
COAL CITY COBB COMPANY, INC.

**CERTIFICATE OF SERVICE**

The undersigned certifies that a true and correct copy of the foregoing motion was served on August 4, 2017, pursuant to the Texas Rules of Civil Procedure by ***Electronic Mail***, to the following counsel of record:

Tracey R. Wallace
Tracey.wallace@jacksonlewis.com
JACKSON LEWIS P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201
Telephone: (214) 520 – 2400
Facsimile: (214) 520 – 2008

*/s/Steven V. Walkowiak*
Steven V. Walkowiak

# TAB

# 15

FILED FOR RECORD
2017 AUG 30 PM 3:41
MELANIE REED
DISTRICT CLERK
ELLIS COUNTY, TX

CAUSE NO. 96285

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC.<br><br>*Plaintiff,*<br><br>v.<br><br>PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR),<br><br>*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT<br><br>OF ELLIS COUNTY, TEXAS<br><br>443RD JUDICIAL DISTRICT |

**AGREED AMENDED TEMPORARY INJUNCTION**

Plaintiff Coal City Cob Company, Inc. ("Coal City") and Defendants Palm Enterprises, Inc. and Sharon Frank (as Guarantor) submit this Amended Agreed Temporary Injunction.

Having considered the evidence and the arguments, the Court concludes that Coal City and the Defendants were parties to a February 3, 2014 Affiliate Agreement ("Affiliate Agreement"). Under the Affiliate Agreement, the Defendants agreed not to (1) misappropriate Coal City's confidential information, (2) solicit Coal City's customers to transfer their business away from Coal City, or (3) solicit Coal City's contractors and employees, including drivers, to quit working for Coal City and work elsewhere. Coal City has alleged that the Defendants violated all three provisions, and if not restrained, will continue doing so. The Court agrees. There is sufficient evidence demonstrating a likelihood of success on the merits for Coal City in its claims against the Defendants for breach of contract, tortious interference with existing contracts, civil conversion, Texas Theft Liability Act, and/or Texas Uniform Trade Secrets Act. The Court has seen sufficient evidence that absent a temporary injunction, the Defendants will continue violating these provisions of the Affiliate Agreement, and such violations will cause Coal City to experience irreparable harm and that such harm is probable, imminent, and irreparable. Coal City has demonstrated that the injuries suffered by the Defendants are

irreparable because they cannot be accurately measured or compensated through monetary damages. Coal City has shown that the Defendants' conduct, should it go unrestrained and enjoined, will cause harm to Coal City's operations and sales and will cause an impact on revenue and profitability that are impossible to quantify with a specific pecuniary standard. Coal City has shown that it is entitled to a temporary restraining order because it is already suffering harm and will continue to suffer harm before notice can be served and a hearing may be held.

IT IS THEREFORE ORDERED that based on the evidence presented at the hearing on July 14, 2017, Coal City's application for temporary injunction Defendants is GRANTED.

IT IS FURTHER ORDERED that until the end of trial in this case (the Injunction Period'), the Defendants are restrained and enjoined from disseminating proprietary information and trade secrets of Coal City including, without limitation, its services, products, customer information, processes, sales information, know-how, practice, policies, and other confidential information which is considered proprietary or secret by Coal City, including without limitation, City's information about its finances, customer rates, customer identifications, customer lanes, and information about valuable Coal City employees (including names, addresses, e-mail addresses, and phone numbers).

IT IS FURTHER ORDERED that during the Injunction Period, the Defendants shall not solicit or haul freight for the following Coal City customers on the following customer lanes: (a) Tradebe Treatment & Recycling, LLC ("Tradebe") - East Chicago, IN to Logansport, IN, (b) Tradebe - East Chicago, IN to Greencastle, IN; ( c) Tradebe - East Chicago, IN to Paulding, OH, (d) Kemira Chemicals, Inc. ("Kemira")- East Chicago, IN to Millington, TN, (e) Kemira - Butler, IN to East Chicago, IN; (f) Kemira - Jeffersonville, IN to East Chicago, IN, (g) Solvay USA, Inc - University Park, ILL to Knoxville, TN; (h) Solvay- University Park, IL to Murray, KY, (i)

Solvay- University Park, IL to Corsicana, TX, (j) Solvay- University Park, IL to Saint Louis, MO, (k) Solvay - University Park, IL to Kilgore, TX, (l) Nalco-Champion ("Nalco") - University Park, IL to Kilgore, TX, (m) Nalco - University Park, IL to Centerville, TX, (n) Nalco - University Park, IL to Hebbronville, TX, (o) Harcross Chemicals, Inc. - Lima, OH to Dallas, TX, (p) Harcross - University Park, IL to Longview, TX, (q) Harcross - University Park, IL to Sibley, LA, (r) Harcross - Houston, TX to Dallas, TX, (s) Harcross - University Park, IL to Dallas, TX; (t) Harcross - Winder, GA to Longview, TX; (u) Harcross - Winder, GA to Sibley, LA, (v) Harcross - University Park, IL to Pasadena, TX, and (w) Univar USA, Inc. -Charleston, SC to North Charleston, South, SC (collectively, the "Customer Lanes"). During the TRO Period, the Defendants are expressly prohibited from hauling freight for these customers on the Customer Lanes by use of vehicles containing the following VIN numbers: (1) 1XPBD49X7FD308061, (2) 1XPBD49X7GD308062, (3) 1XPBD49X9GD308063, (4) 1XPBD49XOGD308064, (5) 1XPBD49X2GD308065, (6) 1XPBD49X4GD308066, (7) 1XKDD49X8DJ334908, or (8) 4V4NC9EH4EN164270.

IT IS FURTHER ORDERED that during the Injunction Period, the Defendants (and anyone acting in concert with the Defendants) may not dispatch Rashid Malik, Christian Russell, James Uribe, Eric Holder, or Derek Turner (the "Drivers") to haul freight on the Customer Lanes. The Defendants are expressly prohibited from facilitating the hauling of freight for these customers on the Customer Lanes by use of the vehicles owned or operated by the Driver containing the following VIN numbers: (1) M1AW07Y0FM046539), (2) SKJJABCK15PN82105), (3) 1XP5D49XX7N679837, (4) 1XKADB9X47J156443, or (5) 2WKEDDJJ4YK965013).

IT IS FURTHER ORDERED that during the Injunction Period, the Defendants may not solicit any of Coal City's customers, or solicit any of Coal City's drivers or other contractors or employees.

IT IS FURTHER ORDERED that in addition to being binding on the Defendants, this temporary injunction is also binding upon Palm's agents, servants, attorneys (collectively, "Agents") and anyone acting in concert or participation with Palm or any of the Agents who receive actual notice of this temporary restraining order. The Clerk of this Court shall issue a temporary injunction in conformity with the law and the terms of this Order. The temporary injunction is immediately effective upon the Court's signature. Subject to further order of this Court, this temporary restraining order expires at the close of trial.

IT IS FURTHER ORDERED that Coal City shall submit bond, cash in lieu of a bond, or firm check from the law firm of Greenberg Traurig in the amount of one hundred dollars ($100.00).

IT IS FURTHER ORDERED that a final trial date shall be set for the 20th day of August, 2018, at 9:00 a.m.

**NOTICE - a violation of this Temporary Injunction can result in contempt of court, which is punishable by jail time, or a fine/sanctions, or both jail time and a fine/sanctions.**

SIGNED this 29 day of August 2017

JUDGE PRESIDING

AGREED:

Tracey R. Wallace
Jackson Lewis, P.C.

ATTORNEYS FOR DEFENDANTS

Steven V. Walkowiak
Greenberg Traurig, LLP

ATTORNEYS FOR PLAINTIFF

# TAB

# 16

96285
Filed 8/15/2017 3:31 PM
Melanie Reed
District Clerk
Ellis County, Texas

**Ellis County District Clerk** Ellis County - District Clerk **Questions: 972-825-5091**

**E-FILING REQUEST FOR ISSUANCE**

## CITATIONS,WRITS,NOTICE,PRECEPT,TRO, ETC..

- This document Must be filed as a separate LEAD document when e-filing
- Choose the filing code "Request" and add the type of issuance in the description field
- Select the type of issuance using the "Optional Services" section on the e-filing screen
- If a service document is required, you MUST add the copies using the "Optional Services" section, select Certified Copies/Regular Copies and add as many pages as needed.(Ex: Petition is 5 pages, 3 citations are requested: 5x3=15 pages will need to be printed by Clerk at $1.00 per page).

Cause No. 96285 Document to be served: Writ of Injunction

Style of Case: Coal City Cob Company, Inc. v. Palm Enterprises, Inc. and Sharon Frank (As Guarantor)

PLEASE USE THIS FORM WHEN REQUESTING ISSUANCE OF THE BELOW LISTED TYPES OF ISSUANCE THROUGH THE E-FILING SYSTEM.

PLEASE USE OTHER REQUEST FORMS FOR: ABSTRACTS, EXECUTIONS, SUBPOENAS AND ORDER WITHHOLDING

**Please select the type and quantity of issuance(s) needed:**

| Type | Amt. | Quantity | Type | Amt. | Quantity |
|---|---|---|---|---|---|
| Citation | $8 | | Writ: Attachment | $8 | |
| Notice | $8 | | Writ: Certiorari | $8 | |
| Precept | $8 | | Writ: Commitment | $8 | |
| Temporary Restraining Order | $8 | | Writ: Garnishment | $8 | |
| Scire Facias | $8 | | Writ: Possession | $8 | |
| Letter Rogatory | $8 | | Writ: Sequestration | $8 | |
| Show Cause Notice | $8 | | Writ: Turnover | $8 | |
| | | | Writ: Other | $8 | 1 |

**All service payment options are chosen by picking the correct options in the "Optional Service" section of e-filing**

Name of Party to be served: Sharon Frank Type: Personal Service

Address for service: Jackson Lewis P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201

Name of Party to be served: ______________________ Type: __________

Address for service: ______________________

Name of Party to be served: ______________________ Type: __________

Address for service: ______________________

Please attach additional pages if there are more parties to be served.

**ALL CITATIONS WILL BE E-FILED BACK TO YOU UNLESS YOU CHOOSE ONE OF THE FOLLOWING OPTIONS.**

☐ I have paid for a copy of the document to attach to the issuance and would like it sent by certified mail.

☐ I have paid for a copy of the document to attach to the issuance and would like it served by Ellis County Sheriff/Constable: SHF ☐; PCT1 ☐; PCT2 ☐; PCT3 ☐; PCT4 ☐

☐ I have paid for a copy of the document to attach to the issuance and would like it served by posting. (A Motion & Order are required.)

☐ I would like issuance served by Publication. (A Motion & Order are required.)
Name of Publication ______________________

**Requestor Name:** Steven V. Walkowiak
**Phone No.** 214-665-3683
**E-Mail Address:** walkowiaks@gtlaw.com

# TAB

# 17

Filed 10/11/2017 4:34 PM
Melanie Reed
District Clerk
Ellis County, Texas

CAUSE NO. 96285

COAL CITY COB COMPANY, INC., Plaintiff, v. PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR), Defendants.

IN THE DISTRICT COURT OF ELLIS COUNTY, TEXAS, 443RD JUDICIAL DISTRICT

REPORTER'S CERTIFICATION
DEPOSITION OF SHARON FRANK
JULY 11, 2017

I, Lezley Cull, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, SHARON FRANK, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on July 21, 2017 to the witness or to the attorney for the witness for examination, signature and return to me by August 10, 2017;

That the amount of time used by each party

at the deposition is as follows:

Mr. Barry M. Golden, 3:41

Ms. Tracey R. Wallace, 0:09

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Mr. Barry M. Golden, Attorney for Plaintiff

Ms. Tracey R. Wallace, Attorney for Defendants

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred. Certified to by me this 13th day of July, 2017.

[signature]

Lezley Cull, Texas CSR 5528
Expiration Date: 12/31/17
DepoTexas, Firm Registration #459
6500 Greenville Avenue
Suite 445
Dallas, Texas 75206
214-373-4977

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original ~~deposition~~ signature page was (was not) returned to the deposition officer on August 10, 2017;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Barry M. Golden, Custodial Attorney;

That $2712.94 is the deposition officer's charges to the Plaintiffs for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me this 11th day of October, 2017.

Lezley Cull

Lezley Cull, Texas CSR 5528
Expiration Date: 12/31/17
DepoTexas, Firm Registration #459
6500 Greenville Avenue
Suite 445
Dallas, Texas 75206
214-373-4977

# TAB

# 18

CAUSE NO. 96285

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC., | ) | IN THE DISTRICT COURT OF |
| Plaintiff, | ) | |
| v. | ) | ELLIS COUNTY, TEXAS |
| PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR), | ) | |
| Defendants. | ) | 443RD JUDICIAL DISTRICT |

REPORTER'S CERTIFICATION
DEPOSITION OF ROGER NIKODYM
JULY 12, 2017

I, Lezley Cull, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, ROGER NIKODYM, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on July 21, 2017 to the witness or to the attorney for the witness for examination, signature and return to me by August 10, 2017;

That the amount of time used by each party

at the deposition is as follows:

Mr. Barry M. Golden, 4:05

Ms. Tracey R. Wallace, 0:14

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Mr. Barry M. Golden, Attorney for Plaintiff

Ms. Tracey R. Wallace, Attorney for Defendants

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 13th day of July, 2017.

NDTCA Transcript Signed Electronic

Lezley Cull, Texas CSR 5528
Expiration Date: 12/31/17
DepoTexas, Firm Registration #459
6500 Greenville Avenue
Suite 445
Dallas, Texas 75206
214-373-4977

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original ~~deposition~~ signature page was/(was not) returned to the deposition officer on August 10, 2017;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Barry M. Golden, Custodial Attorney;

That $2351.55 is the deposition officer's charges to the Plaintiffs for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me this 11th day of October, 2017.

Lezley Cull

Lezley Cull, Texas CSR 5528
Expiration Date: 12/31/17
DepoTexas, Firm Registration #459
6500 Greenville Avenue
Suite 445
Dallas, Texas 75206
214-373-4977

# TAB

# 19

Filed: 10/18/2017 3:27 PM
Melanie Reed
District Clerk
Ellis County, Texas

**CAUSE NO. 96285**

| | | |
|---|---|---|
| **COAL CITY COB COMPANY, INC,** | § | **IN THE DISTRICT COURT** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **OF ELLIS COUNTY, TEXAS** |
| | § | |
| **PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR)** | § | |
| | § | |
| | § | **443RD JUDICIAL DISTRICT** |
| **Defendant.** | § | |

**MOTION TO SUBSTITUTE COUNSEL**

Defendants Palm Enterprises, Inc. and Sharon Frank (As Guarantor) ("Defendants") file this Motion to Substitute Counsel, requesting that their current respective counsel be permitted to withdraw and that Vic H. Henry, Michael G. Oddo and Katherine Knight and the Law Firm of Henry Oddo Austin & Fletcher, P.C. be permitted to substitute as counsel of record.

**I.**

Defendants are currently represented in this action by Tracey R. Wallace and Julie Farmer and the Law Firm of Jackson Lewis LLP, 500 N. Akard, Suite 2500, Dallas, Texas 75201. Defendants hereby request this Court allow this counsel to withdraw from representation of Defendants.

**II.**

Defendants further ask that the law firm of Henry Oddo Austin & Fletcher, P.C., through Vic H. Henry, Michael G. Oddo and Katherine Knight, be permitted to substitute as counsel of record for Defendants. In support of this Motion, Defendants would show as follows:

1. The law firm of Henry Oddo Austin & Fletcher, P.C., through Vic H. Henry, Michael G. Oddo, and Katherine Knight, has been retained to represent Defendants.

2. Defendants have instructed their current counsel to withdraw, therefore, Defendants have consented to said withdrawal and substitution.

3. Defendants' new counsel is located at the following address: Henry Oddo Austin & Fletcher, 1700 Pacific Avenue, Suite 2700, Dallas, Texas 75201.

4. Withdrawal and substitution of counsel can be accomplished without material adverse effect on the interests of these Defendants or to the Plaintiff, and is not sought for delay.

5. Defendants request that all notices given or required to be given, and all papers served or required to be served in these proceedings, be served on the undersigned as follows:

Vic H. Henry
vhhenry@hoaf.com
Michael G. Oddo
moddo@hoaf.com
Katherine Knight
kknight@hoaf.com
1700 Pacific Avenue, Suite 2700
Dallas, Texas 75201
214-658-1900 (Telephone)
214-658-1919 (Facsimile)

6. **DISTRICT CLERK TO NOTE**

Defendants Palm Enterprises, Inc. and Sharon Frank (As Guarantor) request this Court allow their current attorneys to withdraw for all purposes from representing them, and that the law firm Henry Oddo Austin & Fletcher, P.C., through Vic H. Henry, Michael G. Oddo, and Katherine Knight, be designated as counsel for Defendants Palm Enterprises, Inc. and Sharon Frank (As Guarantor) for all purposes in the above-entitled cause.

Respectfully submitted,

**JACKSON LEWIS LLP**

By: /s/ Tracey R. Wallace
Tracey R. Wallace Esq.
State Bar No. 00797617
Tracey.Wallace@jacksonlewis.com
Julie Farmer Esq.
State Bar No. 24059734
FarmerJ@jacksonlewis.com
500 N. Akard, Suite 2500
Dallas, Texas 75201
PH: (214) 520-2400
FX: (214) 520-2008

**ATTORNEYS FOR DEFENDANTS PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR)**

**AGREED:**

**HENRY ODDO AUSTIN & FLETCHER,**
A Professional Corporation
1700 Pacific Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214 658-1900
Facsimile: (214) 658-1919

By: *_/s/ Vic H. Henry_*
Vic H. Henry
TBN 09484250
vhhenry@hoaf.com
Michael G. Oddo
TBN 15192100
moddo@hoaf.com
Katherine Knight
TBN 10759900
kknight@hoaf.com

**NEW COUNSEL FOR DEFENDANTS PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR)**

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document has been forwarded to all counsel of record in accordance with the Texas Rules of Civil Procedure on the 18th day of October, 2017, as follows:

Christopher M. LaVigne
Steven V. Walkowiak
Samuel G. Davison
Greenberg Traurig, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201

*/S/ Vic H. Henry*
Vic H. Henry

**CERTIFICATE OF CONFERENCE**

On October 17, 2017, I hereby certify that this I conferred with Steve Walkowiak, counsel for Plaintiff, regarding the foregoing Motion to Withdraw and Substitute Counsel, and he confirmed by e-mail that Plaintiff does not oppose the Motion.

*/s/ Vic H. Henry*
Vic H. Henry

# TAB

# 20

ORIGINAL

FILED FOR RECORD
2017 OCT 24 PM 4:06
MELANIE REED
DISTRICT CLERK
ELLIS COUNTY, TX

**CAUSE NO. 96285**

| | | |
|---|---|---|
| **COAL CITY COB COMPANY, INC,** | § | **IN THE DISTRICT COURT** |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **OF ELLIS COUNTY, TEXAS** |
| | § | |
| **PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR)** | § | |
| | § | **443RD JUDICIAL DISTRICT** |
| **Defendants.** | § | |

**ORDER GRANTING UNOPPOSED MOTION TO SUBSTITUTE COUNSEL**

Before the Court is the Motion to Substitute Counsel of Defendants Palm Enterprises, Inc. and Sharon Frank (As Guarantor) ("Defendants") in the above-entitled and numbered cause. After considering the merits of the Motion, the Court is of the opinion that the Motion should be GRANTED.

IT IS THEREFORE ORDERED that the Motion to Substitute Counsel is GRANTED and Tracey R. Wallace and Julie Farmer and the Law Firm of Jackson Lewis LLP, 500 N. Akard, Suite 2500, Dallas, Texas 75201 are allowed to withdraw as counsel for Defendants.

IT IS FURTHER ORDERED that the law firm of Henry Oddo Austin & Fletcher, 1700 Pacific Avenue, Suite 2700, Dallas, Texas 75201 (214) 658-1900, through Vic H. Henry, Michael G. Oddo, and Katherine Knight, be permitted to substitute as counsel of record for Defendants.

IT IS FURTHER ORDERED that the District Clerk shall place Defendants' new attorneys' names, address and contact information on any list of attorneys of record to be prepared or existing in this cause, including the computer files and docket sheet.

Date: Oct. 23, 2017

JUDGE PRESIDING

# TAB

# 21

96285
Ellis County - District Clerk
Filed 10/27/2017 3:12 PM
Melanie Reed
District Clerk
Ellis County, Texas

CAUSE NO. 96285

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ELLIS COUNTY, TEXAS |
| | § | |
| PALM ENTERPRISES, INC. and, SHARON FRANK (AS GRANTOR) | § | |
| | § | |
| | § | |
| Defendants. | § | 443RD JUDICIAL DISTRICT |

**UNOPPOSED MOTION TO SUBSTITUTE COUNSEL**

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW Coal City Cob Company, Inc., Plaintiff in the above-referenced cause, and pursuant to the Texas Rules of Civil Procedure, files this Unopposed Motion to Substitute Counsel and in support thereof would respectfully show unto the Court *as* follows:

I.

Plaintiff's current counsel of record is Steven V. Walkowiak of Greenberg Traurig, LLP. Plaintiff now requests this Court to allow Steven Walkowiak on his behalf and on behalf of the law firm of Greenberg Traurig, LLP, to withdraw as attorneys of record for Plaintiff, Coal City Cob Company, Inc. and requests the Court to allow Brian N. Hail and the law firm of Gruber Hail Johansen Shank, LLP. to be substituted in as attorneys of record for said Plaintiff.

II.

This Motion is not made for the purpose of delay only, but rather so that justice may be served.

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Coal City Cob Company, Inc., respectfully prays the Court to allow Steven V. Walkowiak and the law firm Greenberg Traurig, L.L.P. to withdraw as attorneys of record for said Plaintiff and substitute in their place and stead Brian N. Hail and the law firm Gruber Hail Johansen Shank as attorneys of record for said Plaintiff.

Respectfully submitted,

GRUBER HAIL JOHANSEN SHANK, L.L.P.

By: /s/Brian N. Hail
Brian N. Hail
State Bar No. 08705500
bhail@ghtrial.com
1445 Ross Avenue, Suite 2500
Dallas, TX 75202
Telephone (214) 855-6800
Fax (214) 855-6808

**ATTORNEYS FOR PLAINTIFF,**
**COAL CITY COB COMPANY, INC.**

**CERTIFICATE OF CONFERENCE**

I certify that on October 26, 2017, I conferred with Vic Henry at Henry Oddo Austin & Fletcher, and he stated that he is not opposed to Plaintiff's Motion to Substitute Counsel.

/s/Brian N. Hail
Brian N. Hail

**CERTIFICATE OF SERVICE**

The undersigned certifies that a true and correct copy of the foregoing document was served on October 27, 2017 to the following counsel of record electronically via the Court's filing system in accordance with the Texas Rules of Civil Procedure.

Vic Henry
Henry Odo Austin & Fletcher
1700 Pacific Avenue
Suite 2700
Dallas, Texas 75201

/s/Brian N. Hail
Brian N. Hail

# TAB

# 22



FILED FOR RECORD
2017 NOV -3 PM 4:12
MELANIE REED
DISTRICT CLERK
ELLIS COUNTY, TX

CAUSE NO. 96285

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC., Plaintiff, | § | IN THE DISTRICT COURT OF |
| v. | § | ELLIS COUNTY, TEXAS |
| PALM ENTERPRISES, INC. and, SHARON FRANK (AS GRANTOR) Defendants. | § | 443RD JUDICIAL DISTRICT |

**ORDER ON PLAINTIFF'S UNOPPOSED MOTION TO SUBSTITUTE COUNSEL**

CAME ON to be heard the Plaintiff's Unopposed Motion to Substitute Counsel. The Court having read the Motion, finds the motion to be meritorious. It is therefore;

ORDERED, ADJUDGED AND DECREED that Steven V. Walkowiak on behalf of himself and on behalf of Greenberg Traurig, LLP are hereby allowed to withdraw as attorneys of record for Plaintiff, Coal City Cob Company, Inc. It is further,

ORDERED, ADJUDGED AND DECREED that Brian N. Hail and the law firm of Gruber Hail Johansen Shank, LLP, be substituted as attorneys of record for Plaintiff, Coal City Cob Company, Inc. It is further

ORDERED, ADJUDGED AND DECREED that in accordance with Rule 8 of the Texas Rules of Civil Procedure, Brian Hail is hereby designated as the attorney in charge for Plaintiff, Coal City Cob Company, Inc.

SIGNED this 3 day of ~~October~~ Nov, 2017.

JUDGE PRESIDING

GENE KNIZE
Senior District Judge
Presiding by Assignment

# TAB

# 23

Filed 12/14/2017 4:29 PM
Melanie Reed
District Clerk
Ellis County, Texas

**CAUSE NO. 96285**

| | | |
|---|---|---|
| **COAL CITY COB COMPANY, INC.,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **V.** | § | |
| | § | **ELLIS COUNTY, TEXAS** |
| **PALM ENTERPRISES, INC., SHARON FRANK, TRANSWOOD CARRIERS, INC., AND TRANSWOOD, INC.,** | § § § § | |
| | § | |
| ***Defendants.*** | § | **443rd JUDICIAL DISTRICT** |

**PLAINTIFF'S VERIFIED FIRST AMENDED PETITION**

Plaintiff Coal City Cob Company, Inc. ("Coal City") files this Verified First Amended Petition complaining of Defendants Palm Enterprises, Inc. ("Palm"), Sharon Frank, individually and as Guarantor of Palm Enterprises ("Frank"), TransWood Carriers, Inc. ("TransWood Carriers"), and TransWood, Inc.[1] (collectively "Defendants").

## A. NATURE OF THE CASE

1. This is a case about corporate espionage. Coal City is in the business of liquid bulk transportation services to the chemical and hazardous waste industries. Palm worked for Coal City as an "Affiliate" by dispatching vehicles to transport liquids for Coal City's customers. Palm's position was, therefore, one of operations within the Coal City company. As such, Palm had wide access to and necessarily utilized the portions of Coal City's Enterprise Resource Planning ("ERP") system containing much of Coal City's highly confidential and proprietary Trade Secrets,[2] including all of Coal City's information about its finances, customer rates, customer identifications, customer lanes, and information about valuable Coal City employees (including

[1] TransWood Carriers and TransWood, Inc. are collectively referred to herein as "TransWood."
[2] For the purposes of this Pleading, the term "Trade Secrets" shall have the meaning ascribed to it in TEX. CIV. PRAC. & REM. CODE ANN. §134A, unless otherwise indicated.

names, addresses, e-mail addresses, and phone numbers). Additionally, Palm participated in weekly Terminal Managers (Operations) calls, where Palm and Frank also acquired knowledge of Coal City's operating activities and strategies, future business plans, customers, projected customers, financial matters, and planned deliveries spanning into the future. Palm and Frank were granted access to all this highly confidential and proprietary trade-secret information in order to integrate Palm into the Coal City network, and to make it an effective Affiliate for the overall Coal City operations. Prior to acquiring any such information, however, in addition to the protections afforded by relevant trade secret laws, Palm executed a detailed affiliate agreement, which specifically prohibited distributing and disseminating Coal City's Trade Secrets, and further prohibited certain other post-employment activities within the bounds of applicable law.

2. In May 2017, Palm notified Coal City of its intent to terminate its relationship with Coal City. Unbeknownst to Coal City at the time, however, Palm and Frank had previously conspired with Coal City's direct competitor, TransWood Carriers, and its subsidiary, TransWood, Inc., to systematically acquire Coal City Trade Secrets, divert Coal City shipments to TransWood, and otherwise disrupt Coal City customer relationships so that TransWood could step in to acquire these lucrative business opportunities.

3. In March 2017, Palm planned to quit working for Coal City and begin working for TransWood Carriers. But while still under contract with Coal City, Palm and Frank meticulously gathered confidential Coal City Trade Secrets and data, and began recruiting some of Coal City's most valuable drivers to join them in disrupting Coal City's operations. Specifically, Palm and Frank convinced certain key drivers to quit their positions with Coal City and, like Palm, start working for TransWood Carriers and/or TransWood, Inc. These acts were not only prohibited by an agreement between Coal City and Palm, but they give rise to various common law and statutory claims against Defendants under Texas law.

4. In addition to the foregoing, Coal City discovered that Palm, through Frank, accessed the computer system of Coal City without the consent of Coal City—and after access to such system had been restricted. Specifically, Frank accessed Coal City's fuel and cash advance system to restore access to this system for certain former drivers of Coal City who had agreed to follow Palm to TransWood Carriers and/or its subsidiary TransWood, Inc. Although the access to the fuel and cash advance system for these drivers had already been suspended as a result of these individuals' notice to terminate their relationship with Coal City, Frank penetrated the computer system of Coal City, and restored access for these select drivers, and otherwise charged the account of Coal City for fuel and cash advance.

5. As indicated above, Palm and Frank did not act alone. As early as March 2017—a full two months before the date on which Palm gave notice of its intent to terminate its relationship with Coal City—TransWood began working with Palm and Frank to acquire Coal City Trade Secrets, raid Coal City's customers, and otherwise utilize Palm and Frank's unique knowledge to materially harm Coal City, and financially benefit Defendants. Palm and Frank provided a confidential copy of their executed Affiliate Agreement to a representative of TransWood. As a result of this action, TransWood was fully aware of the prohibitions in Palm's affiliate agreement, which restrained its post-employment activities, and otherwise expressly addressed the confidentiality of the materials being fed to TransWood. To wit, Palm and Frank even advised TransWood of their destruction of company emails to cover their tracks; yet, TransWood readily encouraged, accepted, and used Coal City's Trade Secrets to its advantage, and otherwise took advantage of the chaos Palm and Frank created among Coal City's customers.

**B. DISCOVERY CONTROL PLAN & RULE 47 STATEMENT**

6. Pursuant to TEX. R. CIV. P. 190.4, Coal City intends for discovery to be conducted by a Level 3 discovery control plan. As such, Coal City intends to move the Court to enter a

discovery control plan order under TEX. R. CIV. P. 190.4. Coal City seeks monetary relief over $1,000,000, which is within the jurisdictional limits of this Court, and non-monetary relief including the imposition of a constructive trust and/or a permanent injunction.

**C. PARTIES**

7. "Coal City Cob Company, Inc." is a corporation organized under the laws of Illinois, with its principal place of business in Ellis County, Texas.

8. "Palm Enterprises, Inc." is a corporation organized under the laws of Indiana, with its principal place of business in Schererville, Indiana, and has already made an appearance in this lawsuit.

9. "Sharon Frank" is an individual residing in Indiana, and has already made an appearance in this lawsuit.

10. "TransWood Carriers, Inc." is a corporation organized under the laws of Nebraska, with its principal place of business in Omaha, Nebraska. TransWood Carriers engages in business in Texas, but has failed to appoint a registered agent in Texas. Therefore, TransWood Carriers may be served with process through the Secretary of State of Texas, with duplicate copies of process, by Certified Mail, Return Receipt Requested, issued by the District Clerk, with notice to Brian Wood, President of TransWood Carriers, at its home office address at 2665 St. Mary's Avenue, Omaha, Nebraska 68105. Service is authorized under TEX. CIV. PRAC. & REM. CODE ANN. §§ 17.044 and 17.045.

11. "TransWood, Inc." is a corporation organized under the laws of Texas. TransWood, Inc. is authorized to, and does conduct business in Texas, with its principal place of business in Omaha, Nebraska. TransWood, Inc. may be served with process through its registered agent, John C. Sims, at its registered office, 1205 Broadway Street, Lubbock, Texas 79401-3203.

## D.   JURISDICTION AND VENUE

12.     Palm and Frank, acting as an affiliate or agent of Coal City, were at all times relevant to this lawsuit, in the business of facilitating the transport of bulk chemicals to and from locations in Texas, including, among others, (a) Kilgore, Texas; (b) Centerville, Texas; (c) Hebbronville, Texas; (d) Dallas, Texas; (e) Longview, Texas; (f) Pasadena, Texas; and (g) Corsicana, Texas.

13.     TransWood Carriers and its subsidiary TransWood, Inc. are direct competitors of Coal City in the business of transporting bulk chemicals to and from locations in Texas. Both TransWood Carriers, and its subsidiary TransWood, Inc. directly compete with Coal City in substantially similar transportation lanes within Texas. TransWood Carriers and TransWood, Inc. operate numerous facilities in Texas, including locations at Baytown, Buda, Houston, Midlothian, San Angelo, and San Antonio, Texas. The Court has jurisdiction over TransWood Carriers and TransWood, Inc. because, among other acts, between May 15, 2017 and May 20, 2017 Palm rerouted, canceled or otherwise assigned Coal City loads to TransWood Carriers drivers in Texas, which TransWood Carriers and TransWood, Inc. in turn shipped to their own benefit, and Coal City's detriment. Among other loads and as more fully set forth in the fact section below, TransWood Carriers and TransWood, Inc., acting in concert with Palm and Frank, usurped loads of Coal City from Coal City customer Nalco in Centerville Texas, as well as in Kilgore, Texas. Through the combined tortious acts of Palm, Frank, and TransWood, Coal City was deprived of these loads, as well as future business with these and other customers, which Palm acquired for TransWood while under contract with Coal City.

14.     On July 1, 2010, Palm entered into a contractor agreement with Coal City ("2010 Agreement").[3] On May 3, 2013, Palm and Frank, as Guarantor, entered into an affiliate agreement with Coal City ("2013 Agreement").[4] This agreement stated, "[t]his Agreement sets forth the entire Agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, if any related thereto." On February 3, 2014, Palm and Frank (as Guarantor) entered into another affiliate agreement that also stated (in paragraph 33), "[t]his Agreement sets forth the entire Agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, if any related thereto." Thus, the governing agreement between Palm and Coal City is the affiliate agreement dated February 3, 2014 (the "Affiliate Agreement").[5] This Affiliate Agreement is the subject of this lawsuit. Paragraph 25 of the Affiliate Agreement reads, in relevant part:

> [Palm] hereby specifically agrees that, for the purposes of this Agreement and the relationship between [Coal City] and [Palm], [Palm] is authorized to do business, and does business, in the State of Texas. . . . [E]ach party hereby irrevocably submits to the non-exclusive jurisdiction of the state and federal courts of the State of Texas and consents to service of process upon such party in any legal proceeding arising out of or in connection with this Agreement.[6]

15.     Coal City seeks monetary relief within the jurisdictional limits of this Court and non-monetary relief. Further support for jurisdiction is provided in Article 5, Sections 1 and 8 of the Texas Constitution and TEX. GOV'T CODE §§ 24.007 and 24.008.

16.     Pursuant to TEX. CIV. PRAC. & REM. CODE §15.002(a)(1), venue is proper in Ellis County because Palm worked for Coal City, which has its principal place of business in Ellis County, and which is where Coal City sustained injuries sustained from Palm and Frank's conduct.

---

[3] A copy of the 2010 Agreement is not being attached to this Verified Petition due to its inclusion of potentially confidential information. Relevant portions of the 2010 Agreement are quoted herein and previously verified.
[4] A copy of the 2013 Agreement is not being attached to this Verified Petition due to its inclusion of potentially confidential information. Relevant portions of the 2013 Agreement are quoted herein and previously verified.
[5] *See* Ex. A.
[6] Paragraph 25 of the 2013 Agreement contained identical language.

Additionally, venue is appropriate in—and, in fact exclusive to—Ellis County, Texas, based on paragraph 25 of the Affiliate Agreement, which states, in relevant part:

> Any action, proceeding, or claim arising out of or relating to this Agreement commenced by any party must be prosecuted in Ellis County, Texas. Each party hereby waives any plea of privilege that might exist in the absence of such party's agreement to prosecute such claim in Ellis County, Texas[.][7]

17. Pursuant to TEX. CIV. PRAC. & REM. CODE §15.005, venue is proper in Ellis County as to TransWood Carriers and TransWood, Inc. because Plaintiff has previously established venue as to co-defendants Palm and Frank, and the activities of TransWood Carriers and TransWood, Inc. are substantially related to and otherwise intertwined with the activities of Palm and Frank.

**E. FACTS**

18. Coal City is a provider of liquid bulk transportation services. Founded in 1970, Coal City is a provider of liquid bulk transportation services to the chemical and hazardous waste industries. Coal City has a loyal customer base of major chemical manufacturers, distributors, specialty chemical companies and end users who represent some of the most respected names in the business.

19. Coal City entered into an Affiliate Agreement with Palm. On July 1, 2010, Palm entered into the 2010 Agreement. On May 3, 2013, Palm and Frank (as Guarantor) entered the 2013 Agreement. On February 3, 2014, Palm and Frank (as Guarantor) entered the Affiliate Agreement. Since 2010, and under the 2010 Agreement, 2013 Agreement, and Affiliate Agreement, Palm performed liquid bulk transportation services for Coal City's customers.

20. Palm and Frank had wide access to Coal City's Confidential Information. Palm worked for Coal City by dispatching vehicles to transport liquids for Coal City's customers. Palm's position was, therefore, one of operations within the Coal City company. As such, Palm and Frank

[7] Paragraph 25 of the 2013 Agreement contained identical language.

had wide access to and necessarily utilized the portions of Coal City's ERP system containing much of Coal City's highly confidential and proprietary trade secrets, including, without limitation, its services, products, customer information, processes, sales information, know-how, practice, policies, and other confidential information, which is considered proprietary or secret by Coal City. Some of the most important confidential and proprietary trade secrets included Coal City's information about its finances, customer rates, customer identifications, customer lanes, and information about valuable Coal City employees and affiliates (including names, addresses, and phone numbers). Additionally, treating Palm similarly to a company-owned facility, Coal City included Palm on its weekly Terminal Managers (Operations) calls, during which Palm and Frank acquired knowledge of Coal City's operating activities and strategies, including future business targets and future bidding strategies. All the information described in this paragraph shall be defined herein as "Coal City's Confidential Information."

21. Palm agreed not to misappropriate Coal City's Confidential Information. Under the Affiliate Agreement, Palm agreed not to misappropriate or transmit to third parties Coal City's Confidential Information. Paragraph 11 of the Affiliate Agreement reads, in relevant part ("Agreement Not to Misappropriate Confidential Information"):

> **Confidentiality**. As part of the business relationship between [Coal City] and [Palm], [Coal City] will be required to disclose to [Palm] or [Palm] may come into possession of information or data which constitute proprietary information and trade secrets of [Coal City], including, without limitation, it[s] services, products, customer information, processes, sales information, know-how, practice, policies, and other confidential information which is considered proprietary or secret by [Coal City] (hereinafter "Confidential Information"). In consideration of the receipt of such Confidential Information and potential business, [Palm] hereby agrees that during the term of this Agreement and for a period of five (5) years thereafter, it will maintain such Confidential Information in the utmost of confidence and will not disclos[e] such Confidential Information without the prior written consent of [Coal City]; to use such solely in connect with such business relationship; and to take all measures necessary to protect such Confidential Information.[8]

[8] *See* Ex. A.

Palm and Frank have long been on notice as to the restriction against misappropriating Coal City's Confidential Information. Paragraph 17 of the 2010 Agreement stated that:

> [Palm] shall at no time during or after the termination of this Agreement by either party, directly or indirectly through one or more of its shareholders, officers, directors, employees, or otherwise, use o[r] disclose any confidential or proprietary information of Coal City except solely in connection with the performance of this Agreement.

Paragraph 11 of the 2013 Agreement contained identical language to Paragraph 11 of the Affiliate Agreement.

22. Palm and Frank serviced Coal City's Customers. Palm and Frank provided services for many of Coal City's most important customers, including, among others: (a) Tradebe Treatment & Recycling, LLC ("Tradebe"); (b) Kemira Chemicals, Inc. ("Kemira"); (c) Solvay USA, Inc. ("Solvay"); (d) Univar USA, Inc., ("Univar"); (e) Nalco-Champion ("Nalco"); and (f) Harcross Chemicals, Inc. ("Harcross") (collectively, the "Coal City Customers"). There were others that were also Coal City customer serviced by Palm and Frank but are not the key customer list.

23. Palm and Frank Serviced the Customer on the Customer Lanes. Examples of lanes on which Palm and Frank performed liquid bulk transportation services for the Coal City Customers include, among others (collectively, the "Customer Lanes"):

a. Tradebe – East Chicago, Indiana to Logansport, Indiana;

b. Tradebe – East Chicago, Indiana to Greencastle, Indiana;

c. Tradebe – East Chicago, Indiana to Paulding, Ohio;

d. Kemira – East Chicago, Indiana to Millington, Tennessee;

e. Kemira – Butler, Indiana to East Chicago, Indiana;

f. Kemira – Jeffersonville, Indiana to East Chicago, Indiana;

g. Solvay – University Park, Illinois to Knoxville, Tennessee;

h. Solvay – University Park, Illinois to Murray, Kentucky;

i. Solvay – University Park, Illinois to Corsicana, Texas;

j. Solvay – University Park, Illinois to Saint Louis, Missouri;

k. Solvay – University Park, Illinois to Kilgore, Texas;

l. Nalco – University Park, Illinois to Kilgore, Texas;

m. Nalco – University Park, Illinois to Centerville, Texas;

n. Nalco – University Park, Illinois to Hebbronville, Texas.

o. Harcross – Lima, Ohio to Dallas, Texas;

p. Harcross – University Park, Illinois to Longview, Texas;

q. Harcross – University Park, Illinois to Sibley, Louisiana;

r. Harcross – Houston, Texas to Dallas, Texas;

s. Harcross – University Park Illinois to Dallas, Texas;

t. Harcross – Winder, Georgia to Longview, Texas;

u. Harcross – Winder, Georgia to Sibley, Louisiana;

v. Harcross – University Park, Illinois to Pasadena, Texas; and

w. Univar – Charleston, South Carolina to North Charleston, South Carolina.

24. Palm and Frank serviced Coal City's Customers with the Coal City Drivers. Under the Affiliate Agreement, Palm and Frank also performed liquid bulk transportation services for Coal City's customers by utilizing Coal City's independent contractors who were owner-operators of vehicles, including, among others: (a) Rashid Malik ("Malik") (who owned and operated a vehicle with VIN number M1AW07Y0FM046539); (b) Christian Russell ("Russell") (who operated a vehicle owned by Eric L. Holder with VIN number 5KJJABCK15PN82105); (c) James P. Uribe ("Uribe") (who owned and operated a vehicle with VIN Number 1XP5D49XX7N679837); (d) Eric L. Holder ("Holder") (who owned and operated a vehicle with

VIN Number 1XKADB9X47J156443 and owned the vehicle operated by Christian Russell identified above); and (e) Derek L. Turner ("Turner") (who owned and operated a vehicle with VIN number 2WKEDDJJ4YK965013) (collectively, the "Coal City Drivers" and the "Driver Vehicles").[9]

25. In addition to the foregoing, Palm and Frank formerly operated a facility on behalf of Coal City in Charlotte, North Carolina (the "Charlotte Terminal"). When Palm elected to no longer operate the Charlotte terminal, Coal City provided Palm certain concessions and incentives to continue operations with Coal City. Furthermore, Coal City required that Palm reaffirm its obligations to Coal City in light of the concessions which were made at this terminal. The agreement among the parties was documented in writing (the "Takeover Agreement").

26. The Coal City Drivers are extremely valuable. Coal City's owner-operator drivers are extremely valuable to Coal City. These drivers need specialized training and licensing, which makes them rare and highly coveted workers. Plus, not only do they provide for Coal City liquid bulk transportation services—many do so with their own vehicles (or vehicles owned and operated by other independent contractors of Coal City). This eliminates the need for Coal City to expend substantial resources purchasing and maintaining as large a fleet of specialized vehicles. The drivers generate large amounts of revenue for Coal City. Replacing owner operators like them is incredibly difficult and time-consuming. And, even if Coal City were fortunate enough to be able

---

[9] Palm also performed services for Coal City Customers on Customer Lanes with eight of its own vehicles. Those vehicles have the following VIN numbers (collectively, the "Eight Palm Vehicles"):

a. 1XPBD49X7FD308061;
b. 1XPBD49X7GD308062;
c. 1XPBD49X9GD308063;
d. 1XPBD49X0GD308064;
e. 1XPBD49X2GD308065;
f. 1XPBD49X4GD308066;
g. 1XKDD49X8DJ334908; and
h. 4V4NC9EH4EN164270.

to do so, it would then need to expend time and money on training and other related expenses for new hires of this sort.

27. Palm agreed not to solicit the Coal City Customers or the Coal City Drivers. Under the Affiliate Agreement and the Takeover Agreement, Palm also agreed that after termination of the Affiliate Agreement, it would not solicit Coal City's customers or drivers. Paragraph 12 of the Affiliate Agreement reads as follows ("Agreement Not to Solicit Customers" and "Agreement Not to Solicit Drivers"):

> **Non-Competition. Non-Solicitation.** Due to the importance and sensitivity of the Confidential Information, and in consideration for the agreement of [Coal City] to disclose and make such Confidential Information available to [Palm] as set forth above, as well as the payments hereunder, [Palm] hereby covenants and agrees that, during the term of this Agreement and for a period of thirty-six (36) months (the "Non-Compete Period") following the expiration or termination hereof, whether voluntary or involuntary, with or without cause, or for any reason or no reason and, as applicable, [Palm] shall not, either directly or indirectly, on behalf of itself, or any other individual, corporation, partnership, limited liability company, joint venture, or other entity other than [Coal City]: (a) contract or otherwise solicit, either directly or indirectly, any Designated Customer[10] for the purpose of selling, performing, marketing, or otherwise transacting transportation freight hauling, and/or other services of the type performed under this Agreement; or (b) solicit, hire, retain or otherwise engage or go into business with any individual who is or was an employee of or [Palm] Operator of [Coal City] at any time during the twenty-four (24) month period prior to the date of the expiration or termination of this Agreement[.]

Palm and Frank have long been on notice as to the restriction against soliciting Coal City's customers or drivers. Paragraph 16 of the 2010 Agreement stated that:

> **Non-Solicitation.** (a) During the term of this Agreement, and for a period of one (1) year following the termination of this Agreement by either party, [Palm Enterprises, Inc.] shall not, directly or indirectly through one or more of its shareholders, officers, directors, employees, or otherwise, solicit any Coal City customer to which the [Palm Enterprises, Inc.] provided liquid or dry bulk transportation services under this Agreement for the purpose of providing such

[10] Paragraph 1(e) of the Affiliate Agreement defines "Designated Customer" to include any customer either expressly identified on an exhibit to the Affiliate Agreement, or any other customer for which Palm "renders or has rendered transportation services during the term of this agreement. All the customers referenced in this petition fall under the definition of "Designated Customer."

> services directly to such customer, nor shall [Palm Enterprises, Inc.] provide liquid or dry bulk transportation services to such customer.[11]

Paragraph 11 of the 2013 Agreement contained identical language to paragraph 11 of the Affiliate Agreement. As noted in the various agreements themselves, the restrictions are limited so as to comply with Texas law, and are limited to those individuals or entities to which Palm had direct and substantial access.

28. Palm provided a 5-day notice of termination. On May 15, 2017, Palm sent Coal City notice terminating the Affiliate Agreement effective May 20, 2017 ("5-Day Notice Period").[12] The 5-Day Notice Period proved key in the scheme Palm, Frank, and TransWood jointly concocted to disrupt Coal City operations, and seize on the chaos created by Palm and Frank.

29. Upon receiving the May 15, 2017 notice of termination, Coal City immediately reviewed e-mails sent from Palm's Coal City e-mail address. On March 20, 2017, Coal City found e-mails Palm and Frank exchanged with a competitor of Coal City, *i.e.*, TransWood. Coal City also discovered a mutual non-disclosure agreement with TransWood Carriers ("NDA"), dated March 17, 2017—a period in which Palm remained obliged to operate in the best interests of Coal City, and two months prior to any suggestion that Palm was actively subverting Coal City's operations.[13] The name of the representative of TransWood Carriers appearing on the NDA and as recipient of the e-mails from Palm was Roger Nikodym (Director, Affiliate Relations at TransWood, Inc.). Essentially, two months prior to announcing its termination of its Affiliate Agreement with Coal City, Palm agreed to provide liquid bulk transportation services for a competitor of Coal City. That, however, was only the beginning.

---

[11] Paragraph 15(b) of the 2010 Agreement provides that "[f]or purposes of this Section 16, a Coal City customer means any customer to which [Palm] provided motor carrier services during the term of this Agreement, except those customers set forth on Schedule 2 attached hereto who were customers of [Palm] prior to the Effective Date." Schedule 2 contained 98 customers, none of whom are those identified as the Coal City Customers.

[12] *See* Ex. B.

[13] *See* Ex. C.

30. Palm and Frank Violated the Agreement Not to Misappropriate Confidential Information. A further review of Palm's e-mails revealed that in violation of paragraph 11 of the Affiliate Agreement, Palm and Frank also provided TransWood Coal City's Confidential Information, with both TransWood's knowledge of the nature of the information, and of the provisions restricting its dissemination. Beginning in March 2017 (and possibly earlier), Palm and Frank provided TransWood—a direct competitor of Coal City—with Coal City's customer identities, Coal City's driver identities, customer lanes Coal City was servicing, and pricing information ("Known Stolen Confidential Information"). As Palm and Frank had access to a much wider range of confidential and proprietary trade secrets, Coal City has reason to believe that Palm and Frank disseminated or will disseminate much more of Coal City's Confidential Information, including some or all of Coal City's financial information, customer rates, customer identities, and driver information.[14]

31. Palm and Frank Attempted to Conceal Evidence that it Violated the Agreement not to Misappropriate Confidential Information. Palm and Frank took affirmative steps to conceal their transmittal of the Known Stolen Confidential Information and its violation of the Agreement not to Misappropriate Confidential Information, together with its multiple breaches of its duties to Coal City. On March 20, 2017, the day Palm e-mailed its signed NDA to TransWood, Palm and Frank also sent an e-mail to TransWood stating, "I am forwarding these emails to another email address and then deleting from Cob, so you know."[15] A review of Palm's e-mail account at Coal City revealed that it had, as represented to TransWood, been deleting communications with

[14] Coal City has made numerous attempts to retrieve the Known Stolen Confidential Information from TransWood, but such attempts were unsuccessful. *See* Ex. E. On May 16, 2017, Coal City send a demand letter to cease its violations with the Affiliate Agreement and confirm such compliance by May 23, 2017. Palm ignored the demands. *See* Ex. J.

[15] *See* Ex. D.

TransWood, including those communications containing the Known Stolen Confidential Information in order to prevent Coal City from discovering its months-long plot.

32. <u>During the 5-Day Notice Period, Palm and Frank Violated the Agreement Not to Solicit Customers</u>. Under the false pretense of acting as an agent for Coal City, between May 15, 2017 and May 20, 2017—*i.e.*, the 5-Day Notice Period—Palm and Frank contacted several Coal City customers and cancelled or did not accept numerous loads. Then, having created a business interruption for these customers, Palm and Frank took advantage of the confusion and the customer frustration over the cancellations or non-acceptance by requesting that the customers transfer their business with Coal City to TransWood all while holding itself (Palm) and herself ("Ms. Frank") out as continuing to operate on behalf of Coal City. In other words, Palm and Frank committed acts of deception and fraud, and used the fallout from that as a launching pad to violate the Agreement Not to Solicit Customers. Coal City's customers received correspondence from individuals they believed to be representatives of Coal City instructing them that Coal City would no longer handle their transportation needs, and should instead be handled by TransWood. The damage to Coal City was catastrophic.

33. <u>Palm and Frank solicited Tradebe during the 5-Day Notice Period</u>. For example, Palm and Frank contacted or otherwise solicited Tradebe. On or about May 15, 2017, Palm and Frank cancelled all of Coal City's freight with Tradebe and misinformed Tradebe that Coal City could not handle Tradebe's freight any longer. At the same time, Palm and Frank advised Tradebe to retain TransWood to handle the freight that would have previously been handled by Coal City.

34. <u>Palm and Frank solicited Kemira during the 5-Day Notice Period</u>. As a second example, Palm and Frank contacted or otherwise solicited Kemira. First, under the false pretense of acting as an agent for Coal City, on May 15, 2017, Palm and Frank cancelled Coal City's Kemira freights. Then, on that same day, presumably at the behest of Palm and Frank, TransWood

contacted Kemira and—while representing that Palm had leased with TransWood—asked Kemira to allow TransWood to service the lanes Coal City had been servicing.

35. Palm and Frank solicited Solvay during the 5-Day Notice Period. As a third example, Palm and Frank contacted or otherwise solicited Solvay. On May 17, 2017, Solvay advised Coal City that Palm, Frank, and TransWood requested that Solvay allow TransWood to handle a pre-paid load assigned to Coal City—freight number 1100396079.[16] On May 19, 2017, Solvay told Coal City that Palm and Frank instructed Solvay to transfer freight 1100396079 from Coal City to TransWood. According to a May 19, 2017 e-mail from Solvay, Palm "insisted" that this freight was for TransWood. Solvay further told Coal City that Solvay was going "nuts" over the "mess" between Coal City and TransWood.[17] Thus, the actions of Palm and Frank have caused Coal City to suffer reputational harm *vis-à-vis* Solvay, and potentially direct financial harm with respect to Solvay's future business.

36. Palm and Frank solicited Nalco during the 5-Day Notice Period. As a fourth example, on or about May 17, 2017, Palm and Frank solicited or otherwise contacted Nalco. According to a customer e-mail entitled "Nalco Corsicana, Texas," Nalco was asked to transfer Coal City freight to TransWood. The e-mail stated, in relevant part, "I am really trying to stay neutral in all this . . . and this load is a prepaid load . . . I chose [Coal City]. . . . However, [Palm and TransWood] are asking me to tender this to them over at TransWood."[18]

37. Palm and Frank solicited Harcoss during the 5-Day Notice Period. A fifth example involves both Nalco and Harcross. Upon information and belief, on or about May 17, 2017, Palm and Frank solicited Nalco and Harcross. On May 17, 2017, Coal City received a customer e-mail stating, in relevant part:

---

[16] *See* Ex. F.
[17] See Ex. F.
[18] See Ex. G.

> There ha[ve] been some changes at [Coal City] with their logistical folks who act as subcontractors for them. I won't go into all the details as it is still a bit hazy to me...but there is some confusion on who handles the customer routed orders like Nalco and certain Harcross orders. As [Coal City] is typically the carrier who gets these loads. For example we just had a Nalco [freight to be delivered to] Centerville, TX and this new company - Transwood - has taken the load or says it is theirs.[19]

38. Palm and Frank likely solicited Univar during the 5-Day Notice Period. Upon information and belief, between May 15, 2017 and May 20, 2017, Palm and Frank contacted or otherwise solicited Univar as well.

39. After 5-Day Notice Period, Palm continued to violate the Agreement Not to Solicit Customers. After May 20, 2017, Palm and Frank continued contacting or otherwise soliciting the Coal City Customers to take business away from Coal City on the Customer Lanes, and incident to its new position with TransWood.

40. During the 5-Day Notice Period, Palm Violated the Agreement Not to Solicit Drivers. In violation of its Affiliate Agreement, Palm and Frank solicited and attempted to persuade Coal City Drivers to terminate their agreements with Coal City and begin working for TransWood. On or about May 17, 2017, drivers Malik, Russell, Uribe, and Holder terminated their independent-contractor agreements with Coal City to work for TransWood, where they are believed to be currently employed as employees or independent contractors.[20] Palm and Frank continued soliciting and attempting to persuade other employees and independent contractors, including drivers, to terminate their agreements with Coal City and work for TransWood as well.

41. Palm's and Frank's decision to violate the Affiliate Agreement was planned well in advance and with knowledge that it was illegal. A review of Palm's e-mails also revealed Palm's intentions to violate the Affiliate Agreement months in advance and with full knowledge that such acts would violate the terms of the applicable written agreements and applicable law. Palm and

---

[19] *See* Ex. F.
[20] *See* Ex. H.

Frank actively involved TransWood in its conspiracy, and colluded to not only cover their respective tracks, but provide an effective smokescreen so as to prevent the discovery of their plan. By way of example, on March 22, 2017, Palm and Frank e-mailed TransWood a copy of the Affiliate Agreement and wrote:

> There is a possibility that Cob will initiate legal proceedings to challenge the non-compete language. I have already provided you with my attorneys [*sic*] assessment of this, however that may not stop them from trying. It could very well include TransWood being named. . . . What is TransWood's position on this? Will they assist with legal representation if this happens? I think it best to face this possibility now, rather than muddle through it later.[21]

In other words, months before announcing its termination, Palm, Frank, and TransWood were communicating about the likelihood that Palm and Frank's actions would result in a lawsuit, and drawing up battle plans to fight against Coal City inevitably objecting to Defendants' subterfuge and theft. Yet, incredibly enough, Defendants continued to work together to violate the Affiliate Agreement, steal Coal City's Trade Secrets, and otherwise disrupt Coal City's business to the direct and substantial monetary benefit of Defendants' bottom line.

## F. CAUSES OF ACTION

**Count 1: Breach of Contract (against Palm)**

42. The preceding paragraphs are incorporated herein by reference as if repeated verbatim.

43. For valuable consideration that is acknowledged in the Affiliate Agreement, Palm executed the Affiliate Agreement—a valuable and enforceable contract—containing the: (a) Agreement Not to Misappropriate Confidential Information; (b) Agreement Not to Solicit Customers; and (c) Agreement Not to Solicit Drivers.

[21] *See* Ex. I.

44.     Palm breached each of these provisions as set forth above, including, among other things: (a) misappropriating and transmitting Coal City's Confidential Information to a competitor, *i.e.*, TransWood; (b) soliciting the Coal City Customers, including with respect to transferring the business on the Customer Lanes from Coal City to TransWood; and (c) soliciting the Drivers, including persuading Malik, Russell, Uribe, and Holder to quit Coal City and work for TransWood.

45.     Palm's breach of these provisions has caused Coal City to suffer substantial, actual, consequential, and special losses in an amount which is within the jurisdictional limits of this Court, including, but not limited to, lost profits, loss of credit, loss of financing and the costs of training new drivers.

46.     Palm's breach of these provisions also has caused and will continue to cause imminent and irreparable harm to Coal City for which there is no adequate remedy at law unless Palm is enjoined from any further breaches of these provisions.

47.     Further, because Coal City has been required to employ the services of legal counsel to prosecute this action, Coal City is entitled to an award of its reasonable attorneys' fees incurred in the prosecution of this action pursuant to TEX. CIV. PRAC. & REM. CODE §§ 38.001, *et seq.*, in addition to costs of Court, as well as pre-judgment and post-judgment interests at the highest rates allowed by law.

**Claim 2: Breach of Contract (against Frank)**

48.     The preceding paragraphs are incorporated herein by reference as if repeated verbatim.

49.     For valuable consideration that is acknowledged in the Affiliate Agreement, Frank, individually, agreed to serve as the Guarantor of any amounts that may become due and owing to Coal City by Palm under the terms and provisions of the Affiliate Agreement, including without limitation, (a) any amounts that may become due pursuant to the indemnity provision of the

Affiliate Agreement; (b) performance of all of Palm City's other obligations under the Affiliate Agreement; and (c) all costs incurred by Coal City in enforcing its rights and remedies under the Affiliate Agreement, including reasonable attorneys' fees, court costs, and investigation expenses.

50.     Frank has breached her obligations as the Guarantor of the Affiliate Agreement by (a) refusing to indemnify Coal City as required by the indemnity provision of the Affiliate Agreement; (b) refusing to reimburse Coal City for the performance of all of Palm City's other obligations under the Affiliate Agreement; and (c) refusing to reimburse Coal City for all costs it has incurred in enforcing its rights and remedies under the Affiliate Agreement.

51.     Therefore Coal City is entitled to all actual and consequential damages it has incurred as a result of Frank's breach, as the Guarantor, of the Affiliate Agreement, including (a) all direct, indirect and consequential loss, damages, fines and expenses with which Frank is required to indemnify Coal City; and (b) all costs incurred by Coal City in enforcing its rights and remedies under the Affiliate Agreement, including reasonable attorneys' fees, court, costs, and investigation expenses.

52.     Further, because Coal City has been required to employ the services of legal counsel to prosecute this action, Coal City is entitled to an award of its reasonable attorneys' fees incurred in the prosecution of this action pursuant to TEX. CIV. PRAC. & REM. CODE §§ 38.001, *et seq.*, in addition to costs of Court, as well as pre-judgment and post-judgment interests at the highest rates allowed by law.

**Count 3: Tortious Interference with Existing Contract (against Defendants)**

53.     The preceding paragraphs are incorporated herein by reference as if repeated verbatim.

54.     Coal City had valid agreements with the Coal City Customers with respect to the Customer Lanes.

55.     Coal City also had valid agreements with the Drivers, including Malik, Russell, Uribe, and Holder.

56.     Palm, in concert with TransWood and Frank, committed willful and intentional acts of interference with the contracts of the Coal City Customers, including among other things: (a) telling the Coal City Customers that Coal City was unable to haul certain freights; (b) cancelling Coal City freights; (c) telling the Coal City Customers that other Coal City freights were to be hauled by TransWood; and (d) requesting that the Coal City Customers transfer their business on the Customer Lanes from Coal City to TransWood.

57.     In addition, Palm, in concert with TransWood and Frank, committed willful and intentional acts of interference with the contracts of the Coal City Drivers by persuading or attempting to persuade them to terminate the contracts and begin working for TransWood.

58.     Defendants' intentional acts of interference were the proximate cause of actual damages to Coal City, including, among other things (a) damage to the business relationship with the Coal City Customers and attendant reduction of business from them, *i.e.*, injury to Coal City's reputation, and (b) lost profits, loss of credit, loss of financing and the costs of training new drivers, for which there is no adequate remedy at law unless Palm and Frank are enjoined from any further acts of tortious inference with Coal City's existing and potential business relationships.

59.     Further, there was a reasonable probability that Coal City would have continued its business relationship with the Coal City Customers and the Drivers, had Defendants not interfered with those relationships.

60.     By having to take action to enforce its legal rights, Coal City may also suffer harm to its business reputation and goodwill with its customers and prospective customers. Accordingly, as a proximately result of Defendants' conduct set forth herein, Coal City has suffered damages within the jurisdictional limits of this Court.

**Count 4: Tortious Interference with Existing Contract (against Frank and TransWood)**

61. The preceding paragraphs are incorporated herein by reference as if repeated verbatim.

62. Coal City had valid agreements with Palm containing the: (a) Agreement Not to Misappropriate Confidential Information; (b) Agreement Not to Solicit Customers; and (c) Agreement Not to Solicit Drivers.

63. Frank and TransWood's actions constitute tortious interference with Palms' agreement with Coal City, as more fully outlined above. Specifically, Frank and TransWood knowingly induced and encouraged Palm to abandon its contractual obligations to Coal City, create business disruptions for Coal City, and otherwise benefit TransWood while still obliged to act in the best interests of Coal City.

64. Frank and TransWood's acts were the proximate cause of actual damages to Coal City, including but not limited to lost profits, the loss of the value of the Coal City Drivers, and the loss of Coal City's valuable trade secrets.

65. Accordingly, as a proximate result of TransWood's conduct set forth herein, Coal City has suffered damages within the jurisdictional limits of this Court.

**Count 5: Common Law Civil Conversion (against Defendants)**

66. All the foregoing allegations are incorporated by reference for all purposes.

67. Coal City owned, had legal possession of, or was entitled to possession of the Known Stolen Confidential Information.

68. Palm, Frank, and TransWood assumed and exercised dominion and control over the Known Stolen Confidential Information in an unlawful and unauthorized manner, to the exclusion of and inconsistent with Coal City's rights.

69. Coal City made a demand for the property.

70. Defendants have failed to return the property.

71. Coal City has been damaged by the conversion as set forth above.

**<u>Count 6</u>: Misappropriation of Trade Secrets; Violation of Texas' Uniform Trade Secrets Act (against Defendants)**

72. The preceding paragraphs are incorporated herein by reference as if repeated verbatim.

73. In connection with Palm's work for Coal City, Coal City gave, provided access to, and entrusted Palm with Coal City's Trade Secrets and Confidential Information. Coal City went to, and continues to go to, great expense in both time and money to develop and protect the secrecy of its Trade Secrets and Confidential Information. Coal City's Trade Secrets and Confidential Information are essential to Coal City's success and enable Coal City to compete in a specialized market.

74. Coal City's Confidential Information (and other information described above) is a trade secret because it includes a formula, pattern, compilation, program, device, method, technique, process, financial data, and./or list of actual or potential customers or supplies, that (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(6). Defendants used by improper means (either by theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, to limit use, or to prohibit discovery of a Trade Secret, and/or espionage through electronic or other means) to obtain Coal City's Trade Secrets.

75. Defendants misappropriated Coal City's Trade Secrets through:

(A) acquisition of a trade secret of another by a person who knows or has reason to

> know that the trade secret was acquired by improper means; and/or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; (ii) at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was: (a) derived from or through a person who had utilized improper means to acquire it; (b) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (c) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (iii) before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.[22]

76. Palm and Frank divulged and continue to divulge Coal City's Trade Secrets and Confidential Information in concert with TransWood Carriers and TransWood, Inc. Palm, in concert with TransWood Carriers and TransWood, Inc., is using Coal City's Trade Secrets and Confidential Information for its benefit and/or the benefit of TransWood Carriers and TransWood, Inc., and to the detriment of Coal City.

77. Palm and Frank also have a duty not to reveal or use Coal City's Trade Secrets and Confidential Information, and have a duty to refrain from using or even possessing such information. Palm and Frank's actions, singularly and in combination with TransWood Carriers and TransWood, Inc., constitute a breach of its covenant not to use or disclose Trade Secrets or Confidential Information.

78. Defendants' misappropriation is willful and malicious.

79. Defendants' misappropriation proximately caused significant damages to Coal City. Coal City was and is being damaged by lost profits and lost business goodwill as a result of Defendants' wrongful conduct. Coal City seeks damages that include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.

[22] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(3).

80. Further, because Defendants' conduct—*i.e.*, theft in excess of $30,000—gives rise to criminal liability under Chapter 31 of the TEXAS PENAL CODE, as, at a minimum, a third-degree felony, there is no cap on the exemplary damages that Coal City may recover against Defendants. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.008(13).

**<u>Count 7</u>: Texas Theft Liability Act (against Defendants)**

81. The preceding paragraphs are incorporated herein by reference as if repeated verbatim.

82. The TEXAS THEFT LIABILITY ACT ("TTLA") imposes liability on anyone who commits theft, as defined by the TEXAS PENAL CODE.

83. Palm and Frank's intentional and knowing conversation and transmission of Coal City's Confidential Information and Trade Secrets to TransWood violates TEX. CIV. PRAC. & REM. CODE §§ 134.001, *et seq.* Palm and Frank's actions, in concert with TransWood, constitute theft of personal property under TEX. PENAL CODE § 31.03. As a result of Defendants' actions, Coal City suffered and will continue to suffer immediate and irreparable harm. Coal City seeks actual damages, as well as the sum of $1,000 (as permitted under TEX. CIV. PRAC. & REM. Code Ann. §134.005(a)(1)), and is further entitled to exemplary damages and reasonable and necessary attorneys' fees.

84. Further, because Defendants' conduct—*i.e.*, theft in excess of $30,000—gives rise to criminal liability under Chapter 31 of the TEXAS PENAL CODE, as, at a minimum, a third-degree felony, there is no cap on the exemplary damages that Coal City may recover. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.008(13)

**<u>Count 8</u>: Breach of Duty of Loyalty (against Defendants)**

85. The preceding paragraphs are incorporated herein by reference as if repeated verbatim.

86.     Palm and Frank had a fiduciary relationship whereby Palm and Frank were obliged to act in the best interests of Coal City during the term of the agreements governing the relationship.

87.     By actively working for a direct competitor of Coal City, diverting Coal City loads, and otherwise plotting and executing a substantial business disruption to Coal City and the other activities highlighted above, Palm and Frank breached this fiduciary duty.

88.     In addition, TransWood knowingly participated in the breach of Palm and Frank's fiduciary duties to Coal City and is therefore a joint tortfeasor with Palm and Frank and is liable as such.

89.     In addition to the foregoing, the acts executed by Palm were performed with malice and forethought, and were committed knowingly and intentionally, wherein TransWood also knowingly and intentionally participated.

90.     Coal City seeks the following remedies and damages for Palm and Frank's breach of its fiduciary duties: (a) actual damages; (b) consequential damages, including lost profits; (c) exemplary damages as a result of Palm's intentional breach; (d) imposition of a constructive trust on proceeds, funds or property obtained as a result of the breach of Palm and Frank's fiduciary duties; (e) forfeiture of all fees collected by Palm and Frank, including, but not limited to all salary, bonuses, in-kind benefits, and other fees received thereby; (h) disgorgement of all profits, including distributions, made by and through the breaches of fiduciary duty; and (i) an accounting of all valuable tangible and intangible property of Palm and Frank.

**Count 9: Fraudulent Misrepresentation (against Palm and Frank)**

91.     The preceding paragraphs are incorporated herein by reference as if repeated verbatim.

92.     Palm and Frank made material representations of fact to Coal City that they would (a) not misappropriate Coal City's Confidential Information; (b) not solicit Coal City Customers; and (c) not solicit Coal City Drivers.

93.     These material misrepresentations of fact were false at the time they were made and Coal City justifiably relied upon these representations to its detriment.

94.     As a proximate result, Coal City has been damaged, and will continue to be damaged in an amount within the jurisdictional limits of this Court. Accordingly, Coal City seeks to recover all actual damages and all out-of-pocket damages and benefit-of-the-bargain damages incurred as a result of these fraudulent malpresentations.

**Count 10: Harmful Access by Computer Act (against Palm and Frank)**

95.     The preceding paragraphs are incorporated herein by reference as if repeated verbatim.

96.     Palm and Frank knowingly and/or intentionally engaged in conduct in violation of Chapter 33 of the TEXAS PENAL CODE.

97.     Palm and Frank have violated TEX. PENAL CODE 33.02 by knowingly, and without effective consent, accessing Coal City's computers, computer network, and/or computer system.

98.     Specifically, Palm and Frank accessed Coal City's fuel and cash advance system to restore access to this system for certain former drivers of Coal City who had agreed to follow Palm to TransWood Carriers.

99.     As a proximate result of Palm and Frank's conduct in violation of Chapter 33 of the TEXAS PENAL CODE, Coal City has been injured.

100.    As a result of Palm's conduct, Coal City seeks (a) actual damages including all benefit-of-the-bargain damages, out-of-pocket damages, lost profits and loss of goodwill; and (b) reasonable attorney's fees and costs of Court, as well as pre-judgment and post-judgment

interests at the highest rates allowed by law, as authorized by TEX. CIV. PRAC. & REM. CODE § 143.002.

**Count 11: Negligence/Gross Negligence (against Palm and Frank)**

101.    The preceding paragraphs are incorporated herein by reference as if repeated verbatim

102.    Palm and Frank had a fiduciary relationship whereby Palm and Frank were obliged to act in the best interests of Coal City during the term of the agreements governing the relationship.

103.    By actively working for a direct competitor of Coal City, diverting Coal City loads, and otherwise plotting and executing a substantial business disruption to Coal City and the other activities highlighted above, Palm and Frank breached this fiduciary duty.

104.    In addition to the foregoing, the acts executed by Palm were performed with malice and forethought, and were committed knowingly and intentionally, as well as negligently.

105.    Coal City seeks the following remedies and damages for Palm's negligence: (a) actual damages, including all benefit-of-the-bargain damages, out-of-pocket damages, lost profits and loss of goodwill; (b) exemplary damages; and (c) costs of Court, as well as pre-judgment and post-judgment interests at the highest rates allowed by law.

106.    Coal City is entitled to exemplary damages because (a) when viewed objectively from Palm and Frank's standpoint at the time of the events described above, the acts identified above involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Coal City; and (b) Palm and Frank had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Coal City.

## G.   REQUEST FOR TEMPORARY AND PERMANENT INJUNCTION

107.   The preceding paragraphs are incorporated herein by reference as if repeated verbatim.

108.   Coal City's application for temporary and permanent injunction is authorized by TEX. CIV. PRAC. & REM. CODE ANN. § 65.001.

109.   Coal City asks the Court to temporarily and, later permanently, restrain and enjoin Palm, and anyone acting in concert with Palm, from

    a.  disseminating proprietary information and trade secrets of Coal City including, without limitation, its services, products, customer information, processes, sales information, know-how, practice, policies, and other confidential information which is considered proprietary or secret by Coal City, including without limitation, Coal City's information about its finances, customer rates, customer identifications, customer lanes, and information about valuable Coal City employees (including names, addresses, e-mail addresses, and phone numbers);

    b.  soliciting or hauling freight for the following Coal City customers on the following customer lanes: (a) Tradebe Treatment & Recycling, LLC ("Tradebe") – East Chicago, Indiana to Logansport, Indiana; (b) Tradebe – East Chicago, Indiana to Greencastle, Indiana; (c) Tradebe – East Chicago, Indiana to Paulding, Ohio; (d) Kemira Chemicals, Inc. ("Kemira") – East Chicago, Indiana to Millington, Tennessee; (e) Kemira – Butler, Indiana to East Chicago, Indiana; (f) Kemira – Jefferson, Indiana to East Chicago, Indiana; (g) Solvay, USA, Inc. – University Park, Illinois to Knoxville, Tennessee; (h) Solvay – University Park, Illinois to Murray, Kentucky; (i) Solvay – University Park, Illinois to Corsicana, Texas; (j) Solvay – University Park, Illinois to Saint Louis,

Missouri; (k) Solvay – University Park, Illinois to Kilgore, Texas; (l) Nalco-Champion ("Nalco") – University Park, Illinois to Kilgore, Texas; (m) Nalco – University Park, Illinois to Centerville, Texas; (n) Nalco – University Park, Illinois to Hebbronville, Texas; (o) Harcross Chemicals, Inc. – Lima, Ohio to Dallas, Texas; (p) Harcross – University Park, Illinois to Longview, Texas; (s) Harcross – University Park, Illinois to Dallas, Texas; (t) Harcross – University Park, Illinois to Pasadena, Texas; and (w) Univar USA, Inc. – Charleston, South Carolina to North Charleston, South Carolina (collectively, the "Customer Lanes"), or from hauling freight for these customers on the Customer Lanes by use of vehicles containing the following VIN numbers:

(1) 1XPBD49X7FD308061;               (2) 1XPBD49X7GD308065;

(3) 1XPBD49X9GD308063;               (4) 1XPBD49XOGD308064;

(5) 1XPBD49W2GD308065;               (6) 1XPBD49X4GD308066;

(7) 1XKDD49X8DJ334908; or (8) 4V4NC9EH4EN164270.

c.  Dispatching the Coal City Drivers (*i.e.*, Malik, Uribe, Holder, Turner) to haul freight on the Customer Lanes, or from facilitating the hauling of freight for these customers on the customer Lanes by use of the vehicles owned or operated by the Coal City Drivers containing the following VIN numbers:

(1) M1AW07Y0FM046539;               (2) SKJJABCK15PN82105;

(3) 1XP5D49XX7N679837;          (4)1XKADB9X47J156443;          or

(5) 2WKEDDJJ4YK965013; and

d.  Soliciting any of Coal City's customers, or soliciting any of Coal City's drivers or other contractors or employees.

110.    Palm has violated the Agreement Not to Misappropriate Confidential Information, Agreement Not to Solicit Customers, and Agreement Not to Solicit Drivers.

111.    If not stopped, Palm will continue to: (a) disseminate the Known Stolen Confidential Information, and other of Coal City's Confidential Information beyond just the Known Stolen Confidential Information; (b) solicit Coal City Customers or hail freight for Coal City Customers on the Customer Lanes (including by use of the Driver Vehicles).

112.    The acts set forth in this verified petition constitute, *inter alia*, (a) breaches of the Affiliate Agreement; (b) tortious interference with contracts with the Coal City Customers, at least four of the Drivers (and likely other employees and contractors, including other drivers); (c) common law civil conversation; (d) violations of the Texas Theft Liability Act; and (e) violations of the Texas Uniform Trade Secrets Act. Palm has continued violating these laws, and if not stopped, Palm will continue to violate these laws. Based on the preceding verified facts, Coal City has a probably right to recover for Palm's violation of the law.

113.    The harm that Coal City will suffer if a temporary injunction is not issued is probable, imminent, and irreparable. Unless Palm is restrained from its current course of action: (a) Coal City's Known Stolen Information and Coal City's Confidential Information (beyond just the Known Stolen Confidential Information) will be disseminated more widely and its value imminently and irreparably lost; (b) Coal City will lose business from the Coal City Customers and its contractual relationships with the Coal City Customers will be imminently and irreparably lost; and (c) Coal City will lose additional contractors or employees, including drivers, and its contractual relationships with the contractors or employees, including other drivers, will be imminently and irreparably lost.

114.    The injuries suffered by Coal City are irreparable because they cannot be accurately measured or compensated through monetary damages.

115. Palm's conduct, should it go unrestrained, will cause harm to Coal City's operations and sales will cause an impact on revenue and profitability that are impossible to quantify with a specific pecuniary standard.

116. Additionally, even if money damages could be accurately calculated, Coal City's losses are likely to exceed an amount that may be successfully recovered from Palm, possibly preventing adequate compensation to Coal City. Therefore, Coal City has not adequate remedy at law.

117. As such, Coal City is entitled to a temporary injunction. In addition to the Temporary Injunction that is currently in place,[23] which Coal City re-pleads and requests herein, Coal City asks the Court to set its request for a permanent injunction for a full trial on the merits and, after trial, issue a permanent injunction against Palm, on the grounds set forth herein.

118. Coal City is willing to and has already posted bond in an amount specified by the Court.

119. Coal City has joined all indispensable parties under TEX. R. CIV. P. 39.

## H. CONDITIONS PRECEDENT

120. Pursuant to TEX. R. CIV. P. 54, all conditions precedent to Coal City's recovery against Defendants have been performed, have occurred, or have been waived.

## I. REQUEST FOR DISCLOSURE

121. Under Texas Rule of Civil Procedure 194, Coal City requests that TransWood disclose, within 50 days of the service of Plaintiff's First Amended Petition, the information or material described in Rule 194.2.[24]

---

[23] Coal City in no way waives, by the filing of this amended petition, the protection provided by nor releases the obligations imposed under the Temporary Injunction that is currently in place.

[24] This Request for Disclosure is in addition to, and separate from, the Request for Disclosure that was previously served on Palm and Frank.

## J.      PRAYER

WHEREFORE, PREMISES CONSIDERED, Coal City respectfully requests the following:

a.   A Temporary Injunction remain in place until the time of trial of this cause enjoining the conduct set forth in Paragraph 109 above;

b.   A Permanent Injunction be ordered on final trial of this cause enjoining the conduct set forth in Paragraph 109, above;

c.   Actual damages, including all benefit-of-the-bargain damages, out-of-pocket damages, lost profits, loss of goodwill, loss of credit, loss of financing and the costs of training new drivers;

d.   Consequential damages;

e.   Uncapped exemplary damages;

f.   Imposition of a constructive trust on proceeds, funds or property obtained as a result of the breach of Palm's fiduciary duties;

g.   Prejudgment and post-judgment interest;

h.   Court costs;

i.   Reasonable and necessary attorneys' fees and expenses through trial and the appeals process;

j.   That Coal City have Judgment against all Defendants, jointly and severally, as requested above; and

k.   All other relief, at law or in equity, to which Coal City is justly entitled.

## K.   VERIFICATION

I hereby verify that the facts stated in Paragraphs 14–41, and the corresponding footnotes, of the foregoing *First Amended Petition*, are either within my personal knowledge or based upon my review of company records and are true and correct.

Stephen Barnish
Interim President
Coal City Cob Company, Inc.

STATE OF TEXAS          )
                        )
COUNTY OF Travis        )

On this date personally appeared before me Stephen Barnish, Interim President of Coal City Cob Company, Inc., a person known to me, who, after taking an oath swore the foregoing statements were on personal knowledge and were true and correct, under penalty of perjury.

Subscribed and sworn to before me, a notary public this 14th day of December 2017.

Notary Public

My Commission Expires: 6/20/20

[SEAL]

KATHERINE MARIE BOYD
Notary Public, State of Texas
Comm. Expires 06-20-2020
Notary ID 11833545

Dated: December 14, 2017

Respectfully submitted,

**GRUBER HAIL JOHANSEN SHANK LLP**

By: */s/ Brian N. Hail*
**Brian N. Hail**
Texas State Bar No. 08705500
bhail@ghtrial.com
**Jason T. Weber**
Texas State Bar No. 24075251
jweber@ghtrial.com

1445 Ross Avenue, Suite 2500
Dallas, Texas 75202
Telephone: (214) 855-6800
Facsimile: (214) 855-6808

*Attorneys for Plaintiff Coal City Cob Company, Inc.*

## CERTIFICATE OF SERVICE

I certify one true and correct copy of the foregoing instrument was served on all counsel of record, for Defendants Palm Enterprises, Inc. and Sharon Frank, who have already entered an appearance in this lawsuit, in accordance with the Texas Rules of Civil Procedure this 14th day of December, 2017.

**Vic Henry**
vhhenry@hoaf.com
**HENRY, ODDO, AUSTIN, FLETCHER, P.C.**
1700 Pacific, Suite 2700
Dallas, Texas 75201

*Counsel for Defendants Palm Enterprises, Inc. and Sharon Frank*

*/s/ Jason T. Weber*
Jason T. Weber

# Exhibit A

**AFFILIATE AGREEMENT**

**THIS AFFILIATE AGREEMENT** ("Agreement") is hereby entered into, effective as of the date set forth below, by and between **COAL CITY COB COMPANY, INC.** ("CARRIER"), an Illinois Corporation; and the AFFILIATE and GUARANTOR(s) named below:

**AFFILIATE:** PALM ENTERPRISES, Inc., an Indiana corporation
Address: 1060 Kennedy Avenue
Schererville, IN 46375

**GUARANTOR(s):** [signature]
Address: ____________________

which parties hereby covenant and agree as follows:

**WHEREAS,** CARRIER is a motor carrier operating pursuant to authority issued by various state and/or federal agencies; and

**WHEREAS,** AFFILIATE is a X corporation ☐ partnership ☐ LLC ☐ Other ____________, and is duly organized/incorporated and existing under the laws of the State of Indiana, and the owner or lessee of certain tractor and/or trailer equipment who desires to perform transportation services for the CARRIER and the Designated Customers.

**NOW THEREFORE,** in consideration of the promises, covenants, representations, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. Definitions. For the purposes of this Agreement, the following terms shall have the meanings set forth:

(a) "Affiliate Operator(s)" shall mean an independent operator or owner-operator with whom the AFFILIATE has a contract or agreement for the performance of transportation services on behalf of the AFFILIATE. As noted in Paragraph 2(g) below, Affiliate Operators may from time to time be assigned by CARRIER to work out of a terminal or location of AFFILIATE.

(b) "Carrier Operator(s)" shall mean an independent operator or owner-operator with whom the CARRIER has a contract or agreement for the performance of transportation services on behalf of the CARRIER. As noted in Paragraph 2(g) below, CARRIER Operators may from time to time be assigned by CARRIER to work out of a terminal or location of AFFILIATE.

(c) "Carrier Representatives" shall mean any officer, director, shareholder, employee, agent, partner, parent corporation, subsidiary, attorney, lender, insurer, affiliate, representative, successor, and assignee of the CARRIER.

(d) "Change of Control" shall mean (i) any sale, lease, exchange or other transfer (in one transaction or a series of transactions) of all or substantially all of the assets of AFFILIATE (ii) a merger or consolidation of AFFILIATE in which the stockholders, partners, members, or other owners of AFFILIATE as of the date of this Agreement would own, immediately prior to such transaction, in the aggregate, less than fifty percent (50%) of the total combined voting power of all classes of stock, partnership interests, membership interests or other ownership interests of the surviving entity normally entitled to vote, of the surviving entity; or (iii) any reorganization, consolidation or merger of the AFFILIATE where the outstanding stock, partnership interests, membership interests or other ownership interests of the stockholders, partners, members, or other owners of AFFILIATE as of the date of this Agreement are converted into less than fifty percent (50%) of the outstanding voting power of the surviving entity (or its parent entity) immediately after the transaction.

(e) "Designated Customers" shall mean (i) the customers of CARRIER as listed in Schedule "B" and as may be added thereto by CARRIER from time to time and (ii) any other customer of CARRIER for which the AFFILIATE renders or has rendered transportation services during any term of this Agreement.

(f) "DOT" shall mean the United States Department of Transportation and its departments, divisions, and sub-agencies.

(g) "Employee Operator(s)" shall mean a driver or operator employed by the AFFILIATE who performs transportation services on behalf of the AFFILIATE. As noted in Paragraph 2(g) below, Employee Operators may from time to time be assigned by CARRIER or AFFILIATE to work out of a terminal or location of AFFILIATE.

(h) "Equipment" shall mean the tractor(s), trailer(s) and other transportation equipment listed in Schedule "E" attached hereto, which Schedule may be amended from time to time.

(i) "Income Withholding Order" shall mean any order, writ, or notice issued by a court or government agency of competent jurisdiction requiring the CARRIER to withhold income from any income or revenues due to an employee of the AFFILIATE hereunder in connection with the payment, collection, or enforcement of any child support, spousal support, alimony, or other family support.

(j) "Motor Carrier Laws" shall mean the (1) Federal Motor Carrier Act and the rules and regulations of the Federal Motor Carrier Safety Administration, including 49 C.F.R. Parts 382, 383, 391, 392 and 395; (2) Motor Carrier Act of 1980; (3) rules and regulations of DOT; (4) the rules and regulations of the Federal Motor Carrier Safety Administration;  (5) Interstate Commerce Commission Termination Act of 1995; and (6) any state or local laws, statutes, rules, or ordinances governing motor vehicles and/or equipment and transportation services rendered within such jurisdiction, together with any and all successor or replacement legislation enacted with respect to such federal, state, or local laws, statutes, rules and regulations.

2.   **Services; Equipment**.  During the Term (as set forth in Paragraph 2 below) of this Agreement, AFFILIATE hereby agrees to perform and provide to CARRIER the following services and equipment:

(a) *Services*.  AFFILIATE hereby agrees to provide and perform the transportation and other related services to CARRIER, as are designated in Schedule "A-1" attached hereto, for the benefit of CARRIER and the Designated Customers. AFFILIATE has the right to accept or refuse any transportation service assignments requested by the CARRIER. AFFILIATE represents and warrants that AFFILIATE has title to or is authorized to contract the Equipment and Services to CARRIER. It is acknowledged that this Agreement does not require the assignment of any particular load, run or trip to any described vehicle, nor does this Agreement commit CARRIER to the use of any described vehicle if it does not desire or require its use. AFFILIATE understands and agrees that it is responsible for its load and for the route selection, loading, and delivery of such load to and unloading at its destination.

(b) *Equipment*.  AFFILIATE further agrees to provide for the use of the Equipment. The parties agree in the event of any addition, substitution, or decrease of any Equipment to be provided by AFFILIATE under this Agreement, the parties shall amend Schedule "E" to provide for the listing and identification of such added, substituted, or deleted Equipment. AFFILIATE hereby warrants and represents that the Equipment:

   (1) AFFILIATE is the owner or lessee of the Equipment and holds any and all licenses, permits, and registrations required to operate the Equipment in interstate commerce for the purposes contemplated by this Agreement;

   (2) The Equipment is in compliance with any and all local, state and federal laws, statutes, ordinances, rules, and regulations required to operate the Equipment and to perform the Services contracted for hereunder; and

   (3) The Equipment is mechanically sound and AFFILIATE is not aware of any defects or conditions that would affect the rendering or safety of any Services to be performed under this Agreement.

   If the signatory to this Agreement will be anyone other than the beneficial owner of the Equipment, the AFFILIATE agrees to provide such necessary Power(s) of Attorney as CARRIER may require.

(c) *Use of Equipment.*  The parties agree to be bound by all Motor Carrier Laws applicable to operations hereunder.  CARRIER agrees that the Equipment shall be operated only by the AFFILIATE, or its Employee Operators, Affiliate Operators, agents, or employees. AFFILIATE agrees that said Equipment will be operated in compliance with all applicable Federal, State, and local laws and the rules and regulations of any regulatory body having jurisdiction.  AFFILIATE shall require its Employee Operators and Affiliate Operators to carry a copy of this Agreement in the Equipment at all times and file with CARRIER, on a timely basis, all log sheets, physical examination certificates, accident reports, and any other required data, documents, or reports.

(d) *Leased Equipment*.  In the event that the Equipment or any portion thereof is the subject of a lease/purchase agreement (the "Lease-Purchase Agreement") between CARRIER and AFFILIATE, the parties hereby acknowledge and agree that (1) the terms of the Lease-Purchase Agreement shall control and govern the relationship between the parties relating to such

Equipment and (2) in the event of any conflict in the provision of this Agreement and the Lease-Purchase Agreement, the terms of the Lease-Purchase Agreement shall control.

(e) *Carrier's Equipment*. In the course of performing the services, the parties acknowledge that it may be necessary for AFFILIATE to use tank trailers, cargo trailers, and other equipment owned by the CARRIER (the "Carrier Equipment"). In connection with the use of such Carrier Equipment, AFFILIATE hereby agrees as follows:

(1) *Use; Rental/Maintenance Charges*. AFFILIATE agrees to use the Carrier Equipment in a careful and competent manner. AFFILIATE further agrees to keep the Equipment in clean appearance and identified as described herein, at its sole cost and expense, and to return such equipment to the possession of CARRIER upon termination of this Agreement, or upon demand of CARRIER, in the same condition as received, less ordinary wear and tear, at the terminal the AFFILIATE is domiciled or as otherwise mutually agreed to in writing by AFFILIATE and CARRIER. In connection with the use of such Carrier Equipment, AFFILIATE hereby agrees to pay CARRIER, as part of the settlement procedures described in Paragraph 5(c) below, such weekly rental fees and maintenance/mileage fees as set forth in Schedule E-2 (the "Carrier Equipment Charges"), which Schedule may be amended from time to time by CARRIER upon 30 days' notice to AFFILIATE.

(2) *Trailer Damage*. AFFILIATE shall be liable for the first two thousand dollars ($2000.00) damage or loss to Carrier's Equipment while in possession or control of the AFFILIATE, its agents or employees, due to theft, abuse, negligence or accident. Provided, however, any loss or damage to Carrier's Equipment which is a result of gross negligence on the part of AFFILIATE, its agents or employees, shall be the complete and total responsibility of the AFFILIATE up to maximum of ten thousand dollars ($10,000.00) per occurrence. AFFILIATE AGREES TO PAY CARRIER THE FULL VALUE OF THE COST OF REPAIRING OR REPLACING SUCH CARRIER'S EQUIPMENT UP TO A MAXIMUM OF TEN THOUSAND DOLLARS ($10,000.00) AS REQUIRED BY CARRIER AND SHALL INDEMNIFY AND HOLD CARRIER HARMLESS FOR ANY LIABILITY RESULTING FROM SUCH DAMAGE.

(3) *Tank Washes*. AFFILIATE will be responsible for the payment of One Hundred percent (100%) of all tank wash charges for Equipment cleaned at an approved CARRIER tank wash facility, listed in Schedule "F". In the event that AFFILAITE desires to use a particular tank wash facility, it shall submit the name and address of such facility, along with such other information as requested by CARRIER, for approval as an authorized tank wash facility. Thereafter, CARRIER shall have thirty (30) days to investigate and qualify such facility and notify AFFILIATE of its approval or rejection of such facility as an authorized tank wash facility. Should the facilities on Schedule "F" ne changed, whether by CARRIER or the addition of a facility requested by AFFILIATE, the parties agree that a new Appendix B will be supplied to the AFFILIATE by CARRIER. AFFILIATE agrees that, under no circumstances, will it use or utilize a tank cleaning facility that has not been approved by the applicable local, state and federal governmental agencies. AFFILIATE agrees to pay one hundred percent (100%) of all tank wash charges incurred at any third-party tank wash facility not listed in Appendix B, attributable to loads which AFFILIATE is transporting under this Agreement. CARRIER may elect to advance and pay such tank wash charges on behalf of AFFILIATE and deduct such amounts in connection with the settlement of charges due and owing to AFFILIATE.

(4) *Product Disposal*. AFFILIATE herby agrees to insure that all product is unloaded at the customer's/consignee's facility. Unless the retention of product in a trailer in excess of three (3) gallons is specifically authorized and approved by CARRIER or CARRIER's agent, AFFILIATE agrees to pay one hundred percent (100%) of all charges assessed by ANY tank wash facility, as a result of disposing of product in all instances where the amount of product in the tank exceeds three (3) gallons.

(5) *Return of Equipment and/or Other Property of Carrier*. AFFILIATE hereby covenants and agrees that while this Agreement is in effect, and upon termination of this Agreement, AFFILIATE will return all of Carrier's equipment, including CARRIER'S trailers to the possession of CARRIER at the terminal facility at which AFFILIATE has been assigned or as otherwise mutually agreed to in writing by AFFILIATE and CARRIER. AFFILIATE acknowledges and agrees that CARRIER'S business requires a careful allocation of equipment among CARRIER'S facilities in the United States and hereby covenants and agrees that if directed to do so by the CARRIER at the termination of any dispatch or upon termination of this Agreement, and returned the same to the CARRIER'S facility from which the original dispatch occurred or to the following location(s): Coal City, IL. In addition, in the event that AFFILIATE fails or refuses to return any Carrier's Equipment or to pick up an empty trailer as directed by CARRIER, AFFILIATE shall be liable for all costs and expenses incurred by CARRIER, including all legal fees and other out of pocket expenses paid by CARRIER in obtaining a return of such equipment. The

provisions of Section 5(e) related to chargeback of expenses shall also apply to the obligations created under this paragraph. AFFILIATE further agrees to remove the placard, decal, lettering, designs, etc., immediately upon the return of the Equipment to him by CARRIER, and CARRIER may withhold payment pending proof of conformation of such removal. Additionally, AFFILIATE shall pay CARRIER twenty-five dollars ($25.00) a day for AFFILIATES failure to return any of CARRIERS property.

(f) *Inspections*. AFFILIATE agrees that prior to the commencement of this Agreement, it will make the subject Equipment available to CARRIER at CARRIER's nearest place of business or to a third party designated by CARRIER to inspect the same to ensure compliance with said rules and regulations. Attached as Appendix C is a Systemic/Annual Inspection Form which shall be completed for each piece of Equipment under this Agreement at the time such Equipment becomes subject to this Agreement, and such form shall be completed bimonthly thereafter during the term of this Agreement. In the event of a failure to comply with this Section, then and in that event this Agreement shall be null and void and CARRIER shall have no liability to AFFILIATE. Any costs or fees charged or connected with said inspections shall be the responsibility of the AFFILIATE.

(g) *Affiliate Operators and Employee Operators*. In hiring Employee Operators and Affiliate Operators to operate said Equipment on behalf of AFFILIATE, AFFILIATE agrees to retain, hire, and/or contract with only competent and experienced drivers who meet all of the requirements of CARRIER, DOT, and the Motor Carrier Laws, including, but not limited to, familiarity and compliance with state and federal motor carrier safety laws and regulations. AFFILIATE acknowledges and agrees that it has all responsibility for the payment of wages, compensation, payroll taxes, benefits, and all other amounts to said Employee Operators and Affiliate Operators and shall indemnify and hold CARRIER harmless for any such claims. When hiring employees (whether office staff, support personnel or drivers), AFFILIATE hereby agrees to obtain and retain a written waiver signed by each employee acknowledging that said employee is not an employee of CARRIER. AFFILIATE further agrees that when hiring employees, it will comply with all Federal, State, and Local laws and regulations, and shall be solely responsible for ensuring the payment of all payroll or employment taxes to any federal, state, or local government agency. In addition, AFFILIATE, expressly acknowledges and agrees that, in the performance of its obligations under this agreement, it will utilize only those Employee Operators and Affiliate Operators who at all times satisfy all of the CARRIER'S qualifications and standards enacted from time to time by CARRIER and that it will at all times cause its Employee Operators and Affiliate Operators to comply with CARRIER'S policies and procedures in the performance of AFFILIATE'S obligations under this Agreement. CARRIER reserves the right to disqualify any operator of the Equipment that does not meet the qualification standards set forth by CARRIER or the Motor Carrier Laws, in which case AFFILIATE is obligated to provide another fully qualified and licensed operator to operate the Equipment at its sole expense. AFFILIATE acknowledges and agrees that CARRIER may from time to time, for convenience and customer service purposes, assign or designate a CARRIER Operator to work out of, or be based at, a location or terminal owned or operated by AFFILIATE.

(h) *Accident Reports*. AFFILIATE shall immediately report any accident to CARRIER involving operations under this Agreement, including AFFILIATE's written report of such accident In the event AFFILIATE fails to immediately notify CARRIER of the accident, but in no instance shall the time of notification exceed four (4) hours from the time of the accident, AFFILIATE shall be liable for any and all damages resulting from that failure to notify, including but not limited to consequential damages, fines, claims by third parties and reasonable attorney fees.

(i) *Bills of Lading*. It is agreed that, in connection with any Services performed hereunder, any the bills of lading, way bills, freight bills, manifests or other papers identifying the products or cargo transported on or in the Equipment shall be in such from as approved by the CARRIER.

(j) *Customer Payments*. AFFILIATE shall immediately deliver to CARRIER any and all sums of cash, checks, and merchandise which AFFILIATE or its Employee Operators and Affiliate Operators receive pursuant to C.O.D. deliveries or otherwise. Such sums or instruments shall be delivered to CARRIER in the form received by the AFFILIATE. AFFILIATE shall have no liability for the receipt of false, fraudulent, or incorrect payments, so long as it has no knowledge of any facts about the falsity, fraudulent nature, or incorrectness of such payments..

(k) *Hours of Service Rules*. AFFILIATE will ensure that its Employee Operators and Affiliate Operators comply fully with the hours of service rules and prepare, carry on board, and produce upon request accurate daily logs, all in accordance with the Motor Carrier Laws of the various jurisdictions in which they are operating.

(l) *Subcontracting/Trip-Leasing*. AFFILIATE is not prohibited from the pickup, transportation, or delivery of property for more than one common carrier or any other person or entity, provided, that AFFILIATE complies with the trip lease requirements

under 49 C.F.R. § 376.12(c)(2) and this Agreement. AFFILIATE may trip-lease (subcontract) the Equipment to a third party other than an affiliate of CARRIER only upon receiving prior written authorization from CARRIER and only as allowed for under the federal leasing regulations [49 C.F.R. §376.12(c)(2)]. CARRIER assumes no responsibility for the collection of freight charges or payment to AFFILIATE of any trip-lease related revenue. During the term of any trip-lease, AFFILIATE will display only the trip-lease carrier's identification, and, as between AFFILIATE and CARRIER, CARRIER will have no responsibility for, and AFFILIATE will fully indemnify CARRIER regarding, the operation of the Equipment.

3.  **CARRIER's Responsibilities**. CARRIER shall have the following duties and responsibilities:

(a) *Operating-Authority*. CARRIER shall be responsible for maintaining the proper operating authority and certificates, as mandated by the Motor Carrier Laws or the appropriate state regulatory bodies.

(b) *Exclusive Possession and Responsibility*. The Equipment shall be for CARRIER's exclusive possession, control, and use for the duration of this Agreement. CARRIER shall assume complete responsibility for the operation of the Equipment, as required by the Motor Carrier Laws. This subparagraph is set forth solely to conform with Motor Carrier Laws on regulations and shall not be used for any other purposes, including any attempt to classify AFFILIATE as an employee of CARRIER; nor does this provision alter the AFFILIATE's freedom to choose the methods and means of how it will perform the perform the transportation Services offered to it by CARRIER. Nothing in the provisions required by 49 C.F.R. § 376.12(c)(1) is intended as evidence that AFFILIATE or any worker provided by AFFILIATE is an employee of CARRIER. During the term of this Agreement, CARRIER will have the exclusive right to subcontract the Equipment to other authorized motor carriers. AFFILIATE may only subcontract the Equipment only upon meeting the following conditions: (1) AFFILIATE shall receive prior written authorization from CARRIER as set forth in Section 2(l) above, (2) during the performance of such subcontracted services, AFFILIATE shall remove all plates, permits, signage, and identification of CARRIER, and (3) AFFILIATE's subcontracted services shall be under a separate operating authority independent of CARRIER's authority. CARRIER has no right to and will not control the manner nor prescribe the method of doing that portion of the operation which is contracted for in this Agreement by AFFILIATE, except such control as can reasonably be construed to be required by Applicable Law. AFFILIATE reserves the right to accept or reject any freight tendered for transportation by CARRIER.

(c) *Inspection of Equipment*. CARRIER agrees that before taking possession of the Equipment, the Equipment will be inspected by one of its responsible and qualified employees or agents.

(d) *Identification of Equipment*. CARRIER shall identify the Equipment in accordance with the requirements of the Federal Motor Carrier Safety Administration, Department of Transportation, and appropriate state regulatory agencies. CARRIER shall have the right to place and maintain on the Equipment Carrier's name and any lettering, advertisement, slogans or designs as CARRIER may choose. AFFILIATE shall remove such identification at the termination of this Agreement or while operating such Equipment for any purpose other than conducting Carrier's business.

4.  **Duration of Agreement**. This Agreement shall begin on the date indicated on the signature page and shall remain in effect for a period of not less than Three (3) *years* days from that date, but then may be terminated in accordance with the provisions of Section 13; provided, however, that this Agreement may be terminated at any time in accordance with the provisions of Section 12.

5.  **Compensation; Billing**. The CARRIER and AFFILIATE hereby agree that the AFFILIATE shall be compensated for the performance of the Services in accordance with the following provisions:

(a) *General*. It is expressly understood and agreed that AFFILIATE's compensation shall be as set forth in Schedule "C" and such compensation shall constitute the total compensation for everything furnished, provided, or done by AFFILIATE in connection with this Agreement, including the services of AFFILIATE'S Employee Operators and Affiliate Operators. If AFFILIATE's compensation is based on a percentage of gross revenue for a shipment, then, for purposes of computing AFFILIATE's compensation, gross revenue means those monies received by CARRIER from the Shipper or consignee for the transportation of commodities by AFFILIATE on behalf of CARRIER.

(b) *Customer Billing*. AFFILIATE shall be responsible for the entry of all delivery, billing, and invoicing information for the Designated Customers for services rendered by AFFILIATE under the terms of this Agreement. CARRIER shall provide AFFILIATE with its dedicated billing software and/or information as necessary for AFFILIATE to enter, maintain, and monitor such billing procedures. AFFILIATE hereby agrees to (i) perform such billing services in accordance with the CARRIER's applicable policies, rules, and guidelines as may be adopted from time to time, (ii) keep, maintain, and retain any and all delivery, invoices, supporting documents, and other billing information in its ordinary course of business, and in such form

and for such times as CARRIER may require; and (iii) deliver to CARRIER, upon reasonable notice, copies of any and all such billing documents and information as CARRIER may request.

(c) *Settlement Period*. CARRIER shall settle with AFFILIATE with respect to services provided under this Agreement within Five (5) calendar days after AFFILIATE's submission for billing of the proper form of those documents necessary for CARRIER to secure payment. AFFILIATE agrees that CARRIER shall be entitled to deduct from such settlement payment the items listed in Schedule "A-2". If AFFILIATE disagrees with, or disputes any deductions, setoffs, charge backs, or the amount of the settlement payment, it must notify CARRIER, in writing within sixty (60) days of receiving said settlement check, setting forth the basis of its disagreement. The failure to so notify the CARRIER within said thirty (30) day period, shall serve as the AFFILIATE's acceptance of the compensation paid for the loads carried for that settlement period, and AFFILIATE further agrees to forever release and discharge CARRIER from any claim or liability arising out of, or pertaining to, the sum(s) of money paid to the AFFILIATE or deducted from AFFILIATE's settlement payment for that period. CARRIER shall have the right to review all of AFFILIATE's documents and records relating to the use of the Equipment and to the services provided under this Agreement, and AFFILIATE agrees to provide CARRIER with access to such documents and records upon reasonable notice.

(d) *Advances*. AFFILIATE may request from CARRIER, an advance on earned, but unpaid compensation. CARRIER, in its sole discretion, has the right to grant or deny said request. In the event CARRIER grants said request for an advance, AFFILIATE agrees to reimburse or pay CARRIER any and all charges/expenses attributable to making said advance. Said payment or reimbursement shall be deducted on AFFILIATE's next settlement.

(e) *Loans for Repairs*. In the event that CARRIER makes any loans or advances any credit to AFFILIATE for the repair, maintenance, care, or replacement of any Equipment, AFFILIATE hereby agrees to repay such amounts in accordance with the terms and conditions of such loan or advance. In the event that AFFILIATE fails to repay such loan or advance as agreed, CARRIER is hereby authorize to deduct and withhold any such amounts from any compensation due hereunder. Nothing contained in this Agreement shall be construed or interpreted to require or obligate CARRIER to make any such loans, advances, or extensions of credit.

(f) *Chargebacks*. CARRIER shall charge back to AFFILIATE at the time of payment or settlement, any expenses CARREER has initially paid that, under this Agreement, the AFFILIATE is obligated to bear. Such expenses shall be deducted from the amount of AFFILIATE's compensation and shall include, but not be limited to, fuel and mileage taxes, tank washes, product disposal, workman's compensation insurance (as applicable), occupational disability insurance (as applicable), cargo claims, property damage, license and permit fees, and any other expenses set forth in this Agreement. CARRIER will furnish AFFILIATE with a written explanation of how the charge back is computed and, if requested by AFFILIATE, will make the necessary documents available to determine the validity of the charge back.

(g) *Income Withholding Orders/Notices*. In the event that CARRIER is served with any Income Withholding Order for any Employee Operators and Affiliate Operators, CARRIER shall notify AFFILIATE of its receipt and may notify the applicable government agency or administrative body of the relationship evidenced by this Agreement and that such person is not an employee of CARRIER. Upon receipt of such notice, AFFILIATE hereby agrees to take all actions as are necessary or required by law to comply with such Income Withholding Order. AFFILIATE hereby covenants and agrees to indemnify and hold CARRIER harmless from any and all claims, demands, damages, fines, penalties, costs, expenses, attorneys' fees, and other amounts incurred in connection with any Income Withholding Order relating to an employee of AFFILIATE. In consideration of the CARRIER's agreement hereunder, AFFILIATE hereby waives any claim, demand, action, or cause of action against CARRIER arising, either directly or indirectly, out of CARRIER's action relating to an Income Withholding Order.

6. **Operational and Other Expenses**.

(a) *Payment of Operational Expenses*. AFFILIATE shall, at its sole cost and expense, provide all the Equipment ready to operate and fully roadworthy, including the necessary licenses, permits, cab cards, vehicle identification stamps, and state base plates, and shall furnish all necessary oil, fuel, tires and other parts, supplies and equipment necessary or required for the safe and efficient operation and maintenance of the Equipment, including repairs for the operation of such Equipment; and shall pay all other expenses incident to such operation, including, but not limited to, highway use taxes, weight taxes, state property or indefinite state taxes, fuel taxes, fuel tax surcharges, license, permit and registration fees, ferry charges, toll violations, toll evasion, toll charges, and detention and accessorial charges not collected by CARRIER because of AFFILIATE's failure to provide the required documentation.

(b) *Employee Operator's and Affiliate Operator's Expenses*. AFFILIATE agrees to pay all expenses of its drivers and Contracted Operators, helpers, and other employees, including, but no limited to wages, workers compensation insurance or occupational disability insurance, health, welfare and pension costs, and taxes of any kind assessed against the AFFILIATE.

(c) *Empty Mileage Expense*. Unless otherwise required by law, or otherwise agreed between the parties, empty mileage expense, including any expense associated with obtaining the return of empty trailer or other property to the CARRIER'S possession as directed by the Carrier shall be borne by AFFILIATE.

(d) *In-Cab Systems*. Other than initial installation costs and repairs covered by the manufacturer's warranty, AFFILIATE shall be responsible for all costs and expenses required in relocating to another vehicle, operating, and maintaining any communications, GPS, email, asset tracking, and other similar trucking technology equipment and systems.

(e) *Equipment Expenses*. AFFILIATE shall be responsible for all costs and expenses required in maintaining, and shall maintain the Equipment in safe condition and in complete compliance with all Motor Carrier Laws and any and all laws and regulations of the states in which AFFILIATE operates.

(f) *Assessed Expenses*. AFFILIATE recognizes that certain of the foregoing expenses, including, but not limited to, fuel and mileage taxes, are initially assessed against CARRIER even though they are the responsibility of the AFFILIATE. Whenever any such expenses are assessed against CARRIER, the AFFILIATE agrees to pay CARRIER fully for actual documented these expenses with payment terms specified by CARRIER. AFFILIATE expressly agrees that CARRIER may deduct such actual documented expenses from any compensation owed to AFFILIATE.

(g) *Rebates; Discounts*. AFFILIATE hereby acknowledges that CARRIER may from time to time be entitled to discounts, rebates, and/or other incentives in connection with any products, services, plans, or programs to which it may provide access to the AFFILIATE. AFFILIATE hereby agrees that all such discounts, rebates and/or other incentives are the property of the CARRIER and that it has no rights or entitlement thereto. However, nothing contained herein shall prohibit CARRIER, in its sole and absolute discretion and upon such terms and conditions as it may determine, from passing along all or any portion of such discounts, rebates and/or other incentives to AFFILIATE.

(h) *IRP Plate*. AFFILIATE may, if desired at its sole discretion, purchase from CARRIER an International Registration Plan ("IRP") base plate, which plate will be obtained in CARRIER'S name for use by AFFILIATE or its Employee Operators and/or Affiliate Operators. The cost of each IRP plate purchased through CARRIER includes the actual plate cost, taxes, fees, interest and administrative expenses, and shall be deducted from AFFILIATE'S compensation at a rate set forth in Schedule "C" attached hereto until the cost of the IRP plate (as defined above) is paid in full. In the event AFFILIATE chooses to purchase an IRP plate through CARRIER, then AFFILIATE and its Employee Operators and/or Affiliate Operators shall be required to return the plate immediately upon the termination of this Agreement, in which case CARRIER shall refund to AFFILIATE a pro-rata share of the amount received by CARRIER in the event that CARRIER is able to reuse the plate or sell the plate to another contractor. AFFILIATE shall not be entitled to reimbursement for the unused portion of a base plate, however, unless CARRIER is able to reuse or sell the plate to another contractor. AFFILIATE is under no obligation to purchase an IRP plate through CARRIER, and may obtain, at its sole cost and expense, an IRP base plate in its own name.

(i) *Fines*. AFFILIATE agrees to pay all fines imposed for violation of any law or regulation by the state in which AFFILIATE operates, the Department of Transportation, or the Federal Motor Carrier Safety Administration, where such violation results, at least partially, from the acts or omissions of AFFILIATE or its Employee Operators and/or Affiliate Operators.

(j) *Chargebacks*. It is further understood that, except as hereinafter set forth, in the event CARRIER pays any of the items set forth in this section, the amount thereof, any attorneys' fees, paid by the CARRIER shall be repaid to CARRIER by way of a charge-back to the AFFILIATE against any funds or compensation owed to AFFILIATE.

7. **Liability for Damages to Cargo, Etc.** The parties hereby agree as follows:

(a) *Product/Cargo*. AFFILIATE shall be liable for any cost, expenses or other amounts (including any insurance deductibles charged to or required to be paid by CARRIER) relating to any loss, damage, delay, mis-delivery, or contamination of product or cargo resulting from any incident of loss or damage to such product or cargo, which loss, damage, delay, mis-delivery, or contamination is caused by the negligence, grossly negligence, or intentional act of the AFFILIATE, its agents, employees, representatives, Employee Operators, or Affiliate Operators. AFFILIATE AGRESS TO INDEMNIFY AND HOLD CARRIER HARMLESS FOR ANY SUCH CLAIM.

(b) *Other Damages/Claims*. Other than the types of damages/claims addressed in Sections 2(f)(2) and 7(a) of this Agreement, AFFILIATE shall be liable for any cost, expenses or other amounts (including any insurance deductibles charged to or required to be paid by CARRIER) relating to any loss, damage, injury, costs, expenses or amounts incurred by CARRIER or the Designated Customers resulting from negligence, grossly negligence, or intentional act of the AFFILIATE, its agents, employees, representatives, Employee Operators, or Affiliate Operators. AFFILIATE AGRESS TO INDEMNIFY AND HOLD CARRIER HARMLESS FOR ANY SUCH CLAIM.

(c) Nothing contained herein shall in any manner be interpreted or construed to limit or waive any rights of subrogation or contribution that CARRIER or its insurers may have against any third party, including AFFILIATE, its agents, employees, representatives, Employee Operators, or Affiliate Operators, arising out of any for any incident of loss, damage, or injury.

8. **Insurance**. The responsibilities and obligations between CARRIER and AFFILIATE involving insurance shall be as follows:

(a) Unless authorized to be self-insured, CARRIER shall maintain public liability, property damage, and cargo insurance in such amounts as are required by the Interstate Commerce Commission, Department of Transportation, and applicable state regulatory agencies and as set forth in Schedule "D".

(b) AFFILIATE acknowledges that from time to time, CARRIER may make certain insurance programs, plans, and benefits available to AFFILIATE and/or its Employee Operators or Affiliate Operators. In connection with any such programs, plans or benefits, AFFILIATE hereby agrees that it is responsible for the payment of any and all premiums, cost, or other expenses related thereto. Notwithstanding the foregoing, nothing contained herein shall be construed or interpreted to require CARRIER to provide any insurance programs, plans, and benefits available to AFFILIATE, its Employee Operators, and/or Affiliate Operators. AFFILIATE acknowledges and agrees that CARRIER is not a broker, agent, or seller of insurance coverage or benefits, but is merely providing access to such programs, plans, and benefits as an accommodation to AFFILIATE.

(c) AFFILIATE hereby authorizes CARREIR to deduct from its compensation due hereunder any and all premiums and other charges due and owing by AFFILIATE for its insurance coverages required hereunder. In the event that such compensation is insufficient to pay any premiums or other amounts due and owing by AFFILIATE, AFFILIATE hereby agrees to pay to CARRIER, within three (3) days of demand, any such amounts due and owing. AFFILIATE acknowledges and agrees that (1) it is its responsibility to maintain all insurance coverages in full force, (2) it is its obligation and responsibility to pay all premiums and other charges due and owing, and (3) the deduction and/or remittance of premiums by CARREIR is merely for convenience and administrative purposes only and is not intended to impose any duty or obligation on CARRIER to pay such amounts or notify AFFILIATE of any non-renewal or cancellation for non-payment.

(d) AFFILIATE acknowledges and agrees that the insurance coverage provided by CARRIER does not and is not intended to protect AFFILIATE whenever the Equipment is not being operated on behalf of CARRIER. As such, in the event that AFFILIATE performs transportation services for any third party other than CARRIER using the Equipment, AFFILIATE agrees (1) to obtain and maintain separate and independent insurance coverages for any such third-party transportation services and (2) to name CARRIER as an additional insured on any such insurance coverages, and (3) to comply in all respects with Section 3(b) relating to removal of CARRIER identification/signage and operation under separate independent authority.

(e) CARRIER shall maintain insurance coverage for the protection of the public pursuant to the Federal Motor Carrier Safety Administration' and its applicable laws and regulations.

(f) CARRIER's self-insurance or possession of legally required insurance in no way restricts CARRIER's rights of indemnification from AFFILIATE under any provision of this Agreement.

(g) CARRIER shall have no insurance responsibilities or obligations pertaining to AFFILIATE other than those expressly stated in this Agreement or mandated by law.

9. **Cooperation With Carrier On Claims**. AFFILIATE hereby agrees to cooperate with CARRIER and assist in the notification, processing, investigation, management, and resolution of claims CARRIER, its customer and other third parties as follows:

(a) *Cargo Claims*. AFFILIATE warrants that all cargo loaded on the Equipment will be delivered to the consignee with reasonable diligence, speed and care and as may be required by the shipper or on the bill of lading. AFFILIATE and its Employee Operators and Affiliate Operators will immediately report any cargo exceptions, damages or delay to CARRIER.

(b) *Accidents*. AFFILIATE, and its Employee Operators and Affiliate Operators, will notify CARRIER immediately of any property damage and any incident or accident involving any pedestrian or occupant of any type of vehicle, whether or not the incident or accident appears to have resulted in personal injury and whether or not AFFILIATE appears to be at fault.

(c) *Roadside Inspections*. AFFILIATE, and its Employee Operators and Affiliate Operators, will notify CARRIER via telephone or other communications immediately upon completion of any roadside inspection of the Equipment and the results thereof, and AFFILIATE will provide CARRIER with a copy of the roadside inspection report received in connection with each such inspection.

(d) *Notice of Infractions, Claims, or Suits*. AFFILIATE will forward immediately to CARRIER every demand, notice, summons, ticket or other legal process received by AFFILIATE that involves a charge, infraction, claim, suit or other legal proceeding arising from the operation of the Equipment, the relationship created by this Agreement or the services performed hereunder.

(e) *AFFILIATE's Assistance and Cooperation*. AFFILIATE and its Employee Operators and Affiliate Operators will cooperate fully with CARRIER in any legal action, regulatory hearing or other similar process arising from the operation of the Equipment, the relationship created by this Agreement or the services performed by AFFILIATE. AFFILIATE will, upon CARRIER's request, provide written reports or affidavits, attend hearings and trials and assist in securing evidence or obtaining the attendance of witnesses. AFFILIATE will provide CARRIER with any assistance as may be necessary for CARRIER or CARRIER's representatives or insurers to investigate, settle or litigate any accident, claim or potential claim by or against CARRIER.

10. **AFFILIATE Parties Not Employees**. It is expressly and agreed that the AFFILIATE, its Employee Operators, and Affiliate Operators are not employees of the CARRIER and are serving as independent contractors for the Equipment and driver services provided pursuant to this Agreement. AFFILIATE and GUARANTOR hereby agree to defend, indemnify and hold CARRIER harmless for any claims, suits, or actions, including reasonable attorney's fees in protecting CARRIER's interests, brought by its employees, any union, the public, or state or federal agencies, arising out of the operation of the Equipment pursuant to this Agreement. In this regard, AFFILIATE and GUARANTOR hereby assume full control and responsibility for all hours scheduled and worked, wages, salaries, workers' compensation and unemployment insurance, state and federal taxes, fringe benefits and all other costs relating to the use of Employee Operators and Affiliate Operators and other employees of the AFFILIATE, provided by AFFILIATE pursuant to this Agreement. Proof of such control and responsibility shall be submitted by AFFILIATE to CARRIER as required by CARRIER and may include, but not be limited to, proof of highway use tax being currently paid when the AFFILIATE purchases the license; proof of income tax being currently paid; proof of payment of payroll tax for AFFILIATE's drivers and a certificate of insurance containing a 30-day notice of change and/or cancellation clause. As required by law, CARRIER agrees to file and submit information tax returns (Form 1099) to and for AFFILIATE in the event that AFFILIATE is paid more than the statutory amount during a calendar year.

11. **Confidentiality**. As part of the business relationship between CARRIER and AFFILIATE, CARRIER will be required to disclose to AFFILIATE or AFFILIATE may come into possession of information or data which constitute proprietary information and trade secrets of CARRIER, including, without limitation, it services, products, customer information, processes, sales information, know-how, practices, policies, and other confidential information which is considered proprietary or secret by CARRIER (hereinafter "Confidential Information"). In consideration of the receipt of such Confidential Information and potential business, AFFILIATE hereby agrees that, during the term of this Agreement and for a period of five (5) years thereafter, it will maintain such Confidential Information in the utmost of confidence and will not disclosure such Confidential Information without the prior written consent of CARRIER; to use such solely in connection with such business relationship; and to take all measures necessary to protect such Confidential Information. Any breach by a party of any of its obligations under this section would result in irreparable injury to the other party. Such non-breaching party will be entitled (without prejudice to its right to other remedies, including monetary damages, and without the posting of a bond or other security) to injunctive and other equitable relief to prevent or restrain the breach of this section. The obligations of this Paragraph 11 shall survive termination of this Agreement.

12. **Non-Competition; Non-Solicitation**. Due to the importance and sensitivity of the Confidential Information, and in consideration for the agreement of the Company to disclose and make such Confidential Information available to AFFILIATE as set forth above, as well as the payments hereunder, AFFILIATE hereby covenants and agrees that, during the term of this Agreement, and for a period of thirty-six (36) months (the "Non-Compete Period") following the expiration or termination hereof, whether voluntary or involuntary, with or without cause, or for any reason or no reason and, as applicable, AFFILIATE shall not, either directly or indirectly, on behalf of itself, or any other individual, corporation, partnership, limited liability company, joint venture, or other entity other than CARRIER: (a) contact or otherwise solicit, either directly or indirectly, any Designated Customer for the purpose of selling, performing, marketing, or otherwise transacting transportation, freight hauling, and/or other services of the type performed

under this Agreement; or (b) solicit, hire, retain, or otherwise engage or go into business with any individual who is or was an employee or CARRIER Operator of CARRIER at any time during the twenty-four (24) month period prior to the date of the expiration or termination of this Agreement; or (c) make any disparaging comments concerning CARRIER or any of its shareholders, officers, directors, or employees to customers of the CARRIER or other third parties. In addition, AFFILIATE expressly acknowledges (i) that it is and will be able to operate and maintain its business without violating the covenants set forth in Paragraphs 11 and 12; (ii) that its ability to do so was a condition precedent to CARRIER entering into this Agreement and offering the opportunity for the additional business to AFFILIATE as set forth in this Agreement; and (iii) that the covenants and agreements set forth in this Paragraphs 11 and 12 are separate and independent covenants and are adequately supported by the agreements and consideration given by CARRIER hereunder. AFFILIATE acknowledges that, in the event of a breach or violation of Paragraphs 11 or 12, AFFILIATE's conduct will cause damages of an irreparable and continuing nature to CARRIER, for which money damages will not provide adequate relief. Therefore, AFFILIATE agrees that in addition to any money damages CARRIER may be entitled to recover, CARRIER also is entitled to obtain an injunction (including but not limited to a temporary restraining order) for the remainder of the period specified in the restrictive covenant which AFFILIATE breached. CARRIER shall have the right to obtain such injunctive relief without having to post any bond or prove any specific damages. The remedies of CARRIER contained in this Agreement are in addition to and not to the exclusion of any other remedies whether specified in this Agreement, available at law, in equity or otherwise. The AFFILIATE's duties and obligations under this Paragraph shall survive the termination of this Agreement or any of its provisions.

13. **Breach**. Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated, at any time, by either party in the event of a breach by the other of any term obligation contained in this Agreement In the event of a breach and when practicable, written notice shall be served upon the breaching party, notifying such party of the breach and the termination of the Agreement and reason(s) therefore. If, in CARRIER's judgment, AFFILIATE has subjected CARRIER to liability because of AFFILIATE's acts or omissions, CARRIER may take possession of the lading entrusted to AFFILIATE and any equipment owned by CARRIER and complete performance, using such equipment or any other equipment. In such event, AFFILIATE shall waive any recourse against CARRIER for such action and AFFILIATE shall reimburse CARRIER for all direct or indirect costs, expenses, or damages including reasonable attorney's fees incurred by CARRIER as a result of CARRIER's possession of the lading and completing performance.

14. **Termination**. Subject to the provisions of Section 4, this Agreement may be terminated for any reason by giving  five (5) business days written notice to that effect to the other party either personally, by mail, or by fax machine at the address or fax number shown at the end of this Agreement. However, the effective date and time of the termination of this Agreement must be either prior to the AFFILIATE picking up a load, or after the AFFILIATE completes delivery of a load (i.e., the effective date and time of termination of this Agreement cannot be when the AFFILIATE is under dispatch with a load).

15. **Indemnification**. Except as otherwise provided, AFFILIATE hereby covenants and agrees to defend, indemnify and hold CARRIER and the Carrier Representatives harmless from any direct, indirect and consequential loss, damage, fine, expenses, including reasonable attorneys' fees as a result of any action, claim for injury to persons, including death, and damage to property which CARRIER may incur arising out of or in connection with AFFILIATE's services, acts, omissions, or obligations under this Agreement.

16. **Purchase of Products, Equipment, or Services from Carrier**.  AFFILIATE is not required to purchase or rent any products, Equipment or services from CARRIER as a condition of entering into this Agreement. AFFILIATE is free to purchase fuel solely at its discretion and at truck stops of its choice.

17. **Final Settlement Upon Termination**.  With respect to final settlement upon termination of this Agreement, the failure on the part of AFFILIATE to remove all identification devices of CARRIER, and except in the case of identification painted directly on the Equipment, return them to CARRIER in any reasonable manner, shall constitute a breach of this Agreement Such breach, as will any breach, shall entitle CARRIER to withhold any payments owed to AFFILIATE until such obligations are met Upon termination of this Agreement, CARRIER will, within forty-five (45) days after on, return to AFFILIATE, any funds being held to pay expenses incurred prior to termination; however, if AFFILIATE is obligated to pay any sum to CARRIER under such provisions of this Agreement, CARRIER may deduct such obligations from the amounts due to AFFILIATE.

18. **Labor Disputes**.  AFFILIATE hereby agrees that should it become involved in a labor dispute with its employees, it will immediately report this fact to CARRIER. If such labor dispute interferes or tends to interfere with the AFFILIATE'S  operations for CARRIER, AFFILIATE agrees to continue its operation for CARRIER utilizing other employees not involved in the labor dispute.

19. **Operating Regulations; Company Policies**. In conjunction with this Agreement, CARRIER shall publish regulations which, pursuant to the appropriate governmental body having jurisdiction, AFFILIATE must comply with said regulations are hereby

incorporated into this Agreement, and the failure of the AFFILIATE to abide by these regulations may be considered by CARRIER a breach of this Agreement. CARRIER agrees to furnish the AFFILIATE with a copy, of any amendments or additions to the regulations to the AFFILIATE. In addition, AFFILIATE hereby agrees to comply, and require its Employee Operators and Affiliate Operators to comply, with any and all company policies of the CARRIER applicable to AFFILIATEs, as they now exist or may be amended, modified, revised, renewed, or adopted from time to time. Unless a shorter time is stated therein, any amendments or modifications to such policies or regulations shall be effective thirty (30) days after delivery to AFFILIATE,

20. **Equal Contracting Opportunity**: The Services and Equipment specified herein will be furnished by AFFILIATE in full compliance with any and all applicable federal, state, and local laws, statutes, ordinances, rules, and regulations pertaining to government contracts and subcontracts, including, without limitation, Executive Order 11246.

21. **Benefit**. This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors.

22. **Assignment; Right of First Refusal**. ~~CARRIER shall have the right to assign this Agreement at any time without the consent of AFFILIATE~~. The AFFILIATE may not assign this Agreement or any rights to perform any Services hereunder without the prior written consent of the CARRIER. In the event of any attempted assignment of any rights hereunder, any sale of the AFFILIATE, or any Change of Control, the CARRIER shall the right to terminate this Agreement upon thirty (30) days written notice to AFFILIATE; *provided, however*, that in the event of the sale of the ownership interests in, or all or substantially all of the assets of, the AFFILIATE, CARRIER shall have the right, upon receipt of written notice from AFFILIATE of the terms and conditions of such sale, CARRIER shall have a right of first refusal for the purchase of the ownership interests in, or all or substantially all of the assets of, the AFFILIATE, upon the same such terms and conditions. Such right of first refusal shall be exercised by CARRIER within fifteen (15) days from the date of such written notice from AFFILIATE. In the event that AFFILIATE agrees to a modification of the original terms and conditions of such sale, CARRIER shall have an additional ten (10) days to determine whether to exercise such right of first refusal.

23. **Notices**. All notices required or permitted to be given pursuant to this Agreement will be in writing and will be (i) personally delivered, (ii) mailed, first class postage prepaid, or delivered by a nationally recognized express courier service, charges prepaid, (iii) delivered by fax, or (iv) electronic message, if to the Company to the address of CARRIER's registered office (as reflected on the records of the Secretary of State of the State of Texas) and if to AFFILIATE, to the appropriate address set forth above. Any such notice, when sent in accordance with the provisions of the preceding sentence, will be deemed to have been given and received (a) on the day personally delivered, (b) on the third day following the date mailed, (c) the date of actual delivery by a courier, and (d) the date of delivery and confirmation of delivery by the recipient if delivered by fax or electronic message. Any party may change its address, as set out above, by giving notice in writing to all other parties in the manner set forth in this Section, stating the new address.

24. **Complete Agreement And Construction**. This Agreement, including any Appendices attached, constitutes the sole, entire, and existing agreement between the parties herein, and supersedes all prior agreements and undertakings, oral and written expressed or implied, or practices, between the parties, and expresses all obligations and restrictions imposed on each of the respective parties during its terms, except those specifically modified or changed by mutual written agreement between CARRIER and AFFILIATE.

25. **Governing Law; Venue**. This Agreement, and the application or interpretation thereof, will be governed exclusively by its terms and by the laws of the State of Texas, without regard for the conflict of laws provisions of any other State. AFFILIATE hereby specifically agrees that, for the purposes of this Agreement and the relationship between CARRIER and AFFILIATE, AFFILIATE is authorized to do business, and does business, in the State of Texas. Any action, proceeding, or claim arising out of or relating to this Agreement commenced by any party must be prosecuted in Ellis County, Texas. Each party hereby waives any plea of privilege that might exist in the absence of such party's agreement to prosecute such claim in Ellis County, Texas, and each party hereby irrevocably submits to the non-exclusive jurisdiction of the state and federal courts of the State of Texas and consents to service of process upon such party in any legal proceeding arising out of or in connection with this Agreement.

26. **Severability**. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity will not affect the validity of the remainder of this Agreement and the illegal or invalid provision will be enforced to the maximum extent possible to still be legal and valid.

27. **Failure to Pursue Remedies**. The failure of any party to seek redress for violation, or to insist upon the strict performance, of any provision of this Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

28. Survival. The duties, obligations, and provisions of Paragraphs 7, 9, 10, 11, 12, and 15 shall survive the expiration and/or termination of this Agreement and be fully enforceable.

29. Successors and Assigns. Each and every covenant, term, provision, and agreement herein contained will be binding upon each of the parties and their respective heirs, legal representatives, successors, and assigns and will inure to the benefit of each of the parties.

30. Construction, Sections, Appendices, Etc. Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter. Each reference to a "Schedule" herein is, unless specifically indicated otherwise, a reference to a Schedule attached hereto. It is hereby understood that if any Schedule that is to be executed and delivered pursuant to the terms hereof contains blanks, it will be completed correctly and completely in accordance with the terms and provisions hereof and as contemplated herein prior to or at the time of its execution and delivery. All Appendices are a part of this Agreement and are hereby incorporated herein for all purposes.

31. Further Assurances. In connection with this Agreement and the transactions contemplated by it, each party will execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

32. Attorneys' Fees. If any party brings any legal action to enforce or interpret the provisions of this Agreement, the prevailing party will be entitled to reasonable attorneys' fees, costs, and expenses, in addition to any other relief to which such party may be entitled.

33. Entire Agreement. This Agreement sets forth the entire Agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, if any, related thereto.

34. Third-Party Beneficiaries. Except for the Carrier Representatives, there are no third party beneficiaries of this Agreement.

35. Section Headings. The headings in this Agreement are inserted for convenience and identification only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

36. Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if the parties had all signed the same document. All counterparts will be construed together and will constitute one instrument. In making proof of this Agreement, it will not be necessary to account for more than one counterpart executed by the person against whom enforcement is sought.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the 3 day of May, 2013.

| **CARRIER:** | **AFFILIATE:** |
|---|---|
| **COAL CITY COB CO., INC.** | **PALM ENTERPRISES, INC.** |
| By: ______ | By: Stacy C Snak |
| Name: ______ | Printed Name: ______ |
| Title: ______ | Title: President |
| Address for Notices: | Address for Notices: |
| ______ | 1060 Kennedy Ave |
| Waxahachie, Texas 75165 | Schererville, IN 46375 |
| Fax: (____) ____-______ | Fax: (219) 836-7820 |
| | Email: Sfrank@cccob.com |

## SCHEDULE "A-1"

## AFFILIATE SERVICES AND RESPONSIBILITIES

1. Provide transportation, freight, dispatching, customer service, and billing services to meet the needs and requirements of CARRIER and CARRIER's customers.
2. Support CARRIER's various customer and business programs and comply with all related CARRIER policies and procedures relating thereto.
3. Provide at AFFILIATE's sole expense all normal and necessary facilities (and all utilities related thereto), including, but not limited to, office facilities; dispatch facilities; motor vehicle and equipment storage; repair and maintenance of equipment; telephone and voice telecommunications equipment; fuel and related products; tires and motor vehicle parts; equipment and supplies; safety equipment; and all their employees and operators protective equipment and supplies; and all other property and equipment as may be necessary to perform the services under this Agreement.
4. Inspect, maintain, repair, keep in compliance and operate the Equipment within all corporate policies, applicable laws, statutes and regulations of any Governmental body having jurisdiction over the equipment (including, but not limited to the Motor Carrier Laws).
5. Supervise all AFFILIATE drivers to assure a safe operation conducted in conformity with all applicable Motor Carrier Laws and the safety policies of CARRIER, including drivers' logs compliance.
6. Promptly perform all billing of services rendered to CARRIER's customers in accordance with CARRIER'S established billing practices, policies and guidelines and supply CARRIER with all billing information and documentation, utilizing and complying with CARRIER's prescribed scanning procedures.
7. Promptly supply CARRIER with all fuel and mileage reports, drivers' logs, and medical records, collections, and other documents as may be requested by CARRIER.
8. Provide CARRIER with copies of all documents, including correspondence, which AFFILIATE sends out under CARRIER's name.
9. Maintain compliance by AFFILAITE and it Drivers, employees, and Contracted Operator with all of CARRIER's company procedures and policies, including its safety and maintenance procedures, as may be adopted and promulgated from time to time.
10. Immediately notify and promptly provide CARRIER with all required information and documents concerning transportation delays and customer complaints, pursuant to CARRIER's customer service and complaints reporting procedures.
11. Adopt and maintain adequate policies and procedures for notification by AFFILIATE's employees and/or owner operators of (a) any safety violation, accident, injury, or death to or relating to any employee, driver, or Contracted Operator of AFFILIATE or other third party or (b) any release, spill, contamination, or cargo claim occurring in connection with any transportation services, loading, or unloading provided by AFFILIATE.
12. Conduct its operations and manage its personnel in such a manner that CARRIER's good name and reputation are maintained.
13. Adopt and implement a substance abuse testing policy (including random and "for cause" testing) acceptable to CARRIER.
14. Provide CARRIER with quarterly financial statements as may be requested by CARRIER, no later than forty-five (45) days from the end of the quarter. AFFILIATE shall also provide CARRIER with annual financial statements within ninety (90) days of the close of AFFILIATE's fiscal year. AFFILIATE will make available to CARRIER its books and records for examination by internal or outside auditors, within ten (10) days of CARRIER's written request.
15. Comply with all of CARRIER's dispatch and transportation management policies and procedures, including, but not limited to, the installation and implementation on AFFILIATE Equipment of CARRIER approved communications devices and all other related CARRIER software/hardware systems.
16. Maintain all computer software supplied by CARRIER. AFFILIATE shall be responsible for all expenses resulting from the damage, loss, or unauthorized use of software provided by CARRIER's for use by AFFILIATE. Upon the termination of this Agreement, AFFILIATE shall return all copies of computer software to CARRIER.

Initial: CARRIER ______ AFFILIATE ______

## SCHEDULE "A-1"

## AFFILIATE SERVICES AND RESPONSIBILITIES

1. Provide transportation, freight, dispatching, customer service, and billing services to meet the needs and requirements of CARRIER and CARRIER's customers.
2. Support CARRIER's various customer and business programs and comply with all related CARRIER policies and procedures relating thereto.
3. Provide at AFFILIATE's sole expense all normal and necessary facilities (and all utilities related thereto), including, but not limited to, office facilities; dispatch facilities; motor vehicle and equipment storage; repair and maintenance of equipment; telephone and voice telecommunications equipment; fuel and related products; tires and motor vehicle parts; equipment and supplies; safety equipment; and all their employees and operators protective equipment and supplies; and all other property and equipment as may be necessary to perform the services under this Agreement.
4. Inspect, maintain, repair, keep in compliance and operate the Equipment within all corporate policies, applicable laws, statutes and regulations of any Governmental body having jurisdiction over the equipment (including, but not limited to the Motor Carrier Laws).
5. Supervise all AFFILIATE drivers to assure a safe operation conducted in conformity with all applicable Motor Carrier Laws and the safety policies of CARRIER, including drivers' logs compliance.
6. Promptly perform all billing of services rendered to CARRIER's customers in accordance with CARRIER'S established billing practices, policies and guidelines and supply CARRIER with all billing information and documentation, utilizing and complying with CARRIER's prescribed scanning procedures.
7. Promptly supply CARRIER with all fuel and mileage reports, drivers' logs, and medical records, collections, and other documents as may be requested by CARRIER.
8. Provide CARRIER with copies of all documents, including correspondence, which AFFILIATE sends out under CARRIER's name.
9. Maintain compliance by AFFILAITE and it Drivers, employees, and Contracted Operator with all of CARRIER's company procedures and policies, including its safety and maintenance procedures, as may be adopted and promulgated from time to time.
10. Immediately notify and promptly provide CARRIER with all required information and documents concerning transportation delays and customer complaints, pursuant to CARRIER's customer service and complaints reporting procedures.
11. Adopt and maintain adequate policies and procedures for notification by AFFILIATE's employees and/or owner operators of (a) any safety violation, accident, injury, or death to or relating to any employee, driver, or Contracted Operator of AFFILIATE or other third party or (b) any release, spill, contamination, or cargo claim occurring in connection with any transportation services, loading, or unloading provided by AFFILIATE.
12. Conduct its operations and manage its personnel in such a manner that CARRIER's good name and reputation are maintained.
13. Adopt and implement a substance abuse testing policy (including random and "for cause" testing) acceptable to CARRIER.
14. Provide CARRIER with quarterly financial statements as may be requested by CARRIER, no later than forty-five (45) days from the end of the quarter. AFFILIATE shall also provide CARRIER with annual financial statements within ninety (90) days of the close of AFFILIATE's fiscal year. AFFILIATE will make available to CARRIER its books and records for examination by internal or outside auditors, within ten (10) days of CARRIER's written request.
15. Comply with all of CARRIER's dispatch and transportation management policies and procedures, including, but not limited to, the installation and implementation on AFFILIATE Equipment of CARRIER approved communications devices and all other related CARRIER software/hardware systems.
16. Maintain all computer software supplied by CARRIER. AFFILIATE shall be responsible for all expenses resulting from the damage, loss, or unauthorized use of software provided by CARRIER's for use by AFFILIATE. Upon the termination of this Agreement, AFFILIATE shall return all copies of computer software to CARRIER.

Initial: CARRIER [signature] AFFILIATE ________

**SCHEDULE "A-2"**

**Settlement Items/Deductions**

**AFFILIATE: Initial all items that apply:**

| Initial | Item/Deduction |
|---|---|
| ______ | Charges for tank washes |
| ______ | Charges for In-Cab Systems |
| ______ | Repairs and maintenance charges * |
| ______ | Carrier Equipment Charges |
| ______ | Equipment lease/rental payments |
| ______ | Assessed Expenses – 6(f) |
| ______ | Permit or license fees payable by AFFILIATE |
| ______ | Loan or advance payments (including interest, if applicable) |
| ______ | State or federal fines and penalties |
| ______ | Customer Chargebacks |
| ______ | Insurance surcharges |
| ______ | Cargo damages/claims and related charges |
| ______ | Damages to customer property or personnel |
| ______ | Demurrage/Detention Charges |
| ______ | Fuel surcharges |
| ______ | Layover charges |
| ______ | Scaling/Scale tickets |
| ______ | Administrative fees |
| ______ | Any other charges due or payable by AFFILIATE under the Agreement |
| ______ | Other: ______________________________ |
| ______ | Other: ______________________________ |
| ______ | Other: ______________________________ |

Initial: CARRIER _JM_ AFFILIATE ________

**SCHEDULE "B"**

**DESIGNATED CUSTOMERS**

| | Customer Billing Code | Customer |
|---|---|---|
| 1. | CAININ | Calumet Lubricants |
| 2. | CHTSG | Champion Technologies |
| 3. | CIEVCO | Cam2 International |
| 4. | CLBBPA | Chemlogix/Pilot |
| 5. | HADATX | Harcros |
| 6. | PCEAIN | Tradebe |
| 7. | PMPEIL | Sika |
| 8. | | |
| 9. | | |
| 10. | | |
| 11. | | |
| 12. | | |
| 13. | | |
| 14. | | |
| 15. | | |

Initial: CARRIER [signature] AFFILIATE ________

**SCHEDULE "C"**
**COMPENSATION**

| REVENUE ITEMS | AFFILIATE | | CARRIER | |
|---|---|---|---|---|
| | Initial | | Initial | |
| Linehaul[1] | 85% | | 15% | |
| Demurrage | 85% | | 15% | |
| Scaling | 85% | | 15% | |
| In-transit Heat | 85% | | 15% | |
| Fuel Surcharge | ~~85%~~ 100% | | ~~15%~~ 0% | |
| Scale Tickets | 100% | | 0% | |
| Reimbursed Tolls | 100% | | 0% | |
| Pumping/Blower | 100% | 65% to IC 20% to Palma | 0% | |
| Layover Charge | 85% | | 15% | |
| Extra Hose | ~~0%~~ 85% | (Opening) | ~~100%~~ 15% | |
| Tank Cleaning Charge | 100% | | 0% | |

1. Exceptions. The parties agree that the rate of compensation specified herein may be amended for specific shipments, routes or customers, including flat rates for handling products especially in local service. Any and all exceptions are described on the delivery receipt and likewise become a binding part of the Independent Contractor Agreement In such a case, CARRIER shall provide AFFILIATE with a new rate of compensation prior to the commencement of any trip by the AFFILIATE. The amended compensation rate will also be included in an addendum to this Agreement, to be provided to AFFILIATE prior to the commencement of any shipment.

Hose \
Pump / [illegible]

Storage - 100% if pumping unit?

---

[1] Certain loads may contain either an insurance surcharge or tank cleaning charges which have been included into the linehaul revenue. Said insurance surcharge or tank cleaning charge reduces the linehaul revenue allocated to the AFFILIATE on said loads.

**SCHEDULE "D"**
**INSURANCE REQUIREMENTS**

1. AFFILIATE shall be covered under CARRIER's public liability, property damage and, with regard to common carrier service, cargo loss or damage insurance coverage while AFFILIATE is operating the Equipment on behalf of CARRIER (i.e., while under dispatch by CARRIER). It shall be AFFILIATE's responsibility to provide, at its sole cost and expense, public liability and property damage insurance to protect AFFILIATE whenever the Equipment is not being operated on behalf of CARRIER.

2. AFFILIATE shall furnish to CARRIER written certificates obtained from its insurance carrier showing that such insurance has been procured, is being properly maintained, that the premiums therefore are paid, specifying the name of the insurance carrier, the policy number, and the expiration date, and further showing that written notice of cancellation or modification of the policy shall be given to CARRIER at least (30) days prior to such cancellation or modification.

3. AFFILIATE certifies that AFFILIATE has in effect, and will maintain, a policy of workers' compensation or an approved occupational disability insurance policy covering himself and AFFILIATE's employees, agents or servants. It is AFFILIATE's obligation to carry any fire, theft uninsured motorist and collision insurance that AFFILIATE may desire and, upon CARRIER's request, such insurance shall also name CARRIER as insured thereunder. AFFILIATE shall comply with any and all insurance requirements (including, without limitation, workers' compensation insurance) as may be required by the State in which his residence or principal place of business is located.

4. In the event AFFILIATE elects to carry occupational disability insurance instead of workers' compensation insurance pursuant to this Schedule, said occupational disability insurance coverage must be approved in writing by CARRIER.

**SCHEDULE "E"**
**AFFILIATE EQUIPMENT LIST**

Name: Palm
Address:

Fax No.:
Email:

| Year | Make | Model | VIN |
|---|---|---|---|
| 2007 131 | PETERBILT | 379 | 1XP5DU9X17N689382 |
| ~~2007~~ 137 | ~~PETERBILT~~ | ~~379~~ | ~~1XP5DU9X27N689388~~ |
| 2007 1414 | PETERBILT | 379 | 1XP5D49X67N882501 |
| 2007 | KENWORTH | | 1XKADB9X57J153972 |
| 2004 | KENWORTH | T-60 | 3WKAAB8X44F062198 |
| ~~2007~~ 1441 | ~~PETERBILT~~ | ~~379~~ | ~~1XP5D49X07N667826~~ |
| 2009 1451 | PETERBILT | 386 | 1XPHD49X99N776298 |
| 2009 | PETERBILT | 386 | 1XPHD49XX9N776312 |

O/O

Palm

1468
1469
1474
1477
1475
1426
1470
1471
1472
1473
1476

AS

**SCHEDULE "E-2"**
**CARRIER EQUIPMENT LIST**

| Year | Make | Model | VIN/SERIAL NO. | Weekly Rate | Maintenance/ Mileage Fee |
|---|---|---|---|---|---|
| 2005 | BULK | SSI | 3B9TS71E95G007209 | 175.00 | .09 |
| 2005 | BULK | SSI | 3B9TS71E55G007210 | 175.00 | .09 |
| 2005 | BULK | SSI | 3B9TS71E75G007211 | 175.00 | .09 |
| 2005 | BULK | SSI | 3B9TS61EX5G007312 | 175.00 | .09 |
| 2005 | BULK | SSI | 3B9TS61E35G007316 | 175.00 | .09 |
| 2005 | BULK | SSI | 1B9TS71E9X1295170 | 175.00 | .09 |
| 2000 | BRENNER | SSI | 10BFB72TXF0B1872 | 175.00 | .09 |
| 2007 | WALKER | SSI | 5WSAC42227N038418 | 175.00 | .09 |
| 2012 | STE | SSI | 1S9T74225C0017063 | 175.00 | .09 |
| 2012 | STE | SSI | 1S9T74223C0017076 | 175.00 | .09 |
| 1994 | BRENNER | SSI | 10BFU7218RF0A4350 | 175.00 | .09 |
| 2001 | HEIL | SSI | 190FL442113F14238 | 175.00 | .09 |
| 1998 | NOVA | SSI | 1N9S74221WA044128 | 175.00 | .09 |
| 1997 | STE | NISS | 1S9T74220V0017054 | 175.00 | .09 |

As Assigned

# Exhibit B

**Barry Golden**

**Subject:** FW: Palm Enterprises, Inc., 5-day notice of termination
**Attachments:** Palm Affiliate Agreement re signed February 2014.pdf; Palm Supplemental A.PDF; Palm Affiliate Agreement Amendment January 2017 related to Charlotte NC.PDF

---------- Forwarded message ----------
From: "Kurt Vragel" <kurt@kevtrucks.com>
Date: May 15, 2017 8:40 AM
Subject: Palm Enterprises, Inc., 5-day notice of termination
To: "s.barnish@cccob.com" <s.barnish@cccob.com>, "b.littleton@cccob.com" <b.littleton@cccob.com>
Cc:

5-DAY NOTICE OF TERMINATION – PALM ENTERPRISES, INC.

Steve Barnish

President & Chief Financial Officer

Coal City Cob Company, Inc.

4200 I-35E North

Waxahatchie, Texas 75165

by email: s.barnish@cccob.com

Bo Littleton

Coal City Cob Company, Inc.

4200 I-35E North

Waxahatchie, Texas 75165

by e-mail: b.littleton@cccob.com

As provided for in Section 14 of the Affiliate Agreement between Coal City Cob Company, Inc., and Palm Enterprises, Inc., this is your notice that Palm Enterprises, Inc., is terminating that Affiliate Agreement effective as of 9:00 A.M., Saturday, May 20, 2017.

Please send final payments of all money owed to Palm Enterprises, Inc., no later than June 5, 2017.

Any questions about termination, compensation due to Palm Enterprises, Inc., the return of any of your equipment, and any other things that may arise in connection with termination must be made through me and my office.

Please have your lawyer call me if you have any questions or need anything else.

Sincerely,

Kurt E. Vragel, Jr.

Kurt E. Vragel, Jr., P.C.

Attorney for Palm Enterprises, Inc.

1701 East Lake Ave., Suite 170

Glenview, Illinois 60025

Phone: (847) 657-8551

FAX: (847) 657-6801

kurt@kevtrucks.com

# Exhibit C

**Barry Golden**

**Subject:** FW: NDA
**Attachments:** 20170320112645252.pdf

**From:** Sharon Frank [mailto:s.frank@cccob.com]
**Sent:** Monday, March 20, 2017 11:50 AM
**To:** rnikodym@transwood.com
**Subject:** NDA

Here is the signed document Roger.

**Sharon J. Frank**

Coal City Cob
Company, Inc

Indiana Terminal:
1060 Kennedy Avenue
Schererville, IN 46375
219.836.7815
219.836.7820 Fax
708.878.4161 Cell
s.frank@cccob.com

# MUTUAL NON-DISCLOSURE AGREEMENT

This Mutual Non-Disclosure Agreement (the "Agreement") dated as of the 17th day of March, 2017 is made by and between Palm Enterprises with principal offices located at 1060 Kennedy Avenue, Schererville, IN and TransWood Carriers, Inc. whose address is 2565 St. Mary's Avenue, Omaha, NE 68105 each of which is referred to herein individually as a "Party" and collectively as the "Parties".

WHEREAS, in connection with the consideration of possible transactions between the Parties, each Party may provide the other Party with certain sensitive and proprietary information relevant to the operations and business of the other Party in relation to a potential business relationship between the parties. ("the Proposal").

WHEREAS, as a condition to furnishing such information, each Party requires that such information receive confidential treatment in accordance with the provisions of this Agreement.

NOW THEREFORE, in reliance upon and in consideration of the following undertakings, and for good and valuable consideration hereby acknowledged as given and received by each of the Parties, the Parties, on behalf of themselves, their subsidiaries, and their affiliates, agree as follows:

1. Confidentiality. Subject to the provisions of this Agreement, each Party agrees to hold in confidence all confidential, proprietary or trade secret information which has been, or which may hereafter be, communicated to that Party by the other Party orally, in written or electronic form, or in ay other form of communication, either directly or indirectly, in connection with the Proposal ("Confidential Information") and not to disclose, distribute or disseminate the Confidential Information, or any documents, studies, reports or information derived therefrom, in any way to any third party, except as provided herein. This Agreement itself and the fact that the Parties are discussing the Proposal shall also be deemed Confidential Information.

2. Use. Each Party agrees to use Confidential Information received from the other Party only for purposes of the Proposal, or the evaluation thereof. No other rights or licenses to trademarks, inventions, copyrights, patents, or any other intellectual property are implied or granted under this Agreement or by the delivering of Confidential Information from one Party to the other.

3. Copying. Confidential Information supplied by each Party shall not be reproduced by the other Party in any form except pursuant to the terms and conditions of this Agreement and as required to accomplish the intent of this Agreement.

4. Care. Each Party shall provide the same care to avoid disclosure or unauthorized use of Confidential Information as it provides to protect its own similar proprietary information, which care in no event shall be less than that which is commercially reasonable. It is agreed that Confidential Information may only be disclosed by the receiving Party to that Party's (including its subsidiaries' and affiliates') employees, officers, directors, agents, or other representatives who need to know such information for purposes of this Agreement. Each Party agrees to inform each such employee, officer, director, agent, or other representative that the Confidential Information is the furnishing Party's proprietary, confidential and trade secret information and may not be disclosed to third parties. Each Party acknowledges that it will be responsible for any breach of the terms and conditions of this Agreement caused by any such employee, officer, director, agent, or other representative.

# Exhibit D

**Barry Golden**

**Subject:** FW: NDA

**From:** Sharon Frank [mailto:s.frank@cccob.com]
**Sent:** Monday, March 20, 2017 3:38 PM
**To:** RNikodym@transwood.com
**Subject:** RE: NDA

Hope you're feeling better. I am forwarding these emails to another email address and then deleting from Cob, so you know.

I am trying to get through the contract now. Lot's of distractions, but I will persevere until I am through it.

**Sharon J. Frank**

Indiana Terminal:
1060 Kennedy Avenue
Schererville, IN 46375
219.836.7815
219.836.7820 Fax
708.878.4161 Cell
s.frank@cccob.com

**From:** RNikodym@transwood.com [mailto:RNikodym@transwood.com]
**Sent:** Monday, March 20, 2017 3:36 PM
**To:** Sharon Frank
**Subject:** Re: NDA

Thanks Sharon . . . .having a slow day today due to dental surgery this morning, but will give you a shout tomorrow to discuss next steps, your questions, etc.

Hope you're having a great Monday!

Roger Nikodym
TransWood, Inc.
Director, Affiliate Relations
E Mail: rnikodym@transwood.com
Phone: 605-521-9724

From: Sharon Frank <s.frank@cccob.com>
To: rnikodym@transwood.com

Date: 03/20/2017 11:58 AM
Subject: NDA

Here is the signed document Roger.

**Sharon J. Frank**

Coal City Cob
Company, Inc.

Indiana Terminal:
1060 Kennedy Avenue
Schererville, IN 46375
219.836.7815
219.836.7820 Fax
708.878.4161 Cell
s.frank@cccob.com
[attachment "20170320112645252.pdf" deleted by Roger Nikodym/TWI]

# Exhibit E

# MILLER, EGAN, MOLTER & NELSON LLP

June 1, 2017

Brian Schuster, JD
TransWood Carriers, Inc.
2565 St. Mary's Ave.
Omaha, NE 68105

*Via Email*

**Re: Demand for TransWood to Return Coal City's Stolen Confidential Information**

Dear Brian,

I received your voice-mail and e-mails from yesterday. I appreciate your attention to this matter.

Coal City Cob Company, Inc. ("Coal City" or "CARRIER") rejects the counter-proposal from TransWood Carriers, Inc. ("TransWood"). The counter-proposal would not stop the irreparable harm being caused by TransWood and Palm Enterprises, Inc. ("Palm") with respect to the illegal solicitation of customers and drivers as detailed in my letters of May 22 and 26, 2017 ("Prior Correspondence").

There is one matter that Coal City must re-address immediately. As set forth in the Prior Correspondence, Coal City continues to demand that TransWood return Coal City's Stolen Confidential Information (defined below). As stated previously, paragraph 11 of the February 3, 2014 Affiliate Agreement between Coal City and Palm ("Affiliate Agreement") prohibited Palm from providing TransWood with "proprietary information and trade secrets of [Coal City], including, without limitation, its services, products, customer information, processes, sales information, know-how, practices, policies, and other confidential information which is considered proprietary or secret by [Coal City]."

Notwithstanding the restriction in paragraph 11 of the Affiliate Agreement, beginning in March 2017 (and possibly earlier), Palm, through Sharon Frank (Palm's Guarantor), provided TransWood with Coal City's confidential information, including (1) Coal City's customer lanes (2) Coal City's prices, (3) the identity of Coal City drivers who were dispatched by Palm Enterprises, (4) Coal City's contracts (*e.g.*, the Affiliate Agreement), and (5) Coal City's settlement schedule (collectively, the "Stolen Confidential Information").

I understand from our prior communications that TransWood is not disputing that it is in possession, custody, and control of the Stolen Confidential Information. Indeed, we have evidence regarding TransWood's possession of at least some—but certainly not all—of the Stolen Confidential Information, And, during the May 23 call, you stated that TransWood would agree to Coal City's demand to return the Stolen Confidential Information. However, TransWood still has not done so.

Coal City previously demanded, and once more demands, that TransWood return a copy of all e-mails (and attachments) between Sharon Frank (through her Coal City e-mail address or through her personal e-mail address), on the one hand, and anyone with a TransWood e-mail address, on the other hand. Coal City further seeks all text messages between Ms. Frank and anyone at

TransWood (the "Return Demand"). The period for the e-mails and texts should be from March 1, 2016 until present. Coal City would need to receive a copy of the Stolen Confidential Information and verify its completeness prior to TransWood taking any steps to destroy any copies on its end.[1]

In my letter of May 26, 2017, I requested that you let me know how quickly TransWood can comply with the Return Demand. Although I've heard from you since then, I have not yet received a response on this issue. Accordingly, Coal City will set the date. Coal City hereby demands that TransWood comply with the Return Demand and return the Stolen Confidential Information by 5:00 p.m. (Central) on June 8, 2017.

Nothing contained in or omitted from this letter is intended to waive any of Coal City's rights, claims, remedies, or causes of action against TransWood, its corporate officers, employees, contractors, or agents, or the same with respect to Palm and/or Sharon Frank. To the contrary, Coal City expressly reserves all such rights, remedies, and causes of action, whether at law or in equity.

Regards,

Barry Golden

cc: Steve Barnish (via e-mail)
Tom Russell (via e-mail)

[1] During the call, you referred to the potential destruction of all copies of the Stolen Information in the possession, custody, and control of TransWood. Coal City would request that TransWood refrain from any such destruction until after Coal City receives the Stolen Information and verifies in writing from Coal City to TransWood that it had no objections to the destruction. In the interim, TransWood should not destroy any documents.

# Exhibit F

**Barry Golden**

---

**Subject:** FW: Coal City Cobb

---------- Forwarded message ----------
From: **Stephens, Andrew** <andrew.stephens@solvay.com>
Date: Fri, May 19, 2017 at 9:37 AM
Subject: Re: Coal City Cobb
To: Mike Blanchard <m.blanchard@cccob.com>
Cc: Delma Disbrow <delma.disbrow@solvay.com>, Mark Ostroski <mark.ostroski@solvay.com>, Blake Ryder <b.ryder@cccob.com>, Robert Linkman <r.linkman@cccob.com>

However, There is some issues here and I really go nuts with this mess between you guys and transwood

Cause Sharon Frank had me send 1100396078 to her and she insisted it was for them...

On Fri, May 19, 2017 at 9:32 AM, Stephens, Andrew <andrew.stephens@solvay.com> wrote:

These are all I have on my radar right now

| Delivery | Picking Date | Picking time | Purchasing Document | Shipment | Material | Description |
|---|---|---|---|---|---|---|
| 83601073 | 5/20/2017 | 11:00:00 AM | 2260938 | 1100396079 | 116841 | MACKAM CBS 50G BULK |
| 83601076 | 5/21/2017 | 9:30:00 AM | 2264791 | 1100396078 | 116766 | MACKAM 35 BULK |
| 83604386 | 5/28/2017 | 8:00:00 AM | 2256020 | 1100397234 | 116766 | MACKAM 35 BULK |

On Fri, May 19, 2017 at 9:28 AM, Mike Blanchard <m.blanchard@cccob.com> wrote:

Good morning folks! Jack at Nalco tells me they have several loads on the books with you and also added a few more Kilgore's today. Andy could you please send over all tenders that you feel we should already have as we have none.

Thanks!

Mike

Mike Blanchard
National Account Manager
Coal City Cob Co., Inc.
815-693-6129
www.cccob.com

On May 17, 2017, at 1:39 PM, "Stephens, Andrew" <andrew.stephens@solvay.com> wrote:

Hello Delma / Mark

I have Mike Blanchard with Coal City Cobb on this email.

There has been some changes at CCC with their logistical folks who act as subcontractors for them.

I won't go into all the details as it is still a bit hazy to me...but there is some confusion on who handles the customer routed orders like Nalco and certain Harcros orders. As CCC is typically the carrier who gets these loads.

For example we just had a Nalco Centerville, TX and this new company - Transwood - has taken the load or says it is theirs..

I told Mike B, I don't want to get caught in the middle. So he has asked to be put in touch with the contacts at Harcros and Nalco to get this hatched out so we have the carrier for these loads.

I will leave that to you two if you are able to assist him or not.

Thank you.

This message and any attachments is intended for the named addressee(s) only and may contain information that is privileged and/or confidential. If you receive this message in error, please delete it and immediately notify the sender Any copying, dissemination or disclosure, either whole or partial, by a person who is not the named addressee is prohibited We use virus scanning software but disclaim any liability for viruses or other devices which remain in this message or any attachments

..............................

Ce message, ainsi que toute piece jointe, est exclusivement adresse au(x) destinataire(s) nomme(s) et peut contenir des informations confidentielles Si vous recevez ce message par erreur, merci de le detruire et d'en avertir immediatement l'emetteur Toute copie, transmission ou divulgation, integrale ou partielle, par une personne qui n'est pas nommee comme destinataire est interdite Nous utilisons un logiciel anti-virus mais nous denions toute responsabilite au cas ou des virus, ou tout autre procede, seraient contenus dans ce message ou toute piece jointe

This message and any attachments is intended for the named addressee(s) only and may contain information that is privileged and/or confidential If you receive this message in error, please delete it and immediately notify the sender. Any copying, dissemination or disclosure, either whole or partial, by a person who is not the named addressee is prohibited We use virus scanning software but disclaim any liability for viruses or other devices which remain in this message or any attachments

..............................

Ce message, ainsi que toute piece jointe, est exclusivement adresse au(x) destinataire(s) nomme(s) et peut contenir des informations confidentielles Si vous recevez ce message par erreur, merci de le detruire et d'en avertir immediatement l'emetteur. Toute copie, transmission ou divulgation, integrale ou partielle, par une personne qui n'est pas nommee comme destinataire est interdite Nous utilisons un logiciel anti-virus mais nous denions toute responsabilite au cas ou des virus, ou tout autre procede, seraient contenus dans ce message ou toute piece jointe

# Exhibit G

**Barry Golden**

**Subject:** FW: Nalco Corsicana, TX
**Attachments:** 20170517155819071.pdf

**From:** "Stephens, Andrew" <andrew.stephens@solvay.com>
**Date:** May 17, 2017 at 3:58:19 PM CDT
**To:** Mike Blanchard <m.blanchard@cccob.com>
**Subject: Nalco Corsicana, TX**

Mike

I am really trying to stay neutral in all this...and this load is a prepaid load...I chose CCC...However, they are asking me to tender this to them over at transwood.

I explained to them that I am honoring my commitment to CCC since that is whom I tendered it to.

So I don't know who is handling your dispatching now, but make sure they know which loads I was already promised for pick up

I need to know that you have this load on your books to pick up from us on the 20th @ 11am

see the tender

the pick up # 1100396079

confirm back to me please

This message and any attachments is intended for the named addressee(s) only and may contain information that is privileged and/or confidential If you receive this message in error, please delete it and immediately notify the sender Any copying, dissemination or disclosure, either whole or partial, by a person who is not the named addressee is prohibited We use virus scanning software but disclaim any liability for viruses or other devices which remain in this message or any attachments

Ce message, ainsi que toute piece jointe, est exclusivement adresse au(x) destinataire(s) nomme(s) et peut contenir des informations confidentielles Si vous recevez ce message par erreur, merci de le detruire et d'en avertir immediatement l'emetteur. Toute copie, transmission ou divulgation, integrale ou partielle, par une personne qui n'est pas nommee comme destinataire est interdite Nous utilisons un logiciel anti-virus mais nous denions toute responsabilite au cas ou des virus, ou tout autre procede, seraient contenus dans ce message ou toute piece jointe.

# Exhibit H



TransWood

TransWood, Inc.
2565 St. Mary's Avenue
Omaha, NE 68105
Fax: 918-526-1441 (Alt: 918-748-3955)

# Fax Verification Request

Date: 05/22/17 2:34 pm

**To:** Coal City Cob
**From:** Whitney Kearney (driver_hr@transwood.com)
**RE:** Christian Russell -- XXX-XX-[redacted]

**Please return this cover sheet or page two with your response.**
**We use the barcode to identify the driver in our system. Thank you!**

**Notes:**

ADDL INFO: Start Date: 2014-06-01

We have your fax # as 972-923-7599. Please email us if you'd prefer that we use a different number for verifications.

tenstreet
Hire Drivers Faster and Easier
Go Paperless, Better Compliance

**Our main fax is 918-526-1441. It works perfectly for almost all senders. You should always connect - we never have busy signals. If you do have issues, however, please try an alt number (918-748-3955, 267-535-5059, 918-295-8588). These numbers use different long-distance carriers between you and us that may route more cleanly for your particular fax machine. If you continue to have issues, email fax@tenstreet.com. We can usually help.**

fax@tenstreet.com www.tenstreet.com sales@tenstreet.com
pri3663245 support@tenstreet.com

# Employment/Lease Verification

TX12193946

TransWood, Inc.
2565 St. Mary's Avenue
Omaha, NE 68105
Phone: 800-366-3415
Fax: 918-526-1441 (Alt: 918-748-3955)

**Driver:** Christian Russell SSN: XXX-XX-[redacted] Date: 05/22/2017 2:34pm

**Company:** Coal City Cob
Schererville, IN

**Period of Service Detail:**
Start Date 1: ______ Start 2: ______ Start 3: ______ Miles / week: ______
End Date 1: ______ End 2: ______ End 3: ______ Hours / week: ______

Position(s) Held: ______ Reason(s) for Leaving ______

**Driver Class:** Company: ___ Lease: ___ Own/Op: ___ Other: ___

**Type:** Solo: ___ Team: ___ Student: ___ Other: ___

**Truck:** Tractor-Trailer: ___ Straight Truck: ___ Tanker: ___ Other: ___

**Subject to FMCSRs?** Yes: ___ No: ___

**Subject to DOT D&A?** Yes: ___ No: ___

**Eligible for rehire?** Yes ___ No ___ Review ___

**Experience:** Flatbed ___ Van ___ Reefer ___ Intermodal ___ Snow / Ice ___ Tanker ___ Other ___

**Responsible for maintaining logs?** Yes ___ No ___

**Area Driven:** OTR ___ Regional ___ Local ___ Other ___

**Terminated / Discharged?** Yes ___ No ___

# of states driven: ___

**Loads Hauled:** ______ **Trailer Length:** ______

**Accidents:** If none, check: ☐ # Preventable: ___ # Non-Preventable: ___ # DOT Reportable: ___

If more space is needed, please attach an additional sheet:

| Date | City, State / Description | #Fatalities | #Injuries | Hazmat? | Preventable? |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

**Drug and Alcohol** (to be accompanied by an appropriate drug and alcohol release)

In the three years prior to the date of the employee's signature (on the release), for DOT-regulated testing:

| | | | | |
|---|---|---|---|---|
| 1 | Did the employee have alcohol tests with a result of 0.04 or higher? | | Yes | No |
| 2 | Did the employee have verified positive drug tests? | | Yes | No |
| 3 | Did the employee refuse to be tested? | | Yes | No |
| 4 | Did the employee have other violations of DOT agency drug and alcohol testing regulations? | | Yes | No |
| 5 | Did a previous employer report a drug and alcohol rule violation to you? | | Yes | No |
| 6 | If you answered "yes" to any of the above items, did the employee complete the return-to-duty process? | N/A | Yes | No |

NOTE: If you answered "yes" to item 5, you must provide the previous employer's report. If you answered "yes" to item 6, you must also transmit the appropriate return-to-duty documentation (e.g., SAP report(s), follow-up testing record).

Info provided by (Signature): ______ Title, Date ______ Phone ______

Printed Name ______ Email ______ Company DOT # ______

Comments: ______

**Request/Consent for Information from Previous Employer(s)/Carrier(s) For Alcohol and Controlled Substances Testing Records**
**And changes in Parts 390 and 391 of the FMCSA**

X 05-17-2017
Date

X [redacted]
Social Security Number

Christian D Russell
7214 S Prairie Avenue
Chicago, IL 60619
312-607-0209
Gender:

X **Christian D Russell**
Print Name (First, MI, Last)

X [signature]
Signature

I, the above mentioned signer, hereby authorize | Coal City Cob |

To release and forward in accordance with the following regulation, all known information pertaining to my alcohol and controlled substances testing/training records to TransWood, Inc.

## DISCLOSURE AND RELEASE

In accordance with DOT Regulation 49 CFR Part 391.23, I authorize the release of information from my DOT regulated drug and alcohol testing records by the carriers (company/school) listed above to Transwood, Inc., or to HireRight for the sole purpose of transmitting such records to Transwood, Inc.. I authorize release of the following information concerning DOT drug and alcohol testing violations including pre-employment tests during the past three years: (i) alcohol tests with a result of 0.04 or higher; (ii) verified positive drug tests; (iii) refusals to be tested (including verified adulterated or substituted results); (iv) other violations of DOT drug and alcohol testing regulations; (v) information obtained from previous employers of a drug and alcohol rule violation(s); and (vi) documents, if any, of completion of a return-to-duty process following a rule violation. I also authorize the carriers (company/school) listed above to release information about names and dates of previous employers, reasons for termination of employment, work experience, accidents, academic history, professional credentials and other information.

The information that I have authorized Transwood, Inc. or HireRight to review involves tests required by DOT. If any carrier (company/school) listed above furnishes Transwood, Inc. or HireRight with information concerning items (i) through (vi) above, I also authorize that carrier (company/school) to release and furnish the dates of my negative drug and/or alcohol tests and/or tests with results below 0.04 during the three-year period and the name and phone number of any substance abuse professional who evaluated me during the past three years.



TransWood, Inc.
2565 St. Mary's Avenue
Omaha, NE 68105
Fax: 918-526-1441 (Alt: 918-748-3955)

# Fax Verification Request

Date: 05/22/17 2:32 pm

To: Coal City Cob
From: Whitney Kearney (driver_hr@transwood.com)
RE: Rashid Malik -- XXX-XX-

**Please return this cover sheet or page two with your response. We use the barcode to identify the driver in our system. Thank you!**

**Notes:**

ADDL INFO: Start Date: 2016-11-01

We have your fax # as 972-923-7599. Please email us if you'd prefer that we use a different number for verifications.

tenstreet
Hire Drivers Faster and Easier
Go Paperless, Better Compliance

**Our main fax is 918-526-1441. It works perfectly for almost all senders. You should always connect - we never have busy signals. If you do have issues, however, please try an alt number (918-748-3955, 267-535-5059, 918-295-8588). These numbers use different long-distance carriers between you and us that may route more cleanly for your particular fax machine. If you continue to have issues, email fax@tenstreet.com. We can usually help.**

fax@tenstreet.com www.tenstreet.com sales@tenstreet.com support@tenstreet.com
pri3683245

## Employment/Lease Verification

TX12193913

TransWood, Inc.
2565 St. Mary's Avenue
Omaha, NE 68105
Phone: 800-366-3415
Fax: 918-526-1441 (Alt: 918-748-3955)

**Driver:** Rashid Malik SSN: XXX-XX[redacted] Date: 05/22/2017 2:32pm

**Company:** Coal City Cob
Schererville, IN

Period of Service Detail:

Start Date 1: ______ Start 2: ______ Start 3: ______ Miles / week: ______

End Date 1: ______ End 2: ______ End 3: ______ Hours / week: ______

Position(s) Held: ______ Reason(s) for Leaving ______

| Driver Class: | Type: | Truck: | Subject to FMCSRs? | Subject to DOT D&A? |
|---|---|---|---|---|
| Company: ____ | Solo: ____ | Tractor-Trailer: ____ | Yes: ____ | Yes: ____ |
| Lease: ____ | Team: ____ | Straight Truck: ____ | No: ____ | No: ____ |
| Own/Op: ____ | Student: ____ | Tanker: ____ | | |
| Other: ____ | Other: ____ | Other: ____ | | |

| Eligible for rehire? | Experience: | Responsible for maintaining logs? | Area Driven: |
|---|---|---|---|
| Yes ____ | Flatbed ____ | Yes ____ | OTR ____ |
| No ____ | Van ____ | No ____ | Regional ____ |
| Review ____ | Reefer ____ | | Local ____ |
| | Intermodal ____ | | Other ____ |

| Terminated / Discharged? | | |
|---|---|---|
| | Snow / Ice ____ | |
| Yes ____ | Tanker ____ | # of states driven: ____ |
| No ____ | Other ____ | |

Loads Hauled: ______ Trailer Length: ______

Accidents: If none, check: ☐ # Preventable: ____ # Non-Preventable: ____ # DOT Reportable: ____

If more space is needed, please attach an additional sheet:

| Date | City, State / Description | #Fatalities | #Injuries | Hazmat? | Preventable? |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

**Drug and Alcohol** (to be accompanied by an appropriate drug and alcohol release)

In the three years prior to the date of the employee's signature (on the release), for DOT-regulated testing:

1 Did the employee have alcohol tests with a result of 0.04 or higher? Yes No
2 Did the employee have verified positive drug tests? Yes No
3 Did the employee refuse to be tested? Yes No
4 Did the employee have other violations of DOT agency drug and alcohol testing regulations? Yes No
5 Did a previous employer report a drug and alcohol rule violation to you? Yes No
6 If you answered "yes" to any of the above items, did the employee complete the return-to-duty process? N/A Yes No

NOTE: If you answered "yes" to item 5, you must provide the previous employer's report. If you answered "yes" to item 6, you must also transmit the appropriate return-to-duty documentation (e.g., SAP report(s), follow-up testing record).

Info provided by (Signature): ______ Title, Date ______ Phone ______

Printed Name ______ Email ______ Company DOT # ______

Comments: ______

**Request/Consent for Information from Previous Employer(s)/Carrier(s) For Alcohol and Controlled Substances Testing Records
And changes in Parts 390 and 391 of the FMCSA**

X 05-17-2017
Date

X [redacted]
Social Security Number

Rashid Malik
8521 Drake Avenue
Skokie, IL 60076
207-313-7999
Gender:

X Rashid Malik
Print Name (First, MI, Last)

X
Signature

I, the above mentioned signer, hereby authorize

| Coal City Cob | |
|---|---|

To release and forward in accordance with the following regulation, all known information pertaining to my alcohol and controlled substances testing/training records to TransWood, Inc.

## DISCLOSURE AND RELEASE

In accordance with DOT Regulation 49 CFR Part 391.23, I authorize the release of information from my DOT regulated drug and alcohol testing records by the carriers (company/school) listed above to Transwood, Inc., or to HireRight for the sole purpose of transmitting such records to Transwood, Inc.. I authorize release of the following information concerning DOT drug and alcohol testing violations including pre-employment tests during the past three years: (i) alcohol tests with a result of 0.04 or higher; (ii) verified positive drug tests; (iii) refusals to be tested (including verified adulterated or substituted results); (iv) other violations of DOT drug and alcohol testing regulations; (v) information obtained from previous employers of a drug and alcohol rule violation(s); and (vi) documents, if any, of completion of a return-to-duty process following a rule violation. I also authorize the carriers (company/school) listed above to release information about names and dates of previous employers, reasons for termination of employment, work experience, accidents, academic history, professional credentials and other information.

The information that I have authorized Transwood, Inc. or HireRight to review involves tests required by DOT. If any carrier (company/school) listed above furnishes Transwood, Inc. or HireRight with information concerning items (i) through (vi) above, I also authorize that carrier (company/school) to release and furnish the dates of my negative drug and/or alcohol tests and/or tests with results below 0.04 during the three-year period and the name and phone number of any substance abuse professional who evaluated me during the past three years.

# Exhibit I

**Barry Golden**

**Subject:** FW: Concerns
**Attachments:** 20170322182556178.pdf

**From:** Sharon Frank [mailto:s.frank@cccob.com]
**Sent:** Wednesday, March 22, 2017 6:11 PM
**To:** RNikodym@transwood.com
**Cc:** sharoncccob@gmail.com
**Subject:** Concerns

Roger—Per our phone conversation today, I have read through the contract and had the following concerns:

1. Accounts Receivable requirements. My thought is that I don't want to take the time to be chasing after invoice payment on a routine basis, as I feel my time is better spent running the terminal. I am happy to step in when there is a problem that the "back office" folks have, but routinely seems excessive to me. As far as charge backs go, my thought is that customers are vetted through your TransWood. If they aren't paying, that should not be my responsibility. However, if there are issues with incorrect billings that result in charge backs, that is understandable.
2. Insurance deductible is very high. Currently, I am paying $2000 to $2500.
3. Trailer procedures. I'm not sure how you envision this, but currently, we are constantly swapping trailers with other terminals that come to this area and need a different trailer (rear vs. center, no time to wash, bad prior, etc). In addition, these are used trailers that will have all manner of normal wear and tear. I can't imagine a way for me to pay all maintenance for trailers assigned that would be fair to all concerned. I am in favor of a mileage charge in the area of 5 cents per mile for maintenance. That would ensure adequate maintenance and a fair way to charge.
4. There is a possibility that Cob will initiate legal proceedings to challenge the non-compete language. I have already provided you with my attorneys assessment of this, however that may not stop them from trying. It could very well include TransWood being named. As I said earlier, my attorney feels we have a solid basis for winning. What is TransWood's position on this? Will they assist with legal representation if this happens? I think it best to face this possibility now, rather than muddle through it later.

I have attached my current contract with Cob. The schedules are the only ones ever done and some predate the last contract. They were never properly completed. The "Schedule B" is the one Kurt Vragel refers to in his opinion.

**Sharon J. Frank**

Indiana Terminal:
1060 Kennedy Avenue
Schererville, IN 46375
219.836.7815
219.836.7820 Fax
708.878.4161 Cell
s.frank@cccob.com

# Exhibit J

MILLER, EGAN, MOLTER & NELSON LLP

May 16, 2017

Kurt E. Vragel, Jr.
Kurt E. Vragel, Jr. P.C.
1701 East Lake Ave., Suite 170
Glenview, Illinois 60025.

*Via Email*

**Re: Palm Enterprises – Violation of Affiliate Agreement with Coal City Cob**

Dear Mr. Vragel:

My firm represents Coal City Cob Company, Inc. ("Carrier"). I am in receipt of your May 15, 2017 e-mail on behalf of Palm Enterprises, Inc. ("Affiliate") to Steve Barnish and Bo Littleton entitled "5-DAY NOTICE OF TERMINATOIN – PALM ENTERPRISES, INC." Your e-mail purports to invoke paragraph 14 of the February 3, 2014 Affiliate Agreement between Carrier and Affiliate ("Affiliate Agreement") entitled "Termination" ("Termination Provision"). Please direct all future correspondence regarding the Affiliate Agreement, the Termination Provision, or anything involving either to me.

By invoking the Termination Provision from the Affiliate Agreement, it is obvious that that Affiliate is aware of the Affiliate Agreement and its various legal obligations derived from it. Thus, I would like to call your attention to paragraph 12 of the Affiliate Agreement—two paragraphs up from the Termination Provision—entitled "Non-Competition; Non-Solicitation" ("Customer Theft Provision").

The Customer Theft Provision provides, in relevant part, that Affiliate shall not, for a period of thirty-six months following the invocation of the Termination Provision, "contact or otherwise solicit, either directly or indirectly, any Designated Customer for the purpose of selling, performing, marketing, or otherwise transacting transportation, freight hauling, and/or services of the type performed under this Agreement."

Carrier has learned that, while still employed by Carrier (and through Carrier's e-mail and server) Affiliate negotiated employment with a competitor company, TransWood Carriers, Inc. ("TransWood"). Carrier has also learned that through its employment with TransWood (and while still also employed by Carrier), Affiliate illegally and improperly contacted or otherwise solicited Kemira for selling, performing, marketing, or otherwise transacting transportation, freight hauling, and/or services of the type performed under the Affiliate Agreement ("Kemira Solicitation).

Carrier has further learned that Affiliate has, in fact, begun performing those services for Kemira ("Kemira Services").

Of course, none of this should come as a surprise to Affiliate. On March 22, 2017, Affiliate wrote and e-mail to TransWood (again, while still employed by Carrier and using her Carrier e-mail address and server), stating, in relevant part:

> There is a possibility that Cob will initiate legal proceedings to challenge the non-compete language. I have already provided you with my attorneys [sic] assessment of this, however that may not stop them from trying. It could very well include TransWood being named. As I said earlier, my attorney feels we have a solid basis for winning. What is TranWood's position on this? Will they assist with legal representation if this happens? I think it best to face this possibility now, rather than muddle through it later.

The Affiliate's e-mail continues by stating that Affiliate attached its current contract with Carrier and "[t]he 'Schedule B' is the one Kurt Vragel refers to in his position."

Presumably, your opinion is that Kemira is not a Designated Customer for which Affiliate is precluded from soliciting and servicing. Carrier would disagree. Paragraph 1(e) of the Affiliate Agreement defines "Designated Customer" to include any Carrier customer identified on Exhibit B of the Affiliate Agreement ***or*** any customer for which Affiliate "renders or has rendered transportation services during the term of this Agreement." While Kemira may not be identified on Exhibit B of the Affiliate Agreement, Kemira is certainly a customer for which Affiliate rendered transportation services during the term of the Affiliate Agreement. Accordingly, the Kemira Solicitation and performance of the Kemira Services directly violated (and continues to violate) the Customer Theft Provision of the Affiliate Agreement.

As a side (and somewhat ironic) note, on March 17, 2017 (and, once more, while still employed by Carrier and using carrier's e-mail and server), Affiliate entered into a "Mutual Non-Disclosure Agreement" with TransWood, through which Affiliate agreed that for two years after termination from TransWood, Affiliate would not "solicit the business of any specific traffic lane disclosed to the other party, by virtue of this Agreement." In other words, Affiliate—while currently violating the Customer Theft Provision with Carrier—entered into an agreement with a competitor making the same type of covenant.

In any event, the Customer Theft Provision sets forth remedies for violations such as the Kemira Solicitation and performance of the Kemira Services. Specifically, the Customer Theft Provision provides, in relevant part:

> AFFILIATE acknowledges that, in the event of a breach or violation of [the Customer Theft Provision], AFFILIATE'S conduct will cause damages of an irreparable and continuing nature to CARRIER, for which money damages will not

> provide adequate relief. Therefore, AFFILIATE agrees that in addition to any money damages CARRIER may be entitled to recover, CARRIER also is entitled to obtain an injunction (including but not limited to a temporary restraining order) for the remainder of the period specified in the restrict covenant which AFFILIATE breached.

Additionally, paragraph 32 of the Affiliate Agreement entitled "Attorneys' Fees" provides that a prevailing party in an action to enforce provisions such as the Customer Theft Provision, "will be entitled to attorneys' fees, costs and expenses, in addition to any other relief to which such party may be entitled."

Finally, paragraph 25 of the Affiliate Agreement entitled "Governing Law; Venue" states that litigation such as for violation of the Customer Theft Provision must be prosecuted in Ellis County, Texas. In other words, unless Affiliate complies with the following demands, Affiliate should expect to be named as a defendant in a lawsuit in Ellis County, Texas, through which Carrier will be seeking damages, injunctive relief (including a temporary restraining order), attorneys' fees, costs, and other available remedies.

Accordingly, Carrier demands that Affiliate and its principals, employees, affiliate, and agents:

- Immediate cease further Kemira Solicitation;
- Immediately cease performing the Kemira Services;
- Within seven (7) days of the date of this letter, provide a statement in writing that Affiliate has complied with the aforementioned demands; and
- Within seven (7) days of the date of this letter, provide an accounting of all revenues related to the Kemira Services.

Moreover, please be advised that this letter constitutes notice to Affiliate that Carrier anticipates the prospect of seeking recourse through litigation. Accordingly, Affiliate and its principals, employees, affiliates, and agents are subject to a legal obligation to preserve all information, documents, data, and things relating to this matter. That obligation includes preserving all electronic data and storage media, including but not limited to laptops, desktops, hard drives, flash drives, temporary files, cookies, browser history, programs, program information, source code, metadata, user-identification profiles, device information, server records, and server logs. Failure to preserve such information, documents, data, and things violates Affiliate's legal obligations under all applicable laws related to the preservation of documents and electronic data and it can subject Affiliate to sanctions in a court of law

Within seven (7) days of the date of this letter, please confirm in writing that Affiliate has taken all appropriate steps to preserve information, and that this letter and preservation notice have been

shared with all relevant Affiliate principals, employees, affiliates, and agents, including, but not limited to Sharon J. Frank (President and Secretary of Affiliate), Stacy C. Frank (Incorporator of Affiliate), Desi Weaver, Jim Hays, Jim Mitchell, Mark Rose, Marty King, Rick Rodriguez, Stanley Boyd, Tony Wieszkowiak, Sharon Peterson, and Eve Deluca. Carrier has invested heavily in creating its customer list and developing and maintaining its customer relationships, including its relationship with Kemira, and Carrier will enforce its right if necessary. **We look forward to your response within 7 days, which is May 23, 2017.**

Nothing contained in or omitted from this letter is intended to waive any of Carrier's rights, claims, remedies, or causes of action against Affiliate, its corporate officers, employees, contractors, or agents, or the same with respect to TransWood. To the contrary, Carrier expressly reserves all such rights, remedies, and causes of action, whether at law or in equity.

Regards,

Barry Golden

cc: Steve Barnish (via e-mail)

CAUSE NO. 96285

| | | |
|---|---|---|
| COAL CITY COB COMPANY, INC., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ELLIS COUNTY, TEXAS |
| | § | |
| PALM ENTERPRISES, INC. AND SHARON FRANK (AS GUARANTOR) | § | |
| | § | |
| | § | |
| Defendants. | § | ____ JUDICIAL DISTRICT |

**TEMPORARY RESTRAINING ORDER AND**
**ORDER PERMITTING EXPEDITED DISCOVERY**

On this ___ day of June 2017, Plaintiff Coal City Cob Company, Inc. ("Coal City") presented its Verified Original Petition and Application for Temporary Restraining Order to this Court ("Verified Petition").

Having reviewed the Verified Petition and the associated evidence, the Court concludes that Coal City and the Defendants were parties to a February 3, 2014 Affiliate Agreement ("Affiliate Agreement"). Under the Affiliate Agreement, the Defendants agreed not to (1) misappropriate Coal City's confidential information, (2) solicit Coal City's customers to transfer their business away from Coal City, or (3) solicit Coal City's contractors and employees, including drivers, to quit working for Coal City and work elsewhere. Coal City has alleged that the Defendants violated all three provisions, and if not restrained, will continue doing so. The Court agrees. There is sufficient evidence demonstrating a likelihood of success on the merits for Palm in its claims against the Defendants for breach of contract, tortious interference with existing contracts, civil conversion, Texas Theft Liability Act, and/or Texas Uniform Trade Secrets Act. The Court has seen sufficient evidence that absent a temporary restraining order, the Defendants will continue violating these provisions of the Affiliate Agreement, and such violations will cause

Coal City to experience irreparable harm and that such harm is probable, imminent, and irreparable. Coal City has demonstrated that the injuries suffered by the Defendants are irreparable because they cannot be accurately measured or compensated through monetary damages. Coal City has shown that the Defendants' conduct, should it go unrestrained and enjoined, will cause harm to Coal City's operations and sales and will cause an impact on revenue and profitability that are impossible to quantify with a specific pecuniary standard. Coal City has shown that it is entitled to a temporary restraining order because it is already suffering harm and will continue to suffer harm before notice can be served and a hearing may be held.

IT IS THEREFORE ORDERED that based on the evidence contained in the Verified Petition, Coal City's application for temporary restraining order against the Defendants is GRANTED.

IT IS FURTHER ORDERED that for fourteen (14) days from the dates of this Order (the "TRO Period"), the Defendants restrained and enjoined from disseminating proprietary information and trade secrets of Coal City including, without limitation, its services, products, customer information, processes, sales information, know-how, practice, policies, and other confidential information which is considered proprietary or secret by Coal City, including without limitation, City's information about its finances, customer rates, customer identifications, customer lanes, and information about valuable Coal City employees (including names, addresses, e-mail addresses, and phone numbers).

IT IS FURTHER ORDERED that during the TRO Period, the Defendants shall not solicit or haul freight for the following Coal City customers on the following customer lanes: (a) Tradebe Treatment & Recycling, LLC ("Tradebe") – East Chicago, IN to Logansport, IN, (b) Tradebe – East Chicago, IN to Greencastle, IN; (c) Tradebe – East Chicago, IN to Paulding, OH, (d) Kemira Chemicals, Inc. ("Kemira")– East Chicago, IN to Millington, TN, (e) Kemira – Butler, IN to East

Chicago, IN; (f) Kemira – Jeffersonville, IN to East Chicago, IN, (g) Solvay USA, Inc – University Park,, ILL to Knoxville, TN; (h) Solvay – University Park, IL to Murray, KY, (i) Solvay – University Park, IL to Corsicana, TX, (j) Solvay – University Park, IL to Saint Louis, MO, (k) Solvay – University Park, IL to Kilgore, TX, (l) Nalco-Champion ("Nalco") – University Park, IL to Kilgore, TX, (m) Nalco – University Park, IL to Centerville, TX, (n) Nalco – University Park, IL to Hebbronville, TX, (o) Harcross Chemicals, Inc. – Lima, OH to Dallas, TX, (p) Harcross - University Park, IL to Longview, TX, (q) Harcross - University Park, IL to Sibley, LA, (r) Harcross - Houston, TX to Dallas, TX, (s) Harcross - University Park, IL to Dallas, TX; (t) Harcross - Winder, GA to Longview, TX; (u) Harcross – Winder, GA to Sibley, LA, (v) Harcross - University Park, IL to Pasadena, TX, and (w) Univar USA, Inc. – Charleston, SC to North Charleston, South, SC (collectively, the "Customer Lanes"). During the TRO Period, the Defendants are expressly prohibited from hauling freight for these customers on the Customer Lanes by use of vehicles containing the following VIN numbers: (1) 1XPBD49X7FD308061, (2) 1XPBD49X7GD308062, (3) 1XPBD49X9GD308063, (4) 1XPBD49X0GD308064, (5) 1XPBD49X2GD308065, (6) 1XPBD49X4GD308066, (7) 1XKDD49X8DJ334908, or (8) 4V4NC9EH4EN164270.

IT IS FURTHER ORDERED that during the TRO Period, the Defendants (and anyone acting in concert with the Defendants, including TransWood Carriers, Inc.) may not dispatch Rashid Malik, Christian Russell, James Uribe, or Eric Holder (the "Drivers") to haul freight on the Customer Lanes. The Defendants are expressly prohibited from facilitating the hauling of freight for these customers on the Customer Lanes by use of the vehicles owned or operated by the Driver containing the following VIN numbers: (1) M1AW07Y0FM046539), (2) 5KJJABCK15PN82105), (3) 1XP5D49XX7N679837, (4) 1XKADB9X47J156443, or (5) 2WKEDDJJ4YK965013).

IT IS FURTHER ORDERED that in addition to being binding on the Defendants, this temporary restraining order is also binding upon Palm's agents, servants, attorneys (collectively, "Agents") and anyone acting in concert or participation with Palm or any of the Agents who receive actual notice of this temporary restraining order, including without limitation, TransWood Carriers, Inc.

IT IS FURTHER ORDERED that the parties in the above-styled case shall appear before this Court on the ____ day of June at ____o'clock __m. for a temporary injunction hearing.

IT IS FURTHER ORDERED that without waiver of six-hour depositions on the merits during the regular discovery period and without notice requirements otherwise required under merits discovery, during the TRO period, Coal City may take depositions as follows (collectively, the "Expedited Depositions"): (a) a corporate representative of Palm Enterprises, Inc. and Sharon Frank (limited to four hours on the record, collectively), (b) a corporate representative of TransWood and Roger Nikodym (limited to three hours on the record, collectively), and (d) Rashid Malik, Christian Russell, Eric L. Holder, and James P. Uribe (limited to six hours on the record, collectively).

IT IS FURTHER ORDERED that at least two business days prior to the Expedited Depositions, the deponents each produce a copy of all e-mails (and attachments) since March 1, 2017 between (a) Sharon Frank (through her Coal City e-mail address or through her personal e-mail address), on the one hand and (b) the deponent (or in the case of the TransWood corporate representative, anyone with a TransWood e-mail address), on the other hand

The Clerk of this Court shall issue, without bond or any other securing, a temporary restraining order in conformity with the law and the terms of this Order.

The temporary restraining order is immediately effective upon the Court's signature as Palm has waived the requirement of a bond. Subject to further order of this Court, this temporary

restraining order expires at the close of the above-referenced hearing on the _____day of June 2017.

**NOTICE – a violation of this Temporary Restraining Order can result in contempt of court, which is punishable by jail time, or a fine/sanction, or both jail time and a fine/sanction.**

SIGNED this ____ day of June 2017, at ___________ o'clock ___.m.

# TAB

# 24

96285

Ellis County - District Clerk

Filed 12/27/2017 12:21 PM
Melanie Reed
District Clerk
Ellis County, Texas

**THE STATE OF TEXAS**
**COUNTY OF ELLIS**
**CAUSE NO: 96285**

# CITATION

12-20-17 8:15 AM

**TO: TRANSWOOD, INC**
**REG. AGENT: JOHN C. SIMS**
**1205 BROADWAY ST**
**LUBBOCK, TX 79401-3203**

Defendant, in the hereinafter styled and numbered cause: 96285

You are hereby commanded to appear before 443RD JUDICIAL DISTRICT COURT of ELLIS COUNTY, TEXAS to be held at the courthouse of said county in the City of Waxahachie, County of Ellis County, Texas, by filing a written answer to the PLAINTIFF'S VERIFIED FIRST AMENDED PETITION at or before 10:00 A.M. of the Monday next after the expiration of 20 days after the date of service hereof, a copy of which accompanies this citation, in cause number 96285 styled

**COAL CITY COB COMPANY, INC.**
**-VS-**
**PALM ENTERPRISES, INC.**
**FRANK, SHARON**
**TRANSWOOD CARRIERS, INC**
**TRANSWOOD, INC**

Filed in said court on the 12/14/2017

The name and address of the attorney for plaintiff, or the address of the plaintiff is: BRIAN N. HAIL, 1445 ROSS AVE, STE 2500 DALLAS, TX 75202.

**NOTICE TO DEFENDANT:** "You have been sued. You may employ an attorney. If you or your attorneys do not file a written answer with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of 20 days after you were served this citation and petition, a Default Judgment may be taken against you."

WITNESS: Melanie Reed, District Clerk of the District Court of Ellis County, Texas.

ISSUED AND GIVEN UNDER MY HAND AND SEAL OF SAID COURT AT COUNTY OF ELLIS, TEXAS, ON THIS THE 18th day of December, 2017.

**Melanie Reed, District Clerk**
**109 S. Jackson Street Rm. 209**
**Waxahachie, TX 75165**

**SEAL**

By ____________________
Mary Hinds, Deputy



**OFFICER'S RETURN - CAUSE # 96285**

COAL CITY COB COMPANY, INC.
-VS-
PALM ENTERPRISES, INC.
FRANK, SHARON
TRANSWOOD CARRIERS, INC
TRANSWOOD, INC

IN THE 443RD JUDICIAL DISTRICT COURT
OF
ELLIS COUNTY, TEXAS

**NAME AND ADDRESS FOR SERVICE:**
TRANSWOOD, INC
REG. AGENT: JOHN C. SIMS
1205 BROADWAY ST
LUBBOCK, TX 74901-3203

** SEE ATTACHED**
***AFFIDAVIT***

Came to hand on the _____ day of ____________________, 20____, at _________, o'clock ____.m., and executed in ____________________ County, Texas by delivering to each of the within named defendants, in person, a true copy of this Citation with the date of delivery endorsed thereon, together with the accompanying copy of the PLAINTIFF'S VERIFIED FIRST AMENDED PETITION, at the following times and places, to-wit:

| Name | Date/Time | Place, Course and Distance from Courthouse |
|---|---|---|
| | | |

And not executed as to the defendant(s), ________________________________________

The diligence used in finding said defendant(s) being:

________________________________________

and the cause or failure to execute this process is:

________________________________________

and the information received as to the whereabouts of said defendant(s) being:

________________________________________

FEES:
Serving Petition and Copy $______
Total $______

____________________, Officer
____________________, County, Texas
By:____________________, Deputy

____________________ Affiant

**COMPLETE IF YOU ARE A PERSON OTHER THAN A SHERIFF, CONSTABLE, OR CLERK OF THE COURT.**
In accordance with Rule 107: The officer or authorized person who serves, or attempts to serve, a citation shall sign the return. The return must either be verified or be signed under penalty of perjury. A return signed under penalty of perjury must contain the statement below in substantially the following form:

"My name is ____________________, my date of birth is ____________, and my address is
(First, Middle, Last)
________________________________________.
(Street, City, Zip)

SEE ATTACHED**
***AFFIDAVIT***

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.
Executed in ____________County, State of ______, on the ________day of ________________.

____________________
Declarant/Authorized Process Server

____________________
(Id # & expiration of certification)

**RETURN TO:**
Melanie Reed Ellis County District Clerk
109 S. Jackson Street Rm. 209
Waxahachie, TX 75165

STATE OF TEXAS §
COUNTY OF ELLIS §
SIGNED under oath before me on this _____day of ________________,20___.

____________________
Notary Public, State of Texas

# TAB

# 25

# AFFIDAVIT OF SERVICE

Came to hand on the 20th day of December , 2017, at 8:15 o'clock am.
Cause No. 96285

Executed at , 1205 Broadway Street Lubbock, Tx 79401-3203 within the County of Lubbock at 9:20 o'clock am on the 20th day of December , 2017, by delivering to the within named:

Transwood, Inc by delivery to Registered Agent: John C. Sims in person a true copy of CITATION with Plaintiff's Verified First Amended Petition, Exhibits A through I and Temporary Restraining Order & Order permitting Expedited Discovery, having endorsed on Citation the date of delivery

I am not a party to or interested in the outcome of the suit referenced above. I am authorized by written order to serve citation and other notices. I am not less than eighteen (18) years of age.

Service Fee $

| Ellis Co Tx 443rd District Court<br>Coal City Cob Company, Inc<br>Plaintiff<br><br>v.<br>Palm Enterprises, Inc<br>Sharon Frank, Transwood<br>Carriers, Inc and<br>Transwood, Inc<br>Defendant |
|---|

By: Allen Young
Allen Young PSC1686 Exp 12-31-2017
(Authorized Person)

VERIFICATION

STATE OF TEXAS §
COUNTY OF LUBBOCK §

BEFORE ME, A NOTARY PUBLIC, on this day personally appeared Allen Young , known to me to be the person whose name is subscribed to the foregoing document and, being by me first duly sworn, declared that the statements therein contained are true and correct.

Given under my hand and seal of office this 20th day of December , A.D., 2017.

Sue Young
NOTARY PUBLIC, STATE OF TEXAS

SUE YOUNG
Notary Public, State of Texas
Notary ID# 430859-1
My Commission Expires 10-31-2021

86673/353061

96285
Filed 12/25/2017 10:14 AM
Melanie Reed
District Clerk
Ellis County, Texas
Ellis County - District Clerk

**Ellis County District Clerk** **Questions: 972-825-5091**

**E-FILING REQUEST FOR ISSUANCE**

## CITATIONS,WRITS,NOTICE,PRECEPT,TRO, ETC..

- This document Must be filed as a separate LEAD document when e-filing
- Choose the filing code "Request" and add the type of issuance in the description field
- Select the type of issuance using the "Optional Services" section on the e-filing screen
- If a service document is required, you MUST add the copies using the "Optional Services" section, select Certified Copies/Regular Copies and add as many pages as needed.(Ex: Petition is 5 pages, 3 citations are requested: 5x3=15 pages will need to be printed by Clerk at $1.00 per page).

Cause No. 96285

Document to be served: First Amended Petition

Style of Case: Coal City Cob Company, Inc. v. Palm Enterprises, Inc., Sharon Frank, Transwood Carriers, Inc. and Transwood, Inc.

PLEASE USE THIS FORM WHEN REQUESTING ISSUANCE OF THE BELOW LISTED TYPES OF ISSUANCE THROUGH THE E-FILING SYSTEM.

PLEASE USE OTHER REQUEST FORMS FOR: ABSTRACTS, EXECUTIONS, SUBPOENAS AND ORDER WITHHOLDING

**Please select the type and quantity of issuance(s) needed:**

| Type | Amt. | Quantity | Type | Amt. | Quantity |
|---|---|---|---|---|---|
| Citation | $8 | 2 | Writ: Attachment | $8 | |
| Notice | $8 | | Writ: Certiorari | $8 | |
| Precept | $8 | | Writ: Commitment | $8 | |
| Temporary Restraining Order | $8 | | Writ: Garnishment | $8 | |
| Scire Facias | $8 | | Writ: Possession | $8 | |
| Letter Rogatory | $8 | | Writ: Sequestration | $8 | |
| Show Cause Notice | $8 | | Writ: Turnover | $8 | |
| | | | Writ: Other | $8 | |

**All service payment options are chosen by picking the correct options in the "Optional Service" section of e-filing**

Name of Party to be served: Transwood Carriers, Inc. Type: Defendant

Address for service: Texas Secretary of State with Notice to
Brian Wood, President, Transwood Carriers
2665 St. Mary's Ave., Omaha, NE 68105

Name of Party to be served: Transwood, Inc. Type: Defendant

Address for service: John C. Sims, Registered Agent
1205 Broadway Street
Lubbock, TX 79401-3203

Name of Party to be served: ____________________ Type: __________

Address for service: ____________________

Please attach additional pages if there are more parties to be served.

**ALL CITATIONS WILL BE E-FILED BACK TO YOU UNLESS YOU CHOOSE ONE OF THE FOLLOWING OPTIONS.**

☑ I have paid for a copy of the document to attach to the issuance and would like it sent by certified mail.

☐ I have paid for a copy of the document to attach to the issuance and would like it served by Ellis County Sheriff/Constable: SHF ☐; PCT1 ☐; PCT2 ☐; PCT3 ☐; PCT4 ☐

☐ I have paid for a copy of the document to attach to the issuance and would like it served by posting. (A Motion & Order are required.)

☐ I would like issuance served by Publication. (A Motion & Order are required.)
Name of Publication ____________________

**Requestor Name:** ____________________
**Phone No.** ____________________
**E-Mail Address:** ____________________

# TAB

# 26

Filed 1/12/2018 1:40 PM
Melanie Reed
District Clerk
Ellis County, Texas

9252

**CAUSE NO. 96285**

| | | |
|---|---|---|
| **COAL CITY COB COMPANY, INC.,** | § | **IN THE DISTRICT COURT** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **443rd JUDICIAL DISTRICT** |
| | § | |
| **PALM ENTERPRISES, INC., SHARON FRANK, TRANSWOOD CARRIERS, INC. and TRANSWOOD, INC.,** | § § § | |
| | § | |
| **Defendants.** | § | **ELLIS COUNTY, TEXAS** |

**DEFENDANTS TRANSWOOD CARRIERS, INC. AND TRANSWOOD, INC.'S ANSWER TO PLAINTIFF'S VERIFIED FIRST AMENDED PETITION**

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Transwood Carriers, Inc. and Transwood, Inc., two (2) named Defendants in the above styled and numbered cause, and file this joint Answer to Plaintiff's Verified First Amended Petition, and would respectfully show this Court the following:

**I.**

**GENERAL DENIAL**

Pursuant to Rule 92 of the Texas Rules of Civil Procedure, Defendants Transwood Carriers, Inc. and Transwood, Inc. deny each and every, all and singular, of the allegations contained in Plaintiff's Verified First Amended Petition, and demand proof thereof in strict accordance with applicable law.

**II.**

**AFFIRMATIVE DEFENSES**

Subject to and without waiver of their general denial, Defendants Transwood Carriers, Inc. and Transwood, Inc. affirmatively plead the following defenses to Plaintiff's Verified First Amended Petition:

1.      That Defendant Transwood Carriers, Inc. is not a proper party in this case and is not liable in the capacity in which it has been sued;

2.      That these Defendants are not parties to any agreements with Plaintiff;

3.      That the restrictive covenants contained in the Affiliate Agreement that is described in Plaintiff's Verified First Amended Petition are overly broad, unenforceable, fail for lack of consideration, and violate Texas law and/or public policy;

4.      That Plaintiff's claims against these Defendants are barred by waiver;

5.      That Plaintiff's claims against these Defendants are barred by ratification;

6.      That Plaintiff's claims against these Defendants are barred by estoppel;

7.      That the Plaintiff's wrongful actions or conduct caused or contributed to Plaintiff's *alleged* damages/injury;

8.      That Plaintiff's tortious interference with existing contract claim is barred by privilege;

9.      That Plaintiff's tortious interference with existing contract claim is barred by legal justification;

10.     That Plaintiff's tortious interference with existing contract claim is barred by the Restatement (2d) of Torts §771;

11.     That Plaintiff has failed to mitigate it's *alleged* damages;

12.     That Plaintiff has failed to identify its *alleged* trade secrets and confidential information with reasonable particularity;

13.     That the alleged "trade secrets" and "confidential and proprietary information" referenced in Plaintiff's Verified First Amended Petition are not, in reality, trade secrets or confidential/proprietary information as defined by applicable Texas law;

14. That Plaintiff cannot assert any trade secret claims based on general skills and knowledge or publicly available or reasonably ascertainable information;

15. That these Defendants did not unlawfully misappropriate any "trade secrets" of the Plaintiff as alleged;

16. That these Defendants did not have a fiduciary relationship with Plaintiff and owed no *alleged* "duty of loyalty" to Plaintiff; and

17. That the Plaintiff has engaged in certain wrongful actions and conduct that have proximately caused economic damages to Transwood, Inc. Accordingly, Transwood, Inc. seeks – and is entitled to – a credit/set-off for all of the damages that it has sustained as a result of the Plaintiff's wrongful actions and conduct.

WHEREFORE, PREMISES CONSIDERED, Defendants Transwood Carriers, Inc. and Transwood, Inc. respectfully pray that this pleading be received and filed and, upon final trial of this cause, that the Plaintiff take nothing from and against them by way of this suit and for such further relief, both at law and in equity, to which they may show themselves justly entitled.

Respectfully submitted,

**FEE, SMITH, SHARP & VITULLO, L.L.P**

**THOMAS W. FEE**
State Bar No. 06873160
**HOWARD J. KLATSKY**
State Bar No. 00786024
Three Galleria Tower
13155 Noel Road, Suite 1000
Dallas, Texas 75240
972-934-9100
972-934-9200 [Fax]
tfee@feesmith.com
hklatsky@feesmith.com

**ATTORNEYS FOR DEFENDANTS TRANSWOOD CARRIERS, INC. AND TRANSWOOD, INC.**

**CERTIFICATE OF SERVICE**

THIS WILL CERTIFY that a true and correct copy of the foregoing instrument has been mailed, telecopied or hand delivered to all attorneys of record in accordance with the Federal Rules of Civil Procedure on the 12th day of January, 2018, as follows:

***Via Email & E-filing***
Brian N. Hail/Jason T. Weber
Gruber Hall Johansen Shank, LLP
1445 Ross Ave, Suite 2500
Dallas, Texas 75202

***Via Email & E-filing***
Vic Henry
Henry, Dodo, Austin, Fletcher, PC
1700 Pacific, Suite 2700
Dallas, Texas 75201

**HOWARD J. KLATSKY**

**VERIFICATION**

**STATE OF** Nebraska §
§
**COUNTY OF** Douglas §

BEFORE ME, the undersigned notary public, on this date personally appeared Mark Perry who, known to me, deposed on his oath, and stated he is over 21 years of age, has never been convicted of a felony or a crime involving moral turpitude, is fully competent to testify in all respects, has read the above and foregoing Answer to Plaintiff's Verified First Amended Petition, and that the affirmative defenses set forth in paragraph nos. 1 and 3 (relating to the defense of lack of consideration) are true and correct.

FURTHER AFFIANT SAYETH NOT

______________________________,
Authorized Representative Transwood Carriers, Inc.

SUBSCRIBED AND SWORN to before me on this 12 day of January, 2018, to certify which witness my hand and official seal.

Gail A. Vinson
NOTARY PUBLIC,
In and for the State of Nebraska

My Commission Expires:

July 22, 2021

# EXHIBIT

# C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

**COAL CITY COB COMPANY, INC.,**

**Plaintiff,**

**v.**

**PALM ENTERPRISES, INC., SHARON FRANK, TRANSWOOD CARRIERS, INC., and TRANSWOOD, INC.,**

**Defendants.**

**CIVIL ACTION NO. ________________**

## CONSENT TO REMOVAL

I, Michael G. Oddo, counsel of record for Defendants Palm Enterprises, Inc. and Sharon Frank, hereby certify that my clients consent to removal of Cause No. 96285 styled *Coal City Cob Company, Inc. v. Palm Enterprises, Inc., et al*, in the 443rd Judicial District Court of Ellis County, Texas, to the United States District Court for the Northern District of Texas, Dallas Division.

Date: Jan. 11, 2018

Michael G. Oddo
Texas State Bar No. 15192100